**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| QVC GROUP, INC., *et al.*,[1] | Case No. 26-90447 (ARP) |
| Debtors. | (Jointly Administered) |

**NOTICE OF APPEAL**

Notice is hereby given that appellants Adam Gui, Citadel Americas LLC, Converium Capital Inc., Cygnus Opportunity Fund, LLC, Fore Capital, Highbridge Tactical Credit Institutional Fund, Ltd., Highbridge Tactical Credit Master Fund, L.P., Kenneth Grossman, Mycor L/S Credit Master Fund, LP, New Holland Trading LLC (formerly known as Plum Island Partners LLC) (collectively, "Appellants" or the "Preferred Shareholders")[2] of QVC Group, Inc. ("QVCG" and, together with its subsidiaries and affiliates in the above-captioned Chapter 11 cases, the "Debtors"), pursuant to 28 U.S.C. § 158(a)(1), and Rules 8002(a)(1)-(2) and 8003 of the Federal Rules of Bankruptcy Procedure, appeal to the United States District Court for the Southern District of Texas this Court's *Memorandum Decision (I) Approving Disclosure Statement, (II) Confirming Second Amended Plan, and (III) Granting Related Relief* [Dkt. No. 710] (the "Memorandum Decision"), entered in the above-captioned Chapter 11 cases on July 15, 2026, together with the order confirming the Debtors' plan anticipated to be entered by the Court consistent with the

[1] A complete list of each of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

[2] The Preferred Shareholders are certain institutional and individual holders of the 8.000% Series A Cumulative Redeemable Preferred Stock (the "Preferred Stock") issued by QVCG identified in the amended Verified Statement pursuant to Bankruptcy Rule 2019 filed concurrently herewith.

Memorandum Decision (the "Confirmation Order"). A copy of the Memorandum Decision is attached hereto as **Exhibit A**.

The parties to the Confirmation Order, and the names, addresses, and telephone numbers of their respective attorneys, are as follows:

| **Appellants** | **Appellant's Attorneys** |
|---|---|
| Adam Gui<br><br>Citadel Americas LLC<br><br>Converium Capital Inc.<br><br>Cygnus Opportunity Fund, LLC<br><br>Fore Capital<br><br>Highbridge Tactical Credit Institutional Fund, Ltd.<br><br>Highbridge Tactical Credit Master Fund, L.P.<br><br>Kenneth Grossman<br><br>Mycor L/S Credit Master Fund, LP<br><br>New Holland Trading LLC (formerly known as Plum Island Partners LLC) | **GLENN AGRE BERGMAN & FUENTES LLP**<br>Andrew K. Glenn (admitted *pro hac vice*)<br>Kurt A. Mayr (admitted *pro hac vice*)<br>Agustina G. Berro (admitted *pro hac vice*)<br>1185 Avenue of the Americas<br>New York, New York 10036<br>Telephone: (212) 970-1601<br>Email: aglenn@glennagre.com<br>kmayr@glennagre.com<br>aberro@glennagre.com<br><br>-and-<br><br>**CLEARY GOTTLIEB STEEN & HAMILTON LLP**<br>David H. Botter (admitted *pro hac vice*)<br>Joshua Brody (admitted *pro hac vice*)<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225-2000<br>Facsimile: (212) 225-3999<br>Email: dbotter@cgsh.com<br>jbrody@cgsh.com<br><br>-and-<br><br>**KANE RUSSELL COLEMAN LOGAN PC**<br>Mark C. Taylor<br>Texas Bar No. 19713225<br>401 Congress Ave., Suite 2100<br>Austin, Texas 78701<br>Telephone: (512) 487-6650<br>Email: mtaylor@krcl.com |

| **Appellee** | **Appellee's Attorneys** |
|---|---|
| Debtors | **KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C. (admitted pro hac vice)<br>Aparna Yenamandra, P.C. (admitted pro hac vice)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>Email: joshua.sussberg@kirkland.com<br>aparna.yenamandra@kirkland.com<br><br>-and-<br><br>Chad J. Husnick, P.C. (admitted pro hac vice)<br>Gabriela Zamfir Hensley (admitted pro hac vice)<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>Email: chad.husnick@kirkland.com<br>gabriela.hensley@kirkland.com<br><br>-and-<br><br>**GRAY REED**<br>Jason S. Brookner (TX Bar No. 24033684)<br>Lydia R. Webb (TX Bar No. 24083758)<br>Emily F. Shanks (TX Bar No. 24110350)<br>1300 Post Oak Blvd.<br>Suite 2000<br>Houston, Texas 77056<br>Telephone: (713) 986-7000<br>Facsimile: (713) 986-7100<br>Email: jbrookner@grayreed.com<br>lwebb@grayreed.com<br>eshanks@grayreed.com |

*[Remainder of Page Left Intentionally Blank]*

Dated: July 16, 2026

**KANE RUSSELL COLEMAN LOGAN PC**

By: /s/ *Mark C. Taylor*
Mark C. Taylor
Texas Bar No. 19713225
401 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6650
Email: mtaylor@krcl.com

-and-

**GLENN AGRE BERGMAN & FUENTES LLP**

Andrew K. Glenn (admitted *pro hac vice*)
Kurt A. Mayr (admitted *pro hac vice*)
Agustina G. Berro (admitted *pro hac vice*)
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 970-1601
Email: aglenn@glennagre.com
kmayr@glennagre.com
aberro@glennagre.com

-and-

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

David H. Botter (admitted *pro hac vice*)
Joshua Brody (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Email: dbotter@cgsh.com
jbrody@cgsh.com

*Counsel to the Preferred Shareholders*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 16, 2026, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas to all parties registered to receive electronic notice in this case.

By: */s/ Mark C. Taylor*
Mark C. Taylor

# **EXHIBIT A**

**Memorandum Decision**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
July 15, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 26-90447** |
| **QVC GROUP, INC., *et al.*,** | § | |
| **Debtors.** | § | **Jointly Administered** |
| | § | **CHAPTER 11** |

## MEMORANDUM DECISION (I) APPROVING DISCLOSURE STATEMENT, (II) CONFIRMING SECOND AMENDED PLAN, AND (III) GRANTING RELATED RELIEF

## INTRODUCTION

This Court has been asked to confirm the Debtors' joint prepackaged plan of reorganization. The plan is premised on a restructuring support agreement which contains a comprehensive intercompany settlement. The Debtors have a complicated corporate history. Over the last few years, they engaged in, among other things, several intercompany transactions which potentially precipitated various intercompany claims between themselves. The Debtors appointed disinterested fiduciaries to investigate these claims and, if appropriate, to negotiate on behalf of their respective stakeholders, an intercompany settlement. The settlement these disinterested fiduciaries ultimately achieved seeks to resolve all claims in order to achieve a global resolution, preserving—if not maximizing—value for the Debtors' estates, setting up the company for a successful reorganization, paying all third-party general unsecured claims in full, and putting the go-forward operating entity on the path towards long term success. The Debtors ask the Court to approve this settlement and confirm the plan over the objection of a vocal minority of equity holders who feel the process of negotiating the settlement was unfair, it subjects them to disfavorable terms in exchange for little, if any, benefit, and that the plan violates manifold provisions of the Bankruptcy Code. The facts of this case, however, paint a different picture.

The Court conducted a four-day evidentiary hearing where testimony was adduced from eight highly credible Debtor-witnesses, and the parties introduced hundreds of exhibits. After a review of the evidence, the Court concludes all facts demonstrate the negotiations were, in reality, a thorough, fair, and arm's-length process. No disinterested fiduciaries capitulated to any other, and the ultimate outcome for stakeholders was not preordained. The equity holders' treatment under the settlement is a result of the range and magnitude of potential claims the parent-Debtor entity they hold interests in was facing from its subsidiaries and other sources—as well as their own liability. However, a fulsome review of the settlement reveals that the equity holders received valuable releases of claims from the Debtor entities for distributions out of the Debtors' assets totaling more than $450 million. The Court concludes the proposed intercompany settlement meets the requirements of the Bankruptcy Code. With the settlement approved, the remaining confirmation requirements are also satisfied.

It is on the basis of this extensive factual record that the Court makes these Findings of Fact and Conclusions of Law pursuant to Federal Bankruptcy Rules 7052 and 9014. To the extent any Finding of Fact is construed as a Conclusion of Law, it is adopted as such. Moreover, to the extent any Conclusion of Law is construed as a Finding of Fact, it is adopted as such. The Court reserves its right to make additional Findings of Fact and Conclusions of Law as it deems appropriate or as may be requested by any of the parties.

## FINDINGS OF FACT

### I. RELEVANT PREPETITION HISTORY.

#### A. The Debtors' Prepetition Corporate and Capital Structure.

1. QVC Group, Inc. ("QVCG") and its debtor affiliates (collectively, the "Debtors") comprise one of the world's largest

multimedia retailers, specializing in home shopping.[1] The Debtors primary business is to sell a wide variety of consumer products through engaging, video-rich interactive shopping experiences.[2] Originally taking form as a radio broadcasting company in 1977, today the Debtors distribute their collective shopping experiences to over 200 million households each day via 15 television channels, in addition to over 12 million customers via their QVC+ and HSN+ streaming experiences, Facebook, Instagram, TikTok, YouTube, and other mobile apps.[3] The Debtors also operate individual ecommerce sites for each of the four home and apparel lifestyle brands comprising of the Debtors' Cornerstone division (defined below).[4]

2. The Debtors' prepetition corporate structure can be generally understood with respect to four key entities: (i) QVCG, (ii) Liberty Interactive, LLC ("LINTA"), (iii) QVC, Inc. ("QVC"), and (iv) Cornerstone Brands, Inc. ("CBI") (together with QVCG, LINTA, and QVC, the "Key Entities").[5] Put simply, QVCG sat at the top of the company and had 100% ownership of LINTA.[6] LINTA owned 100% of Qurate Retail Group, Inc. ("QRGI"), which in turn owned 100% of QVC, which in turn owned various operating foreign and domestic

[1] JX-035, ECF No. 341-070 at 7 ¶ 13. On June 16, 2026, the Debtors and Preferred Shareholders (defined below) filed the Amended Stipulated Order and Agreement to the Admission Into Evidence of Certain Exhibits, providing a designation of Debtor, Preferred Shareholder, and Joint exhibits admitted at the Combined Hearing (defined below). ECF No. 548. On June 17, 2026, the Court entered the Amended Stipulated Order and Agreement to the Admission Into Evidence of Certain Exhibits. ECF No. 574. Any reference to "JX," "DX," or "PX" exhibits are references to the Parties' designation of exhibits contained therein. With respect to any testimony cited in this Memorandum Decision, "Day 1" references the first day of the Combined Hearing held on June 4, 2026; "Day 2" references the second day of the Combined Hearing held on June 5, 2026; "Day 3" references the third day of the Combined Hearing held on June 8, 2026; on the fourth day, June 10, 2026, no testimony was adduced by the Parties.

[2] JX-035, ECF No. 341-070 at 7 ¶ 13.

[3] JX-035, ECF No. 341-070 at 7 ¶¶ 13, 14.

[4] JX-035, ECF No. 341-070 at 7 ¶ 13.

[5] JX-035, ECF No. 341-070 at 5 ¶ 9.

[6] JX-035, ECF No. 341-070 Ex. B2.

subsidiaries.[7] Under a separate silo, QVCG also owned 62% of QRI Cornerstone, Inc. ("QRI"), with the remaining 38% being owned by LINTA.[8] QRI, in turn, owned 100% of CBI, which owned 100% of the operating entity The Cornerstone Brands Group, Inc. ("Cornerstone"), housing each of the four subsidiary brands dedicated to apparel and home lifestyle items: Frontgate, Ballard Designs, Garnet Hill, and Grandin Road.[9]

3. The Debtors' prepetition capital structure is massive and complex, as a result of historical liability management transactions, historical mergers and acquisitions, internal and external reorganizations, dividends, intercompany notes, and shared service and tax sharing agreements.[10] As of the Petition Date the Debtors had approximately $6.53 billion in total outstanding funded debt obligations—primarily under LINTA and QVC—as well as preferred equity interests with a liquidation preference of approximately $1.272 billion in at the QVCG level.[11] The Debtors' outstanding funded indebtedness exists in three categories, each important for purposes of the Debtors' restructuring efforts and reorganization Plan.[12]

4. The first category is approximately $1.48 billion of funded debt obligations, comprised of various notes (the "LINTA Exchangeable Notes") issued pursuant to that certain Indenture dated as of July 7, 1999 (as amended, restated, amended and restated, supplemented,

---

[7] JX-035, ECF No. 341-070 Ex. B2.

[8] JX-035, ECF No. 341-070 Ex. B2.

[9] JX-035, ECF No. 341-070 Ex. B2.

[10] JX-035, ECF No. 341-070 at 20 ¶ 36.

[11] JX-035, ECF No. 341-070 at 20 ¶ 36; JX-035, ECF No. 341-070 Ex. C1, at 1. These interests include the 8% series A cumulative redeemable preferred stock issued by QVCG (the "QVCG Preferred Equity"). The QVCG Preferred Equity originated as a distribution from QVCG on its common stock. *Wafford Testimony*, Day 2: 330:4–10. The QVCG Preferred Equity Interest Holders were largely comprised of retail shareholders, and accordingly the stock is disparately held today. *Wafford Testimony*, Day 2: 330:4–10. Certain QVCG Preferred Equity Interest Holders, representing a portion of the overall QVCG Preferred Equity base (the "Preferred Shareholders") have objected to the Debtors' Plan and Disclosure Statement, and have also filed their own Motion to Terminate Exclusivity. ECF No. 316; ECF No. 205.

[12] JX-035, ECF No. 341-070 Ex. C1, at 1.

waived, or otherwise modified from time to time, the "LINTA Notes Indenture").[13] The LINTA Exchangeable Notes are a convertible instrument not guaranteed by any Debtor entity and are unsecured.[14]

5. The second category is approximately $2.9 billion of funded debt obligations under the currently operative Fifth Amendment and Restatement Agreement by and among QVC, and QVC Global Corporate Holdings, LLC ("QVC Global") as borrowers, QRGI as subsidiary guarantor, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A. as administrative and collateral agent and related ancillary documents, which collectively provide revolving commitments and extensions of credit (the "Revolving Credit Facility" or "RCF").[15] As part of a 2021 refinancing of the RCF the RCF Lenders received pledges of security interests in the equity and proceeds from the equity (other than distributions made in compliance with the RCF restricted payment covenants) of Cornerstone in addition to the security interests they already held in the equity and proceeds from equity for QVC and Zulily, LLC ("Zulily"), under the prior RCF agreement.[16]

6. The third category is approximately $2.15 billion of funded debt obligations, comprised of various senior secured notes (the "QVC Inc. Notes") issued pursuant to various note indentures.[17] The QVC Inc. Notes are secured equally and ratably by the same collateral as the RCF—the equity of QVC.[18]

7. Neither QVCG nor CBI had funded debt obligations prepetition.[19] QVCG also had outstanding Series A voting common

---

[13] JX-035, ECF No. 341-070 Ex. C1, at 1, 5.

[14] JX-035, ECF No. 341-070 Ex. C1, at 6.

[15] JX-035, ECF No. 341-070 at 24 ¶ 45. 2.2.6.9_QVC – Fifth Amendment and Restatement Agreement, DX-005, ECF No. 340-005 [hereinafter the "*RCF*"].

[16] JX-035, ECF No. 341-070 at 24 ¶ 45.

[17] JX-035, ECF No. 341-070 Ex. C1 at 3.

[18] JX-035, ECF No. 341-070 Ex. C1 at 3.

[19] JX-035, ECF No. 341-070 at 20 ¶ 36; JX-035, ECF No. 341-070 Ex. B1.

stock traded on the New York Stock Exchange, and outstanding Series B voting common traded on the OTC Markets.[20]

**B. Relevant Prepetition Initiatives.**

8. In the lead-up to the filing of these chapter 11 cases, the Debtors were becoming increasingly distressed as a company—a fact which cannot be ignored. In recent years, the Debtors faced a confluence of headwinds that strained their financial performance, including eroding cash flows as a result of an increasing number of customers canceling their TV and cable services ("cord cutting"), record inflation, supply chain disruptions during the COVID era, elevated labor costs, uncertainty caused by the United States' recent tariff policies, and a December 2021 fire at the Rocky Mount distribution center which caused the Debtors to lose more than 1 million customers and more than $500 million in revenue due to compromised product and service ability.[21] The Debtors reacted to these headwinds through a number of strategic, financing, and governance initiatives over the course of several years.[22]

9. Between 2020 and 2025, the Debtors engaged in a number of liability management transactions and debt paydowns to reduce funded debt, borrowing costs, administrative costs and tax burdens, and to manage cash levels throughout their capital structure, described more fully in Part II.A.(1).[23]

10. In June of 2022, the Debtors announced the beginning of a multi-year turnaround plan consisting of two phases: first, Project Athens,[24] and second, the WIN Growth Strategy.[25]

---

[20] JX-035, ECF No. 341-070 Ex. C1 at 7.

[21] JX-035, ECF No. 341-070 at 22 ¶ 39.

[22] *See* JX-035, ECF No. 341-070 at 22–33.

[23] JX-035, ECF No. 341-070 at 22–26.

[24] JX-035, ECF No. 341-070 at 26–27.

[25] JX-035, ECF No. 341-070 at 28. "WIN" stands for "**W**herever She Shops," "**I**nspiring People & Products," and "**N**ew Ways of Working." JX-035, ECF No. 341-070 at 28 ¶ 56.

11. In July and November of 2022, the Debtors also engaged in a number of different foreign and domestic sale-leaseback transactions resulting in the Debtors recognizing substantial gain.[26]

12. During the second quarter of 2023, the Debtors began ongoing dialogue with Evercore Group L.L.C. ("Evercore") regarding capital structure considerations.[27] The Debtors also engaged Kirkland & Ellis ("Kirkland") in April 2025, and AlixPartners in May 2025, as they continued to contemplate and undergo prepetition restructuring efforts.[28]

13. The Debtors' boards and senior management also proactively evaluated the Debtors' corporate governance structure, ultimately recognizing the Key Entities had discrete capital structures and were parties to the aforementioned historical intercompany transactions which may have given rise to potential intercompany claims.[29]

14. In order to ensure each Key Entity had independent and qualified fiduciaries to advocate for each of their respective interests and the interests of their stakeholders, and to address potential conflicts under the Debtors' then-existing governance structure, the Debtor implemented a number of governance changes and amendments at various Key Entity levels during September of 2025.[30] These governance efforts ultimately resulted in: (i) the establishment of an independent board of directors at the QVC level, to which Paul Keglevic and Jilly Frizzley were appointed as initial members, then as the sole disinterested board members; (ii) the establishment of an independent board of managers at the LINTA level, to which Eugene Davis and Thomas Walper were appointed as initial members, then as the sole disinterested board members; and (iii) the appointment of disinterested

[26] JX-035, ECF No. 341-070 at 27 ¶¶ 54–55.
[27] JX-035, ECF No. 341-070 at 28 ¶ 58.
[28] JX-035, ECF No. 341-070 at 28 ¶ 58.
[29] JX-035, ECF No. 341-070 at 28–29.
[30] JX-035, ECF No. 341-070 at 30.

board members at the QVCG and CBI levels (collectively, with the QVC and LINTA disinterested board members, the "Disinterested Directors").[31] Each of the Disinterested Directors has an extensive legal or business career, some of them both, and the Court found all of them that testified to be very credible.

15. Special Committees were formed at the QVCG and CBI levels (each such special committee, a "Special Committee"). Each Special Committee was granted authority consisting of: (i) the exclusive authority to investigate, review, discuss, consider, negotiate, approve, authorize, reject, and act upon any matters in which a conflict exists or is reasonably likely to exist between such entity and any of its stakeholders, including its affiliates and subsidiaries, (each such matter, a "Conflict Matter"), and (ii) the authority to evaluate, review, consider, negotiate, and authorize entry into a transaction, subject to further board approval to the extent such transactions did not constitute a Conflicts Matter.[32]

16. The QVC and LINTA boards, each comprised solely of Disinterested Directors, and the QVCG and CBI Special Committees (each such governing body, a "Governing Body") each engaged separate counsel with respect to Conflicts Matters: the QVCG Governing Body retained Kobre & Kim, LLP ("Kobre"); the LINTA Governing Body retained Milbank LLP[33]; the QVC Governing Body retained Katten Muchin Rosenman LLP ("Katten"); and the CBI Governing Body retained Seward & Kissel LLP ("S&K").[34]

---

[31] QVCG appointed Carol Flaton and Roger Meltzer as their respective Disinterested Directors. JX-035, ECF No. 341-070 at 31–32. CBI appointed Jonathan Foster and Michael Zendan as their respective Disinterested Directors. JX-035, ECF No. 341-070 at 31–32. Disinterested Directors were also appointed at QRGI, along with a Special Committee.

[32] JX-035, ECF No. 341-070 at 30.

[33] Milbank also represented the QRGI Special Committee. JX-035, ECF No. 341-070 at 31 n. 8.

[34] JX-035, ECF No. 341-070 at 31.

17. Between the time of their appointment and respective retentions, and the date of the Debtors' ultimate chapter 11 filing—April 16, 2026 (the "Petition Date"), the Disinterested Directors, in conjunction with their conflicts counsel, underwent efforts to understand and investigate potential claims and defenses related to the historical intercompany transactions, and evaluate any proposed release, settlement, retention, or prosecution of claims or causes of action, as more fully described in Parts II.A and II.A.(1).[35] Those efforts ultimately resulted in a global settlement of all actual and potential intercompany claims among the Key Entities (the "Intercompany Settlement"), which functions effectively as the keystone to the Debtors' Restructuring Support Agreement ("RSA") and reorganization Plan.[36]

## II. THE INTERCOMPANY SETTLEMENT.

### A. The Disinterested Directors' Investigation.

18. The Court finds the Disinterested Directors engaged in a fulsome and comprehensive assessment of potential claims and defenses arising out of the historical intercompany transactions during the course of their independent investigations.[37] The facts of this case demonstrate that throughout the investigation process, the Disinterested Directors at each Key Entity were acting separately and independently of one another, with and through each's respective counsel, and that they relied on broad but detailed sets of information from the Debtor entities, shared advisors' forensic analyses, and their respective counsel's legal

---

[35] JX-026, ECF No. 341-053 at 3, 50–57 [hereinafter the "*Disclosure Statement*"]. The Disclosure Statement was also jointly admitted at the Combined Hearing at JX-026, ECF No. 341-053.

[36] JX-028, ECF No. 341-055 at 38 [hereinafter the "*Plan*"]. The Court's use of the term "*Plan*" in the Findings of Fact is meant to refer to the Plan filed on April 17, 2026. On June 2, 2026, the Debtors filed their Second Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Second Amended Plan"). ECF No. 389. This Second Amended Plan is the operative Plan the Debtors seek confirmation of.

[37] *Disclosure Statement* at 3, 51–52.

advice in arriving at their ultimate assessments as to any potential intercompany claims which may have existed.[38]

19. The Disinterested Directors began with an initial diligence period, issuing numerous formal document and information requests from various Debtor entities seeking *inter alia* board materials and minutes, corporate governance documents, relevant transaction documents, financial and accounting information, and related correspondence.[39] Kirkland, AlixPartners, and Evercore (the "Joint Debtor Advisors") supported the Disinterested Directors' diligence, information collection efforts, and investigations by serving as intermediaries between the four Governing Bodies and management.[40] The Joint Advisors provided facts to all Governing Bodies at the direction of the Debtors' management team to aid efficiency.[41] On November 11, 2025, Kirkland provided each Disinterested Director and their counsel with a presentation of the relevant intercompany transactions that took place between 2020 and 2025 that might give rise to potential intercompany claims and defenses, as part of the Disinterested Directors' initial diligence of the company.[42]

20. After the initial diligence period and the November 11, 2025 Kirkland presentation, the Joint Debtor Advisors began facilitating direct collection of documents on behalf of, and at the request of each Disinterested Director.[43] The Debtors retained AlixPartners to serve as e-discovery vendor in order to facilitate each Disinterested Directors' investigation.[44] In December 2025 and January 2026,

---

[38] *Disclosure Statement* at 3, 51–52.

[39] *Disclosure Statement* at 51.

[40] *Disclosure Statement* at 51.

[41] *Disclosure Statement* at 51.

[42] *Disclosure Statement* at 51; 11-11-25 Key Historical Transactions Fact Overview, JX-051, ECF No. 343-025.

[43] *Disclosure Statement* at 51.

[44] *Disclosure Statement* at 51.

