**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Civil Action No. 26cv05680 |
| QVC GROUP, INC., *et al.*,[1] | Bankruptcy Case No. 26-90447 (ARP) |
| Debtors. | (Jointly Administered) |
| Adam Gui, *et al.*, | |
| Appellants. | |

**PREFERRED SHAREHOLDERS' EMERGENCY MOTION FOR STAY PENDING APPEAL OF CONFIRMATION ORDER, OR, IN THE ALTERNATIVE, FOR LIMITED STAY AND INTERIM STAY PENDING HEARING**

[1] A complete list of each of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 2

RELEVANT BACKGROUND ..... 6

I. The Corporate Structure And The QVCG Preferred Equity ..... 6

II. The Intercompany Settlement ..... 7

III. The Prepackaged Plan Process Excluded The Preferred Shareholders ..... 8

IV. The Confirmation Trial Record ..... 9

A. The Plan Violates Section 1129(a)(10) of the Bankruptcy Code ..... 9

B. The Intercompany Settlement is Neither Fair nor Equitable ..... 9

V. The Confirmation Decision And Need For Emergency Relief ..... 13

RELIEF REQUESTED ..... 14

ARGUMENT ..... 15

I. Legal Standard ..... 15

II. The Preferred Shareholders Have A Substantial Case To Present On Appeal ..... 15

A. The Plan Raises Serious Issues Under Section 1129(a)(10) of the Bankruptcy Code ..... 16

B. The Appropriate Standard of Review Governing the Bankruptcy Rule 9019 Settlement Presents a Substantial Question ..... 20

C. Approval of the Intercompany Settlement Presents a Substantial Question ..... 21

III. The Preferred Shareholders Will Suffer Irreparable Harm Absent A Stay ..... 26

IV. A Stay Will Not Substantially Harm Other Parties And Can Be Tailored ..... 28

V. The Public Interest Favors A Stay ..... 29

VI. The Court Should Enter An Interim Stay Of The Confirmation Order During The Pendency Of This Motion ..... 30

EMERGENCY CONSIDERATION ..... 32

CONCLUSION ..... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Arnold v. Garlock, Inc.*,
278 F.3d 426 (5th Cir. 2001) ........ 19

*Asarco LLC v. Americas Mining Corp.*,
419 B.R. 737 (S.D. Tex. 2009) ........ 20

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ........ 35

*Detroit Free Press, Inc. v. Ashcroft,*
No. 02-1437, 2002 WL 1332827 (6th Cir. Apr. 10, 2002) ........ 35

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007) ........ 32, 35

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ........ 21, 24

*In re AWECO, Inc.*,
725 F.2d 293 (5th Cir. 1984) ........ 26

*In re Beach,*
731 F. App'x 322 (5th Cir. 2018) ........ 26

*In re Bidermann Indus. U.S.A. Inc.*,
203 B.R. 547 (Bankr. S.D.N.Y. 1997) ........ 25

*In re Blast Energy Servs., Inc.*,
593 F.3d 418 (5th Cir. 2010) ........ 32

*In re Container Store Grp., Inc.*,
676 B.R. 356 (S.D. Tex. 2026) ........ 22

*In re Coram Healthcare Corp.*,
271 B.R. 228 (Bankr. D. Del. 2001) ........ 30

*In re Emerald Oil Co.*,
807 F.2d 1234 (5th Cir. 1987) ........ 9, 10, 28

*In re First S. Sav. Ass'n*,
820 F.2d 700 (5th Cir. 1987) ........ 19

*In re Jackson Brewing Co.*,
624 F.2d 599 (5th Cir. 1980) ........ 27

*In re K Lunde, LLC*,
513 B.R. 587 (Bankr. D. Colo. 2014) ........ 22

*In re LATAM Airlines Grp. S.A.*,
620 B.R. 722 (Bankr. S.D.N.Y. 2020) ........ 25

*In re Manges*,
29 F.3d 1034 (5th Cir. 1994) ........ 32

*In re Moore*,
608 F.3d 253 (5th Cir. 2010) ........ 26

*In re NII Holdings, Inc.*,
536 B.R. 61 (Bankr. S.D.N.Y. 2015) ........ 31

*In re Ondova Ltd. Co.*,
620 F. App'x 290 (5th Cir. 2015) ........ 35

*In re Pac. Lumber Co.*,
584 F.3d 229 (5th Cir. 2009) ........ 32, 35

*In re RNI Wind Down Corp.*,
348 B.R. 286 (Bankr. D. Del. 2006) ........ 30

*In re Spirit Airlines*, *Inc.*,
668 B.R. 689 (Bankr. S.D.N.Y. 2025) ........ 22

*In re Tex. Equip. Co.*,
283 B.R. 222 (Bankr. N.D. Tex. 2002) ........ 19, 25

*In re Ultra Petroleum Corp.*,
943 F.3d 758 (5th Cir. 2019) ........ 21, 24

*In re Village at Camp Bowie I, L.P.*,
710 F.3d 239 (5th Cir. 2013) ........ 21

*In re Voluntary Purchasing Grps.*, Inc.,
196 F.3d 1258 (5th Cir. 1999) ........ 32

*In re Voyager Digital Holdings, Inc.*,
2023 WL 2731737 (S.D.N.Y. Apr. 1, 2023) ........ 32

*Matter of Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ........ 9, 10, 25, 31

*Millennium Dental Techs., Inc. v. Fotona d.d.,*
407 F. App'x 482 (Fed. Cir. 2011) ........ 35

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ........ 31

*Nat'l Treasury Employees Union v. Von Raab,*
808 F.2d 1057 (5th Cir. 1987) ........ 20

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 33

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) ........ 27

*Reading & Bates Petroleum Co. v. Musslewhite,*
14 F.3d 271 (5th Cir. 1994) ........ 19

*Rio Grande Cmty. Health Ctr., Inc. v. Armendariz,*
792 F.3d 229 (1st Cir. 2015) .......... 35

*Ruiz v. Estelle*,
650 F.2d 555 (5th Cir. 1981) .......... 19

*Starke v. SquareTrade, Inc.*,
2017 WL 11504834 (E.D.N.Y. Dec. 15, 2017) .......... 20

*Trump v. Int'l Refugee Assistance Project*,
582 U.S. 571 (2017) .......... 33

*Valentine v. Collier*,
956 F.3d 797 (5th Cir. 2020) .......... 19

**Statutes**

11 U.S.C. § 101(31)(E) .......... 23

11 U.S.C. § 1124 .......... 21, 22, 23, 35

11 U.S.C. § 1129(a)(9)(D) .......... 22

11 U.S.C. § 1129(a)(10) .......... passim

28 U.S.C. § 157(b) .......... 10

28 U.S.C. § 158(d)(2) .......... 11, 18

28 U.S.C. §§ 157 and 1334 .......... 10

28 U.S.C. §§ 1408 and 1409 .......... 10

**Rules**

Fed. R. Bankr. P. 8007 .......... passim

Fed. R. Bankr. P. 9019 .......... passim

**TO THE HONORABLE GEORGE C. HANKS JR., UNITED STATES DISTRICT JUDGE:**

Appellants Adam Gui and certain other Preferred Shareholders (the "Preferred Shareholders")[2] of QVC Group, Inc. ("QVCG" and, together with its subsidiaries and affiliates in the above-captioned Chapter 11 Cases, the "Debtors"), by and through their undersigned counsel, Glenn Agre Bergman & Fuentes LLP and Kane Russell Coleman Logan PC, respectfully submit this emergency motion (this "Motion") under Rule 8007 of the Federal Rules of Bankruptcy Procedure for entry of a stay, pending appeal, of the United States Bankruptcy Court for the Southern District of Texas's (the "Bankruptcy Court") *Memorandum Decision (I) Approving Disclosure Statement, (II) Confirming Second Amended Plan, and (III) Granting Related Relief* [Dkt. No. 710] (the "Confirmation Decision") and order [Dkt. No. 722] (the "Confirmation Order") confirming the Debtors' *Second Amended Joint Prepackaged Plan of Reorganization* [Dkt. No. 389] (the "Plan"), which the Bankruptcy Court entered on July 20, 2026.