Kirkland also conducted custodial interviews and collected certain share drive and email documents.[45]

21. Through their independent efforts across both the diligence and investigation period, the Governing Bodies collectively reviewed and analyzed tens of thousands of documents related to the historical intercompany transactions produced from various Debtor entities in addition to Liberty Media Corporation ("LMC"), in its capacity as provider of certain services to QVCG pursuant to the Intercompany Services Agreement (defined below).[46] The Governing Bodies also collectively participated in over 25 meetings with other Disinterested Directors with or through their separate and independent counsels.[47] To analyze potential tax implications relating to the intercompany settlement, the QVCG Governing Body also retained Holtz, Slavett, Drabkin & Warner as independent tax counsel.[48] Each Disinterested Directors' counsel also had access to senior management at the company, collectively conducting 7 separate 90-minute interviews of former and current executives regarding their personal knowledge as to the historical intercompany transactions.[49]

22. The Disinterested Directors also relied on forensic analyses from AlixPartners and Evercore in conducting their respective investigations and assessment of potential intercompany claims and defenses.[50] The AlixPartners forensic team conducted extensive funds flow and APIC-level analyses of various Key Entities' bank records and general ledgers for the years 2019 through 2025 to help the Disinterested Directors better understand the nature and extent of any

[45] *Disclosure Statement* at 51; JX-031, ECF No. 341-060 at 5 ¶ 10, n. 7; JX-032, ECF No. 341-061 at 4 ¶ 11.

[46] *Disclosure Statement* at 51; JX-029, ECF No. 341-056 at 3 ¶ 7; JX-031, ECF No. 341-060 4 ¶ 8, 5 ¶ 12; JX-032, ECF No. 341-061 at 3 ¶ 8.

[47] *Disclosure Statement* at 51; JX-029, ECF No. 341-056; JX-031, ECF No. 341-060; JX-032, ECF No. 341-061.

[48] JX-029, ECF No. 341-056 at 4 ¶ 13.

[49] *Disclosure Statement* at 51; JX-029, ECF No. 341-056; JX-031, ECF No. 341-060; JX-032, ECF No. 341-061.

[50] *Disclosure Statement* at 52; JX-032, ECF No. 341-061 at 3 ¶ 9.

intercompany transfers.[51] The Disinterested Directors' counsel met with the AlixPartners' forensic team and discussed their findings on January 22, 2026, on February 6, 2026, and again on March 6, 2026.[52] On February 11, 2026, AlixPartners also provided a granular analysis on the cash cost to retire the MSI Exchangeables in 2021 to the Disinterested Directors of LINTA and QVC—those being the Key Entities most directly impacted by the 2020 Restructuring (defined and described more fully below in Part II.(A).(1)).[53]

23. Evercore provided all Disinterested Directors, through their respective counsel, a summary of indicia of insolvency using data from 2020 through 2025.[54] The data used included information regarding the Debtors' sales, OIBDA, liquidity, and the trading values of QVCG Preferred Equity and common shares during the relevant period; graphs showing the trading value and yields on QVC and LINTA notes; and a table showing the trading value and yield of QVC notes alongside the dates and amounts of historic distributions from QVC and the amounts of those historic distributions to QVCG.[55] Evercore also provided the Disinterested Directors with an enterprise valuation of CBI to help them better understand its status and how a transfer of that entity would weigh against various considerations the Key Entities might provide or receive under a potential intercompany settlement.[56]

24. Through their collective diligence and investigative efforts, the Disinterested Directors arrived at the following understanding of the relevant prepetition transactions and potential intercompany claims and defenses arising thereunder:

---

[51] *Disclosure Statement* at 52; JX-032, ECF No. 341-061 at 3 ¶ 9; *Stafford Testimony*, Day 1:73:8–83:21.

[52] *Disclosure Statement* at 52.

[53] *Disclosure Statement* at 52.

[54] *Disclosure Statement* at 52; JX-029, ECF No. 341-056 at 4 ¶ 8; JX-032, ECF No. 341-061 at 4 ¶ 10.

[55] *Disclosure Statement* at 52.

[56] CBI 5 Year Financial Projections, JX-004, ECF No. 340-013.

### *(1) Relevant Prepetition Transactions.*

*(a) The 2020 Restructuring.*

25. In December 2022, the Debtors executed a multi-jurisdiction, 15-step restructuring to increase tax efficiency, optimize capital deployment, and reduce administrative cost (the "2020 Restructuring").[57]

26. As part of the 2020 Restructuring, the Debtors retired certain intercompany notes, reducing currency exchange risk, and eliminated defunct subsidiaries, reducing governance and compliance costs.[58] The 2020 Restructuring also facilitated future tax savings for the Debtors' consolidated tax group on the retirement of certain 3.5% participating hybrid option note securities due in 2031 issued by LINTA (the "MSI Exchangeables"), which had accrued a substantial deferred tax liability.[59] To accomplish the retirement of the MSI Exchangeables and achieve this tax efficiency for the Debtors' consolidated tax group, LINTA and the newly created subsidiary QVC Global, established under QVC, entered into a series of agreements, including (i) the Nineteenth Supplemental Indenture, which made QVC Global co-obligor on the MSI Exchangeables; (ii) a payment reimbursement agreement, whereby QVC Global agreed to reimburse LINTA for any payments LINTA made on the MSI Exchangeables; and (iii) a promissory note from LINTA to QVC Global, reflecting a face amount of $1.825 billion (the "LINTA Promissory Note"), which approximately matched the "adjusted issue price"—or outstanding amount, as determined for tax purposes—of the MSI Exchangeables at the time of the transaction.[60]

27. At the time LINTA issued the LINTA Promissory Note in 2020, there was $218 million in principal outstanding on the MSI

[57] *Disclosure Statement* at 41–42.

[58] *Disclosure Statement* at 41–42.

[59] *Disclosure Statement* at 41–42. Not to be confused with the deferred tax liability existing with respect to the LINTA Exchangeable Notes (colloquially referred to as the "Deferred Tax Liability" or "DTL").

[60] *Disclosure Statement* at 41–42.

Exchangeables.[61] At the time of the 2020 Restructuring, the MSI Exchangeables had a market value of approximately $397 million.[62] To reduce variability in the obligations due under the MSI Exchangeables, LINTA transferred the related Total Return Swaps to QVC Global[63] which hedged against fluctuations in the underlying reference security. In December 2021, QVC Global retired the MSI Exchangeables, which then had a market value of $573 million.[64] According to the Debtors' management, the net cost for QVC Global to retire the MSI Exchangeables was approximately $315 million, as well as an additional $105 million in tax liabilities.[65]

28. On December 31, 2021, LINTA repaid $85 million of the initial $1.825 billion face amount of the LINTA Promissory Note.[66] There were no additional payments to reduce the principal amount of the note. The LINTA Promissory Note accrues interest at 0.48% annually and LINTA has made the following interest payments: $8.8 million on December 29, 2021; $8.5 million on December 29, 2022; $8.5 million on December 29, 2023; $8.5 million on December 29, 2024; and $8.4 million on January 8, 2026. As of the Petition Date, the balance on the LINTA Promissory Note was $1.74 billion.[67]

---

[61] QVC, Inc. Form 10-K (FY 2020) at I-28, JX-020, ECF No. 341-025.

[62] QVC, Inc. Form 10-K (FY 2020) at II-38, JX-020, ECF No. 341-025.

[63] QRI Memorandum re Qurate MSI Bond Restructure – Common Control Transaction at 3, DX-431, ECF No. 394-004. These variances in the obligations due under the MSI Exchangeables were purportedly caused by fluctuations in the underlying reference security.

[64] *Disclosure Statement* at 53.

[65] 12-6-2021 Qurate Retail, Inc. Board Meeting at 9, DX-430, ECF No. 394-003.

[66] *Disclosure Statement* at 53.

[67] *Disclosure Statement* at 53.

*(b) 2022 Cash Management Plan and Subsequent Intercompany Transfers.*

29. At the end of 2022, the Debtors executed a series of transactions to optimize cash allocation across their structure and increase balance sheet flexibility (the "2022 Cash Management Plan").[68]

30. The 2022 Cash Management Plan had two components. First, the Debtors prepared Zulily for sale, which required removing it from the RCF.[69] On December 14, 2022, the Debtors accomplished this in several steps: (i) CBI drew $300 million under the RCF[70]; (ii) CBI paid that amount to QVCG in exchange for a promissory note for the same amount[71]; (iii) QVCG contributed the $300 million to Zulily[72]; and (iv) Zulily used approximately $277.204 million of that amount to pay down its borrowings, and retained the remaining $22.795 million on its balance sheet.[73] QVC then drew $300 million from the RCF and paid it to QVCG as a dividend, which in turn used that amount (plus interest) to pay off the CBI promissory note.[74] CBI then repaid its $300 million borrowing under the RCF (collectively, the "December 14 Transfers").[75]

31. Second, the Debtors executed a series of transactions from December 21 through December 29, 2022, to allocate cash across the

---

[68] 12-8-22 Qurate Retail Board Meeting Binder at 126–130, DX-363, ECF No. 345-006; Schedule 2A – Cash Management Plan, Dated December 2022, DX-290, ECF No. 343-038; Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[69] QVC Group, Inc. 10K (FY 2022), JX-016, ECF No. 340-125; *RCF* at Section 9.19; Zulily Purchase Agreement, DX-254, ECF No. 343-002.

[70] CBI Notice of Borrowing, DX-009, ECF No. 340-009; Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[71] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[72] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[73] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[74] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

[75] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001.

Case 4:26-cv-00478 Document 101 Filed in TXSB on 07/15/25 Page 16 of 103

company's structure where it could be needed ahead of potentially tripping certain restrictions under QVC's credit documents.[76] Although the covenants under such credit documents contained carve-outs for distributions for debt service and tax payments, QVCG and LINTA had ongoing cash needs for *inter alia* overhead and anticipated preferred dividends beyond what the carve outs allowed.[77] On December 21, 2022, QVC borrowed an additional $600 million under the RCF, and then paid $800 million to QVCG.[78] After a series of subsequent transactions between QVCG and LINTA over the next 8 days, a bank account at QVCG ultimately held $499 million and a LINTA bank account held $301 million (collectively, the "December 21 Transfers").[79]

32. On December 19, 2022 (before the December 21 Transfers, but after the December 14 Transfers), Kroll LLC issued a solvency presentation and opinion formulated by Duff & Phelps to the QVCG board (the "2022 Duff & Phelps Solvency Opinion").[80] Duff & Phelps concluded that after QVC's $600 million draw on the RCF, and giving effect to the anticipated dividend of $800 million up to QVCG through the December 21 Transfers: (i) the fair value of QVC's assets would exceed QVC's debt; (ii) QVC should be able to pay its debts as they became due; and (iii) QVC would not have an unreasonably small amount of capital for its businesses.[81] Duff & Phelps also concluded that after LINTA received the $301 million distribution and QVCG received the $499 million distribution (reflecting the ultimate allocations in the Key Entities' respective bank accounts following the December 21 Transfers): (i) the fair value of LINTA's assets would

[76] 12-8-22 Qurate Retail, Inc. Board Meeting Binder at 128, 129, DX-363, ECF No. 345-006

[77] 12-8-22 Qurate Retail, Inc. Board Meeting Binder at 128, 129, DX-363, ECF No. 345-006; *RCF* at § 6.05.

[78] QVC Notice of Borrowing at 1, DX-410, ECF No. 393-003; Schedule 2A – December 2022 Cash Management Plan Transfers to QVCG and LINTA at 1, DX-290, ECF No. 343-038.

[79] Schedule 2A – December 2022 Cash Management Plan Transfers to QVCG and LINTA at 1, DX-290, ECF No. 343-038.

[80] 2022 Duff & Phelps Solvency Opinion, JX-009, ECF No. 340-047.

[81] 2022 Duff & Phelps Solvency Opinion at 5–6, JX-009, ECF No. 340-047.

exceed LINTA's debt; (ii) LINTA should have been able to pay its debts as they became due; (iii) LINTA would not have an unreasonably small amount of capital for its businesses; and (iv) the fair value of LINTA's assets would exceed LINTA's liabilities as calculated pursuant to § 18-607 of the Delaware Limited Liability Company Act.[82]

*(c) Post-2022 Cash Management Plan Intercompany Dividends.*

33. After the 2022 Cash Management Plan, QVC continued to pay dividends to QVCG and LINTA for debt service and tax obligations under that certain Tax Liability Allocation and Indemnification Agreement, dated as of April 26, 2004, by and between LMC and QVC, for and on behalf of itself and each subsidiary of QVCG (the "QVC TSA").[83] During this period of time the QVC Notes Indenture Credit Group had a Consolidated Leverage Ratio exceeding 3.50x, meaning the restrictive covenants under the QVC Notes Indentures prohibited dividends other than dividends to make debt principal and interest payments or payments under the QVC TSA.[84] Regardless, between January 2023 and February 2025, QVC paid an aggregate of approximately $586.7 million in dividends (the "Post-2022 QVC Dividends"), comprised of approximately $343.8 million transferred to QVCG and approximately $242.8 million transferred to LINTA.[85] While the Debtors may have a series of written consents showing QVC paid these dividends to its direct parent QRGI, bank account statements and

[82] 2022 Duff & Phelps Solvency Opinion at 6, JX-009, ECF No. 340-047.

[83] Tax Liability Allocation and Indemnification Agreement, JX-002, ECF No. 340-002 [hereinafter the "*QVC TSA*"]. The QVC TSA was originally entered into between QVC, LINTA, and Qurate Retail, Inc. *QVC TSA* at 1. Qurate Retail, Inc. would later undergo a name change to QVC Group, Inc., which has been referred to in this decision as QVCG. *Kearns Testimony*, Day 1:147:13–17. On June 8, 2023, LINTA assigned, and QVCG assumed, all of LINTA's rights, interests, duties, liabilities and obligations under the QVC TSA, as provided in the Assignment and Assumption Agreement (as referenced below).

[84] *See RCF*; QVC, Inc. 2025 10-K, DX-177, ECF No. 341-051; QVC, Inc. 2024 10-K, DX-155, ECF No. 341-029; QVC, Inc. 2023 10-K, DX-154, ECF No. 341-028; QVC, Inc. 2022 10-K, DX-153, ECF No. 341-027.

[85] Davis Polk & Wardwell LLP ("DPW") and Simpson Thacher & Bartlett LLP ("STB") Excel Sheet of Fund Flows, DX-044, ECF No. 340-044.

other documents provided by the Debtors show QVC transferred funds directly to QVCG's and LINTA's bank accounts, respectively.[86] These records also show QVCG held the amounts it received for one to two days before transferring them to a BNY Mellon corporate trust account associated with the LINTA Exchangeable Notes.[87]

*(d) 2024 Capital Contribution & Exchange.*

34. In September 2024, QVC exchanged 89% of its 2027 and 2028 Notes—then worth $959 million—for $605 million of newly issued 2029 Notes and $352 million of cash (the "2024 Capital Contribution and Exchange") in order to facilitate a potential extension under the RCF.[88] The $352 million of cash was comprised of $75 million of cash on hand at QVC and $277 million from a LINTA capital contribution to QVC.[89]

*(e) Payments Under the Intercompany Tax Sharing Agreements.*

35. QVCG files consolidated federal income tax returns (and corresponding relevant state and local tax returns) on behalf of itself and certain of its affiliated direct and indirect subsidiaries which are treated as corporations for income tax purposes, such as QVC and CBI (together, the "Q Consolidated Group"). As such, QVC, CBI, and other "members" of the Q Consolidated Group have joint and several liability for the income tax liability of the entire Q Consolidated Group.[90] LINTA

[86] QVC, Inc. Payments to QVCG for Debt-Related Dividend Payments From January 2023 through November 2025, DX-292, ECF No. 343-040.

[87] QVC, Inc. Payments to QVCG for Debt-Related Dividend Payments From January 2023 through November 2025, DX-292, ECF No. 343-040; *Plan* at 8 (defining "LINTA Notes Trustee" as "The Bank of New York Mellon Trust Company, N.A. (as successor-in-interest to the Bank of New York Mellon, formerly known as The Bank of New York) as trustee under the LINTA Notes Indenture, including any successors thereto, in its capacity as such under the LINTA Notes Indenture").

[88] *See* QVC, Inc. Offering Memorandum, DX-411, ECF No. 393-4.

[89] *See* QVC, Inc. Offering Memorandum, DX-411, ECF No. 393-4; QVC September 2024 Bond Offering Cap Table, DX-424, ECF No. 393-017.

[90] Treas. Reg. § 1.1502-6(a) ("The common parent corporation and each subsidiary which is a member of the group during any part of the consolidated return year shall be severally liable for the tax for such year"). The nature of joint and several liability under the consolidated tax rules does not appear to be in dispute here. *See*

is treated as a disregarded entity from QVCG for applicable income tax purposes, meaning LINTA is generally not treated as a separate "member" of the Q Consolidated Group and LINTA's activities and tax attributes are reported on QVCG's consolidated tax return as if LINTA did not exist.[91] The Internal Revenue Service ("IRS") has historically taken the position that a disregarded entity such as LINTA is not jointly or severally liable for the taxes of the consolidated income tax group of which its regarded tax owner—QVCG—is a member (absent application of state-law veil piercing or similar arguments).[92]

36. In order to provide for the payment and sharing of tax liabilities among the Q Consolidated Group, its members entered into two different tax sharing agreements. The primary tax sharing agreement—the QVC TSA—allocates liability as between QVCG and LINTA on the one hand, and QVC and its subsidiaries on the other.[93] The QVC TSA generally provides that QVC will pay to QVCG an amount equal to QVC's and its subsidiaries' separately calculated tax liability without regard to any amount of available tax attributes that might be available at the Q Consolidated Group level and generated by entities other than QVC and its subsidiaries.[94] Additionally, the QVC TSA includes reciprocal indemnification obligations for the "QVC Group" (defined as QVC and its subsidiaries) and the "QVCG Group" (defined as all entities owned by QVCG other than the QVC Group).[95]

37. The QVC TSA is generally favorable to QVCG. For example, the QVC TSA generally required that QVC make payments to QVCG that exceeded even QVC's own "standalone" tax liability if that

---

*also* ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 14.05 (2d ed. 2026).

[91] *Disclosure Statement* at 53; Treas. Reg. § 301.7701-3(b)(2).

[92] I.R.S. C.A. 201552025 (Aug. 19, 2015).

[93] On June 8, 2023, LINTA assigned, and QVCG assumed, all of LINTA's rights, interests, duties, liabilities and obligations under the QVC TSA in the Assignment and Assumption Agreement, dated June 8, 2023. JX-001, ECF No. 340-001.

[94] *See QVC TSA* Preamble, at 1.

[95] *QVC TSA*, § 10.

"standalone" liability would have been reduced by the use of certain kinds of tax credits that could not be utilized by the Q Consolidated Group in any given year because of QVCG's tax attributes.[96] In the case of this tax credit situation, *QVCG's* liability under the QVC TSA is reduced in future years if the Q Consolidated Group is ultimately able to utilize the relevant tax credits.[97] Contrasting this with QVC's then-current cash tax obligation, if QVC's "standalone" liability exceeds the Q Consolidated Group's tax liability, and in line with the treatment of certain tax credits noted above, if QVC generates taxable income that is offset by *QVC* tax attributes, under the QVC TSA, QVC does *not* receive a cash payment from QVCG.[98] Instead, QVC merely receives a potential future credit against future payments under the QVC TSA.[99] On June 12, 2023, Cornerstone entered into a substantially similar tax sharing agreement with QVCG (the "Cornerstone TSA," and together with the QVC TSA, the "TSAs").[100]

38. Consistent with these contractual requirements, QVC made substantial payments to QVCG, as applicable, under the QVC TSA.[101] Such amounts were ultimately in excess of that needed to be paid to the IRS, both because QVCG had tax attributes available to reduce the overall amount payable, and because those same attributes precluded, in certain years, the Q Consolidated Group from utilizing certain tax credits QVC could have utilized on a standalone basis.[102]

---

[96] *QVC TSA*, §§ 2, 3.

[97] *QVC TSA*, §§ 2, 3.

[98] *QVC TSA*, §§ 2, 3, 4.

[99] QVC TSA § 4.

[100] *Disclosure Statement* at 55.

[101] Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42.

[102] Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42. The Court hesitates to characterize these excess payments as "overpayments," and recognizes that the potential treatment of those funds is disputed between the Parties. Both Parties agree any excess payments were made pursuant to and consistent with the QVC TSA. The Preferred Shareholders, on the one hand, argue the QVC TSA provides that those funds would be treated as future credits to QVC, and therefore not subject to avoidance action claims. The Debtors take a different view, arguing QVC's solvency during the period it made such excess

Between November 2019 and November 2025, QVC paid QVCG $953.7 million under the QVC TSA.[103] Over the same period, QVCG paid tax of $440.8 million to tax authorities, retaining the difference of $512.9 million.[104] CBI also made tax payments up to QVCG between 2020 and 2025, totaling approximately $80.8 million.[105]

39. The QVC TSA also includes indemnification provisions which protect QVC from bearing tax liability on account of taxable income and tax liabilities generated by members of the Q Consolidated Group other than QVC and its subsidiaries (again, the "QVC Group" compared to the "*QVCG* Group").[106] In particular, under § 10(a) of the QVC TSA, the members of the "QVCG Group" agreed to indemnify and hold harmless QVC from and against, *inter alia*, "any Taxes for which such member of the [QVCG] Group is required to pay any Governmental Authority (except for Taxes which [QVCG] has a right to reimbursement from QVC) . . . ."[107] Any tax liability that arises as a result of activities or items arising at QVCG, LINTA, Cornerstone, or any entity not a member of the "QVCG Group" as defined under the QVC TSA would be covered by this indemnity.[108] This would include any tax liability associated with the prospective discharge of certain LINTA Exchangeable Notes contemplated under the Plan (commonly referred to throughout these chapter 11 Cases as the "Deferred Tax Liability" or "DTL"), as that liability would be Taxes (as defined under the QVC TSA) of the "[QVCG] Group" that are neither Taxes of the *QVC* Group, nor reimbursable by QVC under the QVC TSA.[109] The DTL, in simple terms,

payments is a litigable issue, and the treatment of such excess payments remains unclear.

[103] Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42.

[104] Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42.

[105] Qurate/Cornerstone Tax Sharing Payments, 2020 – 2024, DX-046, ECF No. 340-046.

[106] *QVC TSA*, § 10(a), (b). These provisions are reciprocal.

[107] *QVC TSA*, § 10(a).

[108] *QVC TSA*, § 10(a).

[109] *See QVC TSA*, § (1)(v), § 10(a); *Plan* Article IV.(H).

arises as a result of the Q Consolidated Group having deducted on their tax return amounts corresponding to a greater interest rate percentage than the interest which was actually paid to bondholders by LINTA.[110]

(f) *Payments Under the Intercompany SSA.*

40. In November 2018, QVC, HSN Inc. ("HSN") and Zulily entered into the Affiliate Company Shared Services Agreement, dated November 14, 2018 (as amended by the Joinder and Amendment, dated October 8, 2019, the "Intercompany SSA").[111] At the time, HSN was a QVCG subsidiary and parent to CBI.[112] On December 31, 2018, QVCG transferred its ownership interest in HSN, excluding HSN subsidiary CBI, to QVC through a transaction among entities under common control.[113] As a result, HSN became a subsidiary of QVC while CBI remained a subsidiary of QVCG.[114] In October 2019, CBI was joined as a party to the Intercompany SSA with QVC, HSN, and Zulily.[115] On May 24, 2023, the Intercompany SSA terminated as to Zulily upon its divestiture by the Debtors.[116] Current parties to the Intercompany SSA

[110] *Kearns Testimony*, Day 1: 175:15–16; Day 1: 161:22–162:25. The Q Consolidated Group engaged in this tax maneuver because the LINTA Exchangeable Notes were convertible instruments under the LINTA Notes Indenture, which are treated as contingent payment debt instruments ("CPDI") under the IRS rules because they can be exchanged into stock. Because of this CPDI characterization, in conjunction with other contingencies, certain IRS rules required the issuer—LINTA—to compute a yield interest rate on the notes. That interest rate in general on both sets of LINTA Exchangeable Notes (the 3.750% and the 4.000%) is approximately 9%. But the cash paid to the bondholder by LINTA is only 4%, creating a 5% delta between what the Q Consolidated Group can deduct in their joint tax return, and the interest actually paid. In essence, the Q Consolidated Group got a tax deduction for the 9%, but only paid interest on the LINTA Exchangeable Notes at 4%. Since the Q Consolidated Group received those tax deductions year over year, this created a tax savings and accordingly deferred their tax liability. Hence, the DTL. *Kearns Testimony*, Day 1: 175:15–16; Day 1: 161:22–162:25.

[111] Intercompany SSA, DX-408, ECF No. 393-001.

[112] QVC, Inc. 2024 10-K at I-3, JX-024, ECF No. 341-029.

[113] QVC, Inc. 2024 10-K at I-3, JX-024, ECF No. 341-029.

[114] QVC, Inc. 2024 10-K at I-3, JX-024, ECF No. 341-029.

[115] Joinder and Amendment to the Intercompany SSA, dated Oct. 8, 2019, DX-409, ECF No. 393-002.