The Bankruptcy Court entered the Confirmation Order more than twenty-four hours before the scheduled hearing on the Preferred Shareholders' emergency stay motion [Dkt. No. 716] (the "Stay Motion") pending in the Bankruptcy Court.[3] It did so without ruling on the Stay Motion, without granting an administrative stay to preserve the status quo pending the hearing it had itself set, and without stating any reasons for declining to do so. Under these circumstances, awaiting a ruling from the Bankruptcy Court is no longer practicable, and the Preferred Shareholders accordingly seek relief directly from this Court pursuant to Bankruptcy Rule 8007(b)(2)(A) and (B).

---

[2] The Preferred Shareholders are certain institutional and individual holders of the 8.000% Series A Cumulative Redeemable Preferred Stock (the "Preferred Stock") issued by QVCG.

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

## PRELIMINARY STATEMENT

The Confirmation Order should be stayed because the Preferred Shareholders have a pending appeal involving substantial, unresolved legal questions concerning who is entitled to vote on a plan of reorganization, the standard of review for insider settlements, and what constitutes a fair and equitable settlement under Bankruptcy Rule 9019. Without a stay, the Debtors will consummate the Plan, transfer every dollar and every asset out of QVCG, cancel $1.4 billion in Preferred Stock, and then argue that the appeal is equitably moot. That sequence is not speculative. It is the Debtors' stated objective, and it could render appellate review meaningless.

The Confirmation Order approves an improper intercompany settlement (the "Intercompany Settlement") between QVCG and its subsidiary, QVC, Inc. ("QVC"). The Preferred Shareholders—holders of QVCG's 8% Series A cumulative redeemable preferred stock—challenged a prepackaged Plan built on the Intercompany Settlement that transfers all of QVCG's value to its subsidiary, QVC. The Preferred Shareholders established that this settlement was the product of a preordained, non-arm's-length process among insiders warranting entire-fairness scrutiny, not business-judgment deference. The intercompany claims being "settled" consisted of unfiled fraudulent-transfer claims based on dividends paid over three years ago and hypothetical tax-indemnification claims that have not been assessed by the IRS and have already been substantially insured. In exchange for releasing these dubious claims, QVCG surrendered approximately $195 million in cash and its 62% equity stake in Cornerstone.

Tellingly, the purported intercompany claims were never disclosed in any SEC filings. Instead, they were first concocted by the Debtors, their advisors, and subsidiary company creditors and then negotiated in a settlement that was disclosed for the first time only when the Debtors filed Chapter 11. No parties were allowed to vote on this settlement, and the only parties adversely

affected, QVCG's preferred shareholders, were excluded from the negotiation of the settlement and strenuously oppose it. The Bankruptcy Court overruled all objections and confirmed the Plan.

The Plan and the Intercompany Settlement raise substantial legal issues that warrant serious appellate consideration.

First, the Plan violates Section 1129(a)(10) of the Bankruptcy Code, which requires at least one impaired class of claims to vote to accept a plan where, as here, any class of claims is impaired. No such vote occurred here because the Debtors misclassified the Intercompany Settlement claim as unimpaired. The undisputed evidence proves that the claim is in fact impaired: QVC is receiving materially less than the face amount of its $400 million settlement—at most approximately $278.7 million—and is receiving equity in partial satisfaction. The Confirmation Decision reaffirms this conclusion. *See* Confirmation Decision at 90 (finding that the combined value of the Distributable Cash and equity interests in Cornerstone is substantially less than $400 million). Under Fifth Circuit precedent, that qualifies as impairment as a matter of law. Yet the Bankruptcy Court adopted a novel interpretation allowing any debtor, at its sole option, to deem any settlement class "unimpaired"—thereby eliminating the requirement that an impaired non-insider class accept the Plan. The Fifth Circuit has never considered, let alone endorsed, this proposition. Indeed, creditors at QVC and other affiliated debtors who also compromised their claims in settlements under the Plan were classified as impaired and permitted to vote. Only the QVC-QVCG Settlement Claim was gerrymandered into an "unimpaired" classification—precisely because counting QVC's vote would not satisfy Section 1129(a)(10) of the Bankruptcy Code, since QVC is an insider whose acceptance cannot count. This ruling warrants appellate review.

Second, the settlement itself should not have been approved under Bankruptcy Rule 9019. Under the "settlement," all of the value of the QVCG estate was transferred to QVC based solely

on the vote of a special committee that never assessed the probability of success of the underlying claims, never obtained an estimate of litigation costs, and never insisted on any recovery for Preferred Shareholders. The Preferred Shareholders—the only parties adversely affected—were excluded from the process and their objections were disregarded. Normally, such wholesale value transfers occur only through substantive consolidation, veil-piercing, or actual litigation. Here, insiders manufactured an intercompany "claim" and then "settled" it on terms that gave QVCG nothing—an extraordinary outcome that was not the product of arm's-length negotiation.

Bankruptcy Rule 9019 requires a settlement to be fair and equitable. That determination requires the court to assess whether there was arm's-length negotiation that accounted for the probability of success on the merits, the cost of litigation, and the views of affected stakeholders. The settlement here satisfies none of these criteria. QVCG's own director, Roger Meltzer, admitted that, before agreeing to the $400 million settlement claim, he never assessed the probability of success of the intercompany litigation he agreed to settle. Driven solely by a desire to placate QVC's creditors, the settlement recognized no possibility that QVCG might prevail, made no deduction for QVC's litigation costs, and provided no recovery whatsoever for Preferred Shareholders—the only QVCG stakeholders who stood to gain or lose from the underlying litigation. The outcome was preordained. By February 12, 2026—before QVCG's Special Committee even began negotiating with QVC—the Committee had already concluded that the most it could obtain for Preferred Shareholders was a release. The undisputed evidence establishes that the settlement was designed to placate QVC's creditors at the expense of QVCG's equity.

Third, the Bankruptcy Court improperly applied business-judgment deference to this insider transaction. The Fifth Circuit has not addressed whether business judgment or entire fairness applies to an intercompany settlement, which, by definition, involves only insiders.

Where, as here, a settlement involves insiders, courts customarily apply the entire-fairness standard. At a minimum, this implicates an important, unresolved legal question. And the record here establishes that the Debtors failed to meet their burden to show that the settlement was fair and equitable under either standard.

A bankruptcy court's discretion to approve settlements is not limitless. The Fifth Circuit Court of Appeals has repeatedly vacated settlements approved by bankruptcy courts where, as here, they (i) settled weak claims for substantial value, (ii) parties in interest opposed the settlement, and (iii) the settlement was reached between insiders without the participation of the parties in interest. *See In re Emerald Oil Co*., 807 F.2d 1234, 1239 (5th Cir. 1987) (reversing approval of a settlement where "the hazards of litigation d[id] not justify the approved compromise whereby the creditors receive less than one-third of their potential recovery after trial"); *Matter of Foster Mortg. Corp*., 68 F.3d 914, 918 (5th Cir. 1995) (vacating a settlement where the bankruptcy court "gave no consideration to issues we find dispositive: that nearly all creditors in interest opposed this settlement and that the settlement was reached between insiders without the participation of the creditors"). The Preferred Shareholders should have an opportunity to present their substantial case on appeal.

Absent a stay, the Preferred Shareholders will suffer irreparable harm. The Debtors will consummate the Plan and transfer QVCG's distributable cash to QVC, transfer QVCG's interest in Cornerstone to QVC, cancel the Preferred Stock, and grant releases binding against the Preferred Shareholders. Once those transactions close, the Debtors clearly will invoke equitable mootness and ask the Fifth Circuit to decline review.

The loss of appellate rights is itself irreparable harm as a matter of law. While the failure to grant a stay would be catastrophic for the Preferred Shareholders, QVC and other stakeholders

will suffer no meaningful harm from a stay. QVCG's cash and its Cornerstone equity will remain intact, and unsecured creditors will have the same recovery whether the appeal succeeds or fails. The Plan itself contemplates that the Effective Date for one Debtor may occur before the Effective Date for another. A narrowly tailored stay would merely preserve the status quo at QVCG while these substantial legal questions are resolved.

This case warrants meaningful appellate review. It raises important questions that warrant review on a full record, not foreclosure through consummation. The public interest is not served by allowing a debtor to rush past appellate review by implementing transactions that moot the very rights the Preferred Shareholders seek to vindicate.

The Confirmation Order should be stayed.