[116] *Disclosure Statement* at 55.

include QVC, HSN, and CBI, and the agreement is automatically set to renew on November 14, 2026.[117]

41. Under the Intercompany SSA, participating parties may act as a service provider or service recipient of certain business operations and administrative services set forth in the agreement or any other services mutually agreed upon, subject to certain exceptions.[118] The cost of services provided under the Intercompany SSA is determined as the proportionate part of the compensation and benefits paid to service provider personnel, plus an allocation of related overhead costs, and is paid on a monthly basis.[119] For services provided by third-party vendors, service recipients pay fees and expenses at cost, without markup, which are due within 45 days of the service recipient's receipt of a monthly detailed and itemized invoice from the service provider.[120]

42. All parties to the Intercompany SSA have historically paid costs incurred in-full on a monthly basis.[121] Among other services, QVC and CBI (and before its divestiture, Zulily) exchanged invoices for expenses relating to personnel and business advisory services.[122] In sum, Zulily has paid QVC $2.16 million, $2.69 million, $2.59 million, and $2.79 million for management-related expenses incurred in 2019, 2020, 2021, and 2022, respectively. CBI has paid to QVC $1.69 million, $1.5 million, $1.29 million, $3.1 million, $3.39 million, $3.53 million, and $2.1 million for management-related expenses incurred in 2019, 2020, 2021, 2022, 2023, 2024, and 2025, respectively.[123]

*(g) CBI Removal from the RCF.*

43. On April 1, 2025, QVC notified the RCF Lender Group of its election to remove CBI as a borrower under the RCF.[124] Pursuant to

[117] Intercompany SSA § 9(a), DX-408, ECF No. 393-001.
[118] Intercompany SSA § 4, Schedule A, DX-408, ECF No. 393-001.
[119] Intercompany SSA § 4, Schedule A, DX-408, ECF No. 393-001.
[120] *Disclosure Statement* at 55–56.
[121] *Disclosure Statement* at 72.
[122] QVC, Inc. 2025 10-K at II-25, JX-025, ECF No. 341-051.
[123] *Disclosure Statement* at 56.
[124] *Disclosure Statement* at 57.

§ 9.19(a) of the RCF Credit Agreement, QVC elected to remove CBI as a borrower under the RCF (the "CBI Removal").[125] For QVC to elect CBI's removal, CBI was required to pay off all of its outstanding RCF Loans and terminate, or cash collateralize all outstanding letters of credit issued on its account.[126] QVC and CBI were jointly and severally liable for all borrowings under the RCF when QVC elected CBI's removal.[127]

*(h) QVCG Preferred Dividends.*

44. The Preferred Shareholders' rights are governed by that certain Certificate of Designations (the "COD") adopted by the board of QVCG on August 20, 2020, in advance of the original QVCG Preferred Equity issuance.[128] Pursuant to the COD, Preferred Shareholders are "entitled to receive, when, and as if declared by the [QVCG] Board of Directors, out of funds legally available therefore, preferential dividends that shall accrue and cumulate" at a rate of 8.0% per annum (unless a triggering event escalates the applicable rate).[129] QVCG's failure to pay results *inter alia* in an increased liquidation price of the QVCG Preferred Equity.[130] Upon liquidation, Preferred Shareholders "receive [the liquidation preference] from the assets of" QVCG "[s]ubject to the prior payment in full of any Debt Instrument and other liabilities owed to the Corporation's creditors" and any senior class of equity.[131] QVCG paid quarterly dividends to the Preferred Shareholders until May 23, 2025 (such dividends, the "QVCG Preferred Dividends"), when it suspended the QVCG Preferred Dividends.[132]

---

[125] Notice of Removal of a Borrower, dated April 1, 2025, JX-003, ECF No. 340-012.

[126] *RCF* § 9.19, DX-005, ECF No. 340-005.

[127] *RCF*, DX-005, ECF No. 340-005.

[128] Certificate of Designations of 8.0% Series of Cumulative Redeemable Preferred Stock of Qurate Retail, Inc., DX-240, ECF No. 341-114 [hereinafter the "*COD*"].

[129] *COD* § 3(a).

[130] *COD* § 3(b), (c).

[131] *COD* § 4.

[132] QVC Group, Inc. 2025 10-K at II-61, JX-016, ECF No. 340-125; QVC Group, Inc. 2023 10-K at II-56, JX-017, ECF No. 340-126 ("During the years ended December 31, 2023, 2022 and 2021, the Company declared and paid four quarterly cash

Case 4:26-cv-04580 Document 101-1 Filed on 07/17/26 in TXSD Page 31 of 109

45. Between November 2019 and November 2025, QVCG paid approximately $456 million in QVCG Preferred Dividends.[133] Additionally, between November 2019 and May 2025, QVCG paid approximately $1.738 billion in cash dividends to its common shareholders.[134]

46. Beginning in Q4 2022, QVCG's board obtained a solvency opinion from Duff & Phelps prior to issuing each QVCG Preferred Dividend.[135] In each opinion, Duff & Phelps concluded that after each QVCG Preferred Dividend: (i) immediately prior to giving effect to the proposed dividend, the surplus of QVCG exceeded the amount of the proposed dividend and (ii) after giving effect to the consummation of the proposed dividend, (a) the assets of QVCG exceeded its debts, (b) QVCG should be able to pay its debts, and (c) QVCG would not have an unreasonably small capital for the business in which it is engaged.[136]

---

dividends, each for $2.00 per share to stockholders of record of the Preferred Stock."); QVC Group, Inc. 2024 10-K at II-55, JX-018, ECF No. 341-001 ("During the years ended December 31, 2024, 2023, and 2022, the Company declared and paid four quarterly cash dividends, each for $2.00 per share to stockholders of record of the Preferred Stock. On February 14, 2025, the Company declared a quarterly cash dividend of $2.00 per share, which will be payable in cash on March 17, 2025, to stockholders of record of the Preferred Stock at the close of business on February 28, 2025."); QVC Group, Inc. Q2 2025 10-Q at I-20, DX-148, ECF No. 341-022 ("On May 23, 2025, the Board of Directors announced its decision to suspend payment of the quarterly cash dividend on the Preferred Stock, beginning with the quarterly cash dividend payable on June 16, 2025."); QVC Group, Inc. 8-K at 2, DX-442, ECF No. 405-008 (On May 23, 2025, QVC Group, Inc. [] announced that its [Board] has decided to suspend its quarterly cash dividend [] of $2.00 per share for its 8.0% Series A Cumulative Redeemable Preferred Stock [] beginning with the quarterly dividend payable on June 16, 2025.").

[133] Schedule 5A - Summary of QVCG Outflows to QVCG Preferred Shareholders for the Period November 2019 – November 2025, DX-296, ECF No. 343-044.

[134] Schedule BA - Summary of QVCG Outflows to QVCG Common Stockholders for the Period November 2019 – November 2025, DX-298, ECF No. 343-046.

[135] 11-14-2022 Qurate Retail, Inc. Board Meeting Minutes, DX-366, ECF No. 345-009.

[136] *See e.g.*, 5-17-23 Qurate Retail Inc. Dividend Committee Written Consent, Exhibit A Duff & Phelps Opinion at 5, JX-065, ECF No. 345-011.

***(2) Potential Intercompany Claims.***

*(a) Avoidance Claims.*

47. As a result of their investigations into the historical intercompany transactions, the Disinterested Directors determined various avoidance claims and related defenses may exist between certain Key Entities within the company.[137] The Court does not make any conclusive findings as to the merit of these claims. Rather, the Court finds that the Disinterested Directors each conducted and analyzed their due diligence of the company, and each separately and independently formulated an understanding as to the potential existence of such claims, their potential magnitude, potential defenses, and the factual and legal issues underpinning such potential claims which may need to be addressed by a court through litigation.[138]

48. With respect to the 2020 Restructuring, the Court finds each of the Disinterested Directors concluded through their investigation that the issuance of the LINTA Promissory Note as a means of financing the retirement of the MSI Exchangeables may have given rise to actual or constructive fraudulent transfer claims under § 544 of the Bankruptcy Code, assertable by QVC against LINTA, subject to various counter arguments and defenses.[139] The Disinterested Directors believed that either type of avoidance claim could be to the magnitude of the full $1.74 billion outstanding on the LINTA Promissory Note. The Court also finds the Disinterested Directors concluded LINTA having made approximately $85 million in principal and approximately $42.7 million in interest payments on the LINTA Promissory Note could have given rise to actual or fraudulent transfer claims assertable by LINTA against QVC. The Disinterested Directors agreed contingent legal issues would exist as to the extent any

---

[137] JX-027, ECF No. 341-054 at 5–6; JX-029, ECF No. 341-056 at 3–5; JX-032, ECF No. 341-061 at 5–7; JX-031, ECF No. 341-060 at 4–6.

[138] JX-027, ECF No. 341-054 at 5–6; JX-029, ECF No. 341-056 at 3–5; JX-032, ECF No. 341-061 at 5–7; JX-031, ECF No. 341-060 at 4–6.

[139] JX-027, ECF No. 341-054; JX-032, ECF No. 341-061.

badges of fraud could have been proven under the applicable version of the Uniform Fraudulent Transfer Act ("UFTA"). The Disinterested Directors also believed QVC's and LINTA's solvency was a litigable issue with respect to either actual or constructive fraudulent transfer claims.

49. With respect to the 2022 Cash Management Plan and subsequent December 14 and December 21 Transfers, the Court finds each of the Disinterested Directors concluded QVC having drawn $300 million on the RCF as part of the steps taken to divest Zulily, and QVC having drawn $600 million on the RCF and subsequently sending a collective $800 million up to QVCG to be paid to QVCG and LINTA bank accounts, respectively, may have given rise to actual or constructive fraudulent transfers claims under § 544, assertable by QVC against QVCG, and LINTA as initial or subsequent transferee.[140] The Disinterested Directors believed various badges of fraud under the applicable version of the UFTA may have existed. They also believed various arguments and counterarguments might exist as to whether QVC received reasonably equivalent value in exchange for the December Transfers. The Court finds each of the Disinterested Directors believed the solvency of QVC before either the December 14 or December 21 Transfers would be a litigable issue in any potential litigation, despite the company's purported reliance on the 2022 Duff & Phelps Solvency Opinion at the time of the transactions.[141] In light of the complexities

[140] JX-027, ECF No. 341-054; JX-032, ECF No. 341-061. While CBI may have been an initial or subsequent transferee as part of the 2022 Cash Management Plan, the QVC Disinterested Director's independent investigation ultimately concluded no viable or valuable causes of action against CBI were worthy of pursuit. JX-027, ECF No. 341-054 at 10 ¶ 36.

[141] *See Keglevic Testimony* Day 3: 37:4–38:11 (QVC Disinterested Director explaining their view as to multiple indicia of insolvency); *Keglevic Testimony* Day 3: 38:25–39:6; 39:11–14; 39:20–40:19 (QVC Disinterested Director explaining issues with Duff & Phelps solvency opinions); *Meltzer Testimony*, Day 3: 157:1–11 (QVCG Disinterested Director expressing opinion that solvency was "clearly litigable," would be a battle of the experts, with a long duration and uncertain outcome); *see also* JX-095, ECF No. 453-002 (FTI insolvency perspective of QVC as of 2022); *Wafford Testimony*, Day 2: 352:18–353:14 (explaining how QVC could upstream to QVCG during 2022 Cash Management Plan despite its own potential insolvency). The Disinterested Directors formulated this view as to solvency, *i.e.*, the nature of it being

involved in such a dispute—such as the fact-intensive nature of solvency—the Disinterested Directors were cognizant that any potential claims precipitated by this prepetition transaction would result in protracted, discovery-heavy and expert-intensive litigation.

50. With respect to the post-2022 Cash Management Plan intercompany dividends between 2023 and 2025, the Court finds the Disinterested Directors concluded QVC having paid $343.8 million in dividends to QVCG and $242.8 million in dividends to LINTA may have given rise to actual or constructive fraudulent transfer claims under § 544, assertable by QVC against QVCG and LINTA.[142] The Disinterested Directors again recognized that legal issues may exist as to reasonably equivalent value and the existence of certain badges of fraud under the applicable version of the UFTA. The Disinterested Directors also recognized that QVC's solvency during the period the dividends were paid would be a litigable issue, and that any potential litigation would require comprehensive, fact-intensive and expert-driven solvency analyses. Solvency arguments might be further complicated by potential reference to, and disputes regarding, reliance on QVCG-specific solvency opinions as indications of whether QVC, a subsidiary, was solvent during the relevant time periods.

51. With respect to the 2024 Capital Contribution and Exchange, the Court finds the Disinterested Directors concluded the $277 million capital contribution from LINTA used by QVC to exchange 89% of its 2027 and 2028 Notes may have given rise to actual or constructive fraudulent transfers under § 544, assertable by LINTA

---

a contested issue in any underlying litigation, based on their comparison of the metrics used in the 2022 Duff & Phelps Solvency Opinion (as well as other Duff & Phelps solvency opinions issued both at the QVCG and QVC levels for other transactions), the Evercore insolvency analysis, and the FTI 2022 insolvency analysis. The Disinterested Directors concluded that the Duff & Phelps solvency opinions historically used by the company may or may not be reliable, given their choice of metrics, but at bottom would be subject to reliability disputes in any litigation.

[142] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056; JX-032, ECF No. 341-061.

against QVC.[143] As with each other potential avoidance action claim, the Disinterested Directors recognized legal issues might exist as to the extent certain badges of fraud could be proven, as well as to the extent LINTA received reasonably equivalent value in exchange for the contribution. They also recognized these potential claims might be further complicated by questions as to whether the value of LINTA's potential claim might be reduced by claims QVC might have against LINTA.

52. With respect to payments under the intercompany TSAs, the Court finds the Disinterested Directors concluded QVC's payments to QVCG for taxes between November 2019 and 2025, totaling approximately $953.7 million, and CBI's payments to QVCG for taxes between 2020 and 2025, totaling approximately $80.8 million, may have given rise to actual or constructive fraudulent transfer claims under § 544, assertable by QVC and CBI, respectively, against QVCG.[144] The Disinterested Directors had at least four concerns here. First, they apprehended that QVC was making payments at least from 2018 through 2022 up to QVCG (then referred to as Qurate Retail, Inc.) before LINTA assigned its rights and interests under the QVC TSA to QVCG, potentially creating avoidance issues. Second, the Disinterested Directors were concerned about how those pre-assignment payments (or overpayments) up to QVCG might be treated under the later-assigned contractual provisions of the QVC TSA. Similar pre and post-execution timing issues may exist with respect to payments from CBI up to QVCG which predate the CBI TSA. Third, the Disinterested Directors also understood issues may exist as to how any potential overpayments made from QVC and CBI up to QVCG under the then-operative TSAs would be treated under the contracts' applicable provisions. Namely, whether those overpayments' characterization is limited to credits which offset QVC's and CBI's future obligations under the respective TSAs, and/or whether the value of those payments could possibly be subject to

[143] JX-032, ECF No. 341-061; JX-027, ECF No. 341-054.

[144] JX-027, ECF No. 341-054; JX-031, ECF No. 341-060; JX-029, ECF No. 341-056.

Case 24-90505 Document 701-1 Filed in TXSB on 06/15/25 Page 30 of 103

avoidance claims. The Debtors consistently maintained the position that excess tax payments made from QVC up to QVCG were made in compliance with the QVC TSA—but the Disinterested Directors each still believed avoidance issues may exist.[145] Fourth, the Disinterested Directors understood issues may exist as to the extent QVC and CBI received value, if any, under the TSA from QVCG. Separately, the Disinterested Directors concluded potential preference claims under § 547 may exist based on the same payments and overpayments under the respective TSA, assertable by QVC and CBI against QVCG. They recognized legal issues with respect to whether those payments were made in the ordinary course may exist as well.

53. With respect to payments made under the Intercompany SSA, the Court finds the Disinterested Directors concluded various parties' payments for services by counterparties under the Intercompany SSA may have given rise to actual or constructive fraudulent transfer claims.[146] As with the other potential fraudulent transfer claims, the Disinterested Directors again recognized QVC's solvency would be disputed in any litigation, as well as the extent the services QVC received were reasonably equivalent to value paid for them. They recognized potential issues existed as to the extent value was transferred on account of antecedent debts. They recognized the calculations of fees owed would be disputed by any parties to such litigation, and resolution of that issue and the others would be fact intensive. The Disinterested Directors also concluded various parties' payments under the Intercompany SSA may have given rise to potential preference claims, and that potential legal and factual issues may exist as to whether such payments were made in the ordinary course of business.

54. With respect to the CBI Removal, the Court finds the Disinterested Directors concluded QVC's election to remove CBI as

---

[145] *Kearns Testimony*, Day 1: 222:4–20; *Wafford Testimony*, Day 1: 404:12–18.

[146] JX-027, ECF No. 341-054; JX-031, ECF No. 341-060; *see also Disclosure Statement* at 55–56.

borrower under the RCF may have given rise to actual or constructive fraudulent transfer claims, assertable by QVC against QVCG.[147] The Disinterested Directors believed various badges of fraud may have existed. They believed issues may exist as to fraudulent intent as well. And they recognized that fact-intensive issues as to QVC's solvency and a potential lack of reasonably equivalent value received in exchange for the transaction would exist in any such litigation. They also recognized complicated issues would exist as to how an exchange of value would be conceptualized by a court.

55. <u>With respect to the QVCG Preferred Dividends</u>, the Court finds the Disinterested Directors concluded QVCG having paid approximately $456 million in QVCG Preferred Dividends to the Preferred Shareholders may have given rise to actual or constructive fraudulent transfer claims, assertable by QVCG against the Preferred Shareholders.[148] As with each of the other potential actual fraudulent transfer claims, the Disinterested Directors believed certain statutory badges of fraud may exist. With respect to potential constructive fraudulent transfer claims, the Disinterested Directors recognized issues may exist as to whether each or any of the QVCG Preferred Dividends rendered QVCG insolvent, or whether there was an exchange of reasonably equivalent value. Indeed, the Disinterested Directors recognized the complicated and fact intensive nature of any potential constructive fraudulent transfer claim, as QVCG's solvency would need to be analyzed at the time each transfer was made. They believed various arguments and counterarguments may exist as to the reliability of the Duff & Phelps solvency opinions issued for the QVCG board in connection with the QVCG Preferred Dividends. They also recognized

[147] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056. While this claim would in theory also be assertable against CBI, the QVC Disinterested Directors ultimately concluded that no claims against CBI were worthy of pursuit, particularly given the Reorganized CBI will become a subsidiary of QVC and therefore a release would be, in their view, more appropriate. JX-027, ECF No. 341-054 at 10 ¶ 36.

[148] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056.

Case 25-90454 Document 701 Filed in TXSB on 07/15/25 Page 32 of 103

potential legal issues may exist as to the applicability of the safe harbor provision under § 546.

*(b) Illegal Dividends*

56. Again, with respect to the QVCG Preferred Dividends, the Court finds the Disinterested Directors concluded QVCG having paid approximately $456 million in QVCG Preferred Dividends to the Preferred Shareholders may have given rise to illegal dividend claims assertable by QVCG's creditors against QVCG and its directors.[149] The Disinterested Directors also believed QVC may be entitled to pursue such illegal dividend claims against the Preferred Shareholders in the event QVCG did not. They recognized that complicated factual issues would exist as to the extent QVCG had surplus[150] at the time of each distribution, and/or the extent QVCG had net profits in the fiscal years—or preceding fiscal years—in which the dividends were declared. They also recognized potential legal issues would exist as to the extent the QVCG directors were acting in compliance with their fiduciary duty of care at the time of declaring each dividend.

*(c) The Deferred Tax Liability.*

57. With respect to the Deferred Tax Liability, or DTL, the Court finds the Disinterested Directors concluded there was a risk—albeit a small one—that liability to the IRS may materialize based on the Q Consolidated Group having deducted on their consolidated tax return amounts for interest paid on the LINTA Exchangeable Notes as if those notes' interest rate was 9%, when the cash paid to bondholders by LINTA was only 4%.[151] The Disinterested Directors believed the

[149] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056.

[150] Defined under the Delaware General Corporate Law ("DGCL") as "[t]he excess, if any, at any given time, of the net assets of the corporation over the amount so determined to be capital . . . [.]" DEL. CODE ANN. tit. 8, § 154. In a very general sense, a corporation will have surplus as to potentially issue a dividend if the company's net assets (amount by which total assets exceed total liabilities) exceed its capital (the aggregate par value of all issued shares). *Id.* Whether a company has surplus or net profits are factual issues.

[151] JX-027, ECF No. 341-054; JX-029, ECF No. 341-056; *see also* QVC Group, Inc. 2025 10-K, JX-019, ECF No. 341-002 ("Taxing authorities may challenge tax positions we will take with respect to the consequences of the Chapter 11 Cases and

government would look to QVCG as lead taxpayer of the Q Consolidated Group for payment if the DTL materialized. The Disinterested Directors also understood that the members of the Q Consolidated Group may be jointly and severally liable for the DTL, but that QVC may have an indemnity claim against QVCG for its portion pursuant to QVC TSA. The Disinterested Directors understood that the Debtors had obtained a "should"-level tax opinion regarding exposure on the DTL, and that professional tax consultants opined it was "more likely than not" the DTL would not materialize.[152] The Disinterested Directors were also aware the Debtors had obtained a tax insurance policy for the DTL, but that policy only covered a portion of the projected potential liability.[153] The Disinterested Directors understood that even with insurance the potential out-of-pocket exposure on the DTL was anywhere from approximately $550-$800 million.[154] They also understood a confluence of factors potentially affected the total aggregate liability under the DTL, and that each of these risks combined could balloon the Debtors' potential exposure from approximately $550-$800 million to in excess of

---

the transactions contemplated thereby and, in the event such a challenge were successful, it could result in a material current tax liability for Reorganized QVC. It is our position that certain deferred tax liabilities recorded on our financial statements as of December 31, 2025 will not materialize into a current tax liability because of the application of certain tax rules applicable to companies under the protection of a Bankruptcy court.").

[152] JX-072, ECF No. 348-008 (PWC "should" opinion, dated February 20, 2026). *Kearns Testimony*, Day 1: 229:17–230:9; *see also Wafford Testimony*, Day 1: 405:2–8 (stating the company's position was that the DTL would not materialize). The actual percentage of risk associated with "should"-level tax opinion is not clear, even among tax professionals. While a "should" opinion is generally meant to represent a "more likely than not" chance of an event happening/not happening, it is definitively not a "will" opinion, which is meant to convey a greater degree of certainty. *Kearns Testimony*, Day 1: 187:18–188:4; Day 1: 230:7–9.

[153] Moreover, the Disinterested Directors did not know with certainty, nor did the Debtors know, how the premium on the tax insurance policy reflected the market's belief as to a likelihood that the DTL would materialize. Full coverage was potentially available for the DTL, but the next tranche of incremental coverage necessary to achieve full insurance was only obtainable through secondary markets, the premium for which was "incredibly expensive." *Wafford Testimony*, Day 1: 347:7–15; Day 1: 375:19–376:4.

[154] Summary of Calculation of Potential Out-of-Pocket DTL Costs (With Included Assumptions), DX-435, ECF No. 406-001.

$1 billion.[155] These contingent risks included (i) a potential change-in-ownership issue under § 382 of the Internal Revenue Code caused by aggressive investing in the company's preferred equity before and after the Petition Date, which threatened the loss of certain tax attributes, including the ability to offset the DTL through use of accrued interest deduction carryforwards[156]; (ii) the fact that receipt of insurance proceeds on the DTL policy would itself constitute a realization event on which the Debtors would experience gain, necessitating a "tax gross-up"; (iii) the fact that significant interest may accrue on the DTL; (iv) the fact that penalties may be imposed by the IRS; (v) the fact that interest may accrue on those penalties; and (vi) the potential added costs associated with audit and litigation expenses.[157]

**B. Process of Negotiating the Intercompany Settlement.**

58. During the course of their investigations into the potential intercompany claims, and with greater intensity between February and April of 2026, the Disinterested Directors underwent negotiations to determine whether a settlement of potential intercompany claims was achievable between the Key Entities.[158] Such a settlement was eventually reached. Based on the evidence presented at the Combined Hearing, the Court finds the negotiations were arm's-length, that the Disinterested Directors each acted independently during the course of their respective investigations and subsequent negotiations with one another (whether negotiating directly with other Special Committee members, or negotiating by and through their respective independent counsel). All Disinterested Directors' testimony as to the negotiation of the Intercompany Settlement was highly credible. No Disinterested Director or Special Committee member at any Key Entity capitulated

---

[155] Summary of Calculation of Potential Out-of-Pocket DTL Costs (With Included Assumptions), DX-435, ECF No. 406-001.

[156] DX-235, ECF No. 341-109.

[157] Summary of Calculation of Potential Out-of-Pocket DTL Costs (With Included Assumptions), DX-435, ECF No. 406-001.

[158] JX-027, ECF No. 341-054 ¶¶ 20–21; JX-029, ECF No. 341-056 ¶¶ 12–22; JX-032, ECF No. 341-061 ¶¶ 18–31; *Disclosure Statement*, 51–57.

during the negotiations. The Court finds that the terms of the negotiated Intercompany Settlement were not preordained, but rather were reached as part of a thorough, complete, and arm's-length process.