## RELEVANT BACKGROUND

## I. THE CORPORATE STRUCTURE AND THE QVCG PREFERRED EQUITY

1. QVCG is the ultimate parent holding company in the Debtors' corporate structure. As of April 10, 2026, QVCG had approximately $195 million in cash. Disclosure Statement, Art. IV.D.3. Critically, QVCG has zero funded indebtedness. First Day Decl. ¶ 36. In SEC filings submitted shortly before the Petition Date (and in the years preceding it), QVCG did not disclose the existence of any indebtedness, contingent-but-unliquidated claims, or known litigation claims against it and in favor of any of its affiliates, nor did QVC in its own separate SEC filings. *See* Ex.[4] 1, QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026).

2. QVCG issued approximately $1.272 billion in face amount of the Preferred Stock. Disclosure Statement, Art. IV.D.2(e). The Preferred Stock consisted of 12,723,158 shares issued and outstanding as of December 31, 2025. Ex. A, QVC Group, Inc., Annual Report (Form 10-K)

[4] Unless otherwise noted, all references herein to "Exhibit _" or "Ex. _" are to the exhibits attached hereto.

(Apr. 15, 2026) at II-57. It is publicly traded under the ticker symbol "QVCPQ" and was listed on the NASDAQ until April 24, 2026. *See* Ex. B, QVC Group, Inc., Current Report (Form 8-K) (Apr. 20, 2026). The Preferred Stock is subject to a mandatory redemption on March 15, 2031, and holders were entitled to receive quarterly cash dividends at a fixed rate of 8% of face amount per year (which rate increased by contract to 9.5% due to dividend arrearages). Disclosure Statement, Art. IV.D.2(e). In June 2025, QVCG suspended paying cash dividends. *Id.* On the day before the bankruptcy filing, the Preferred Stock trading closed at approximately $2.55 per share.

3. QVCG also holds a 62% equity interest in QRI Cornerstone, Inc. ("Cornerstone"). Cornerstone is a solvent, operating company with approximately $74 million in cash, no funded debt, and positive Adjusted OIBDA. Cornerstone generated approximately $937 million in revenue and $16 million in Adjusted OIBDA in 2025 (*see* Ex. A, QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026) at II-62), and is projected annually to generate $30 million to $42 million of OIBDA through 2029. *See* Ex. C, QVC Group, Inc., Current Report (Form 8-K), Ex. 99.3 (Apr. 16, 2026). The Debtors' financial advisor estimated Cornerstone's value to be $35 million to $135 million, with a midpoint of $85 million. *See* June 5 Trial Tr. (Griffin) at 425:8-12. Cornerstone and QVCG's $195 million cash provide substantial value to Preferred Shareholders that is being entirely wiped out pursuant to the Intercompany Settlement.

## II. THE INTERCOMPANY SETTLEMENT

4. The Intercompany Settlement would transfer almost 100% of QVCG's value to QVC. It allows QVC a $400 million claim against QVCG (the "QVC-QVCG Settlement Claim") to settle (i) alleged, unfiled fraudulent conveyance claims seeking to avoid and recover approximately $800 million distributed from QVC to QVCG in connection with the 2022 Cash Management Plan, and (ii) contractual claims under the Tax Liability Allocation and Indemnification Agreement, dated April 26, 2004 (the "TSA"), for alleged overpayments of

approximately $500 million in alleged tax overpayments from QVC to QVCG from 2018 through 2024 and a potential tax indemnification claim of up to approximately $2 billion relating to LINTA's deferred tax liabilities (the "Alleged Intercompany Claims"), which has already been substantially, if not fully, mitigated through insurance. *See Statement of Disinterested Directors of QVC, Inc. in Support of Joint Prepackaged Chapter 11 Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates* ("QVC Board Statement") [Dkt. No. 147] ¶ 16; Disclosure Statement, Art. VII.B.3(c)-(e).

5. Pursuant to the settlement, QVC will receive 100% of QVCG's distributable cash in satisfaction of the Alleged Intercompany Claims. *See* Plan, Art. III.B.4(b)-(c). QVC will also receive QVCG's 62% equity stake in Cornerstone in satisfaction of the Alleged Intercompany Claims. The trial record confirmed that QVCG transferred that interest to QVC as part of the overall settlement, even though the Plan's treatment of the QVC-QVCG Settlement Claim refers only to QVCG distributable cash and contains no distribution mechanic for the Cornerstone equity. *See* June 8 Trial Tr. (Meltzer) 193:16-23 ("We made a decision that, in the context of the overall settlement and the other items that were being negotiated with Inc., that we would transfer our 62 percent interest in Cornerstone to Inc.").

## III. THE PREPACKAGED PLAN PROCESS EXCLUDED THE PREFERRED SHAREHOLDERS

6. The Preferred Shareholders were excluded from the process that produced the Intercompany Settlement. Before the Petition Date, the Debtors and their advisors negotiated the restructuring with holders of QVC Notes, RCF Lenders, and LINTA Noteholders—none of whom held claims against QVCG—while leaving out the only stakeholders with a meaningful economic interest in QVCG.

7. In February 2026, counsel for certain Preferred Shareholders asked QVCG to include the Preferred Shareholders in restructuring negotiations. QVCG ignored this overture. The Debtors instead proceeded with a prepackaged Plan under which no class of claims or interests against QVCG voted to accept.

## IV. THE CONFIRMATION TRIAL RECORD

8. The evidence at trial established both that the Plan is not confirmable and the Intercompany Settlement is neither fair nor equitable.

### A. The Plan Violates Section 1129(a)(10) of the Bankruptcy Code

9. Under QVCG's Plan, the QVC-QVCG Settlement Claim is deemed "Unimpaired," as is every other class of claims under the Plan. But the evidence at trial confirmed that this $400 million claim is ***impaired*** because claimants are receiving (i) less than 100% of the value of the claim, and (ii) QVCG's equity stake in Cornerstone in partial satisfaction of the claim.

10. By the Debtors' own valuation of Cornerstone, QVCG's equity stake in that business is worth, at most, $83.7 million. *See supra* ¶ 6. Combined with $195 million of cash on QVCG's balance sheet, the QVC-QVCG Settlement Claim is receiving, at most, $278.7 million, substantially less than the $400 million allowed claim.

11. As explained above, the trial record confirmed that the QVC-QVCG Settlement Claim is also receiving QVCG's equity stake in Cornerstone as a distribution. *See supra* ¶ 8, *citing* June 8 Trial Tr. (Meltzer) 193:16-23 ("We made a decision that, in the context of the overall settlement and the other items that were being negotiated with Inc., that we would transfer our 62 percent interest in Cornerstone to Inc.").

12. The trial record thus unequivocally established that the Plan violates Section 1129(a)(10) of the Bankruptcy Code, which requires that at least one class of claims that is impaired under the plan has accepted the plan. *See* 11 U.S.C. § 1129(a)(10).

**B. The Intercompany Settlement is Neither Fair nor Equitable**

13. The evidence at trial also established that the Intercompany Settlement is neither fair nor equitable.

14. First, the evidence established that the Alleged Intercompany Claims were weak at best. The claims to claw back the dividends require proof of insolvency, but QVC was unlikely to establish that it was insolvent at the time of transfer because:

i. Kroll provided a solvency opinion concluding that QVC was solvent at the time it made the $800 million dividend to QVCG (*see* PX-153; PX-173);

ii. Kroll provided multiple additional, contemporaneous solvency opinions concluding that QVCG was solvent at all relevant times (*see* PX-48, PX-50, PX-59, PX-52, PX-53, PX-60, PX-51, PX-46, PX-192);

iii. QVC's director testified that, if QVCG was solvent, it was reasonable to assume that QVC was also solvent (*see* June 8 Trial Tr. (Keglevic) at 66:6-15);

iv. QVC's CFO testified that the solvency opinions were issued in good faith (*see* June 5 Trial Tr. (Wafford) at 401:19-23); and

v. The *only* alleged evidence of insolvency was a deck prepared by Evercore relying solely on bond prices, which, critically and without explanation, excluded bonds trading at 80 to 90 cents (*see* PX-150; PX-374)

15. When scrutinized, the tax claims fared no better. The record shows that QVC never overpaid its tax obligations. Both QVC's Vice President of Tax and its CFO testified that QVC's tax payments complied with the TSA. *See* June 4 Trial Tr. (Kearns) at 204:10-205:11; June 5 Trial Tr. (Wafford) at 404:12-18.