59. On February 6, 2026, the Joint Debtor Advisors circulated a status report to the QVCG Board of Directors and Compensation Committee, outlining recent updates on the ongoing development of their restructuring transaction plan.[159] The February 6 status report outlined four transaction term sheets that had theretofore been exchanged between the company and certain lender constituencies, namely, certain RCF lenders, QVC Notes lenders, and LINTA Notes lenders.[160] The February 6 status report showed the company and its creditor constituencies were in agreement on implementing a restructuring through a pre-packaged chapter 11 plan, but were in disagreement as to various material goalposts, such as: (i) how to pay fees and expenses associated with a chapter 11 case; (ii) recovery for RCF lenders; (iii) recovery for LINTA lenders; (iv) recovery for general unsecured creditors ("GUCs"); (v) funding for CBI; and (vi) recovery for the Preferred Shareholders.[161] Specifically with respect to a recovery for the Preferred Shareholders, the Debtors' October 17, 2025 term sheet proposed that QVCG distribute cash to the Preferred Shareholders upon the company's emergence from bankruptcy, in addition to a 62% stake in the equity of reorganized CBI.[162] On January 26, 2026, certain RCF lenders submitted a counter term sheet, which proposed distributing no cash to the Preferred Shareholders, but contemplated granting up to a 62% stake in the reorganized CBI.[163] Also on January 26, 2026, certain QVC Note lenders submitted their own counter which contemplated

[159] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG, JX-080, ECF No. 450-001.

[160] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

[161] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

[162] DX-437, ECF No. 406-003 at 4.

[163] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

distributing to the Preferred Shareholders a to-be-determined "cash tip," or a to-be-determined percentage of equity in the reorganized QVC or CBI.[164] Eleven days earlier, on January 15, 2026, certain LINTA Note lenders submitted their own counter, but their term sheet did not contemplate a recovery for the Preferred Shareholders.[165] Accordingly, at the outset of subsequent negotiations which took place throughout the course of February through April 2026, the company and various creditor constituencies were not in agreement as to any recovery the Preferred Shareholders may receive under a potential restructuring, but had contemplated as much as both a cash distribution and equity in the reorganized QVC or CBI, and as little as, potentially, nothing.[166]

60. On February 12, 2026, Kobre submitted a status update to the QVCG Special Committee on the potential impending restructuring, QVCG's potential exposure on the potential intercompany claims, and an overview of how QVCG's cash position might be affected by the bankruptcy.[167] In the February 12 status update, Kobre advised the QVCG Special Committee as to their interpretation of the potential intercompany claims between the Key Entities, and advised on the "importance of a consensual resolution" of any potential intercompany claims that may exist.[168] Kobre advised the QVCG Special Committee of QVCG's limited cash on hand (then determined to be approximately $200 million), the face value of its preferred equity (approximately $136 million), and the low amount of GUC claims against it (less than $15

[164] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

[165] Joint Meeting of the Board of Directors and the Compensation Committee of QVCG at 8, JX-080, ECF No. 450-001.

[166] Although the substance of the investigation into the intercompany claims and negotiation of the Intercompany Settlement were undergone independently by each respective Disinterested Director group, the Court finds the fact that the company and certain creditor constituencies were not in agreement as to potential distributions to the Preferred Shareholders under a potential restructuring is further indicia that the result eventually reached by the Disinterested Directors was not preordained.

[167] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002.

[168] QVCG Special Committee Restructuring Update at 2–4, JX-081, ECF No. 450-002.

million).[169] Kobre advised that diligence had revealed QVC had upstreamed to QVCG over $2 billion in the last four-year period, and over $4 billion in the last six-year period.[170] Kobre advised as to potential issues regarding both QVC's and QVCG's solvency at the time each paid respective dividends either upstream, or to the Preferred Shareholders, based on a comparison of the relevant Duff & Phelps solvency opinions and recent solvency analyses of the Key Entities for the relevant time periods provided by the Joint Debtor Advisors (Evercore).[171] Kobre also advised that QVCG was expected to fund its share of Joint Debtor Advisory fees associated with its own "box," based on a to-be-determined allocation.[172] In light of the foregoing, Kobre advised the QVCG Special Committee as to how QVCG's cash might be distributed under a potential agreement, suggesting "releases" for the Preferred Shareholders from potential claims on the QVCG Preferred Dividends as their "potential recovery."[173] The Kobre February 12 status update did not contemplate distributing cash or equity to the Preferred Shareholders.[174] Regardless, the Kobre February 12 status update indicated the QVCG Disinterested Directors had a preliminary understanding of the Key Entities' and Preferred Shareholders' potential exposure under the intercompany claims, and those claims' magnitude. The February 12 status update also indicated the QVCG Disinterested Directors were aware of how much leverage the QVC Disinterested Directors would have against them in the subsequent negotiations.

---

[169] QVCG Special Committee Restructuring Update at 2, JX-081, ECF No. 450-002.

[170] QVCG Special Committee Restructuring Update at 2, 9, JX-081, ECF No. 450-002.

[171] QVCG Special Committee Restructuring Update at 11–16, JX-081, ECF No. 450-002.

[172] QVCG Special Committee Restructuring Update at 8, JX-081, ECF No. 450-002.

[173] QVCG Special Committee Restructuring Update at 7, JX-081, ECF No. 450-002.

[174] QVCG Special Committee Restructuring Update at 7, JX-081, ECF No. 450-002.

Case 26-90447 Document 710 Filed in TXSB on 07/15/26 Page 38 of 103

61. On February 13, 2026, at a counsel-only meeting, counsel for the Special Committees of QVCG (Kobre), QVC (Katten), and LINTA (Milbank) exchanged presentations on their respective positions as to potential intercompany claims and defenses.[175] As represented by Kobre, the QVCG Special Committee opened with the position that "clawback claims by QVC against QVCG were not likely to be viable," and that each of the contingent legal or factual issues in any avoidance claim (intent to defraud, hinder or delay, certain badges of fraud, reasonably equivalent value, and a showing of QVC's or QVCG's insolvency, *et cetera*) would likely resolve in the favor of QVCG.[176] The QVCG Special Committee took a similar aggressive position with respect to potential avoidance claims assertable by QVC and LINTA against the Preferred Shareholders.[177] The QVCG Special Committee also asserted an interpretation that QVC would likely have joint and several liability under the DTL, and that, in essence, QVC had much more to lose than QVCG under the DTL because the parent would not be holding assets after the restructuring.[178] The Court finds the QVCG Special Committee's representation at the February 13 meeting was an aggressive position at the outset of negotiations—if not the most aggressive position that the QVCG Special Committee could have taken at that stage. The QVCG Special Committee took this aggressive position (through Kobre) despite likely being aware, (through Kobre's prior advice to the contrary), that QVCG indeed had significant exposure under potential intercompany claims from QVC, that the legal and

[175] QVC Group, Inc. Intercompany Settlement Position, JX-008, ECF No. 340-043; Presentation Regarding Potential Valuable and Viable QVC, Inc. Claims and Causes of Action, JX-050, ECF No. 343-018; Board of Managers of Liberty Interactive LLC and Special Committee of the Board of Directors of Qurate Retail Group, Inc. Intercompany Claims Positions, JX-006, ECF No. 340-024.

[176] QVC Group, Inc. Intercompany Settlement Position at 2–6, JX-008, ECF No. 340-043.

[177] QVC Group, Inc. Intercompany Settlement Position at 6, JX-008, ECF No. 340-043.

[178] QVC Group, Inc. Intercompany Settlement Position at 7, JX-008, ECF No. 340-043.

factual issues in any avoidance action were litigable, and that such litigation would be fact-intensive, lengthy, and costly.[179]

62. On February 19, 2026, the QVC and QVCG Disinterested Directors held individual meetings with their respective counsel regarding the developing Intercompany Settlement and upcoming negotiations with the Special Committees.[180]

63. On February 22, 2026, Katten sent initial demand letters, with proposed settlement term sheets attached, to Kobre and Milbank.[181] QVC proposed to LINTA (i) granting QVC a $600 million GUC claim against LINTA and (ii) granting an aggregate $66.7 million in bondholder claims against LINTA, treated as GUC claims.[182] QVC proposed to QVCG (i) payment of third-party GUC claims against QVCG in full, in an amount not to exceed $15 million; (ii) granting QVC at least a $400 million allowed GUC claim against QVCG; (iii) payment of such $400 million GUC claim and other allowed claims by QVC against QVCG with all QVCG's available cash—after payment of QVCG's administrative and third-party GUC claims—and any other assets owned by QVCG, which included the equity in CBI; (iv) that QVC would fund the purchase of tax insurance and payment of any liability on the DTL with proceeds from the treatment of QVC's allowed claim against QVCG; and (v) no recovery for the Preferred Shareholders or common equity holders of QVCG.[183] Both proposals to QVCG and LINTA included mutual releases/customary debtor releases between the Parties (except for the terms of the settlement), subject to completion of the

[179] *See* JX-029, ECF No. 341-056 at 5 ¶¶ 13–14.

[180] 02-19-2026 Disinterested Directors of QVC Meeting Minutes, DX-076, ECF No. 340-076; 02-19-2026 Disinterested Directors of QVCG Meeting Minutes, DX-092, ECF No. 340-092.

[181] QVC Settlement Proposal to QVCG, JX-014, ECF No. 340-121; QVC Settlement Proposal to LINTA, DX-120, ECF No. 340-120. The QVC proposal to both QVCG and LINTA provided *inter alia* that allocation of shared advisory fees was still subject to determination.

[182] QVC Settlement Proposal to LINTA at 7, DX-120, ECF No. 340-120.

[183] QVC Settlement Proposal to QVCG at 7, JX-014, ECF No. 340-121; QVC Settlement Proposal to LINTA at 7, DX-120, ECF No. 340-120.

investigation into potential intercompany claims by the Disinterested Directors of QVC.[184]

64. The Court finds the Disinterested Directors of QVC arrived at the $400 million allowed claim figure as the lowest acceptable amount they felt could be acceptable as fiduciaries for the company, particularly in light of the magnitude of QVC's potential claims against QVCG, which they believed to be in excess of $3 billion in the aggregate, and QVCG's limited cash, which was estimated at around $180-$200 million.[185] The Court finds the Disinterested Directors of QVC did not include any distribution for the Preferred Shareholders based on their interpretation that QVC had been acting as QVCG's "ATM" for at least the past six years, having upstreamed approximately $4 billion of cash, and that $456 million of that money had already been paid from QVCG to the Preferred Shareholders as dividends.[186] The Court finds that QVC's Disinterested Directors believed that a mutual release of potential claims had significant value for QVCG and the Preferred Shareholders.[187]

65. On February 23 and 24, 2026, the Special Committees held virtual and in-person settlement conferences where counterproposals to the initial QVC proposals were made, and the QVCG Disinterested Directors made an ask for a $25 million distribution for the Preferred

[184] QVC Settlement Proposal to QVCG at 7, JX-014, ECF No. 340-121. QVC Settlement Proposal to LINTA at 7, DX-120, ECF No. 340-120.

[185] *Keglevic Testimony*, Day 3: 24:25–24:10.

[186] *Keglevic Testimony*, Day 3: 33:18–34:6; Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001; QVC Notice of Borrowing at 1, DX-410, ECF No. 393-003; Schedule 2A – December 2022 Cash Management Plan Transfers to QVCG and LINTA at 1, DX-290, ECF No. 343-038; DPW and STB Excel Sheet of Fund Flows, DX-044, ECF No. 340-044; QVC, Inc. Payments to QVCG for Debt-Related Dividend Payments From January 2023 through November 2025, DX-292, ECF No. 343-040; Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42; Schedule 5A - Summary of QVCG Outflows to QVCG Preferred Shareholders for the Period November 2019 – November 2025, DX-296, ECF No. 343-044.

[187] *Keglevic Testimony*, Day 3: 32:4–9.

Shareholders.[188] QVC's Disinterested Directors rejected the $25 million request full stop, as they believed it was a non-starter.[189] QVCG's Disinterested Directors did not insist further on any other amount of cash for the Preferred Shareholders during the February 23 and 24 meetings.[190] The QVCG Disinterested Directors did not bring an independent tax advisor to the meetings, and did not hire their own independent financial advisor or investment banker in preparation for the settlement negotiations.[191]

66. Regardless of this outcome, the Court finds that QVCG's Disinterested Directors having not insisted further on a distribution for the Preferred Shareholders at the February 23 and 24 meetings was not a capitulation to the QVC Disinterested Directors, and that the negotiations had proceeded in good faith and at arm's-length. All Disinterested Directors recognized that the outcome of the claims was uncertain due to the plethora of legal and factual issues within each claim.[192] Based on the advice of Kobre up until that point, the QVCG Disinterested Directors understood QVCG's potential exposure to QVC and the magnitude of such claims.[193] Indeed, the QVCG Disinterested Directors seemed to recognize that QVC had leverage over QVCG both before and during the February 23 and 24 meetings. And both the QVC and QVCG Disinterested Directors had independently developed—through thorough and complete diligence of the company provided to all Disinterested Directors through the Joint Debtor Advisors—a parallel understanding that QVC had been the ATM of QVCG for at least the past six years.[194] Nonetheless, QVCG was not slated to receive "nothing"

---

[188] *Keglevic Testimony*, Day 3: 32:4–9.

[189] *Keglevic Testimony*, Day 3: 32:4–9.

[190] *Meltzer Testimony*, Day 3: 310: 11–24; 311:13–18.

[191] *Meltzer Testimony*, Day 3: 222:10–21; 303:24–304:1; 304:11–14.

[192] JX-027, ECF No. 341-054 at 5–6; JX-029, ECF No. 341-056 at 3–5; JX-032, ECF No. 341-061 at 5–7; JX-031, ECF No. 341-060 at 4–6; *Disclosure Statement*, at 52–57.

[193] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002; JX-027, ECF No. 341-054.

[194] Schedule 2B – 2022 Cash Management Plan, Dated December 2022, DX-301, ECF No. 344-001; QVC Notice of Borrowing at 1, DX-410, ECF No. 393-003;

under the terms of the settlement after the February 23 and 24 meetings—despite its Special Committee eventually agreeing to transfer all QVCG's Distributable Cash plus its interest in CBI to QVC, and granting QVC an allowed $400 million GUC claim.[195] As of the time of the February 23 and 24 meetings, both groups of Disinterested Directors understood QVCG had limited cash on hand, and that regardless of its potential success in litigating or defending the hypothetical intercompany claims from QVC, QVCG would still bear a significant potential liability under the DTL which dwarfed even the avoidance action claims.[196] The QVCG Disinterested Directors never formulated an assessment as to QVCG's potential success on the intercompany claims, but well understood that litigating the claims, particularly with respect to fact-intensive solvency disputes, was guaranteed to be costly and value destructive for both Key Entities.[197] Moreover, it was unclear to both sets of Disinterested Directors how, if at all, QVCG might be able to fund such disputes given its limited cash.[198] Regardless, they understood QVCG's limited cash position placed it at risk of being completely wiped out by the DTL even if it achieved complete victory against QVC on the avoidance claims.[199] They recognized that by getting (i) a release of all QVC's claims against

Schedule 2A – December 2022 Cash Management Plan Transfers to QVCG and LINTA at 1, DX-290, ECF No. 343-038; DPW and STB Excel Sheet of Fund Flows, DX-044, ECF No. 340-044; QVC, Inc. Payments to QVCG for Debt-Related Dividend Payments From January 2023 through November 2025, DX-292, ECF No. 343-040; Schedule 4 – Tax Sharing Agreement Summary, Dated November 30, 2025, DX-294, ECF No. 343-42; Schedule 5A - Summary of QVCG Outflows to QVCG Preferred Shareholders for the Period November 2019 – November 2025, DX-296, ECF No. 343-044.

[195] 04-14-2026 Special Committee of the Board of Directors of QVC Group, Inc. Meeting Minutes, DX-096, ECF No. 340-096.

[196] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002 (Kobre's views as to QVC's potential claims pre-February 23, 24 meeting); JX-027, ECF No. 341-054; Presentation Regarding Potential Valuable and Viable QVC, Inc. Claims and Causes of Action, JX-050, ECF No. 343-018 (Katten's views as to QVC's potential claims during/post February 23, 24 meeting).

[197] *Meltzer Testimony*, Day 3: 316:18–317:1.

[198] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002; JX-027, ECF No. 341-054; Presentation Regarding Potential Valuable and Viable QVC, Inc. Claims and Causes of Action, JX-050, ECF No. 343-018.

[199] *Meltzer Testimony*, Day 3: 186:10–18.

Case 26-90468 Document 710 Filed in TXSB on 01/15/26 Page 43 of 103

QVCG, and (ii) QVC to assume all QVCG's liability under the DTL, they would succeed in taking all QVCG's risk off the table.[200]

67. The Disinterested Directors of QVC independently believed their initial February 22 term sheet was mutually beneficial, as their primary goal was a fast and final resolution of the claims.[201] They were, however, prepared to litigate to finality all claims against both QVCG and the Preferred Shareholders in order to maximize returns if a settlement was not reached. The Disinterested Directors of QVCG understood this—as of the February 23 and 24 meetings—and were aware that QVC's Disinterested Directors were prepared to unleash their arsenal of claims in the event a resolution was not achieved.[202] Accordingly, QVCG's Disinterested Directors having potentially failed to use QVC's Disinterested Directors' "fast and final" motivation as *their own* leverage point would *not* demonstrate the negotiations were not arm's-length. The litigation alternative, whether done inside or outside of the company's bankruptcy, would be expensive and lengthy.[203] And the Disinterested Directors of QVC understood that they represented the operating company which would likely have sufficient cash—or, at least, more than QVCG had—to fund subsequent litigation.[204]

68. Nor were the Preferred Shareholders collectively slated to receive "nothing" under the settlement after the February 23 and 24 meetings concluded. Despite a distribution now being off the table,

---

[200] *Meltzer Testimony*, Day 3: 194:13–195:2.

[201] *Keglevic Testimony*, Day 3: 99:1–8 (if claims litigated, QVC's recovery would be reduced by its fees and QVCG's fees); *Keglevic Testimony*, Day 3: 99:12–100:4; 102:20–103:5 (litigation would preclude "fast and final" solution QVC Disinterested Directors identified as their objective); *Keglevic Testimony*, Day 3: 101:18–22 (QVC recognized possibility of losing litigation and recovering nothing); *Keglevic Testimony*, Day 3: 103:20–104:1 (QVC Disinterested Director's view that litigation would have been "ugly," would have hurt both estates, and that litigation was "much worse" than settling).

[202] *Keglevic Testimony*, Day 3: 125:11–19.

[203] *Keglevic Testimony*, Day 3: 46:20–47–6; *Meltzer Testimony*, Day 3: 197:4–11; *Wafford Testimony*, Day 2: 379:8–9.

[204] *Keglevic Testimony*, Day 3: 27:6–18.

those Preferred Shareholders who received QVCG Preferred Dividends got to keep the $456 million in aggregate distributions they had previously received—funded with QVC's money—and a release of all claims for those funds.[205] Not getting a distribution out of the Debtors' reorganization was not a preordained directive from Kirkland, because the company *had* contemplated a distribution as early as October 2025.[206] Kobre's *suggestion* at the February 12, 2026 status update that the Preferred Shareholders get releases as a "*potential recovery*" also does not indicate that the result of the February 23 and 24 negotiations was preordained or that the QVCG Disinterested Directors capitulated at the meeting.[207] One day after advising the QVCG Disinterested Directors as to QVC's potential exposure, Kobre represented to QVC's Disinterested Directors' counsel a converse position—despite already understanding they were potentially on thin ice.[208] That the QVCG Disinterested Directors ultimately did not pursue a distribution, but rather obtained releases, was still a substantial result under the settlement—but was not one guaranteed from the outset. Indeed, the initial term sheet authorized by the QVC Disinterested Directors did not include releases for the Preferred Shareholders.[209] It cannot be said the Preferred Shareholders collectively did not receive value under the settlement, nor can it be said the QVCG Disinterested Directors capitulated or that "releases with no distribution" was a preordained result.

69. On February 25, 2026, Kobre returned a markup of the QVC/QVCG proposal to Katten, reducing QVC's allowed GUC claim

---

[205] The QVCG Disinterested Directors admittedly did not know at the time of negotiating the settlement what proportion of then-existing Preferred Shareholders were of the subset that received the QVCG Preferred Dividends versus shareholders who bought the stock after those dividends were paid. *Meltzer Testimony*, Day 3: 333:25–334:11.

[206] DX-437, ECF No. 406-003 at 4.

[207] QVCG Special Committee Restructuring Update at 7, JX-081, ECF No. 450-002.

[208] QVCG Special Committee Restructuring Update, JX-081, ECF No. 450-002; QVC Group, Inc. Intercompany Settlement Position, JX-008, ECF No. 340-043.

[209] *Keglevic Testimony*, Day 3: 32:4–9.

against QVCG to $350 million, and removing the language requiring that QVCG fund all QVC's allowed claims with "100% of any other assets owned by [QVCG]," which theoretically included QVCG's equity in CBI.[210]

70. On February 26, 2026, Milbank sent Katten a counter to the QVC/LINTA proposal.[211] Also on February 26, 2026, the QVC and QVCG Disinterested Directors came to an agreement in principle on the $400 million GUC claim amount, subject to overall resolution.[212] At the time of this agreement, ownership and funding of CBI was still subject to negotiation.[213] However, QVCG's Special Committee (through statements of counsel), had agreed to no distributions for the Preferred Shareholders as part of the settlement.[214] Mutual releases were also agreed upon, including a release of QVCG from the DTL (through QVC's assumption of it) and a release for the Preferred Shareholders.[215]

71. On February 27, 2026, Katten circulated a proposed response, subject to client signoff, to Milbank regarding the QVC/LINTA settlement.[216]

72. Also on February 27, 2026, counsel from Cleary Gottlieb Steen & Hamilton LLP ("Cleary") contacted Kirkland on behalf of certain Preferred Shareholders regarding conduct in connection with the Debtors' restructuring negotiations.[217] In the letter from Cleary, counsel advised Kirkland that the Board of QVCG owes fiduciary duties solely to QVCG and its stakeholders—not any of its subsidiaries or their creditors; that significant asset value still existed at QVCG; and that

[210] 02-25-26, 02-26-26 Emails Between Kobre and Katten, DX-037, ECF No. 340-037.

[211] Liberty Interactive, LLC and QVC, Inc. Proposed Settlement Framework, DX-416, ECF No. 393-009.

[212] 02-26-26 Email Between Katten and Kobre, JX-082, ECF No. 450-003.

[213] 02-26-26 Email Between Katten and Kobre, JX-082, ECF No. 450-003.

[214] 02-26-26 Email Between Katten and Kobre, JX-082, ECF No. 450-003.

[215] 02-26-26 Email Between Katten and Kobre, JX-082, ECF No. 450-003.

[216] 02-27-26 Email Between Katten and Milbank, With QVC/LINTA Proposal Markup Attached, DX-417, ECF No. 393-010.

[217] 02-27-26 Letter from Cleary to K&E, JX-041, ECF No. 341-112.

those certain Preferred Shareholders were willing to engage the Board of QVCG in a constructive dialogue regarding these matters and the terms of the potential forthcoming settlement.[218] Despite the letter from Cleary, QVCG's Special Committee never engaged with any Preferred Shareholder prior to the eventual consummation of the Intercompany Settlement.[219] Regardless, a lack of engagement with the Preferred Shareholders does not necessarily demonstrate bad faith, particularly given the fact that the QVC and QVCG Disinterested Directors negotiated releases for the Preferred Shareholders. There is no direct or credible evidence the settlement was agreed upon with any intention of disenfranchising the Preferred Shareholders.

73. On February 28, 2026, the Special Committees at QVC and LINTA arrived at an agreement on the LINTA/QVC Joint Settlement Framework.[220]

74. On March 1, 2026, the Special Committees at QVC and QVCG arrived at an Agreement in Principle on the QVCG/QVC settlement, with the $400 million allowed GUC claim and mutual releases, but subject to a forthcoming CBI funding analysis.

75. On March 10, 2026, Kirkland circulated a draft plan and certain creditor facing materials incorporating the Disinterested Directors' QVCG/QVC settlement framework.[221] The draft plan reflected the Agreement in Principle that as part of the QVCG/QVC

---

[218] 02-27-26 Letter from Cleary to K&E, JX-041, ECF No. 341-112.

[219] *Meltzer Testimony*, Day 3: 325:11–14; 326:4–8; 327:3–8. The QVCG Disinterested Directors understood Cleary purported to represent approximately 1-2% of the Preferred Shareholders. *Melter Testimony*, Day 3: 205:11–14. Around the Fall of 2025, the Debtors received correspondence from Houlihan Lokey ("Houlihan") on behalf of a certain unspecified percentage of QVCG preferred equity holders. *Wafford Testimony*, Day 1: 328:23–329:17. After the Debtors' advisors replied back to Houlihan, the Debtors "really didn't hear anything beyond that." *Wafford Testimony*, Day 1: 328:23–329:17. The correspondence from Cleary on behalf of certain Preferred Shareholders was received months later, at a time when the Disinterested Directors' investigations and negotiations were substantially under way.

[220] 02-26-26 Through 03-01-26 Emails Between Milbank and Katten, DX-419, ECF No. 393-012.