16. The record also shows that QVC's hypothetical tax indemnity claims were weak. Among other things, (i) QVC obtained a "should" opinion from PwC with a high degree of certainty that QVC's tax obligation would never become payable (*see* June 4 Trial Tr. (Kearns) at 227:19-228:8, 229:17-230:9); (ii) QVC's CFO testified that both the Debtors' position and his own personal view were that the tax liability "will not" materialize (*see* June 5 Trial Tr. (Wafford) at

405:2-7); and (iii) QVC obtained insurance coverage for the potential tax claims with a 3.8% premium (*see* June 8 Trial Tr. (Meltzer) at 293:7-17), implying a low likelihood that the claims will ever have to be paid.

17. Second, the evidence established that QVCG failed to assess the probability of success of the Alleged Intercompany Claims. Incredibly, QVCG's director conceded at trial that he never came to a view regarding QVC's probability of success on the Alleged Intercompany Claims. *See* June 8 Trial Tr. (Meltzer) at 316:18-317:1 ("Q: [B]efore you agreed to the $400 million claim amount, you did not come to a view [on] the probability that QVC, Inc. would prevail on the intercompany litigation, did you? A: I did not come to a view any more than I came to a view as to whether we would succeed in defending it.").

18. Third, the evidence established that QVCG failed to negotiate at arm's length. Among other things:

i. QVCG's director conceded that the settlement recognized no possibility that QVCG might prevail (*see* June 8 Trial Tr. (Meltzer) at 320:13-18);

ii. QVCG's director conceded that he never insisted on a recovery for Preferred Shareholders (*see id.* at 310:11-24; 311:13-22);

iii. By February 12, 2026, before any direct negotiations QVC's representatives, QVCG's directors had already limited Preferred Shareholder recovery to releases only (*see* PX-368; *see also* June 8 Trial Tr. (Meltzer) at 278:13-280:25)

iv. QVCG obtained no estimate of litigation costs (*see id.* at 320:19-24);

v. QVCG did not use those costs, QVC's litigation risk, or QVC's desire for a "fast and final" resolution as leverage (*see id.* at 321:8-24; June 8 Trial Tr. (Keglevic) at 101:18-22); and

vi. QVCG funded at least $75 million in professional fees to date to consummate a restructuring of other QVC debtor entities (*see id.* at 274:23-275:11).

19. Fourth, the evidence established that QVCG had only approximately $220,000 of third-party trade claims. *See* DX-439. While the QVCG directors extolled the virtue of paying

general unsecured claims in full, the record is now clear that there are only $220,000 of third-party trade claims. The vast majority of purported general unsecured claims—more than $9.5 million—are tax priority claims that are entirely unaffected by the Intercompany Settlement because they have priority status over general unsecured claims. *See id.*

20. Fifth, the evidence established that the QVCG directors never analyzed whether existing Preferred Shareholders would benefit from the releases included in the Intercompany Settlement. The QVCG directors also extolled the importance of obtaining releases for the Preferred Shareholders in connection with the settlement, but QVCG's director conceded at trial that he never determined whether existing Preferred Shareholders would benefit from the releases. *See* June 8 Trial Tr. (Meltzer) at 333:25-334:11.

21. Sixth, no Preferred Shareholder has expressed support for the settlement. The Debtors have argued that only the Preferred Shareholders who retained counsel to formally object to the Plan oppose the settlement. That is false. Since the trial ended, other Preferred Shareholders have written to the Bankruptcy Court expressing their dissatisfaction with the settlement. *See* June 16, 2026 Wampanoag Capital LLC Letter [Dkt. No. 547]; June 22, 2026 A. Ariker Letter [Dkt. No. 598]. The views of Preferred Shareholders must be taken into account because they are the only stakeholders that stand to gain or lose from the settlement. Yet QVCG simply ignored the views of the Preferred Shareholders because the decision had already been made to sacrifice their recovery for the benefit of QVC creditors. The Confirmation Decision validated the Debtors' disregard for Preferred Shareholder interests by adopting a legal standard for settlement approval that only considers whether the settlement is in the "best interests of creditors" and ignores all consideration of the interests of equity holders.

22. Seventh, the Preferred Shareholders have offered to fund the intercompany litigation at no cost to the estates. *See* PX-301.

23. On this record, the Debtors did not (and cannot) establish that the Intercompany Settlement is fair and equitable.

## V. THE CONFIRMATION DECISION AND NEED FOR EMERGENCY RELIEF

24. Bankruptcy Rule 8007(a)(1)(A) required the Preferred Shareholders to seek a stay pending appeal from the Bankruptcy Court in the first instance. On July 15, 2026, the Bankruptcy Court entered the Confirmation Decision overruling the Preferred Shareholders' objections and confirming the Plan. On July 16, 2026, in compliance with that requirement, the Preferred Shareholders filed a notice of appeal of the Confirmation Decision and the forthcoming Confirmation Order, together with the Stay Motion seeking a stay of the Confirmation Order pending that appeal. The Bankruptcy Court set a hearing on the Stay Motion for July 21, 2026, at 1:00 p.m. (Central Time)—the first opportunity the Bankruptcy Court gave itself to rule on the requested stay.

25. Notwithstanding that schedule, on July 20, 2026, more than twenty-four hours before the scheduled hearing, the Bankruptcy Court entered the Confirmation Order. It did so without ruling on the Stay Motion, without granting an administrative stay to preserve the status quo pending the hearing it had itself set, and without stating any reasons for declining to do so. The Confirmation Order expressly provides that "[i]n the absence of any party obtaining a stay pending appeal, the Debtors are authorized to consummate the Plan." Confirmation Order ¶ 156. By entering the Confirmation Order on this basis before the Stay Motion could be heard, the Bankruptcy Court failed to afford the Preferred Shareholders the relief they requested and cleared the way for the Debtors to consummate the Plan—and potentially moot this appeal—notwithstanding the pending, unresolved Stay Motion. Under these circumstances, awaiting a

ruling from the Bankruptcy Court is no longer practicable, and the Preferred Shareholders accordingly seek relief directly from this Court pursuant to Bankruptcy Rule 8007(b)(2)(A) and (B).

26. On the Effective Date, the Plan deems substantial consummation to occur, authorizes the Debtors and Reorganized Debtors to consummate restructuring transactions, and binds all holders of claims and interests. *See* Plan, Arts. IX.C, XII.A, IV.C, IV.G.

27. Emergency relief is therefore necessary. Without a stay, the Debtors can cause the Effective Date to occur and implement the QVCG-related transactions before the Preferred Shareholders obtain meaningful appellate review, including direct review by the Fifth Circuit if authorized. The Preferred Shareholders will separately file a request for certification of a direct appeal to the Fifth Circuit under 28 U.S.C. § 158(d)(2) and Bankruptcy Rule 8006. *See* Fed. R. Bankr. P. 8007(a)(1)(A); 28 U.S.C. § 158(d)(2); Plan, Arts. IX.A-C, XII.A.

## RELIEF REQUESTED

28. By this Motion, the Preferred Shareholders respectfully request that the Court: (i) enter an order, substantially in the form attached hereto as **Exhibit D**, granting an immediate interim stay pending a hearing and ruling on this Motion and, if necessary, pending the Fifth Circuit's consideration of direct appeal authorization and any further stay relief, and (ii) enter an order, substantially in the form attached hereto as **Exhibit E**, staying the Confirmation Order pending appeal and prohibiting the Debtors from causing the Effective Date to occur while any stay remains in effect; or alternatively, staying the QVCG-specific provisions of the Plan, including implementation of the Intercompany Settlement, transfer or distribution of QVCG distributable cash, transfer of QVCG's 62% Cornerstone interest, cancellation of Preferred Stock, and

enforcement of releases against the Preferred Shareholders; and (iii) granting such other and further relief as is just and proper.

## ARGUMENT

### I. LEGAL STANDARD

29. Bankruptcy Rule 8007 permits a party to seek "a stay of a judgment, order, or decree of the bankruptcy court pending appeal." Fed. R. Bankr. P. 8007(a)(1)(A).

30. Courts in the Fifth Circuit consider four factors: "(1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest." *In re First S. Sav. Ass'n*, 820 F.2d 700, 704, 709 (5th Cir. 1987); *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (same); *In re Tex. Equip. Co.*, 283 B.R. 222, 226-27 (Bankr. N.D. Tex. 2002) (same).

31. "The first two factors are the most critical." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020). Moreover, the Fifth Circuit "has refused to apply these factors in a rigid mechanical fashion." *Reading & Bates Petroleum Co. v. Musslewhite,* 14 F.3d 271, 272 (5th Cir. 1994); *see, e.g., In re First S. Sav. Ass'n*, 820 F.2d at 709 n.10 (finding that the absence of one factor was not fatal).