[221] 02-23-26 Emails From Kirkland, DX-242, ECF No. 341-116.

settlement, QVC would receive (i) an allowed GUC claim of $400 million against QVCG; (ii) all of QVCG's Distributable Cash; and (iii) QVCG's interests in CBI.[222]

76. On March 20, 2026, Kirkland circulated a CBI Funding Analysis generated by AlixPartners to the Special Committees' counsel.[223] With respect to the ultimately agreed-on CBI transfer, the Disinterested Directors at QVC and QVCG had a parallel (but independently formulated) understanding that, based on AlixPartners' five-year financial projection and its funding analysis, CBI's horizon for funding itself after the reorganization was dubious, if not bleak.[224] Both sets of Disinterested Directors recognized CBI would have potential synergies with QVC as its parent,[225] namely from (i) being able to participate in QVC's UPS Agreement; (ii) access to new employees; (iii) access to outside professional services; (iv) access to information technology and audit services; and (v) distribution of management fees.[226]

77. On March 30, 2026, the Joint Debtor Advisors circulated a Company Term Sheet reflecting agreements in principle among the Disinterested Directors at the Key Entities.[227]

---

[222] 02-23-26 Emails From Kirkland at 25, DX-242, ECF No. 341-116.

[223] Restructuring Funding Analysis (CBI), DX-265, ECF No. 343-013.

[224] Cornerstone Brands, Inc. 5 Year Financial Projections, Dated December 2025, JX-004, ECF No. 340-013; Restructuring Funding Analysis (CBI), Dated 03-20-2026, DX-265, ECF No. 343-013; *Keyes Testimony*, Day 1: 280:21–281:3.

[225] The expert report at DX-384, ECF No. 345-027, which provides a "football field" valuation of CBI relying on discounted cash flow and comparable companies analyses, was excluded from evidence and therefore the Court shall not consider it. ECF No. 421. Mr. Griffin, however, testified as to his basis for formulating the valuation. The Disinterested Directors also conveyed an understanding that in their view, CBI would be benefitted from being housed under QVC rather than in its own silo under QVCG.

[226] Cornerstone Brands, Inc. Separation Evaluation (Update to V12.18.25), Dated 01-09-2026, DX-255, ECF No. 343-003.

[227] Company Term Sheet, JX-100, ECF No. 499-021.

78. On April 7, 2026, Katten sent Kobre a revised term sheet regarding the QVCG/QVC settlement.[228]

79. Between April 8, 2026, and April 15, 2026, conversations between the Special Committees continued regarding CBI.[229] The Debtors and certain creditors exchanged terms sheets as well as drafts of the plan and RSA incorporating potential settlements.[230]

80. On April 13, 2026, Katten sent a final markup of the QVCG/QVC Settlement Term Sheet.[231] Under this version, QVC received 100% of QVCG's CBI interest, all QVCG's Distributable Cash, and its Remaining Assets. New cash-use covenants and a fiduciary out were also added. The next day, Kobre sent back a copy of that version with its own comments attached, subject to client review and approval.[232]

81. On April 14, 2026, the Special Committee of QVCG formally approved the Intercompany Settlement terms.[233] Also, a final pre-filing term sheet was circulated, containing RSA termination right and cash restriction provisions.

82. On April 16, 2026, the Governing Bodies granted unanimous written consent to authorize the Debtors' bankruptcy filing

---

[228] Settlement Term Sheet Regarding Intercompany Claims Between QVC Group, Inc. and QVC, Inc., DX-278, ECF No. 343-026.

[229] 02-23-26 Through 04-12-26 Emails Between Kirkland, DPW, and STB, JX-043, ECF No. 341-117; 02-26-26 Through 04-15-26 Emails Between Kirkland and Akin, DX-246, ECF No. 341-120.

[230] 02-23-26 Through 04-12-26 Emails Between Kirkland, DPW, and STB, JX-043, ECF No. 341-117; 02-26-26 Through 04-15-26 Emails Between Kirkland and Akin, DX-246, ECF No. 341-120.

[231] 02-25-26 Through 04-13-26 Emails Between Katten and Kobre, DX-036, ECF No. 340-036.

[232] 02-22-26 Through 04-14-26 Emails Between Katten and Kobre, DX-041, ECF No. 340-041.

[233] 04-14-26 Meeting Minutes of Special Committee of the Board of Directors of QVCG, DX-096, ECF No. 340-096.

and entry into the RSA.[234] That same day, the Debtors filed voluntary petitions for chapter 11 bankruptcy.[235]

**C. Overview of the Intercompany Settlement.**

83. Under the final terms of the Intercompany Settlement, QVCG got (i) a full resolution of and releases from all potential claims from QVC, including avoidance claims and tax indemnity claims, which had potential aggregate liability of in excess of $1 billion; (ii) a shift of QVCG's liability under the DTL (under which the aggregate liability could theoretically exceed $ 1 billion) to QVC, with tax insurance being funded by the proceeds of all QVC's allowed claims against QVCG; (iii) no obligation to bear shared post-petition administrative costs or costs associated with the Joint Debtor Advisors; (iv) guaranteed unimpairment of all third-party GUC claims, totaling approximately $15 million; and (v) releases for Preferred Shareholders on potential claims arising from the $456 million QVCG Preferred Dividends.[236] In exchange, QVCG gave QVC (i) a $400 million allowed GUC claim against it and (ii) all QVCG's Distributable Cash which under the terms of the Plan included QVCG's 62% equity stake in CBI.[237]

84. Under the Intercompany Settlement, LINTA got (i) a resolution of and release from all potential claims from QVC, including avoidance claims, which had potential aggregate liability in excess of $2.1 billion; (ii) a recovery for Holders of Allowed LINTA Notes Claims in their pro rata share of LINTA Distributable Cash, which would include approximately $88 million of cash LINTA retained prepetition, plus an approximately $23.3 million distribution from QVC as part of settling LINTA's potential intercompany claims, minus certain administrative, allowed secured, and allowed GUC claims; and (iii) no obligation to bear shared post-petition administrative costs or costs

[234] 04-16-26 Omnibus Unanimous Written Consent in Lieu of a Special Meeting of the Governing Bodies, DX-375, ECF No. 345-018.

[235] ECF No. 1.

[236] *See generally Plan.*

[237] *See generally Plan.*

associated with the Joint Debtor Advisors.[238] In exchange, LINTA gave QVC (i) complete disallowance of the LINTA Promissory Note and (ii) a mutual resolution of and release from all potential intercompany claims from LINTA.[239]

85. Under the Intercompany Settlement, CBI got (i) increased likelihood of going-concern preservation, including the increased ability to continue at least near-term operations, and a favorable set-up for business overhead and administrative costs, by virtue of being transferred to QVC and (ii) unimpairment of all claims.[240]

86. Under the Intercompany Settlement, QVC got (i) a resolution of and release from all potential intercompany claims from LINTA; (ii) disallowance of the LINTA Promissory Note; (iii) a $400 million GUC claim against QVCG, to be funded by all QVCG's Distributable Cash, comprised of approximately $195 million and QVCG's 62% equity stake in CBI[241]; (iv) a potentially shorter stay in chapter 11, reducing chances of business disruptions as the remaining operating entity under the settlement; and (v) go-forward control over consolidated tax return compliance, including the ability to make certain relevant tax elections otherwise not available under the current Q Consolidated Group scheme.[242] In exchange, QVC gave (i) LINTA a release of all QVC's potential intercompany claims against it, totaling approximately $1.8-$2.1 billion; (ii) LINTA a distribution of $23.3 million, and permitted LINTA to keep its approximately $88 million in prepetition cash; (iii) QVCG a release of all QVC's potential intercompany claims against it, totaling approximately $1-3 billion (accounting for the DTL indemnity claim and potential prejudgment

---

[238] *See generally Plan.*

[239] *See generally Plan.*

[240] *See generally Plan.*

[241] To be clear, the Plan does not quantify the value of QVCG's equity interest in CBI, but rather contemplates that QVCG will transfer to QVC all QVCG's Distributable Cash, which impliedly includes QVCG's equity in CBI. *See Plan*, Article III.B.4.; Article IV.B; *see also* ECF No. 212 Ex. C. (Restructuring Steps Plan, providing Debtors method for transferring QVCG's equity in CBI to QVC).

[242] *See generally Plan.*

interest); (iv) QVCG the benefit of assuming all its liability under the DTL; (v) the Preferred Shareholders a release of all potential claims for QVCG Preferred Dividends assertable by QVC on behalf of QVCG, totaling approximately $456 million; and (vi) all Parties the benefit of assuming responsibility for all post-petition Joint Debtor Advisor fees, alleviating the need for "true-ups" from each Key Entity for post-petition administrative fees theretofore accrued but not yet paid.[243] The Intercompany Settlement also enabled the Debtors to pay all third-party GUC claims in full under the terms of the Second Amended Plan.[244]

## III. CLASSIFICATION UNDER THE PLAN, THE NOTICING PROCESS, SOLICITATION PROCESS AND VOTING RESULTS.

87. The Plan establishes four groups of Classes corresponding to each of the four Key Entity Debtors (QVCG,[245] QVC,[246] LINTA,[247] CBI[248]). In total, there are three voting Classes: two in Class B (RCF

[243] *See generally Plan*.

[244] *See generally Plan*.

[245] Class A, which classifies Claims against and Interests in QVCG is comprised of eight subclasses. Four subclasses of A are unimpaired, are presumed to accept, and therefore not entitled to vote. One of those subclasses is the "QVC-QVCG Settlement Claim." Three other subclasses of A are impaired, are deemed to reject, and therefore are not entitled to vote. The remaining subclass is classified either as unimpaired and presumed to accept, or impaired and deemed to reject, but otherwise is not entitled to vote.

[246] Class B, which classifies Claims against and Interests in QVC is comprised of eight subclasses. Three subclasses are unimpaired, are deemed to reject, and therefore are not entitled to vote. One is impaired, deemed to reject, and not entitled to vote. Two are either unimpaired and presumed to accept, or impaired and deemed to reject; but otherwise not entitled to vote. The remaining two subclasses—RCF Claims against the QVC Debtors, and QVC Notes Claims against the QVC Debtors—are impaired and entitled to vote.

[247] Class C, which classifies Claims against and Interests in LINTA, is comprised of seven subclasses. Three are unimpaired, presumed to accept, and not entitled to vote. One is impaired, deemed to reject, and not entitled to vote. Two are either unimpaired and presumed to accept, or impaired and deemed to reject, but otherwise are not entitled to vote. One—LINTA Notes Claims—is impaired and entitled to vote.

[248] Class D, which classifies Claims against and Interests in CBI, is comprised of six subclasses. Three are unimpaired, presumed to accept, and note entitled to vote. Two are either unimpaired and presumed to accept, or impaired and deemed to reject,

Claims, and QVC Notes Claims), and one in Class C (LINTA Notes Claims) (collectively, the "Voting Classes").

88. On April 16, 2026, prior to commencing these chapter 11 cases, the Debtors instructed their Soliciting Agent, Kroll, to distribute, via electronic mail or mail, as applicable, Solicitation Packages containing the Disclosure Statement (including all exhibits attached thereto), the Plan, and the applicable Ballot to each member of the Voting Classes entitled to vote on the Plan as of April 13, 2026 (the "Voting Record Date").[249] Each holder of a Claim to whom a Solicitation Package was transmitted was directed in the Disclosure Statement and applicable Ballot to follow the instructions contained in the Ballot (as described in the Disclosure Statement) to complete and submit its respective Ballot to cast a vote to accept or reject the Plan.[250] Each holder of a Claim was informed in the Disclosure Statement and applicable Ballot that such holder needed to submit its Ballot such that it was actually received by Kroll by May 19, 2026, at 11:59 p.m. CT (the "Voting Deadline").[251]

89. On the Petition Date, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[252] On or around the same day, the Debtors also filed the Plan, Disclosure Statement, and Scheduling Motion, pursuant to which the Debtors sought to schedule a Combined Hearing on approval of the Disclosure Statement and Confirmation of the Plan and related objection deadlines.[253] On April 17, 2026, this Court entered the Order (I) Scheduling a Combined Disclosure Statement and Plan Confirmation Hearing, (II) Approving the Solicitation Procedures, (III) Approving the Deadlines and Notices Related Thereto, (IV) Waiving Certain Requirements in Connection

---

but otherwise are not entitled to vote. The remaining is impaired, deemed to reject, and not entitled to vote.

[249] *See* ECF No. 364 ¶ 7 [hereinafter "*Voting Report*"].

[250] *Voting Report* ¶ 8.

[251] *Voting Report* ¶ 11.

[252] ECF No. 1.

[253] ECF Nos. 15, 14, 41.

Therewith, and (V) Granting Related Relief (the "Scheduling Order"), which (i) established May 19, 2026, at 11:59 p.m. CT as the deadline to object to the adequacy of the Disclosure Statement and confirmation of the Plan (the "Objection Deadline") and (ii) approved the form and manner of the Combined Hearing Notice and the Publication Notice.[254]

90. Starting on April 17, 2026, the Debtors mailed, or caused to be delivered, the Combined Hearing Notice.[255] The Combined Hearing Notice informed recipients of: (i) the commencement of these Chapter 11 Cases on April 16, 2026; (ii) the scheduling of the Combined Hearing to consider approval of the Disclosure Statement and Confirmation of the Plan on May 26, 2026, at 9:00 a.m. CT[256]; (iii) the key terms of the Plan, including classification and treatment of Claims and Interests; (iv) key dates and information regarding approval of the Disclosure Statement, Confirmation of the Plan, and the Objection Deadline; (v) the methods by which parties may request copies of the Plan and Disclosure Statement; and (vi) the full text of the release, exculpation, and injunction provisions set forth in the Plan.[257] In addition, the Debtors caused the Publication Notice to be published in the *New York Times* (national edition) on April 23, 2026,[258] and in the *New York Times* (international edition) on April 27, 2026.[259] The Combined Hearing Notice was also made available at no charge on the public website maintained by Kroll at: https://restructuring.ra.kroll.com/QVC.

91. Certain Holders of Claims and Interests were not solicited because such Holders are (i) unimpaired under the Plan and therefore conclusively presumed to have accepted the Plan pursuant to § 1126(f), or (ii) impaired and not entitled to receive a distribution under the Plan,

---

[254] ECF No. 70.

[255] ECF No. 70 Ex. 1 (Combined Hearing Notice).

[256] The Combined Hearing was ultimately continued by stipulation until June 4, 2026, at 1:00 p.m. CT. ECF No. 327.

[257] *See* ECF No. 80.

[258] *See* ECF No. 127.

[259] *See* ECF No. 146 (actual date of publication on April 29, 2026).

and therefore conclusively deemed to reject the Plan pursuant to § 1126(g) (collectively, the "Non-Voting Classes").[260] Instead, shortly after the Petition Date, the Debtors mailed, or caused to be delivered, to all Holders or potential Holders of Claims and Interests in the Non-Voting Classes the Notice of Non-Voting Status, which informed recipients of their status as ineligible to vote (either as presumed to accept the Plan or deemed to reject it) and, as applicable, gave the Non-Voting Classes that were presumed to accept the Plan an opportunity to opt out of the Third-Party Releases in the Plan, or gave the Non-Voting Classes deemed to reject the Plan an opportunity to opt in.[261]

92. On May 12, 2026, the Debtors filed and served the Notice of Filing of Plan Supplement, which included then-current drafts of the following exhibits: (i) the Schedule of Retained Causes of Action; (ii) the Rejected Executory Contracts and Unexpired Lease List (reflecting no rejections); and (iii) the Restructuring Steps Plan.[262] On May 19, 2026, the Debtors filed and served the Second Notice of Filing of Plan Supplement, which included certain of the ABL Facility Documents (including the executed commitment letter).[263] On May 19, 2026 the Debtors filed their First Amended Chapter 11 Plan, and on June 2, 2026, filed their Second Amended Chapter 11 Plan.[264] On June 12, 2026, the Debtors filed and served the Third Notice of Filing of Plan Supplement, which included certain ABL Facility Fee Letters filed under seal.[265]

93. The Debtors completed their solicitation on the Voting Deadline.[266] The Debtors completed their tabulation of the Ballots shortly thereafter, following a complete review and audit of all received

---

[260] *See Voting Report* ¶ 7; *Disclosure Statement*.

[261] *Voting Report* ¶ 7. The Debtors did not mail Notices of Non-Voting Status to classes of intercompany claims, *i.e.*, Classes A4, A5, B6, B7, C5, C6, D4 and D5.

[262] ECF No. 212.

[263] ECF No. 293.

[264] ECF Nos. 289, 389.

[265] ECF No. 503. This filing was made after the Court closed the evidentiary record of the Combined Hearing.

[266] *Voting Report* ¶¶ 11, 13–14.

Ballots.[267] Each of the Voting Classes voted to accept the Plan, as follows:

| Classes | Accept | | Reject | |
|---|---|---|---|---|
| | Number (% of Number Voting) | Amount (% of Amount Voting) | Number (% of Number Voting) | Amount (% of Amount Voting) |
| **Class B3** RCF Claims against the QVC Debtors | 17 (100%) | $3,034,444,444.40 (100%) | 0 (0%) | $0.00 (0%) |
| **Class B4** QVC Notes Claims against the QVC Debtors | 1,096 (85.56%) | $1,111,733,174.46 (99.88%) | 185 (14.44%) | $1,359,558.42 (0.12%) |
| **Class C3** LINTA Notes Claims against the LINTA Debtors | 865 (81.91%) | $904,963,513.00 (98.95%) | 191 (18.09%) | $9,971,200.00 (1.05%) |

## V. THE PREFERRED SHAREHOLDERS' MOTION TO TERMINATE EXCLUSIVITY AND OBJECTIONS TO CONFIRMATION.

94. Leading up to the Combined Hearing, the Debtors received six formal objections, one reservation of rights, and certain informal objections to the Disclosure Statement and Plan.[268] Prior to the Combined Hearing, the Debtors resolved drafting issues raised by certain arbitration claimants,[269] as well as all informal objections through modifications to the Plan and agreed language for a potentially forthcoming proposed Confirmation Order. To date, five outstanding

[267] *See Voting Report* ¶ 15.

[268] ECF No. 291; ECF No. 318; ECF No. 295; ECF No. 299; ECF No. 300; ECF No. 338; ECF No. 322.

[269] ECF No. 322.

objections remain, as well as the Preferred Shareholders Motion to Terminate Exclusivity, further described below.

95. On May 8, 2025, the Preferred Shareholders filed their Emergency Motion to Terminate Exclusivity Under 11 U.S.C. § 1121(d).[270] In the Motion to Terminate Exclusivity, the Preferred Shareholders argue *inter alia* there is no basis to approve the Intercompany Settlement under Bankruptcy Rule 9019, and that the Debtors' proposed Plan—built on the RSA and Intercompany Settlement—is unconfirmable.[271] The Preferred Shareholders argue against the procedural and economic fairness of the Intercompany Settlement, as well as the proposed treatment of Preferred Equity as a Class under the terms of the Plan.[272] The Preferred Shareholders request the Court terminate the Debtors' Exclusive Periods, and have the Preferred Shareholders' proposed plan for QVCG considered in tandem with the Plan proposed by the Debtors.[273]

96. On May 25, 2026, the Preferred Shareholders filed their Objection to Confirmation of the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization.[274] The Preferred Shareholders in their objection reiterate their position laid out in the Motion to Terminate Exclusivity, that there is no basis to approve the Intercompany Settlement under Rule 9019, and that the Debtors' proposed Plan is unconfirmable based on a failure to comport with various provisions of § 1129 of the Bankruptcy Code.[275]

97. On May 19, 2026, the United States Trustee (the "U.S. Trustee") filed its Objection to Confirmation of the First Amended Joint

---

[270] ECF No. 205. As noted *supra*, prior to filing their Motion to Terminate Exclusivity, certain Preferred Shareholders had filed an Emergency Motion for Entry of an Order Directing the Appointment of an Official Committee of Preferred Equity Security Holders. ECF No. 133. These Preferred Shareholders later withdrew their motion voluntarily.

[271] ECF No. 207.

[272] ECF No. 207.

[273] ECF No. 207.

[274] ECF No. 318.

[275] ECF No. 316.

Prepackaged Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.[276] The U.S. Trustee initially objected to the Plan on grounds that (i) the Bankruptcy Code does not authorize the nonconsensual release of non-debtor third parties by other non-debtor third parties; (ii) the Debtors' proposed opt out provisions in the Ballots and the Non-Voting Notices are ineffective to confer affirmative consent to the Third-Party Releases in the Plan; (iii) the Plan includes a permanent injunction provision that violates Fifth Circuit precedent set forth in *Highland Capital II*[277] and the Bankruptcy Code; (iv) the Plan should expressly state that it does not release claims asserted by governmental entities acting under the police and regulatory authority; and (v) the Plan seeks a waiver of the 14-day stay required under Rule 3020(e) without a legal or factual basis to substantiate such waiver.[278] As of the conclusion of the Combined Hearing, the Debtors worked with the U.S. Trustee to resolve objections (iii)-(v). The U.S. Trustee continues to stand on its arguments with respect to the Plan's proposed use of Third-Party Releases, and the opt out mechanism as a means of conferring affirmative consent.

98. On May 19, 2025, interested party Guowei Zhang filed his Objection to Confirmation of the Debtors' Chapter 11 Plan and Request for Continuance, Additional Disclosure, and Preservation of Rights.[279] In his objection, Mr. Zhang requests the Court not confirm the Debtors' proposed Plan prior to the IRS, equity holders, and other interests parties having a chance to examine the nature of the Debtors' exposure under the DTL and proposed treatment of the LINTA Exchangeable Notes, as well as the intercompany account history and valuation

[276] ECF No. 291.

[277] *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 132 F.4th 353 (5th Cir. 2025) [hereinafter "*Highland II*"].

[278] ECF No. 291, at 2 ¶ 1.

[279] ECF No. 295.

analyses which serve as a basis for the Intercompany Settlement and $400 million GUC claim amount.[280]

99. On May 18, 2026, interested party Salil Rajadhyaksha, acting individually and as "attorney-in-fact" for certain Class A7 (QVCG Common Equity Interests) and Class A6 (QVCG Preferred Equity Interests) Holders, filed his Objection to Confirmation of the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization.[281] On May 20, 2026, Mr. Rajadhyaksha filed a supplemental objection.[282] In his objections, Mr. Rajadhyaksha asserts a variety of arguments as to why the Plan does not meet various requirements of § 1129, why the Disclosure Statement does not provide adequate information as required by § 1125(a)(1), and why the Plan's proposed debtor release under § 1123(b)(3)(A) is not appropriate.[283]

100. On May 28, 2026, interested party Bhavin Shah filed his Objection to Confirmation of the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization.[284] In his objection Mr. Shah argues *inter alia* the Plan was not proposed in good faith, the Disclosure Statement lacks adequate information, and the terms of the Intercompany Settlement are questionable, unfair to common equity holders, and deserve greater scrutiny.[285]

101. On June 4, 2026, the Court held the first day of the four-day long Combined Hearing, where it considered the Second Amended Plan,[286] Disclosure Statement,[287] and Motion to Terminate Exclusivity.[288] Testimony was adduced from the Debtors' witnesses Ted Stafford (partner at AlixPartners in the investigations, disputes, and

[280] ECF No. 295.
[281] ECF No. 299.
[282] ECF No. 300.
[283] ECF Nos. 299, 300.
[284] ECF No. 338.
[285] ECF No. 338.
[286] ECF No. 389.
[287] *Disclosure Statement.*
[288] ECF No. 421.

risk group), Paul Kearns (the Debtors' vice president of tax), Jason Keyes (partner and managing director at AlixPartners in the turnaround and restructuring group), Bill Wafford (the Debtors' Chief Financial Officer), Patrick Griffin (vice president at Evercore in the restructuring liability management group), Thomas Walper (Disinterested Director at LINTA), Paul Keglevic (Disinterested Director at QVC) and Roger Meltzer (Disinterested Director at QVCG).[289] The Court finds each of the Debtors' witnesses were highly credible based on their years of experience in the legal or business fields, as well as their personal knowledge about the Debtors. While the Preferred Shareholders sought admission of various exhibits throughout the course of the Combined Hearing, they chose not to put up their own witnesses after the Debtors rested.[290] On June 10, 2026, the Court heard closing arguments on the Second Amended Plan, Disclosure Statement, and Motion to Terminate Exclusivity, and at the conclusion of the Combined Hearing took all matters under advisement.[291]

## CONCLUSIONS OF LAW

### I. JURISDICTION & VENUE.

28 U.S.C. § 1334(a) provides district courts with jurisdiction over this proceeding. 28 U.S.C. § 157(b)(1) states that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This proceeding has been referred to this Court under General Order 2012-6 (May 24, 2012). This Court has jurisdiction in this proceeding as it is a core proceeding which the Court can consider under 28 U.S.C. § 157(b)(2)(A), (B), and (L). The Court has constitutional authority to

[289] ECF Nos. 421, 443, 461.

[290] ECF No. 461.

[291] ECF No. 486. The Court also took under advisement the Debtors' recently filed Emergency Motion Pursuant to Section 345(b) of the Bankruptcy Code Seeking an Extension to Comply with Section 345 of the Bankruptcy Code on an Interim Basis. ECF No. 362.

enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## I. WHETHER THE INTERCOMPANY SETTLEMENT SATISFIES BANKRUPTCY RULE 9019.