32. Here, all four factors weigh in favor of a stay.

### II. THE PREFERRED SHAREHOLDERS HAVE A SUBSTANTIAL CASE TO PRESENT ON APPEAL

33. To show likelihood of success for a stay pending appeal, an appellant need only (i) present a "substantial case on the merits when a serious legal question is involved," and (ii) show that the "balance of the equities [*i.e.*, factors 2-4] weighs heavily in favor of granting the stay." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 439 (5th Cir. 2001); *In re Tex. Equip. Co., Inc.*, 283 B.R. at

227 ("With respect to questions of law . . . especially questions involving the application of law, or when the law has not been definitively addressed by a higher court, the movant more easily satisfies the first element."). A "serious legal question" is one "of substantial import to others" (*Asarco LLC v. Americas Mining Corp*., 419 B.R. 737, 741 (S.D. Tex. 2009) (quoting *Nat'l Treasury Employees Union v. Von Raab,* 808 F.2d 1057, 1059 (5th Cir. 1987)); or one involving a "fact-intensive question in an evolving area of the law, which the court views as presenting a serious question going to the merits." *Starke v. SquareTrade, Inc.*, 2017 WL 11504834, at *2 (E.D.N.Y. Dec. 15, 2017).

34. Here, the Preferred Shareholders have a substantial case to present on appeal involving serious legal questions, including (i) whether, at the sole option of the debtors, any settlement claim can be deemed "unimpaired" and disenfranchised under Section 1129(a)(10), (ii) whether a debtor seeking approval of an insider intercompany settlement is entitled to deference under the business judgment rule or whether the entire fairness standard of review applies, (iii) whether a settlement that wipes 100% of the value of one debtor for the benefit of its debtor subsidiaries can be fair and equitable when the record is rife with evidence that the negotiation was not at arm's length and the purportedly independent directors simply capitulated, and (iv) whether it is appropriate to only consider the best interests of creditors, without regard to any equity holder interests, when determining whether to approve a settlement in a Chapter 11 plan .

### A. The Plan Raises Serious Issues Under Section 1129(a)(10) of the Bankruptcy Code

35. Section 1129(a)(10) of the Bankruptcy Code requires that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As explained above, the record is clear that the QVC-QVCG Settlement Claim is impaired because claimants are receiving (i) less

than 100% of the value of the claim, and (ii) equity in Cornerstone in partial satisfaction of that claim. *See supra* ¶ 8. In the Confirmation Decision, the Bankruptcy Court acknowledges that the QVC-QVCG Settlement claim is receiving less than $400 million of value, but mistakenly concludes that claim is unimpaired.

36. The Bankruptcy Court adopted the Debtors' argument that the QVC-QVCG Settlement Claim is unimpaired because QVC agreed, through the RSA and the Intercompany Settlement, to accept QVCG's Distributable Cash and the equity in Cornerstone in full satisfaction of its $400 million allowed settlement claim. *See* Confirmation Decision at 95. In the Bankruptcy Court's view, Section 1124 exempts this treatment from the impairment analysis because QVC, as holder of the claim, agreed under Section 1123(a)(4) to accept less than the full value to which it would otherwise be entitled. *Id.* at 95. There is no Fifth Circuit authority allowing this. Accordingly, the Preferred Shareholders have a strong case that the Bankruptcy Court erred on this serious legal question.

37. Section 1124 provides that a class is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder." 11 U.S.C. § 1124; *see also In re Ultra Petroleum Corp.*, 943 F.3d 758, 763-64 (5th Cir. 2019) ("Impairment results from what the *plan* does.") (emphasis in original) (citing *In re Am. Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988)). The Plan does not leave QVC's rights unaltered. It limits QVC's cash recovery to QVCG's Distributable Cash, and transfers QVCG's 62% Cornerstone interest to QVC as part of the overall settlement. *See* Plan, Art. III.B.4; Plan Supplement [Dkt. No. 212], Ex. C; Preferred Shareholders' Plan Objection ¶¶ 65-69. As explained above, as reflected in the Debtor's own valuation, QVC's maximum recovery on account of the QVC-QVCG Settlement Claim is roughly $278.7 million, materially below the $400 million

allowed claim. *See supra* ¶ 13. If even a slight, artificial alteration constitutes impairment, *see In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 245 (5th Cir. 2013) (rejecting a motive inquiry and materiality requirement under Section 1129(a)(10) because "any alteration of a creditor's rights, no matter how minor," constitutes impairment under Section 1124), then so too does receipt of approximately 70% of an allowed claim and receiving equity instead of cash in satisfaction of that claim.

38. The three cases on which the Bankruptcy Court relied do not compel a different result. *See* Confirmation Decision ¶ 94-95. Both *In re Container Store Grp., Inc.*, 676 B.R. 356, 377-88 (S.D. Tex. 2026), and *In re Spirit Airlines*, *Inc.*, 668 B.R. 689, 702 (Bankr. S.D.N.Y. 2025), addressed opt-out mechanics for third-party releases, not whether an insider settlement claim can be deemed unimpaired to avoid Section 1129(a)(10). *In re K Lunde*, *LLC*, 513 B.R. 587, 595 n.4 (Bankr. D. Colo. 2014), involved statutory tax treatment under Section 1129(a)(9)(D), not a plan-created settlement that transfers a debtor's remaining assets. None of these cases permits a debtor to manufacture unimpairment of an insider's discounted settlement claim so that no impaired non-insider class of claims exists at that debtor.

39. The contemporaneous plan documents confirm why Class A4's impairment matters. The April 12, April 14, April 15, and April 16 drafts treated Class A4 as "Impaired" and stated that QVC was entitled to vote, while the filed Plan treated Class A4 as "Unimpaired," deemed QVC to accept under Section 1126(f), and asserted that Section 1129(a)(10) was satisfied or inapplicable because QVCG had no impaired class of claims. *See* JX 0043, QVC_0031711-QVC_0031873 (4/12/26 Draft Plan) at 32; JX 0044, QVC_0046581-QVC_0046836 (4/14/26 Draft Plan) at 31; JX 0045, QVC_0044406-QVC_0044615 (4/15/26 Draft Plan) at 116; JX 0046, QVC_0037415-QVC_0037597 (4/16/26 Draft Plan) at 127; Plan, Art. III.B.4(d), III.G. That

change is not a bookkeeping point. It is the mechanism by which the Plan attempts to avoid the only thing Section 1129(a)(10) would otherwise require at QVCG: acceptance by an impaired non-insider class of claims. If Class A4 is impaired, QVC would be the only impaired accepting claim class at QVCG, and QVC is an insider whose vote could not be counted to satisfy Section 1129(a)(10).[5]

40. The Bankruptcy Court's acceptance of the Debtors' impaired classification of the RSA parties, alongside its acceptance of the unimpaired classification of the QVC-QVCG claim, confirms that its ruling on Section 1124 was outcome-driven rather than neutral. The RCF Lenders, QVC Noteholders, and LINTA Noteholders also "settled" disputed recoveries as part of the RSA and the broader restructuring. Indeed, the LINTA Noteholders accepted an approximately 92.5% haircut on their claims. *See* Confirmation Decision at 72. Yet unlike the QVC-QVCG Settlement Claim, the Debtors classified those RSA parties' claims as impaired, solicited their votes, and relied on their acceptance to satisfy Section 1129(a)(10) at the QVC and LINTA Debtor levels. *See* Confirmation Decision at 92-93. The Debtors cannot have it both ways: if a negotiated settlement in which a creditor accepts less than the full value of its claim renders that creditor "unimpaired" under Section 1124, the RSA parties' claims should likewise have been unimpaired, and no Debtor would have had an impaired accepting class. That the Debtors instead deemed the RSA parties impaired and entitled to vote—while deeming the QVC-QVCG Settlement Claim unimpaired and therefore not entitled to vote—reveals that the Debtors classified economically similar settlements differently depending on which classification was needed to satisfy Section

[5] QVC is an insider of QVCG because QVCG directly or indirectly owns 100% of QVC. *See* 11 U.S.C. § 101(31)(E) (defining "insider" to include, inter alia, an "affiliate" of the debtor); *id.* § 101(2) (defining "affiliate" to include an entity that "directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor"); *see also* First Day Decl., Ex. B1 (Simplified Corporate Structure Chart).