Under § 1123(b)(3)(A) of the Bankruptcy Code, a plan may provide for the settlement of any claim or interest belonging to the debtor or the estate. 11 U.S.C. § 1123(b)(3)(A). In considering settlements under § 1123(b)(3)(A), bankruptcy courts apply the same legal test used to approve settlements under Bankruptcy Rule 9019—that is, whether the settlement is fair and equitable and in the best interest of the estate. *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc.*, 390 U.S. 414, 424–25 (1968)). In considering whether a settlement is fair and equitable, courts in the Fifth Circuit apply a three-part test:

> (i) the probability of success in the litigation, with due consideration for the uncertainty in fact and law;
>
> (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and
>
> (iii) all other factors bearing on the wisdom of the compromise.

*Id*. The "other factors" under prong three, also referred to as the *Foster Mortgage* factors, include: (i) "the best interests of the creditors, 'with proper deference to their reasonable views'"; and (ii) "'the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion.'" *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Ref. Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *In re Foster Mortg. Corp.*, 68 F.3d 914, 917–18 (5th Cir. 1995)). The Debtors, as proponents of the Intercompany Settlement, have the burden of establishing that a balance of the above factors leads to a fair and equitable compromise. *In re Allied Props., LLC*, No. 06-33754, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007). The burden under

Case 26-90045 Document 710 Filed in TXSB on 07/15/25 Page 61 of 103

Rule 9019 is not a high one. The Debtors need only show that the settlement falls within the "range of reasonable litigation alternatives." *Id*.

### A. Whether the Intercompany Settlement Warrants Business Judgment Deference.

In general, when considering whether to approve a settlement, the Court gives "[g]reat judicial deference . . . to the [debtors'] exercise of business judgment." *See In re Robertshaw US Holding Corp.*, 662 B.R. 300, 314 (Bankr. S.D. Tex. 2024). The Preferred Shareholders argue that because the proposed Intercompany Settlement is between Debtor-insiders, it should be subject to the heightened "entire fairness" standard of review. The Preferred Shareholders argue the QVCG Disinterested Directors were not adequately informed of the settlement due to a fundamentally flawed process, and that they effectively deferred to the other Key Entity Disinterested Directors and the Joint Debtor Advisors throughout the negotiation. Accordingly, the Preferred Shareholders argue entire fairness applies, and the Court should consider both the fairness of the parties' dealing (the process) and the fairness of the price (the substance) in evaluating whether to approve the Intercompany Settlement.

Notably, the Fifth Circuit has not adopted a categorical rule requiring application of entire fairness to a 9019 merely because the settlement involved debtor-affiliates. Entire fairness review as a concept derives from state-level corporate law principles. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). Courts apply entire fairness when the facts of the case demonstrate one party stands on both sides of the transaction. *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 405 (S.D. Tex. 2008) (citing *Weinberger*, 457 A.2d at 710). The Preferred Shareholders cite numerous cases where courts expressly incorporate entire fairness review when evaluating certain transactions in the bankruptcy context, including settlements of estate causes of action.[292]

[292] *See e.g.*, *In re Vanderbilt Minerals, LLC*, No. 26-60110 (WAK), 2026 WL 1138767, at *6 (Bankr. S.D.N.Y. Apr. 27, 2026) (applying entire fairness to proposed

Those courts, however, applied heightened scrutiny only after finding the underlying transactions were conflicted.[293]

Despite the Key Entities indisputably being statutory "insiders" under the Bankruptcy Code, 11 U.S.C. § 101(31)(E), 101(2)(A), [Findings of Fact 2], the Key Entities appointed Disinterested Directors at each silo to investigate the historical intercompany transactions, and to negotiate on behalf of themselves and their respective stakeholders. [Findings of Fact 13–14]. Each Disinterested Director was in turn represented by their own respective conflicts counsel. [Findings of Fact 13–16]. No direct evidence was introduced to demonstrate (i) the siloed structure of the Disinterested Directors and Special Committees at each Key Entity was deficient to resolve potential conflicts; (ii) that the Disinterested Directors themselves were conflicted; or (iii) that conflicts counsel was conflicted/created a conflict. The Disinterested Directors stood to receive releases under the Plan, and were compensated in association with their having rendered services for each respective Debtor-entity during the course of the investigation, negotiation, and reorganization. Debtor-releases and professional compensation of this kind are standard practices and are not at all out of the ordinary. That the Intercompany Settlement resolved potential avoidance and illegal dividend claims for QVC dividends to QVCG, and QVCG Preferred Dividends to Preferred Shareholders did not create a conflict, because the recently-appointed Disinterested Directors were the ones

settlement of estate claims); *In re Latam Airlines Group, S.A.*, 620 B.R. 722, 769–70 (Bankr. S.D.N.Y. 2020) (applying entire fairness to proposed DIP financing transaction); *In re Soundview Elite Ltd.*, 594 B.R. 108, 129 (Bankr. S.D.N.Y. 2018) (applying entire fairness to equity sale transaction).

[293] *In re Vanderbilt Minerals, LLC*, 2026 WL 1138767, at *6 (applying entire fairness after parties agreed at hearing that was the standard to be employed, "given the insider transactions at issue"); *In re Latam Airlines Group, S.A.*, 620 B.R. at 769–70 (applying entire fairness after finding parties to certain tranche of DIP financing transaction were present on both sides of the transaction due to shared equity ownership); *In re Soundview Elite Ltd.*, 594 B.R. 108, 129 (Bankr. S.D.N.Y. 2018) (applying entire fairness where sign-off board members sat as directors for entities on both sides of transaction, transaction lacked independence, and transaction was facilitated using insider affiliates).

investigating, negotiating, and proposing to release these claims—not the directors who authorized the dividends to begin with.

The Joint Debtor Advisors facilitated information flow between the company and each Disinterested Director group, providing diligence, fund flow analyses, financial projections, solvency analysis, and valuation analysis of various Debtor entities to equally and adequately inform them of the intercompany transactions and potential intercompany claims. [Findings of Fact 18–24, 59–82]. The Joint Debtor Advisors did not, however, tell the Disinterested Directors what opinions to formulate, or what conclusions to arrive at with respect to the investigation and negotiation. They each made their own independent determinations, through the advice of counsel, as to the existence and magnitude of potential claims, and the legal or factual issues that may exist within them. [Findings of Fact 18–24, 47–57].

The Preferred Shareholders argue the $400 million GUC claim was manufactured to support the other Debtors' restructuring and evidences a conflict to justify entire fairness review. But they misconstrue the timeline and process of the negotiation. Kobre represented at the February 13, 2026, meeting that QVC's potential claims against QVCG were "without merit" and that QVC was solvent during the relevant time periods according to the Duff & Phelps solvency opinions. [Findings of Fact 61]. The Court has already found this was the most aggressive position Kobre could have taken at the outset of negotiations—posturing, to advance the interests of their client. [*Id.*].

One day before this counsel-only meeting, Kobre advised the QVCG Disinterested Directors of QVCG's potential exposure and precarious position. [Findings of Fact 60, 66]. It therefore comes as no surprise that Kobre/the QVCG Disinterested Directors would ultimately walk back Kobre's initial posturing at the February 13 meeting, once it became apparent the QVC Disinterested Directors also understood they had the leverage in the negotiations. [*Id.*; Findings of Fact 65–73].

Case 4:26-cv-04680 Document 10-1 Filed in TXSB on 07/15/26 Page 64 of 103

This entire process of posturing and walking back is only indicative that the process was robust and at arm's-length, and not a preordained result. The $400 million GUC claim appearing "as early" as February 26, 2026, is a mischaracterization of this robust process. The Disinterested Directors had been engaged in months-long investigations, and had been negotiating at that point for nearly two weeks with increasing intensity. [Findings of Fact 18–25, 59–68]. Kobre even sent a counter to the $400 million at $350 million the day before February 26. [Findings of Fact 69]. The Court concludes the $400 million GUC figure does not evidence a conflicted transaction.

With respect to the Preferred Shareholders' argument that QVCG's Disinterested Directors' reliance on Evercore, a "conflicted financial advisor," evidences a conflict, the Court disagrees as well. Evercore as a Joint Debtor Advisor helped to inform both sides of the transaction, true, but Evercore's analysis was not substantively relied on for the purposes of assessing the merits of claims. [Findings of Fact 48, 49, 50, 61, 66]. The QVC and QVCG Disinterested Directors emphasized time and time again their belief that solvency is litigable—not that they believed, one way or the other, that the Duff & Phelps solvency opinions or Evercore's analyses were the correct ones—although they each independently recognized the Duff & Phelps solvency opinion would be subject to reliability disputes. [*Id.*]. Both sides of the transaction took Evercore's analyses on insolvency as a data point, much like how they took Kirkland's diligence productions and AlixPartners' fund-flow analyses as data points to inform their understanding of the historical transactions and general state of the company. [*Id.*]. Indeed, Evercore used different insolvency metrics than Duff & Phelps , which the Disinterested Directors evidently interpreted not necessarily for the truth of the analysis, but for the fact that if either side chose to pursue the claims, disputed financial analyses—for either side's respective position—would be litigated at the forefront. [*Id.*]. This supposed "reliance" on Evercore as a data point did not serve to conflict the QVCG Disinterested Directors.

With respect to the Preferred Shareholders' argument that the substantive analysis underpinning the terms of the Intercompany Settlement remained entirely opaque prior to the Combined Hearing, this argument is largely an attack on a straw man. The historical intercompany transactions, albeit highly complicated, were clearly laid out in the Disclosure Statement, along with the Disinterested Directors assumptions as to the legal and factual issues existing with respect to all potential claims. [*See Disclosure Statement*]. It was clear from the evidence that QVC had the leverage in the settlement, and the Disinterested Directors knew this. [Findings of Fact 60–82]. If the ultimate terms provide QVC with a higher proportion of "gets" than "gives," that does not indicate a conflict—it demonstrates the result of the Disinterested Directors' interpretation of the data. The valuation of the $400 million GUC claim was explained as the QVC Disinterested Directors' lowest acceptable figure they could possibly make as fiduciaries of the company. [Findings of Fact 64]. They did not explain it as a supposed enterprise valuation of QVCG, nor was there any requirement that their valuation of QVCG would have to correspond to that ultimate allowed claim amount.[294]

The Preferred Shareholders' point that the RSA locked the Parties in before adversarial testing is an argument out of sequence. The terms of the RSA were contingent on the result of the Intercompany Settlement, as evidenced by the negotiation timeline. [Findings of Fact 58–82]. The Boards authorized entry into the RSA only after the terms of the Intercompany Settlement were finalized. [*Id.*]. The Debtors had incentive from the beginning to undergo a rigorous analysis of the claims, because the gives and gets at the QVC and QVCG levels were still uncertain, particularly at the early stages in the negotiation (*e.g.*, the ultimate value of QVC's allowed claim against QVCG, whether to

[294] If the $400 million GUC claim was instead $0, would that imply QVCG had an enterprise valuation of $0? Certainly not—it would be interpreted as a strong "get" for QVCG as part of the settlement. This point by the Preferred Shareholders is hard to understand.

make a distribution to the Preferred Shareholders and LINTA stakeholders, and if so, in what amount, *et cetera*). [Findings of Fact 59].

The Preferred Shareholders argument that "all other" stakeholders having participated in the Intercompany Settlement, represented separately by their respective counsel, does not stand to create a conflict in the Intercompany Settlement. Cleary notably did not specify which Preferred Shareholders they represented, or in what amount. The QVCG Disinterested Directors' understanding at the time was Cleary represented 1-2% of the entire Preferred Shareholder body. [Findings of Fact 72]. Moreover, the QVCG Preferred Equity was disparately held, having originated as a distribution on the common. [Findings of Fact 3]. It therefore becomes apparent why the QVCG Disinterested Directors declined to engage with Cleary. The Preferred Shareholders as equity were set to be extinguished under the Plan. Even if an Intercompany Settlement was not negotiated and the claims remained in-tact, extinguishing the QVCG Preferred Equity may have been the result of the reorganization anyways. Certain LINTA Noteholders having been represented by Akin Gump Strauss Hauer & Feld LLP is a false dichotomy. This was a creditor constituency, not equity. Moreover, LINTA had categorically more leverage than QVCG in the negotiations, based on the Disinterested Directors' investigation of the intercompany transactions. [Findings of Fact 48, 51, 84]. LINTA being in a more favorable position than QVCG does not mean a conflict existed.

In sum, the Court concludes the investigation and negotiation of the Intercompany Settlement was not subject to a conflict. Adversarial testing is not a requirement before a settlement can be conflict free.

While this Court does not disagree with the holding of those cases the Preferred Shareholders cited to support the entire fairness inquiry, none are dispositive here because the current facts do not demonstrate

a conflict existed.[295] Nor does the holding in *Foster Mortgage* warrant application of heightened scrutiny, because there the Fifth Circuit was concerned not just about the proposed settlement of claims having been between insiders, but that an overwhelming majority of creditors in interest opposed such settlement of claims. 68 F.3d at 919. Here, the only objectors are holders of Preferred Equity Interests and a handful of other *pro se* equity holders. [Findings of Fact 94–101]. These objectors are not creditors, as was the case in *Foster Mortgage*, but equity. 68 F.3d at 919. Here, there are no creditors objecting to the proposed Intercompany Settlement and Plan. [Findings of Fact 94–101].

Accordingly, the Court shall review whether the Intercompany Settlement is fair and equitable and in the best interest of creditors under the more deferential business judgment standard of review. *In re Robertshaw US Holding Corp.*, 662 B.R. at 314.

### B. Whether the Intercompany Settlement is Fair, Equitable, and In the Best Interest of Creditors.

#### ***(1) The Probability of Success in the Litigation, With Due Consideration for the Uncertainty in Fact and Law.***

Turning to the first factor, bankruptcy courts need not "conduct a mini-trial to determine the probable outcome of any claims" resolved in the proposed settlement. *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997). A court need only "appraise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision[.]" *In re Age Refining Co.*, 801 F.3d 530, 541 (5th Cir. 2015). The Court has familiarized itself extensively with the historical intercompany transactions potentially giving rise to avoidance,

[295] Moreover, bankruptcy courts in the Second Circuit have noted the issue of whether business judgment was exercised is just one factor to evaluate in reviewing whether a 9019 is fair and equitable, and that the Court must also conduct its own review. *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012); *In re GOL Linhas Aéreas Inteligentes S.A.*, 659 B.R. 641, 651 (Bankr. S.D.N.Y. 2024).

dividend, and tax liability claims. So did the Disinterested Directors, in sufficient manner. [Findings of Fact 18–46].

That the QVCG Disinterested Directors did not formulate a determination on the likelihood of success in prosecuting—or defending—against the claims does not defeat satisfaction of prong one of the 9019 standard. Here, through the course of their investigation and negotiation, the Disinterested Directors believed, and this Court concludes, that the outcome of all potential intercompany claims was highly uncertain. [Findings of Fact 66]. That uncertainty was their understanding going into the settlement, and that was their justification for entering into it. [Findings of Fact 60–68]. The alternative outcome—litigation—was an unpredictable result, and therefore an uncertain return for each Key Entity; but a value destructive process for all Debtors regardless. [Findings of Fact 66]. Through exercise of their fiduciary obligations as directors of their respective Key Entity, they each independently formulated the determination that settling under the terms of the Intercompany Settlement was in the best interest of the Debtors' estate, as well as the Debtors-entities' stakeholders. Under business judgment deference, it is not the province of the Court to second guess those determinations.

True, the Debtors uniformly maintained the position that the DTL would not materialize, which speaks to supposed "certainty" of litigation (or lack thereof) from the IRS and QVC's corresponding indemnity claim. [Findings of Fact 57]. But the magnitude of liability was, in their view, too great not to consider it a highly motivating factor for QVCG to settle QVC's potential claims against it. [Findings of Fact 57, 66]. Moreover, other factors, like QVCG's limited cash on hand, it not having full tax insurance coverage, and the potential change in ownership issue highlight the fact that even though the DTL had a low likelihood of materializing, a mere single digit risk of loss percentage on the DTL threatened to completely wipe QVCG out. [Findings of Fact 57, 66].

True, many of the avoidance claims hinge on certain Key Entities' insolvency, but that issue was, in each of the Disinterested Directors view, litigable both at the QVC and QVCG level. [Findings of Fact 48–50, 61]. Regardless of this uncertainty over proving insolvency of any Key Entities, the Disinterested Directors of QVC were ready to pursue their arsenal of claims if a fast and final resolution was not reached during the negotiation. [Findings of Fact 67]. All Disinterested Directors agreed, however, litigating the avoidance claims was guaranteed to be highly expensive—a potential drawback, if not a negative outcome in any lawsuit pursued. [Findings of Fact 48–50, 61, 66]. The Disinterested Directors at QVCG were therefore presented with the option of either arriving at speedy resolution which, in their view, was value maximizing, or litigating against an entity that has leverage on them, all while relying on a limited asset pool. [Findings of Fact 66]. Again, the 9019 inquiry is focused on whether the settlement was fair, equitable, and in the best interest of *creditors*. Diminishing potential recovery out of estate assets through administrative fee burn for expensive professionals in extensive litigation over complicated intercompany financial transactions is unlikely to promote creditors' interest. The facts here demonstrate that the Disinterested Directors believed settling, rather than litigating, claims, would be more beneficial to creditors generally. The same reasoning applies to the potential illegal dividend claims. Those claims have various legal and factual contingencies that would need to be determined or proved up in litigation. The ultimate result of such a suit is uncertain, but guaranteed to be expensive, much like the avoidance claims. [Findings of Fact 56].

The Preferred Shareholders seem to argue that the Disinterested Directors should be expected to marshal all resources available at QVCG to get something for their constituency. The Court rejects the notion that in order to comply with the standard for Rule 9019, the Disinterested Directors had to expend all resources or exhaust all conceivable settlement options. Instead, the Disinterested Directors achieved a settlement that paid all GUC claims in full, including all

outstanding trade vendor claims at the QVCG level, resolved all potential intercompany claims, took all QVCG's tax risks off the table, and secured a release for the Preferred Shareholders for liability on the QVCG Preferred Dividends.

The Debtors and Preferred Shareholders each hold divergent views on how the landscape of caselaw regarding these potential claims support or detract from their positions.[296] Although argument in briefing does not elucidate what was going through the mind of the Disinterested Directors, particularly given they were represented by separate conflicts counsel during the investigation and negotiation, it speaks to the nature of how complicated, lengthy, costly, and *uncertain* litigating the claims would be.

Based on this uncertainty of result, as well as various negative effects litigating the claims may have had, the Court concludes prong one of the 9019 analysis weighs in favor of concluding the Intercompany Settlement was fair and equitable and in the best interest of creditors.

***(2) The Complexity and Likely Duration of the Litigation and any Attendant Expense, Inconvenience and Delay.***

Next, the Court will consider the "complexity and likely duration of the litigation and any attendant expense, inconvenience and delay" and the difficulty, if any, to be encountered in collecting a judgment. *In re Jackson Brewing Co.*, 624 F.2d 599, 600.

Each type of potential intercompany claim (avoidance, DTL, illegal dividend) individually would implicate manifold legal issues—both under bankruptcy and applicable non-bankruptcy law—as well as extensive and complicated factual issues, particularly as it related to certain Key Entities' solvency and the reliability of the Duff & Phelps and Evercore insolvency analyses, as well as the extent to which certain Key Entities' had surplus or net profits at relevant time periods. [Findings of Fact 47–57]. The Disinterested Directors understood

[296] ECF No. 359; ECF No. 316.

litigating these claims would be a lengthy process, particularly with respect to the avoidance claims given the necessity for extensive expert testimony from financial analysts and/or investment bankers to prove or disprove insolvency at various company levels. [Findings of Fact 49, 50]. Hiring these experts would be expensive, too. Again, QVCG would have limited cash available to fund the professionals involved in such a lawsuit, or to pay the experts. [Findings of Fact 60, 64, 66]. The Disinterested Directors at QVC preferred a quick path to global peace, but were prepared to draw out the process and litigate all claims in its arsenal to maximize returns if an amicable resolution could not be reached. [Findings of Fact 67].

From a different point of view, the Disinterested Directors also understood that a fast and final resolution of the claims was preferable to the company filing bankruptcy and litigating the claims through separate adversary proceedings between Debtor entities. [Findings of Fact 67]. The Intercompany Settlement was also more preferrable to them than pursuing confirmation for all Debtors besides QVCG, and leaving that Debtor "on the operating table" with a limited asset pool to litigate (or defend against) the avoidance claims and dividend claims on their merits. [*Id.*; Findings of Fact 60, 64, 66]. The Court concludes factor two weighs in favor of approving the Intercompany Settlement.

***(3) All Other Factors Bearing on the Wisdom of the Compromise.***

With respect to factor three, the *Foster Mortgage* factors ask the Court to consider (i) whether the settlement is in "the best interests of the creditors, 'with proper deference to their reasonable views,'" and (ii) "the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion." 68 F.3d at 917–18.

In considering the best interest of creditors, bankruptcy courts should consider the "amount of creditor support for a compromise settlement." *Id.* at 914. The Fifth Circuit was careful to note, however, that it was not creating a categorical rule allowing a majority of creditors to veto a settlement. Instead, it emphasized that while the desires of

creditors are not binding, a court should consider them when their wishes represent the views of a majority of creditors.

Here, the Court concludes the Intercompany Settlement is in the best interest of creditors within the meaning of *Foster Mortgage* factor one. The Intercompany Settlement functions as the keystone to the RSA and the Plan. Without the settlement, the Debtors face an uncertain future, both in terms of the dark waters of litigating the intercompany claims, as well as funding their go-forward operations absent the proposed reorganization, particularly at the CBI level.

Moreover, no creditor has lobbied an objection to the Intercompany Settlement or the Plan. The only objectors are equity and the U.S. Trustee. The Intercompany Settlement and Plan both have overwhelming creditor support. While typical third-party creditors were not parties to the settlement investigation and negotiation, the Key Entities as creditors of one another each agreed to the compromise, through the representation of the Disinterested Directors.

The Plan, in turn, was accepted by a wide majority of each creditor-voting class. These three Voting Classes were significant both in members and dollar value. [Findings of Fact 93]. For example, the LINTA Noteholders took an approximately 92.5% haircut on their claims; despite this significant reduction, they still voted to accept by a wide majority. On the other hand, QVCG was able to pay all its GUC claims in full, including outstanding trade vendor claims, as a result of the Intercompany Settlement. Under *Foster Mortgage* factor one, the Court is required to defer to creditors' viewpoint that approval of the Intercompany Settlement is appropriate.[297] 68 F.3d at 917–18.

The Preferred Shareholders seek to unwind this compromise between the Debtors and various creditor constituencies—despite the amicable and productive result—for their own potential upside. Their

[297] ECF No. 392 (Statement of the Official Committee of Unsecured Creditors in (I) Support of Confirmation of the Plan and (II) Response to the Preferred Shareholder Ad Hoc Group's Objection).

arguments fail to demonstrate the Intercompany Settlement is not in the best interest of creditors, with reasonable deference to their views. *Foster Mortgage* sub-prong one weighs in favor of concluding the Intercompany Settlement was in the best interest of creditors.

Regarding *Foster Mortgage* factor two, the extent to which the settlement is truly the product of arm's-length bargaining, the Court concludes the facts demonstrate the settlement was achieved through a fair, arm's-length process devoid of fraud and collusion. [*See* Findings of Fact 18–82 (detailing both investigation and negotiation)]. The Key Entities were each represented by Disinterested Directors who obtained independent conflicts counsel to represent and advise them throughout their investigation and negotiation. [Findings of Fact 14–16]. The nature of using the Joint Debtor Advisors to facilitate information flow and inform the Disinterested Directors about the company and historical intercompany transactions does not demonstrate the process was not arm's-length.

Nor was the result preordained as the Preferred Shareholders suggest. The company initially proposed different terms for the restructuring than that which were agreed upon by virtue of the Intercompany Settlement. [Findings of Fact 59]. That Kobre proposed releases as the Preferred Shareholders "potential recovery" at the February 12, 2026, status update does not demonstrate them ultimately receiving solely releases under the Intercompany Settlement was a preordained result. [Findings of Fact 60, 68]. Kobre and the QVCG Disinterested Directors negotiated as best they could for a better result both for QVCG and the Preferred Shareholders, as all disinterested fiduciaries are expected. [Findings of Fact 60–68]. The $400 million GUC claim was not arrived at to manufacture Plan confirmation. The QVC Disinterested Directors explained that it was the lowest figure they could accept as fiduciaries. [Findings of Fact 64].

The fact that the QVCG Disinterested Directors did not engage with the Preferred Shareholders or QVCG Preferred Equity Holders during the negotiation process does not demonstrate their ultimate

treatment under the settlement was the product of fraud or collusion by the company or Kirkland. Equity was slated to get wiped out under the Plan, which may have been the case absent the Intercompany Settlement. Under the Intercompany Settlement, those Preferred Shareholders who received the $456 million in aggregate dividends got to keep with their cash, but a release of those claims was not a guaranteed result. Indeed, the initial term sheet authorized by the QVC Disinterested Directors *did not* include releases for the Preferred Shareholders. [Findings of Fact 68]. Accordingly, after considering both *Foster Mortgage* factors, the Court concludes all factors bearing on the wisdom of the compromise supports approval of the Intercompany Settlement.