1129(a)(10) at each Debtor. That kind of classification gerrymandering, in a case of this size and visibility, presents exactly the sort of policy-laden question the Fifth Circuit should be given the opportunity to address.

41. Independently, the Plan also impairs the QVC-QVCG Settlement Claim by converting the Alleged Intercompany Claims, which the Disinterested Directors estimated could aggregate $1 to $3 billion in liability (*see* Disclosure Statement, Art. V.D; QVC Board Statement ¶ 22), from contingent, disputed, and unliquidated claims into a liquidated claim allowed in the amount of $400 million. *See* Plan, Art. III.B.4(b). That conversion alters QVC's rights: it eliminates QVC's right to litigate potential intercompany claims and fixes their value at $400 million (a 60-87% discount according to the QVC's Board's own estimation). *See generally In re Ultra Petroleum Corp.*, 943 F.3d 758, 763 (5th Cir. 2019) ("[i]mpairment results from what *the plan* does") (emphasis in original) (citing *In re Am. Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988)).

42. The Plan therefore violates Section 1129(a)(10) of the Bankruptcy Code, and a stay is warranted to preserve appellate review of that error.

**B. The Appropriate Standard of Review Governing the Bankruptcy Rule 9019 Settlement Presents a Substantial Question**

43. In response to the Preferred Shareholders' position that entire fairness should govern review of the Intercompany Settlement, counsel for the Debtors conceded in the Debtors' opening statement that "our response to that is, go ahead. Apply the entire fairness standard." *See* June 4 Trial Tr. (Sussberg) at 17:24-18:4. The Bankruptcy Court—without addressing the Debtors' admission concerning the proper standard of review—nevertheless held that QVCG's decision to approve the Intercompany Settlement is entitled to deference under the business judgment rule. *See* Confirmation Decision at 61. The Bankruptcy Court's holding was based on

its finding that the settlement process here was not conflicted. *See* Confirmation Decision at 62-67. At least some courts have disagreed that the relevant inquiry is whether the settlement process was conflicted, holding instead that "[b]y definition, the business judgment rule is not applicable to transactions among a debtor and an insider of the debtor. Those kinds of transactions are inherently suspect because 'they are rife with the possibility of abuse.'" *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (citing *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997)). While the Fifth Circuit has not determined the proper standard of review for a settlement between a debtor and an insider of the debtor, it has recognized that "a court's scrutiny must be great when the settlement is between insider and an overwhelming majority of creditors in interest oppose such settlement of claims." *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995).

44. The absence of definitive Fifth Circuit authority on the precise standard applicable to an insider intercompany settlement only reinforces that the Preferred Shareholders have presented a substantial case on appeal. *See In re Tex. Equip. Co., Inc.*, 283 B.R. at 227 ("With respect to questions of law . . . especially questions involving the application of law, or when the law has not been definitively addressed by a higher court, the movant more easily satisfies the first element."). Whether the proper criterion for selecting the standard of review is the presence of a conflict in the negotiation process, rather than the insider nature of the transaction, is precisely the kind of question the Fifth Circuit has not resolved.

### C. Approval of the Intercompany Settlement Presents a Substantial Question

45. The Preferred Shareholders have at least a substantial case that the Bankruptcy Court erred by approving the Intercompany Settlement under Bankruptcy Rule 9019. *See* Confirmation Decision at 67-74. The core problem is straightforward: the Bankruptcy Court

treated uncertainty, cost, process labels, and the rhetoric of a global settlement as substitutes for the estate-specific analysis required.

46. Bankruptcy Rule 9019 does not require a mini-trial, but it does require an informed, independent judgment on a sufficient factual record. *See In re AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984) ("approval of a compromise, absent a sufficient factual foundation, inherently constitutes an abuse of discretion"). A settlement must be "*fair and equitable* and in the best interest of the estate." *In re Beach,* 731 F. App'x 322, 325 (5th Cir. 2018) (emphasis added). In evaluating whether a settlement is fair and equitable, the Bankruptcy Court must consider: "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors and a proper deference to their respective views; (4) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010). The Bankruptcy Court erred in applying these factors to the undisputed facts in the record.

47. First, the Bankruptcy Court reasoned that the probability of success factor favored approval because the outcome of the litigation was uncertain and the Disinterested Directors believed that settling, rather than litigating, would be more beneficial to estate creditors because litigating could diminish potential recovery out of the estate assets. *See* Confirmation Decision at 69-70. Critically, the Bankruptcy Court "d[id] not make any conclusive findings as to the merits" of the underlying claims. Confirmation Decision at 26. "Rather, the Court f[ound] that the Disinterested Directors each conducted and analyzed their due diligence of the company, and each

separately and independently formulated an understanding as to the potential existence of such claims, their potential magnitude, potential defenses, and the factual and legal issues underpinning such potential claims which may need to be addressed by a court through litigation." *Id.* at 26. Indeed, the Bankruptcy Court elsewhere confirmed that it deferred entirely to the Disinterested Directors' judgment rather than independently assessing the merits, stating that it "will not second guess the Disinterested Directors' business judgment that releases with no distribution for the Preferred Shareholders was appropriate . . ." *Id.* at 85. But the law is clear that the Bankruptcy Court must do more than that. The Bankruptcy Court cannot simply defer to the business judgment of the debtors. The court must reach its own "intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (applying *TMT Trailer Ferry* factors). The Bankruptcy Court's failure to do so here constitutes clear error.

48. The Bankruptcy Court's reasoning also elided a central point: the record did not merely show uncertainty; it showed specific defenses that QVCG never weighed. QVCG's own materials stated that QVC was not likely to make the required showing of insolvency for clawback claims (*see* PX-153), and QVC's CFO testified that the contemporaneous solvency opinions were issued in good faith. *See* June 5 Trial Tr. (Wafford) at 401:19-23. QVC's tax witness testified that the alleged tax overpayments were not overpayments under the TSA (*see* June 4 Trial Tr. (Kearns) at 204:10-205:11, 222:4-20), and QVC's CFO likewise testified that QVC's payments to QVCG complied with the TSA. *See* June 5 Trial Tr. (Wafford) at 404:12-18. The asserted tax-indemnity exposure was similarly contested: QVC obtained a "should" opinion that the tax liability would not materialize (*see* June 8 Trial Tr. (Meltzer) at 182:19-183:14), QVC's own position was that the

tax liability "will not" materialize and QVC's CFO agreed with that position (*see* June 5 Trial Tr. (Wafford) at 405:2-8), and QVC obtained $925 million of tax insurance for a premium of approximately $36 million. *See* June 8 Trial Tr. (Meltzer) at 293:7-17. Yet Mr. Meltzer admitted that, before agreeing to the $400 million claim, he did not come to a view on QVC's probability of success, and that the settlement recognized ***no*** possibility that QVCG might prevail. *See* June 8 Trial Tr. (Meltzer) at 316:18-317:1, 320:13-18. Bankruptcy Rule 9019 does not let a debtor convert uncertainty into proof. On this record, the probability factor supports reversal, not approval.

49. The Fifth Circuit's decision in *In re Emerald Oil Co*., 807 F.2d 1234 (5th Cir. 1987) is instructive. There, the bankruptcy court approved a settlement of a fraudulent conveyance claim finding that the compromise was reasonable and in the estate's best interests in light of its conclusion that the trustee "might not succeed" in setting aside the transfer. *Id.* at 1239. The Fifth Circuit disagreed with the bankruptcy court's assessment of the strength of the claim, finding that the trustee likely could set aside the transfer as a matter of law. *See id*. The Fifth Circuit therefore reversed the Bankruptcy Court's approval of the settlement, emphasizing that the "hazards of litigation do not justify the approved compromise whereby the creditors receive less than one-third of their potential recovery after trial." *Id.*

50. Second, the Bankruptcy Court reasoned that the complexity and cost factor favored approval because the potential intercompany claims would "implicate manifold legal issues" as well as "complicated factual issues" that would be time-consuming and expensive to litigate. *See* Confirmation Decision at 70-71. This could be said of any settlement of significant bankruptcy litigation claims and would render this factor meaningless. But even so, litigation would have given QVCG ***some chance of a recovery***, whereas this settlement eliminated any chance of one.