Based on the extensive evidentiary record before it, the Court finds the settlement is fair and equitable and in the best interest of the estates and their creditors. All factors weigh in favor of an approval of the Intercompany Settlement, and the Court finds it reflects a sound exercise of the Debtors' business judgment. Therefore, the Court approves the Intercompany Settlement.

## III. WHETHER THE PLAN COMPLIES WITH THE REQUIREMENTS OF § 1129.

The Debtors, as the proponents of the Second Amended Plan, have the burden of proving all elements of 11 U.S.C. § 1129(a) by a preponderance of the evidence. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993). The Court concludes that the Debtors have met their burden of proof and that all applicable elements of 11 U.S.C. § 1129 are satisfied. Accordingly, the Court shall confirm the Second Amended Plan.

### (A) Section 1129(a)(1): The Second Amended Plan Complies With the Applicable Provisions of Title 11.

Section 1129(a)(1) provides that a plan must comply with all the applicable provisions of Title 11. This includes the mandatory requirements of §§ 1122 and 1123.

Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Here, the Second Amended Plan properly classifies claims and interests in accordance with 11 U.S.C. § 1122(a). The claims and interests placed in each class are "substantially similar to the other claims or interests" of each such class.[298] Valid business, factual, and legal reasons exist for separately classifying the various classes of claims and interests created under the Plan. The Plan's classification scheme generally follows the Debtors' capital structure, classifying claims and interests into four main categories: Class A for QVCG, Class B for QVC, Class C for LINTA, and Class D for CBI Debtors. Within each main category there are subcategories classifying each claim based on priority, secured status, holder status, type, or other unique factors including prepetition legal rights or legal rights under the Bankruptcy Code.[299]

Section 1123(a)(4) requires that all creditors within a class be treated the same, unless the holder of a particular claim or interests agrees to less favorable treatment. Here, all Class A6 members are set to receive no distribution under the Second Amended Plan and their QVCG Preferred Equity Interests are set to be extinguished.[300] By definition, their treatment under the Second Amended Plan is equal.

The Preferred Shareholders argue that the Second Amended Plan violates § 1123(a)(4) because the Debtor releases available to Class A6 (QVCG Preferred Equity Interest, *i.e.*, the Preferred Shareholders) only benefit those current QVCG Preferred Equity Interest Holders who received QVCG Preferred Dividends. In the Preferred Shareholders view, a release of claims from the Debtors provides no value to current Holders that did not receive any dividends.[301] Citing to the Fifth

[298] ECF No. 389, Art. III.

[299] ECF No. 389.

[300] ECF No. 389, Art. III.B.6.

[301] The Preferred Shareholders' original position throughout the Combined Hearing is that the intercompany claims are without merit—including those potential claims against themselves for the QVCG Preferred Dividends. Counterintuitively,

Case 26-90045 Document 101 Filed in TXSB on 06/17/25 Page 76 of 103

Circuit's decision in *In re Serta Simmons Bedding, L.L.C.*, the Preferred Shareholders argue the court must "'look below the surface' to determine whether plan treatment is 'in fact equal in value,' and not merely identical in form."

In *Serta*, the Fifth Circuit on independent grounds reversed the court's prior approval of a reorganization plan which treated intra class creditors unequally. 125 F.4th 555, 591–93 (5th Cir. 2024). In *Serta* there were two classes in question: one, creditors who participated in the "2020 Uptier" and continued to hold super-priority debt from the uptier transaction ("Class 3"); the other, creditors who did not participate in the 2020 Uptier, but later purchased the super-priority debt on secondary markets ("Class 4"). *Id.* at 571. The reorganization plan ultimately contemplated by the court provided both Classes 3 and 4 with an indemnity whereby the company agreed to indemnify recipients for any losses, claims, damages and liabilities which they might incur in connection with their participation in the 2020 Uptier. *Id.* The Fifth Circuit took many issues with the reorganization plan, *inter alia*, but specifically with respect to § 1123(a)(4) held that because all members of Classes 3 and 4 stood to receive dramatically varying value under the indemnity, depending on whether the members had participated in the 2020 Uptier, the plan subjected them to unequal treatment. *Id.* at 591.

> To [certain class members], the indemnity was potentially worth millions or even tens of millions of dollars. But to other class members [] that had no involvement with the uptier, the indemnity was worth little or even nothing. Thus, some class members received settlements with higher effective values than their co-class members. [] Given this differential, the Plan indemnity constituted impermissible unequal treatment.

*Id.* at 591–92 (citations omitted).

---

they now decry that a release of liability for those claims would be incredibly valuable to only some members of Class A6.

The Second Amended Plan here is different than the one in *Serta.* It is like comparing apples to oranges. Here, as noted above, the Second Amended Plan proposes no distribution for the Preferred Shareholders in Class A6 while those in *Serta* stood to receive the indemnity.[302] The Preferred Shareholders do, however, receive broad Debtor releases (as defined under the Plan) of any and all potential claims or Causes of Action assertable against them in connection with them having received the QVCG Preferred Dividends.[303]

While the Fifth Circuit declined to articulate the scope of what equal treatment means under § 1123(a)(4), its review of caselaw focused on the *payment* of value and the *tendering* of consideration in exchange for that value as part of a settlement. *See id.* (citing *AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986)) ("For its part, the D.C. Circuit has held that equal treatment prohibits disparate treatment with respect to value, thus prohibiting the payment of different settlements to co-class members or a requirement that some class members tender more valuable consideration for the same settlement."); *In re Quigley Co., Inc.*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010) ("Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution.").

[302] ECF No. 389, Art. III.B.6.

[303] *See* ECF No. 389, Art. I.16, 172(b), 173(m); Art. VIII.C. Under Article I.172(b), the Preferred Shareholders are included in the definition of "Related Parties" of the Debtors. ECF No. 389. Under Article I.173(m), Related Parties of the Debtors are included in the definition of "Released Parties." ECF No. 389. Under Article VIII.C, the Second Amended Plan provides a broad Debtor release to all Released Parties from *inter alia*, "any and all claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, and their Estates, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or assertable, accrued or unaccrued, existing or hereafter existing, contingent or noncontingent . . . ." ECF No. 389. The Second Amended Plan's definition of Avoidance Actions canvases the array of avoidance actions generally available under the Bankruptcy Code—which would include potential claims to recover amounts for the QVCG Preferred Dividends. ECF No. 389, Art. I.16. This was the "release" the QVCG Disinterested Directors negotiated for.

With respect to the supposed payment of value from the Debtors under the settlement here, an indemnity has "make-whole" characteristics which confer qualitatively different forms of value on recipients than a release. Whereas an indemnity creates an affirmative right to payment in the event of litigation, a release does not create any such affirmative right to payment (*i.e.*, "value") for the Preferred Shareholders in the same way. From this viewpoint, it becomes clear that current Preferred Shareholders who received QVCG Preferred Dividends do not receive different "payments of value" under the Intercompany Settlement than those current Holders who did not receive any such dividends.[304] This interpretation is consistent with the "equal opportunity, equal result" principle the *Serta* court clarified from the Third Circuit's holding in *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).[305]

---

[304] Mr. Meltzer, Disinterested Director of QVCG, when questioned about whether he was aware of the universe of Preferred Shareholders existing at the time the QVCG Preferred Dividends were paid, stated "*the question of transferee liability [for the QVCG Preferred Dividends] was discussed*" by the QVCG Disinterested Directors and their counsel during the course of negotiating the Intercompany Settlement. *Meltzer Testimony*, Day 3:333:20–24 (emphasis added). Mr. Meltzer disagreed with the belief that not all Preferred Shareholders received value from the releases. When asked why, he stated "[f]or a number of reasons. The existing group of Preferred – objecting Preferred Shareholders only represent about a third of the Preferred class. The Preferred class was widely-held and fully-distributed Preferred [*sic*] class that came as a result of a dividend on the common. Those were essentially the people that received the dividends, the $456 million in dividends. The Preferred holders that are objecting holders acquired their positions, I believe, after the petition date . . . So, releases to them, when they have no economic interest other than their having purchased the shares post-petition, has nothing to do with the potential claims that could be brought against, honestly, retail holders that have purchased or were subsequent transferees of people who had received the dividends." *Meltzer Testimony*, Day 3: 209:7–25; 210:1–4. He later stated "lawyers can differ on this subject" but "I do not, as a Disinterested Director right now, have a firm understanding or a firm belief as to what the likely – what transferee liability may be directed at those people who [] maybe [did] not [get] dividends but bought [the stock] from people who got dividends." *Meltzer Testimony*, Day 3:335:20–25; 336:1–2.

[305] *In re W.R. Grace & Co.* was an asbestos case, wherein the Third Circuit held that equal treatment under § 1123(a)(4) for certain tort claimants necessitated equal opportunity to recover on account of their claims; not that the claimants recover the same amount. 729 F.3d at 237. The Fifth Circuit distinguished such asbestos cases

Conversely, with respect to the supposed tendering of value under the settlement, none of the Preferred Shareholders gave any consideration in exchange for their treatment. They do not "give up" their interests in the QVCG Preferred Equity as part of the Intercompany Settlement. Their equity interests were to be extinguished under the terms of the Second Amended Plan; a release of claims for the dividends was not a contingency of that. The QVCG Disinterested Directors negotiated the terms of the settlement on their behalf as fiduciaries; the QVCG Preferred Shareholders consent was not required to arrive at an agreement. In the same vein, the QVCG Disinterested Directors determined they could not get a cash distribution for the Preferred Shareholders as an additional get under the settlement. That was a product of the leverages the Key Entities' had on one another. The Preferred Shareholders did not "give up" the right to receive additional cash from their ATM to-date (QVC) under the settlement.

The Second Amended Plan treats all Preferred Shareholders the same. The Debtor releases they receive are not contingent on such treatment. Courts have previously held exculpation and release provisions have no bearing on a plan's treatment of claims or interests. *In re Adelphia Comm. Corp.*, 368 B.R. 140, 250–51 (Bankr. S.D.N.Y. 2007). Nor do the Debtor releases here have any bearing on the treatment of the Preferred Shareholders' interest.

---

not on their interpretation of the law, but on their facts, concluding that Class 3 and 4 members had not all similarly participated in the 2020 Uptier in an analogous manner to how all tort-claimant class members had suffered injuries as a result of exposure to asbestos. The Fifth Circuit stated "[a] better analogy would be a plan distribution by which all class members were given the opportunity to litigate their asbestos injuries, but only half had such injuries. We do not think our sister circuits would find such arrangement compliant with § 1123(a)(4)." *In re Serta Simmons Bedding,* 125 F.4th at 592. This highlights the underlying distinction between the Second Amended Plan, *Serta*, and the asbestos cases: a release does not convey on the QVCG Preferred Shareholders the right to receive *value* from the Debtors, but rather grants all a release for *liability* from the Debtors only some may have experienced. This Court's interpretation of § 1123(a)(4) is therefore consistent with Fifth and Third Circuit jurisprudence in this area.

Accordingly, this Court concludes the Preferred Shareholders received equal, rather than unequal treatment under the Second Amended Plan within the meaning of § 1123(a)(4) and *Serta*. Moreover, the Court has concluded all remaining Classes receive equal treatment under the Plan within the meaning of § 1123(a)(4). As such, that provision does not stand in the way of this Court's conclusion as to whether § 1129(a)(1) is satisfied.

**(B) Section 1129(a)(2): The Proponent of the Second Amended Plan has Complied with the Applicable Provisions of Title 11.**

Section 1129(a)(2) of the Bankruptcy Code requires that "the proponent of the plan compl[y] with the applicable provisions of [Title 11]." 11 U.S.C. § 1129(a)(2). Though this language is broad, bankruptcy courts have mostly limited their inquiry of § 1129(a)(2) to ensuring the plan proponent has complied with the requirements of 11 U.S.C. §§ 1125 and 1126. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 423–24 (Bankr. S.D. Tex. 2009); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

Section 1125 of the Bankruptcy Code provides plan solicitation and disclosure requirements. *See* 11 U.S.C. § 1125. A disclosure statement must contain "adequate information" which means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records" that would enable "a hypothetical investor of the relevant class to make an informed judgment about the plan." *See* 11 U.S.C. § 1125(a)(1). Further, "in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." 11 U.S.C. § 1125(a)(1). Courts determine what constitutes "adequate information" on a case-by-case basis under the facts and circumstances presented. *See Mabey v. SW. Elec. Power Co. (In re Cajun Elec. Power Coop.)*, 150 F.3d

503, 518 (5th Cir. 1998). The adequacy of a disclosure statement is a determination largely within the bankruptcy court's discretion. *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion)*, 844 F.2d 1142, 1157 (5th Cir. 1988).

Here, the disclosure statement includes, among other information: a summary of the events leading to the Chapter 11 cases, including prepetition challenges and initiatives; an overview of the Intercompany Settlement; the key terms of the Debtors' Plan; risk factors affecting the Plan; information on federal income tax consequences; and it attached the RSA, the Plan of Reorganization, financial projections, and liquidation and valuation analyses.[306] The Court concludes that the Disclosure Statement contains adequate information for parties-in-interest to make an informed judgment of the Plan. As such, it approves the Disclosure Statement on a final basis.

The objecting Preferred Shareholders argue that the Disclosure Statement fails to provide adequate information regarding the Intercompany Settlement.[307] They argue that the Debtors' disclosures of the QVC-QVCG Settlement are inadequate because it "assigns no value or estimated range to any individual Potential Claim, provides no analysis of the relative strengths and weaknesses of those claims, and offers no explanation of how the identified claims were aggregated or discounted to arrive at the $400 million figure."[308]

The Court disagrees and concludes the Disclosure Statement contains sufficient information concerning the Intercompany Settlement to warrant approval. The Disclosure Statement contains a multi-page overview of the Intercompany Settlement including information regarding the Disinterested Directors' Investigations, their process, and a summary of potential claims.[309] The information contained in the Disclosure Statement is sufficient to convey the

---

[306] *See generally Disclosure Statement*.
[307] *See* ECF No. 316 at 41–42.
[308] ECF No. 316 at 42.
[309] *See Disclosure Statement* at 46–57.

Disinterested Directors' understanding and the basis for their understanding—including the nature of the historical intercompany transactions and the potential legal and factual issues that may exist in any intercompany claims. The fact that it did not contain the substantive diligence, fund-flow, or solvency reports the Preferred Shareholders are critical of the Disinterested Directors having used to arrive at the Intercompany Settlement does not mean creditors did not have enough information on whether to accept the Second Amended Plan or not. Indeed, the information revealed about the investigation and negotiation demonstrated that the basis of the Intercompany Settlement was, in large part, due to the uncertainty around the potential success and outcome of the intercompany claims. The Disclosure Statement is sufficient in conveying that the claims may exist, based on its detailing of the historical intercompany transactions. Accordingly, the Court finds the Debtors' detailed disclosure of the Intercompany Settlement provided enough information for creditors to decide whether or not to accept the Second Amended Plan within the meaning of § 1125.

Further, § 1126 provides the requirements for acceptance of a plan. *See* 11 U.S.C. § 1126. Under § 1126, only holders of allowed claims and allowed interests in impaired classes that will receive or retain property under a plan, on account of such claims or interests, may vote to accept or reject the plan. *See* 11 U.S.C. § 1126. Here, Debtors solicited votes from Classes B3, B4, and C3—all impaired classes of claims that will recover under the plan.[310] The Voting Report reflects that these classes accepted the Second Amended Plan according to 11 U.S.C. §§ 1126(c) and (d).[311] Debtors did not solicit votes from other claim or interest holding classes because they were either unimpaired and presumed to accept the plan under 11 U.S.C. § 1126(f) or impaired and deemed to reject the plan under 11 U.S.C. § 1126(g).

[310] *See* ECF No. 364 at 2.
[311] *See* ECF No. 364, Ex. A.

Because the Debtors have complied with the post-petition disclosure and solicitation requirements of § 1125, and the plan acceptance requirements of § 1126, the requirements of § 1129(a)(2) are satisfied.

**(C) Section 1129(a)(3): The Second Amended Plan was Proposed in Good Faith and Not by any Means Prohibited by Law.**

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Good faith should be evaluated 'in light of the totality of the circumstances surrounding establishment of [the] plan,' mindful of the purposes underlying the Bankruptcy Code." *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013). The Fifth Circuit has held that the plan must be proposed with a legitimate and honest purpose of reorganizing and with a reasonable hope of success. *In re Sun Country*, 764 F.2d 406, 408 (5th Cir. 1985). Additionally, "[t]o be proposed in good faith, a plan must fairly achieve a result consistent with the [Bankruptcy Code]." *In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

To begin, the Court notes that the Intercompany Settlement and the Second Amended Plan are good results for the Debtors and their creditors, generally. The Debtors were able to right-size their balance sheet, improve liquidity, and position their go-forward operating entity QVC for long-term success. The Debtors also rescued CBI from its silo and brought it under QVC's umbrella, enabling synergies that might otherwise save an entity which the Disinterested Directors believed had an uncertain future. [Findings of Fact 76]. The Debtors were also able to pay all third-party GUC claims in full. [Findings of Fact 86]. Under *Sun Country*, these considerations weigh in favor of a conclusion that the Second Amended Plan was proposed with a legitimate and honest purpose of reorganizing the business, and that the plan has a reasonable hope of success. 764 F.2d at 408. These considerations are also consistent with the Bankruptcy Code's underlying purpose of preserving

the company as a going-concern, and maximizing asset value for creditors. *See In re Vill. at Camp Bowie I, L.P.*, 710 F.3d at 247.

The Second Amended Plan has been met with overwhelming creditor support, evidenced by *inter alia* all Voting Classes accepting by large margins, and the Unsecured Creditors' Committee expressing its support. [Findings of Fact 93; ECF No. 392]. The Second Amended Plan, along with the RSA, Intercompany Settlement, and related documents were products of negotiations between the Debtors and the Consenting Stakeholders held at arm's-length and in good faith. [Findings of Fact 58–82]. The Second Amended Plan does not improperly benefit any single constituency, but represents a robust compromise where many, if not all stakeholders made concessions to achieve the result. Under *Village at Camp Bowie*, all of these factors weigh in favor of concluding the Second Amended Plan was proposed in good faith. 710 F.3d at 247.

The Preferred Shareholders, Mr. Rajadhyaksha and Mr. Shah each object to confirmation on grounds that the Debtors' Second Amended Plan was not proposed in good faith. With respect to the Preferred Shareholders, their argument centers around the process of negotiating the Intercompany Settlement. The Court has dispelled concerns the Intercompany Settlement was the product of a capitulation or that it was preordained. [Findings of Fact 68]. Rather, the agreement was the product of a robust and arm's-length process between disinterested fiduciaries of each box at the company. [Findings of Fact 58–82]. The process was not, however, result-oriented, and no direct evidence indicates otherwise. Moreover, the QVCG Disinterested Directors (or Debtors, generally) not having engaged the Preferred Shareholders as part of the negotiation does not indicate a fraud. They held the belief that the QVCG Preferred Equity was disparately held, and that Cleary only represented 1-2% of the entire holder base. [Findings of Fact 72]. Moreover, the Cleary letter was sent at time when the Disinterested Directors were months into the process. [*Id.*]. Nonetheless, the QVCG Disinterested Directors took the Preferred

Shareholders interests into account during the negotiation by securing them a release which was not included in the term sheet initially authorized by the QVC Disinterested Directors. [Findings of Fact 68]. The Court will not second guess the Disinterested Directors' business judgment that releases with no distribution for the Preferred Shareholders was appropriate, particularly given their understanding as to QVCG's exposure to QVC, and its exposure under the DTL.[312]

With respect to Mr. Rajadhyaksha's and Mr. Shah's arguments regarding the fact that the company did not disclose its contemplated restructuring, there is no such requirement under the Bankruptcy Code. Nor does a lack of disclosure as to highly sensitive bankruptcy considerations at the upper levels of management demonstrate the Second Amended Plan was not proposed with a legitimate hope of a successful reorganization. *See Sun Country*, 764 F.2d at 408. Mr. Rajadhyaska's other allegations regarding prepetition public communications, executive compensation, solvency and other governance issues similarly miss the mark. The Court concludes none of these considerations weigh in favor of a conclusion that the Second Amended Plan was not proposed in good faith under § 1129(a)(3). Nor are the Debtors expressly required to preserve historical allocations of risk, value, or tax attributes among affiliated entities, or maintain the corporate structure favored by prior management. Rather, all of these business elements are subject to change in preparation for and during a bankruptcy proceeding, generally for the purpose of setting a debtor up for a successful reorganization. The Court has duly considered them in evaluating the Second Amended Plan, and has concluded it was

---

[312] It also bears worth noting the Preferred Shareholders initially sought to form an official equity committee, but later voluntarily abandoned their motion in favor of pursuing their Motion to Terminate Exclusivity and their plan Objection. ECF No. 133 (withdrawn). Equity committees in bankruptcy are restricted from trading in securities of the company after their formation under fiduciary duty and securities laws. After the Preferred Shareholders abandoned their attempt to form an equity committee, the Debtors produced various documents from the company as well as documents from the Disinterested Directors, refuting the argument the Debtors sought to prevent the Preferred Shareholders from investigating the substantive basis the Disinterested Directors had for formulating opinions as to the intercompany claims.

proposed for a legitimate bankruptcy purpose, with a reasonable hope of success.

Accordingly, the Court concludes the Second Amended Plan satisfies § 1129(a)(3).

### (D) Section 1129(a)(4): All Payments for Services or Costs in Connection with the Debtors' Chapter 11 Case are Subject to Court Approval.

Section 1129(a)(4) requires:

> Any payment made or to be made by the proponent, by the debtor . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). This provision by its terms requires court approval for any payment made or to be made for services, costs, or expenses made in connection with the case. *In re Cajun Elec. Power Coop.*, 150 F.3d at 513.

Here, Article I of the Second Amended Plan provides that professionals are compensated for services pursuant to §§ 328 and 330 of the Bankruptcy Code—which require fees to be examined by the Court.[313] Article II.C.1 of the Second Amended Plan provides that all requests for payment of Professional Fee Claims for services rendered and expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date, and that the Bankruptcy Court will determine allowed amounts.[314] Lastly, Article II.C.2 of the Second Amended Plan provides for an escrow of funds for professional fees, and that such fees will be paid from the escrow account following this Court's approval.[315] Thus, under these provisions, the Court concludes that 11 U.S.C. § 1129(a)(4) is satisfied.

---

[313] *See* ECF No. 389 at 10 ¶ 122.
[314] *See* ECF No. 389 at 20.
[315] See ECF No. 389 at 20.

**(E) Section 1129(a)(5): The Second Amended Plan Makes the Proper Governance Disclosures.**

Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that a plan proponent disclose the identity and affiliations of any individual proposed to serve, post-confirmation, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or successor of the debtor under the plan. 11 U.S.C. § 1129(a)(5)(A)(i). Here, Article IV.K of the Second Amended Plan discloses that after the effective date the terms of the current members of the board of directors or other Governing Body[316] of each Debtor will expire, and such current directors shall be deemed to have resigned.[317] A New Board[318] will then be established at each of the Reorganized Debtors for an initial term. The Second Amended Plan further details that the New Board will be identified in a Plan Supplement, to the extent known and determined at the time of filing.[319] This New Board will serve from and after the Effective Date and will be appointed according to the Governance Term Sheet and the applicable New Organizational Documents of such Reorganized Debtor.[320]

Courts find that a debtor's inability to specifically identify future board members does not mean the debtor has not met the requirements of § 1129(a)(5)(A)(i). *See In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however. If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i)."). Thus, the Court concludes that the

[316] *See* ECF No. 389 Article I.80. ("'*Governing Body*' means . . . a board of directors, board of managers, manager, managing member, general partner, special committee, or any other similar governing body of any of the Debtors.").

[317] *See* ECF No. 389 at 45.

[318] *See* ECF No. 389 Article I.109. ("'*New Board*' means the board of directors or similar governing body of Reorganized QVC that shall be appointed in accordance with the terms of the Governance Term Sheet.").

[319] *See* ECF No. 389 at 45.

[320] *See* ECF No. 389 at 45.

Case 25-90468 Document 701 Filed in TXSB on 07/15/25 Page 88 of 103

Second Amended Plan satisfies the requirements of 11 U.S.C. § 1129(a)(5).

### (F) Section 1129(a)(6): § 1129(a)(6) is Inapplicable.

Section 1129(a)(6) of the Bankruptcy Code requires that any governmental regulatory commission with jurisdiction, post-confirmation, over the rates of the debtor has approved any rate change provided in the plan. 11 U.S.C. § 1129(a)(6). The Second Amended Plan does not provide for any rate changes, therefore, § 1129(a)(6) is inapplicable.