Moreover, QVCG never undertook the work needed to rely on litigation cost as a settlement justification. Mr. Meltzer admitted that QVCG never obtained an estimate of litigation costs for either QVCG or QVC, and never used the cost of litigation for either side as leverage. *See* June 8 Trial Tr. (Meltzer) at 320:19-24; 321:8-11. QVC, by contrast, had every reason to pay for speed and finality: its director testified that litigation would reduce QVC's recovery by fees (*see* June 8 Trial Tr. (Keglevic) at 99:1-8), delaying the "fast and final" resolution was his "objective" (*see id.* at 99:12-100:4; 102:20-103:5; 126:17-21), create risk that QVC could lose and recover nothing (*see id.* at 101:18-22), and be "ugly" and harmful to the estate. *Id.* at 100:5-12. QVCG did not use that leverage, did not deduct litigation costs from QVC's asserted recovery, and accepted a settlement that gave QVCG no upside from winning. The Preferred Shareholders also offered to fund litigation costs so the estates would not bear them. *See* PX-301. Complexity may justify compromise; it cannot justify total capitulation, surrendering all of QVCG's value without first testing whether the cost problem was real, avoidable, or useful as leverage against QVC.

51. Third, the Bankruptcy Court reasoned that the settlement was the product of arm's length bargaining because each key debtor had disinterested directors and separate counsel. *See* Confirmation Decision at 73. But titles and process labels are not talismans. Before negotiations even began, the QVCG Special Committee limited Preferred Shareholder recovery to releases (*see* PX-368). One day later, QVCG's opening position was that QVC's clawback claims were not likely viable and QVCG should pay nothing for them. *See* PX-153. QVC then proposed an at least $400 million unsecured claim with no recovery for Preferred Shareholders (*see* June 8 Trial Tr. (Keglevic) at 106:10-107:9), and QVCG ultimately accepted a $400 million claim with no Preferred Shareholder recovery. *See id.* at 113:15-114:3.

52. The Bankruptcy Court found that "Kobre and the QVCG Disinterested Directors negotiated as best they could for a better result both for QVCG and the Preferred Shareholders." Confirmation Decision at 73. But that finding is not supported by the facts established at trial. Indeed, Mr. Meltzer admitted that he never insisted on any Preferred Shareholder recovery (*see* June 8 Trial Tr. (Meltzer) at 310:11-24; 311:13-22), did not hire an independent financial advisor, investment banker, or solvency expert, did not bring QVCG's tax advisor to the settlement meeting (*see id.* at 178:25-179:6, 221:17-222:4, 222:10-21; 303:24-304:1; 304:11-14), and ignored Preferred Shareholder outreach before the settlement was finalized. *See id.* at 325:11-14; 326:4-8; 327:3-8. That is not arm's length bargaining. As the court explained in *In re Coram Healthcare Corp.*, a debtor cannot hire a purportedly independent fiduciary to simply "sprinkle holy water" to cleanse an otherwise conflicted transaction. *In re Coram Healthcare Corp*., 271 B.R. 228, 240 (Bankr. D. Del. 2001).

53. Fourth, the Bankruptcy Court reasoned that the stakeholder interest factor favored approval because the settlement "functions as the keystone to the RSA and the Plan." Confirmation Decision at 72. That argument cannot support approval. Bankruptcy Rule 9019 required a QVCG-specific inquiry: was it fair and equitable for QVCG to give QVC its distributable cash and QVCG's 62% Cornerstone interest while leaving Preferred Shareholders with no recovery? The fact that the settlement was part of a broader restructuring did not answer that question. To the contrary, because the settlement was embedded in the Plan and eliminated Preferred Shareholder recovery, the Bankruptcy Court must ensure that the settlement did not bypass the voting and confirmation protections that ordinarily apply when a plan transfers estate value away from junior stakeholders. If the desire for "global peace" were sufficient, a debtor could transfer value from

one estate to another debtor's creditors whenever doing so made a multi-debtor restructuring easier to confirm. Bankruptcy Rule 9019 does not permit that result.

54. The Bankruptcy Court also emphasized that "no creditor has lobbied an objection" to the settlement—the only objectors are equity and the U.S. Trustee. Confirmation Decision at 72. That emphasis was misplaced. Where, as here, "there is a likelihood of a recovery for equity, the Court can and should consider the interest of equity holders in applying" the stakeholder interest factor. *In re RNI Wind Down Corp.*, 348 B.R. 286, 298 (Bankr. D. Del. 2006), *subsequently aff'd*, 359 F. App'x 352 (3d Cir. 2010). No Preferred Shareholder before the Bankruptcy Court supported the settlement, even though the Preferred Stock had approximately $1.4 billion of liquidation preference and was the only constituency with an economic incentive to test QVC's claims. Since the trial ended, multiple Preferred Shareholders have written to the Bankruptcy Court expressing their dissatisfaction with the settlement. *See supra* ¶ 24. The stakeholder interest factor therefore weighs against approval.

55. The Fifth Circuit's decision in *Matter of Foster Mortg. Corp.*, 68 F.3d 914 (5th Cir. 1995) is instructive. There, the Fifth Circuit vacated a settlement approved by the bankruptcy court because the bankruptcy court "gave no consideration to issues we find dispositive: that nearly all creditors in interest opposed this settlement and that the settlement was reached between insiders without the participation of the creditors. In our estimation, the court abused its discretion by not showing proper deference to the views of the creditors." *Id.* at 918; *see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (identifying, among the factors bearing on whether a settlement is fair and equitable, "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement");

*In re NII Holdings, Inc.*, 536 B.R. 61, 120 (Bankr. S.D.N.Y. 2015) (finding that parties in interest supported the settlement where "the Plan received overwhelming approval from every impaired class of creditors, all of whom will be affected by the Settlement"). The same reasoning applies here: the relevant parties in interest—the preferred shareholders of a solvent debtor—all oppose the settlement and were excluded from the negotiation.

56. Each of the relevant factors therefore weighed against approval of the QVC-QVCG Settlement. The Preferred Shareholders have, at minimum, a substantial case that approval of the settlement should be reversed.

## III. THE PREFERRED SHAREHOLDERS WILL SUFFER IRREPARABLE HARM ABSENT A STAY

57. Absent a stay, the Preferred Shareholders will suffer irreparable harm because the Debtors may consummate the Plan and then argue that appellate review is equitably moot. That risk matters here because the appeal concerns assets, releases, cancellations, and waivers that the Debtors intend to implement on or around the Effective Date. Courts recognize that the loss of appellate rights is irreparable harm as a matter of law. *See In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 348 (S.D.N.Y. 2007) (holding that "loss of appellate rights" is "a quintessential form of prejudice"); *In re Voyager Digital Holdings, Inc.*, 2023 WL 2731737, at *10 (S.D.N.Y. Apr. 1, 2023) (holding that risk of mootness absent a stay satisfies the irreparable-harm prong); *see also In re Pac. Lumber Co.*, 584 F.3d 229, 242-43 (5th Cir. 2009) (noting that plan consummation may often be dispositive of equitable mootness and that substantial legal issues can and should be preserved for review).

58. The Preferred Shareholders do not concede that their appeal would be equitably moot. But courts grant stays precisely because consummation of a Chapter 11 plan may create a serious risk that appellate courts will be asked to decline review, and the Debtors have indicated

that they believe the appeal would be equitably moot. *See In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (recognizing that equitable mootness is prudential and permits a court to decline review); *In re Blast Energy Servs., Inc.*, 593 F.3d 418, 424 (5th Cir. 2010) (stating that equitable mootness applies only when reorganization has progressed too far for practical relief); *In re Pac. Lumber Co.*, 584 F.3d at 242-43 (describing risks created by plan consummation absent a stay); *In re Voluntary Purchasing Grps.*, Inc., 196 F.3d 1258 (5th Cir. 1999) (per curiam) (reversing denial of stay where, absent a stay, appellants' right to contest confirmation could be thwarted).

59. The harm is especially concrete here because, on or around the Effective Date, the Plan authorizes the Debtors to transfer assets, issue and distribute new equity, enter exit financing, issue takeback debt, adopt new organizational documents, and make the Plan binding on all holders of claims and interests. *See* Plan, Arts. IV.A, IV.C.3-5, IV. E, IV.G, IV.I, XII.A. Those steps would not merely advance the broader restructuring; they would implement the very QVCG-specific transactions that the Preferred Shareholders seek to challenge on appeal. *See* Plan, Arts. VIII.C-D, VIII.F.