### (G) Section 1129(a)(7): The Second Amended Plan Satisfies the "Best Interests" Test.

A plan satisfies 11 U.S.C. § 1129(a)(7) when all holders of claims or interests in impaired classes either vote to accept the plan or receive the same amount or more under the plan than they would in a chapter 7 liquidation.[321] This statutory provision, otherwise known as the "best interests" test ensures that reorganization is in the best interest of impaired claimholders who have voted against the plan. *See In re Cypresswood Land Partners, I*, 409 B.R. at 428. The "best interests" test applies to individual claim or interest holders impaired under a plan, even if the class as a whole has voted to accept the plan. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

Here, the Debtors prepared a Liquidation Analysis to reflect estimated recoveries under a hypothetical chapter 7 liquidation.[322] The Liquidation Analysis assumes the Court denies confirmation and that the Debtors seek and are granted court approval of the Intercompany

---

[321] Section 1129(a)(7)(A) of the Bankruptcy Code provides: "With respect to each impaired class of claims or interests—(A) each holder of a claim or interest of such class—(B) **(i)** has accepted the plan; or **(ii)** will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [Title 11] . . . [.]"

[322] *See Disclosure Statement* Ex. D.

Settlement.[323] In each Debtors' liquidation analyses, the projected recoveries under the Plan are either equal to or in excess of the recoveries estimated in a chapter 7 liquidation.[324] Therefore, the Second Amended Plan meets the requirements of 11 U.S.C. § 1129(a)(7).

The objecting parties argue that the plan does not meet the "best interests test" as to the QVCG Debtor.[325] They contend that under the Plan they receive nothing, but under a chapter 7 liquidation they would likely receive a recovery.[326] The Preferred Shareholders assert that the intercompany claims lack merit and that a chapter 7 trustee would litigate the claims and either reduce the claims or eliminate them completely.[327] At which point, they allege, Preferred Shareholders would potentially realize a significant recovery.[328] Further, they assert that even if the settlement was adopted by a chapter 7 trustee there would be a residual value to pay preferred shareholders.[329]

First, in a hypothetical liquidation, the trustee may choose to adopt the Intercompany Settlement. In such a case, the Debtors'

---

[323] *See Disclosure Statement*, Exhibit D. The Debtors Liquidation Analysis reasonably assumes approval of the Intercompany Settlement. This assumption recognizes the variety of issues resolved by the Intercompany Settlement which would remain pending and require resolution in a chapter 7 liquidation. *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *118–*119 (Bankr. S.D.N.Y. 2004) (recognizing the need for an "apples to apples" comparison so that creditors have a clear understanding of the differences between recoveries under the plan compared to a potential chapter 7). A hypothetical chapter 7 liquidation analysis is "inherently speculative" and "is often replete with assumptions and judgments." *ACC Bondholder Group v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.),* 361 B.R. 337, 367 (S.D.N.Y. 2007). As discussed *supra*, the Disinterested Directors' investigation resulted in their conclusion that there were many possible intercompany claims that were best resolved by the Intercompany Settlement. Thus, the Debtors' evidence-based assumptions appropriately reflect the magnitude of intercompany claims and their clear effect on any chapter 7 liquidation—by requiring that a chapter 7 trustee either settle the claims or pursue litigation. *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 275 (Bankr. D. Del. 2016).

[324] *See Disclosure Statement*, Exhibit D; ECF No. 389 at 23–36.

[325] ECF No. 316 at 38–39.

[326] ECF No. 316 at 38–39.

[327] ECF No. 316 ¶ 72.

[328] ECF No. 316 ¶ 72.

[329] ECF No. 316 ¶ 73.

Liquidation Analysis demonstrates that the Preferred Equity holders would receive the same under the Second Amended Plan as they would under a chapter 7 liquidation, which is no recovery. For value to flow to the Preferred Shareholders, QVCG's cash and equity interests in CBI would have to amount to more than QVC's $400 million claim. Evercore's enterprise valuation of CBI (which was the only evidence presented) showed a maximum value of $135 million under a comparable companies analysis assuming a 4.5 EBITDA multiple (which would equate to $82.3 million for QVCG's 62% equity interest).[330] [Finding of Fact 78]. The CBI equity interest value combined with the QVCG cash would fall short of QVC's $400 million claim. Thus, in a liquidation, if a trustee were to adopt the Intercompany Settlement, equity would still receive no recovery, and QVCG's General Unsecured Creditors would only receive an approximate 43.9% recovery as opposed to the 100% recovery they are receiving under the Second Amended Plan.[331]

Second, as discussed *supra*, the Intercompany Claims are highly uncertain, complex, and would likely result in prolonged and costly litigation. If a chapter 7 trustee were to choose to litigate the Intercompany Claims, the evidence supports that litigation would likely be value destructive and all QVCG stakeholders would be worse off. [Finding of Fact 68]. The chapter 7 trustee would need to win on all claims for there to be a recovery to Preferred Equity. However, if the trustee were to lose on even a fraction of potential claims, it is possible that the QVCG cash would be wiped out—both by the claim itself and the cost to litigate—and stakeholder recovery would be diminished. The result would be that equity would still receive no recovery under this scenario, which is what they receive under the Second Amended Plan.

[330] The Court does consider this valuation for the truth of its matter, nor was Evercore's expert report admitted into evidence. Mr. Griffin did, however, testify as to his formulation of the valuation of CBI.

[331] *See Disclosure Statement*, Ex. D.

Because the Second Amended Plan is in the best interest of creditors, the Court concludes it satisfies 11 U.S.C. § 1129(a)(7).

**(H) Section 1129(a)(8): The Plan is Confirmable Notwithstanding Its Failure to Satisfy § 1129(a)(8).**

Section 1129(a)(8) of the Bankruptcy Code is satisfied when each class of claims or interests either accepts a proposed plan or is not impaired under the proposed plan. 11 U.S.C. § 1129(a)(8). Here, Classes A6, A7, A8, B8, C7, and D6 are impaired and deemed to reject the plan.[332] Additionally, Classes A5, B6, B7, C5, C6, D4, and D5 are unimpaired or impaired and presumed to accept or deemed to reject the plan.[333] Therefore, the Second Amended Plan does not satisfy the requirements of 11 U.S.C. § 1129(a)(8). However, as discussed *infra*, this provision does not prevent the Court from confirming the Debtors' Second Amended Plan because it satisfies the "cram down" requirements of § 1129(b).

**(I) Section 1129(a)(9): The Second Amended Plan Provides for Payment of all Allowed Priority Claims.**

Section 1129(a)(9)(A) of the Bankruptcy Code requires that, unless otherwise agreed to, a plan provide holders of claims of a kind specified in § 507(a)(2)—administrative claims under § 503(b)—payment in full by the effective date of the plan. Here, Article II.A of the Second Amended Plan provides that "each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim" on the Effective Date, as soon as reasonably practicable thereafter, or at some other time as defined in Article II.A.[334] Thus, the Second Amended Plan complies with § 1129(a)(9)(A).

---

[332] *See* ECF No. 389 at 23–25.
[333] *See* ECF No. 389 at 23–25.
[334] ECF No. 389 at 19.

Section 1129(a)(9)(B) requires that claimholders of the kind specified in §§ 507(a)(1) or 507(a)(4) through (7) of the Bankruptcy Code must receive

> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim[.]

11 U.S.C. § 1129(a)(9)(B). Here, no holders of the types of claims specified in § 1129(a)(9)(B) are impaired. Thus, the Second Amended Plan complies with § 1129(a)(9)(B).

Additionally, § 1129(a)(9)(C) of the Bankruptcy Code specifies the payment of claims under § 507(a)(8)—priority tax claims. Here, the Second Amended Plan specifies that each holder of an allowed priority tax claim shall be treated in accordance with the terms of § 1129(a)(9)(C).[335] Thus, the Second Amended Plan satisfies § 1129(a)(9)(C).

The Second Amended Plan satisfies each of the requirements set forth in § 1129(a)(9).

**(J) Section 1129(a)(10): At Least One Class of Impaired Creditors Accepted the Second Amended Plan as to the QVC and LINTA Debtors, and § 1129(a)(10) Does Not Apply to QVCG or the CBI Debtors Because They Do Not Have Any Impaired Classes.**

Section 1129(a)(10) requires that, where there is an impaired class of claims, at least one impaired class of claims accept the plan. 11 U.S.C. § 1129(a)(10).

Here, as to the QVC Debtor, Classes B3 and B4 are impaired under the Second Amended Plan and have voted to accept, independent

[335] ECF No. 389 at 20.

of any insider votes.[336] As to the LINTA Debtor, Class C3 is an impaired class and has voted to accept the plan.[337] Therefore, § 1129(a)(10) is satisfied as to the QVC and LINTA Debtors. CBI and QVCG do not have an impaired class of claims, so § 1129(a)(10) does not apply as to those Debtors.[338]

The objecting Preferred Shareholders argue that § 1129(a)(10) is not satisfied as to the QVCG Debtor.[339] They allege that under the Second Amended Plan, no classes of claims or interests against QVCG have voted to accept the Plan.[340] They assert that the only classes of claims that are designated as impaired—Classes A6 (QVCG Preferred Equity Interests), A7 (QVCG Common Equity Interests), and A8 (§ 510(b) claims against QVCG) are all deemed to reject the plan.[341]

However, the Bankruptcy Code is clear that § 1129(a)(10) applies to classes of "claims" that are impaired under the plan. See 11 U.S.C. § 1129(a)(10). "Claims"[342] are distinct from an interest in an equity security. *Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 855 F.3d 459, 469 (2d Cir. 2017) ("[A]n interest in an equity security is distinct from a claim to a right to payment or an equitable remedy"). Here, as defined by the Bankruptcy Code, the QVCG Debtor only has unimpaired classes of "claims" under the Second Amended Plan. Because § 1129(a)(10) applies when there is an impaired class of claims, this statutory provision does not apply to QVCG who does not have an impaired class of claims.

---

[336] *See* ECF No. 364, Exhibit A.
[337] *See* ECF No. 364, Exhibit A.
[338] *See* ECF No. 389 at 23–24, 25.
[339] *See* ECF No. 316 at 33–37. In their objection to plan confirmation, the objecting Preferred Shareholders argue that the §1129(a)(10) applies on a "per debtor" basis because QVCG is not substantively consolidated with QVC. In closing arguments, the Debtors clarified that they are seeking approval of the Second Amended Plan on a "per debtor" basis. Thus, the Court will consider § 1129(a)(10) on a "per debtor" basis.
[340] *See* ECF No. 316 at 33–34.
[341] *See* ECF No. 316 at 34.
[342] *See* 11 U.S.C. § 101(5) (defining the term "claim").

The objecting Preferred Shareholders further argue that the QVC-QVCG Settlement Claim is not unimpaired, as suggested under the Second Amended Plan.[343] They argue that because the Second Amended Plan contemplates QVC receiving less than their alleged claim, their claim is impaired.[344] They argue that the Debtors artificially eliminated any "impaired class," and that accepting the Debtors position would render §§ 1124 and 1129 meaningless because "any plan proponent could evade the impaired-accepting-class requirement by drafting a settlement entitling a creditor to 'whatever is left over.'"[345]

The Court disagrees with the Preferred Shareholders' argument. Section 1124 defines "impairment" under the Bankruptcy Code by providing, in relevant part:

> *Except as provided in section 1123(a)(4) of this title* [Title 11], a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
>
> **(1)** leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest . . .

11 U.S.C. § 1124(1) (emphasis added). As provided above, under § 1123(a)(4), a plan must provide the same treatment for each claim or interest in a class, *unless* the holder of that claim or interest agrees to a less favorable treatment. *See* 11 U.S.C. § 1123(a)(4). Courts have interpreted this provision to mean that creditors can agree to treatment that is less than their full and equitable rights—by settlement, stipulation, or some form of agreement—and be considered unimpaired under § 1124. *In re Container Store Grp., Inc.*, 676 B.R. 356, 377 (S.D. Tex. 2026) ("Parties who agree to a settlement under this provision are considered unimpaired"); *In re Spirit Airlines, Inc.*, 668 B.R. 689, 701 (Bankr. S.D.N.Y. 2025) ("It is well established that consenting to a less

---

[343] *See* ECF No. 316 at 35–37.
[344] *See* ECF No. 316 at 35–37.
[345] *See* ECF No. 316 ¶ 69.

favorable treatment under Section 1123(a)(4) of the Bankruptcy Code does not make that party 'impaired' under Section 1124(1) of the Code"); *In re K Lunde, LLC*, 513 B.R. 587, 595 n. 5 (Bankr. D. Colo. 2014) ("An agreement or consent to a particular treatment removes the claim from the presumption of impairment").

Here, the QVC-QVCG Settlement Claim is based on the Intercompany Settlement discussed *supra* and memorialized in the RSA. In it, QVC has consented to a less favorable treatment—accepting a $400 million claim and receiving in full satisfaction of that claim the QVCG distributable cash and 62% equity interest in CBI. Because QVC has agreed to settle its claim, it is considered unimpaired under the Second Amended Plan.

Further, the objecting Preferred Shareholders' argument that plan proponents could create settlements to get around the provisions of § 1129(a)(10) is unpersuasive.[346] First, settlements require two consenting parties, so a settling party would need to agree to recover less than what they are legally entitled to. Further, § 1129(a)(10) would still apply if the Debtor had an impaired class of claims.

The Court concludes that QVCG does not have an impaired class of claims, so § 1129(a)(10) does not apply to that Debtor. Therefore, the Court further concludes that all Debtors have met the requirements of § 1129(a)(10).

**(K) Section 1129(a)(11): Confirmation of the Second Amended Plan is Not Likely to be Followed by the Liquidation, or the Need for Further Financial Reorganization, of the Debtor.**

A plan must be feasible. Section 1129(a)(11) of the Bankruptcy Code requires that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor

[346] *See* ECF No. 316 ¶ 69.

> under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). Under this provision, bankruptcy courts "need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required." *In re Briscoe Enters.*, 994 F.2d at 1165–66. The court must find there is "a reasonable probability of success." *In re Cypresswood Land Partners, I*, 409 B.R. at 433.

Courts consider a list of factors for feasibility of a reorganization plan. This list typically includes:

> (1) the adequacy of the debtor's capital structure;
>
> (2) the earning power of the debtor's business;
>
> (3) economic conditions;
>
> (4) the ability of the debtor's management;
>
> (5) the probability of the continuation of the same management; [ ]
>
> (6) and [sic] any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Save Our Springs Alliance, Inc. v. WSI (II)-COS, L.L.C.*, 632 F.3d 168, 173 n.6 (5th Cir. 2011). The Court is not required, however, to consider all six factors. *Id.* at 173.

The Court concludes that the Second Amended Plan is feasible. The Debtors have prepared financial projections forecasting the Reorganized Debtors financial performance for the annual periods ending December 31, 2026 through to December 31, 2029.[347] These projections support Debtors' assertion that the Reorganized Debtor will be able to meet their obligations under the Plan as they come due.[348] Furthermore, the Second Amended Plan contemplates reducing billions

---

[347] *See Disclosure Statement*, Exhibit C.
[348] JX-079, ECF No. 405-011.

in funded debt and strengthening the business as a going-concern.[349] Thus, the Court concludes that § 1129(a)(11) is satisfied.

**(L) Section 1129(a)(12): All Fees Payable Under 28 U.S.C. § 1930 Have Been Paid Or Will be Paid on the Effective Date.**

Section 1129(a)(12) of the Bankruptcy Code requires that "[a]ll fees payable under [28 U.S.C. § 1930], as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." Article XII.C of the Second Amended Plan provides that all fees due and payable pursuant to 28 U.S.C. § 1930(a) that have not been paid, will be paid on the Effective Date or when due.[350] Therefore, 11 U.S.C. § 1129(a)(12) is satisfied.

**(M) Section 1129(a)(13): The Second Amended Plan Provides for Continuation of Retiree Benefits Post-Effective Date.**

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continued payment of all retiree benefits post-effective date at the level established by 11 U.S.C. 1114(e)(1)(B) or (g). Article IV.O.1 of the Plan provides that "pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law."[351] Therefore, the Court finds that the Second Amended Plan satisfies 11 U.S.C. 1129(a)(13).

**(N) Sections 1129(a)(14) Through (16) Are Inapplicable.**

Section 1129(a)(14) does not apply because the Debtors are not subject to any domestic support obligations. *See* 11 U.S.C. § 1129(a)(14).

---

[349] *See Disclosure Statement* at 3.
[350] *See* ECF No. 389 at 72.
[351] *See* ECF No. 389 at 47.

Section 1129(a)(15) does not apply because none of the Debtors are individuals. *See* 11 U.S.C. § 1129(a)(15).

Section 1129(a)(16) does not apply because the Debtors are moneyed, business, or commercial corporations. *See* 11 U.S.C. § 1129(a)(16).

### (O) The Second Amended Plan Complies With § 1129(b) of the Bankruptcy Code.

Section 1129(b)(1) provides, in relevant part:

> [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) [11 U.S.C. 1129(a)(8)] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). This provision allows a debtor to "cram down" its plan over the objection of a creditor. *In re D & F Constr., Inc.*, 865 F. 2d 673, 675 (5th Cir. 1989).

#### *(1) The Plan is "Fair and Equitable."*

With respect to a class of impaired unsecured claims, § 1129(b)(2)(B)(i) provides that a plan is "fair and equitable" if each claimholder is paid in full. 11 U.S.C. § 1129(b)(2)(B)(i). Alternatively, § 1129(b)(2)(B)(ii) provides that a plan can be determined to be "fair and equitable" if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). The latter condition is known as the "absolute priority rule." *Bank of Am. Nat'l Trust & Sav. Ass'n*, 526 U.S. at 442. Under the absolute priority rule, dissenting classes of creditors must be fully satisfied before any junior creditor receives any recovery for its

claim. *Cantu v. Schmidt (In re Cantu)*, 784 F.3d 253, 256 n. 2 (5th Cir. 2015).

Under the Debtors' Second Amended Plan, no class junior to the impaired and deemed rejecting classes—classes A6, A7, A8, B8, C7, and D6— is receiving anything under the Plan. As for the classes which are for certain Intercompany Claims and Interests—A5, B6, B7, C5, C6, D4, and D5—which may be reinstated, and thus have unimpaired status, the Debtors contend that the treatment of these would be for the "purposes of preserving the Debtors' corporate structure and will have no economic substance."[352] Under these circumstances, the Plan satisfies § 1129(b)'s absolute priority rule.

"The corollary of the absolute priority rule is that senior classes cannot receive more than one hundred percent (100%) recovery for their claims." *In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009). A senior class of creditors cannot receive more than the full amount of their claim, and any excess must flow to junior classes. *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007).

Objecting parties argue that the Plan violates the corollary to the absolute priority rule because QVC is receiving more than 100% of its $400 million claim.[353] The evidence does not support this argument. As discussed *supra*, the evidence supports the proposition that QVC is not receiving more than a 100% recovery. [Finding of Fact 88]. The sum of 62% of the high end of Evercore's valuation of Cornerstone and the QVCG Distributable Cash is less than QVC's $ 400 million GUC claim. The Second Amended Plan satisfies the corollary to the absolute priority rule because no senior class is receiving more than 100% recovery for their claims. Therefore, the Court concludes that the Second Amended Plan is "fair and equitable" under 11 U.S.C. § 1129(b)(1).

---

[352] *See* ECF No. 359 ¶ 240.
[353] ECF No. 316 at 39–40.

### *(2) The Plan Does Not Discriminate Unfairly in Violation of § 1129(b)(1).*

Under § 1129(b)(1) of the Bankruptcy Code, a plan must not unfairly discriminate against an impaired non-accepting class. 11 U.S.C. § 1129(b)(1). The Bankruptcy Code does not define what it means to "discriminate unfairly," but "[c]ourts generally assess unfair discrimination based on the facts and circumstances presented in the case."[354] *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 319 (Bankr. S.D. Tex. 2024). "The Code does not prohibit unequal treatment of claims that are properly classified in different classes so long as the discrimination is not unfair." *In re Cypresswood Land Partners, I*, 409 B.R. at 434. Thus, Debtors must state a basis for discriminating between two classes and show by a preponderance of the evidence that such discrimination is not unfair to impaired rejecting classes. *In re Robertshaw US Holding Corp.*, 662 B.R. at 320.

Here, the Second Amended Plan does not unfairly discriminate between similar classes of claims and interests. The Second Amended Plan classifies claims in a permissible manner based on legally acceptable rationale. QVCG equity interests—Classes A6 and A7—sit at the bottom of the priority scheme, and no junior classes will receive a recovery.[355] Similarly, § 510(b) claims, which are "subordinated to all claims or interests that are senior to or equal [to] the claim or interest represented by such security," are receiving similar treatment. *See* 11 U.S.C. § 510(b).

Further, with respect to the potentially impaired classes of Intercompany Claims and Interests—Classes A5, B6, B7, C5, C6, D4,

[354] In *In re Robertshaw*, this Court explained: "Some courts have utilized multi-factor tests or rebuttable presumption tests as an analytical framework to assess unfair discrimination. They are helpful considerations, but could be construed to either create additional burdens on the debtor to satisfy this prong or appear to repeat standards already required in other parts of § 1129 required for confirmation. The text requires a plan not to unfairly discriminate against an impaired non-accepting class." *In re Robertshaw US Holding Corp.*, 662 B.R. at 319–20.

[355] *See* ECF No. 389 at 24.

and D5—the Second Amended Plan can be confirmed despite their potential impairment/rejection because it does not discriminate unfairly with respect to those classes. These classes of Intercompany Claims and Interests are distinct from other classes based on their business purpose—which, as the Debtors contend, is to support the Debtors' corporate structure, and if reinstated, would "advance an efficient reorganization by avoiding the need to unwind and recreate the corporate economic substance of the Plan for the Debtors' stakeholders."[356]

Therefore, the Court finds that the Second Amended Plan properly classifies claims and interests according to priority and character, and it does not unfairly discriminate impaired rejecting classes.

**(P) Section 1129(c): The Second Amended Plan Satisfies § 1129(c) of the Bankruptcy Code.**

Section 1129(c) of the Bankruptcy Code prohibits confirmation of multiple plans. The Second Amended Plan satisfies this provision because there is only one proposed plan.

The Debtors have met all requirements of 11 U.S.C. § 1129, therefore, the Second Amended Plan is confirmed.

## IV. THE SECOND AMENDED PLAN'S THIRD-PARTY RELEASES ARE CONSENSUAL.

The U.S. Trustee objects to the Second Amended Plan's opt out third-party releases and contends that they are nonconsensual and, therefore, prohibited under the United States Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*[357] 603 U.S. 204 (2024). However, well-established precedent in this district, as well as the district court's decision in *Container Store*, acknowledge that under the appropriate circumstances the failure to opt-out *can* constitute consent to a third-

[356] *See* ECF No. 359 ¶ 240.
[357] *See* ECF No. 291 at 9–11.

Case 25-90480 Document 710 Filed in TXSB on 06/17/25 Page 102 of 103

party release. *See* 676 B.R. at 388 (finding that "[f]or these reasons, consistent with its longstanding precedent, the court holds that the failure to opt-out constitutes consent to a third-party release under the appropriate circumstances"). In *Container Store*, the district court found that the third party releases in the reorganization plan were consensual—with the exception of two classes who received no recovery under the plan and were deemed to reject. *See In re Container Store Grp., Inc.*, 676 B.R. at 390–91. Here, the Plan excludes from the definition of "Releasing Parties" all classes of claims or interests deemed to reject the Plan—unless they affirmatively elect to do so by opting-in to the releases.[358] Only classes that will receive a recovery under the Plan are required to opt-out to avoid consenting to the third-party release.

The Court finds that the third-party releases satisfy the applicable law. Interested parties were provided sufficient notice, an opportunity to opt-out, and the disclosure statement contained a detailed description of the opt-out and third-party releases. *See In re Container Store Grp., Inc.*, 676 B.R. at 384 (listing factors courts consider "in determining whether the procedures around the opt-outs were sufficient to find consent"). Therefore, the Court finds that the Plan complies with *Container Store*, and the U.S. Trustee's objection is overruled.

## V. PREFERRED SHAREHOLDERS' MOTION TO TERMINATE EXCLUSIVITY

The objecting Preferred Shareholders filed an Emergency Motion to Terminate Exclusivity Under 11 U.S.C. § 1121(d).[359] For the reasons discussed *supra*, the Court confirms the Debtors' Second Amended Plan. As such, the Court concludes that the Motion to Terminate Exclusivity is moot at this time. In the event the Second Amended Plan does not go effective, the Court reserves judgment on this matter.

[358] *See* ECF No. 389 at 14 ¶ 174.
[359] ECF No. 205.

## CONCLUSION

Based on the foregoing reasons, the Court hereby **OVERRULES** all objections; **APPROVES** the Disclosure Statement; **CONFIRMS** the Second Amended Plan; and **RESERVES JUDGMENT** on the Motion to Terminate Exclusivity.

The Debtors are requested to submit a confirmation order consistent with this Memorandum Decision's Findings of Fact and Conclusions of Law within (7) days.[360]

SIGNED 07/15/2026



Alfredo R Pérez
United States Bankruptcy Judge

[360] Such confirmation order shall be supplemental to these Findings of Fact and Conclusions of Law, and shall address matters not addressed in these Findings of Fact and Conclusions of Law, or agreements with other parties that would address issues with such parties that are not addressed herein.