60. The Plan makes that risk acute. It provides that substantial consummation occurs on the Effective Date; authorizes transfers, new debt and equity issuances, exit financing, and other restructuring transactions; and provides that, on the Effective Date, holders are deemed to have waived arguments concerning their claims or interests if not disclosed before confirmation. *See* Plan, Arts. IV.A, IV.C.3-5, IV.E.2-5, IV.I, IV.J, IX.C, XII.A, XII.N. If QVCG distributable cash and the 62% Cornerstone interest are transferred, releases become operative, and the Preferred Stock is canceled, the Preferred Shareholders cannot be restored fully after the fact. *See* Plan, Arts. III.B.6, VIII.C–D, VIII.F.

## IV. A STAY WILL NOT SUBSTANTIALLY HARM OTHER PARTIES AND CAN BE TAILORED

61. A stay will not substantially harm other parties because the Court can tailor relief to the QVCG-specific provisions that threaten appellate rights. Courts may tailor a stay to operate only with respect to a portion of the proceeding. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (recognizing courts' ability to tailor stay relief); *Nken v. Holder*, 556 U.S. 418, 428 (2009) (describing a stay as a means of suspending judicial alteration of the status quo). The Plan itself supports tailored relief because it states that conditions precedent apply to each Debtor individually and that the Effective Date for one Debtor may occur before the Effective Date for another. *See* Plan, Art. IX.B.

62. The Debtors have argued that the Plan preserves QVC and Cornerstone as going concerns, saves jobs, eliminates funded debt, provides exit financing, pays general unsecured claims in full, and resolves inter-debtor litigation. *See* Debtors' Confirmation Brief at 10-11. But the Preferred Shareholders do not ask the Court to unwind the enterprise; they ask the Court to preserve QVCG's disputed assets and their appellate rights while the QVCG-specific issues are reviewed.

63. At a minimum, the Court should stay the transfer or distribution of QVCG distributable cash, the transfer of QVCG's 62% Cornerstone interest, the cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders. Practically speaking, this will result only in lowering the amount of distribution certain of QVC's creditors will take at emergence. There will be no impact to the business, employees, supplies, or customers. That relief would preserve the appellate remedy without necessarily preventing the Debtors from seeking to implement non-QVCG transactions that can lawfully proceed without impairing the Preferred Shareholders' appeal. *See* Plan, Art. IX.B-C.

64. No bond should be required. The assets at issue during the pendency of the stay (*i.e.,* QVCG's distributable cash and its 62% Cornerstone equity interest) will remain intact and available to be transferred to the Debtors or other parties later should the Preferred Shareholders not prevail on appeal. Accordingly, there is no cognizable risk of harm to the Debtors or other parties that a bond would need to secure. To the extent the Court nonetheless determines that a bond is necessary, the Debtors are already holding approximately $75 million in professional fees that QVCG funded to consummate the restructuring of other Debtor entities and for which QVCG is entitled to reimbursement, as set forth herein. *See* June 8 Trial Tr. (Meltzer) at 274:23-275:11. Because the Debtors already control those funds, that $75 million can serve as adequate security for a stay, and the Debtors can simply hold onto it pending the outcome of the appeal without requiring the Preferred Shareholders to post any additional collateral. *See* Fed. R. Bankr. P. 8007.

## V. THE PUBLIC INTEREST FAVORS A STAY

65. Finally, the public interest compels staying the Confirmation Order pending resolution of the Preferred Shareholders' appeal because meaningful appellate review is a substantial and important right, particularly where confirmation of a complex Chapter 11 plan may otherwise become practically unreviewable. *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 342, 348 (explaining the importance of meaningful appellate review and holding that loss of appellate rights is irreparable prejudice); *In re Pac. Lumber Co.*, 584 F.3d at 243 ("substantial legal issues can and ought to be preserved for review").

66. The public interest also favors correct application of the Bankruptcy Code's confirmation requirements. This appeal will raise important issues concerning impairment, Bankruptcy Rule 9019 settlements, good faith, best interests, and the ability to transfer value through an insider intercompany settlement in a multi-debtor plan. *See* 11 U.S.C. §§ 1124, 1129(a)(3), 1129(a)(7), 1129(a)(10), 1129(b); Fed. R. Bankr. P. 9019; *Czyzewski v. Jevic Holding*

*Corp.*, 580 U.S. 451, 464 (2017) (the priority system is a "basic underpinning" of business bankruptcy law).

## VI. THE COURT SHOULD ENTER AN INTERIM STAY OF THE CONFIRMATION ORDER DURING THE PENDENCY OF THIS MOTION

67. The Court should enter an immediate interim stay pending a hearing and ruling on this Motion. Without interim relief, the Debtors may consummate the Plan before this Motion can be fully briefed and decided, thereby threatening to moot the relief requested here. Courts have entered interim stays to preserve the status quo where consummation or a transaction may occur before a stay motion can be resolved. *See In re Ondova Ltd. Co.*, 620 F. App'x 290, 291 (5th Cir. 2015) (per curiam) (temporarily staying sale order until further order of the court); *see also Rio Grande Cmty. Health Ctr., Inc. v. Armendariz,* 792 F.3d 229, 231 (1st Cir. 2015) (per curiam) (issuing a temporary stay of certain district court orders while considering a stay of the same); *Millennium Dental Techs., Inc. v. Fotona d.d.,* 407 F. App'x 482, 483 (Fed. Cir. 2011) (per curiam) (issuing a temporary stay of a district court order directing appellant to draft and sign a settlement agreement pending the circuit court's ruling on a stay motion and entry into a settlement); *Detroit Free Press, Inc. v. Ashcroft,* No. 02-1437, 2002 WL 1332827, at *1 (6th Cir. Apr. 10, 2002) (per curiam) (granting a temporary stay pending appeal of a district court injunction).

## EMERGENCY CONSIDERATION

68. Emergency consideration is warranted because the Confirmation Order already authorizes the Debtors to consummate the Plan in the absence of a stay, and the Bankruptcy Court entered that order less than twenty-four hours before the very hearing it had scheduled on the Stay Motion, without ruling on the Stay Motion and without explanation. That sequencing leaves the Preferred Shareholders exposed to the risk that the Debtors will cause the Effective Date to occur and implement the QVCG-related transactions before this Motion can be fully briefed and decided,

and before any court has ruled on the merits of the requested stay. An immediate administrative stay is necessary to preserve the status quo while this Motion is considered, so that the Plan is not consummated in the meantime and the requested relief is not rendered ineffective.

## CONCLUSION

For the foregoing reasons, the Preferred Shareholders respectfully request that this Court: (i) enter an order, substantially in the form attached hereto as **Exhibit D**, granting an immediate interim stay pending a hearing and ruling on this Motion and, if necessary, pending the Fifth Circuit's consideration of direct appeal authorization and any further stay relief, and (ii) enter an order, substantially in the form attached hereto as **Exhibit E**, staying the Confirmation Order pending appeal and prohibiting the Debtors from causing the Effective Date to occur while any stay remains in effect; or alternatively, staying the QVCG-specific provisions of the Plan, including implementation of the Intercompany Settlement, transfer or distribution of QVCG distributable cash, transfer of QVCG's 62% Cornerstone interest, cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders; and (iii) granting such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: July 20, 2026

**KANE RUSSELL COLEMAN LOGAN PC**

By: /s/ *Mark C. Taylor*
Mark C. Taylor
Texas Bar No. 19713225
401 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6650
Email: mtaylor@krcl.com

-and-

**GLENN AGRE BERGMAN & FUENTES LLP**

Andrew K. Glenn (admitted *pro hac vice*)
Kurt A. Mayr (admitted *pro hac vice*)
Agustina G. Berro (admitted *pro hac vice*)
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 970-1601
Email: aglenn@glennagre.com
kmayr@glennagre.com
aberro@glennagre.com

*Counsel to the Preferred Shareholders*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 20, 2026, I served the foregoing Motion upon all parties and/or counsel of record, via CM/ECF to all counsel of record and on the counsel listed below by e-mail in accordance with the Federal Rules of Civil Procedure.

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com

Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gabriela Zamfir Hensley (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: chad.husnick@kirkland.com
gabriela.hensley@kirkland.com

-and-

**GRAY REED**

Jason S. Brookner (TX Bar No. 24033684)
Lydia R. Webb (TX Bar No. 24083758)
Emily F. Shanks (TX Bar No. 24110350)
1300 Post Oak Blvd.
Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com
eshanks@grayreed.com

By: */s/ Mark C. Taylor*