# KIRKLAND & ELLIS LLP

609 Main Street
Houston, TX 77002
United States

+1 713 836 3600

www.kirkland.com

Rex W. Manning
To Call Writer Directly:
+1 713 836 3474
rex.manning@kirkland.com

Facsimile:
+1 713 836 3601

July 20, 2026

**<u>Via E-Mail</u>**

The Honorable George C. Hanks, Jr.
United States District Court for the
Southern District of Texas
515 Rusk
Houston, Texas 77002

> Re:   *Gui. et al., Case No. 26-cv-05680* (S.D. Tex.)*,* on appeal from *In re QVC Group, Inc., et al., Case No. 26-90447 (ARP)* (Bankr. S.D. Tex.)

Dear Judge Hanks:

I again write on behalf of the QVC Debtors regarding the request from certain appellants to stay entry of a confirmation order from the Bankruptcy Court on an emergency basis. As previewed in my previous letter, tonight the Debtors filed an opposition brief and supporting declaration in response to the appellants' request. A courtesy copy of the filing is attached hereto as **Exhibit A**.

We thank the Court for its attention to this matter and are happy to address any questions the Court may have.

Sincerely,

*/s/ Rex W. Manning*
Rex W. Manning

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| QVC GROUP, INC., *et al.*,[1] | ) | Case No. 26-90447 (ARP) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**DEBTORS' OBJECTION TO PREFERRED SHAREHOLDERS' EMERGENCY**
**MOTION FOR STAY PENDING APPEAL [DOCKET NO. 716]**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .......................................................................................................................... 4

    A.    QVC Group's Story. ................................................................................................. 4

    B.    QVC Group's Chapter 11 Cases. ............................................................................ 5

    C.    The Intercompany Settlement. ................................................................................ 7

    D.    The Chapter 11 Plan. .............................................................................................. 8

    E.    Cornerstone's Dependence on QVC. ...................................................................... 9

    F.    Confirmation and This Court's Findings. ............................................................ 11

    G.    The Preferred Shareholders' Appeal and Stay Motion. ...................................... 11

    H.    Time Is of the Essence. .......................................................................................... 12

ARGUMENT ............................................................................................................................. 13

I.    The Stay Factors Weigh Heavily Against A Stay Pending Appeal. .......................... 13

    A.    The Preferred Shareholders have not Shown a Likelihood of Success on
        Appeal. .................................................................................................................. 14

    B.    The Preferred Shareholders Have Not Shown They Will Suffer Irreparable
        Harm. .................................................................................................................... 29

    C.    A Stay Would Substantially and Irreparably Harm the Debtors, Their
        Creditors, Other Stakeholders, and Numerous Other Parties. ........................... 31

    D.    The Public Interest Disfavors a Stay. ................................................................... 37

II.    At A Minimum, A Stay Pending Appeal Should Require The Preferred
    Shareholders To Post A $900 Million Bond. ................................................................. 38

CONCLUSION .......................................................................................................................... 43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. F.D.A.*,
No. 23-10362, 2023 WL 2913725 (5th Cir. Apr. 12, 2023) ......................................................31

*Azby Fund v. Wadsworth Ests., LLC*,
No. 22-30092, 2022 WL 17582273 (5th Cir. Dec. 12, 2022) ...................................................25

*Bank of America, N.A. v. Mega World Builder Corp.*,
No. 4:24-cv-3021, 2025 WL 1485868 (S.D. Tex. Jan. 8, 2025) ...............................................36

*Cook v. Waldron*,
No. H-05-3438, 2006 WL 1007489 (S.D. Tex. Apr. 18, 2006) .................................................23

*F.D.I.C. v. Belcher*,
No. 19-12561, 2020 WL 242781 (E.D. La. Jan. 16, 2020) .......................................................36

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ..................................................................................................................14

*In re 1300 Desert Willow Rd., LLC*,
677 B.R. 176 (Bankr. S.D.N.Y. 2026) ......................................................................................15

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007) .....................................................................................4, 38, 39, 41

*In re Allied Props., LLC*,
No. 06-33754, 2007 WL 1849017 (Bankr. S.D. Tex. June 25, 2007) .....................................22

*In re American Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ......................................................................................16

*In re Babcock & Wilcox*,
No. CIV.A.00-1410, 2000 WL 1092434 (E.D. La. Aug. 2, 2000) ...........................................37

*In re Boca Del Rio Props., Inc.*,
No. H-0602439, 2006 WL 2459445 (S.D. Tex. Aug. 23, 2006) ..............................................36

*In re Boy Scouts of Am. & Delaware BSA, LLC*,
642 B.R. 504 (Bankr. D. Del. 2022) .........................................................................................19

*In re Boy Scouts of Am.*,
137 F.4th 126 (3d Cir. 2025) .....................................................................................................19

*In re Cajun Elec. Power Co-op., Inc.*,
119 F.3d 349 (5th Cir. 1997) ........................................................................18, 22, 26

*In re Calpine Corp.*,
No. 05-60200 (BRL), 2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) ...................4, 37, 39

*In re Camp Arrowhead*,
No. SA-10-CV-11-XR, 2010 WL 363773 (W.D. Tex. Jan. 22, 2010) ....................................30

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ......................................................................19

*In re Container Store Grp., Inc.*,
676 B.R. 356 (S.D. Tex. 2026) .........................................................................15, 16

*In re Container Store Grp., Inc.*,
No. 24-90627, 2025 WL 4226766 (Bankr. S.D. Tex. Apr. 7, 2025) ..........................29, 30, 31

*In re Coram Healthcare Corp.*,
271 B.R. 228 (Bankr. D. Del. 2001) ........................................................................28

*In re Dewey & LeBoeuf LLP*,
478 B.R. 627 (Bankr. S.D.N.Y. 2012) ......................................................................19

*In re Emerald Oil Co.*,
807 F.2d 1234 (5th Cir. 1987) .............................................................................23

*In re Foster Mortgage Corp.*,
68 F.3d 914 (5th Cir. 1995).........................................................................18, 21, 27

*In re Gen. Motors Corp.*,
409 B.R. 24 (Bankr. S.D.N.Y. 2009)........................................................................4, 39

*In re Gleasman*,
111 B.R. 595 (Bankr. W.D. Tex. 1990) ......................................................................39

*In re Hanish, LLC*,
570 B.R. 4 (Bankr. D.N.H. 2017) ...........................................................................15

*In re Highland Capital Mgmt., L.P.*,
132 F.4th 353 (5th Cir. 2025) .........................................................................31, 32

*In re Houston Reg'l Sports Network, L.P.*,
886 F.3d 523 (5th Cir. 2018) .........................................................................31, 32

*In re Jackson Brewing Co.*,
624 F.2d 599 (5th Cir. 1980) .........................................................................18, 22, 24

iii

*In re K Lunde, LLC*,
 513 B.R. 587 (Bankr. D. Colo. 2014) ...................................................................16

*In re LATAM Airlines Grp. S.A.*,
 No. 20-11254 (JLG), 2022 WL 272167 (Bankr. S.D.N.Y. Jan. 28, 2022) .............19

*In re Motors Liquidation Co.*,
 539 B.R. 676 (Bankr. S.D.N.Y. 2015) ..................................................................40

*In re Nat'l CineMedia, LLC*,
 No. 4:23-CV-02414, 2023 WL 5030098 (S.D. Tex. Aug. 4, 2023) .......................29

*In re North American Specialty Insurance Co.*,
 No. 4:21-cv-02201 (S.D. Tex.) ........................................................................31, 32

*In re Permian Producers Drilling, Inc.*,
 263 B.R. 510 (W.D. Tex. 2000)..............................................................................19

*In re Perry*,
 No. CV 23-5265, 2024 WL 68257 (E.D. La. Jan. 5, 2024).....................................40

*In re Quintela Grp., LLC*,
 No. 4:20-cv-03499 (S.D. Tex.) ........................................................................31, 32

*In re Raborn*,
 No. 15-10938, 2017 WL 4536090 (Bankr. M.D. La. 2017) ...................................37

*In re RNI Wind Down Corp.*,
 348 B.R. 286 (Bankr. D. Del. 2006) ......................................................................27

*In re Serta Simmons Bedding, LLC*,
 125 F.4th 555 (5th Cir. 2024) .........................................................................31, 32

*In re Serta Simmons Bedding LLC*,
 No. 23-90020, 2023 WL 4275019 (S.D. Tex. June 29, 2023)................................31

*In re Smith*,
 397 B.R. 134 (Bankr. D. Nev. 2008) .....................................................................37

*In re Spirit Airlines, Inc.*,
 668 B.R. 689 (Bankr. S.D.N.Y. 2025)..............................................................15, 16

*In re Stewart*,
 604 B.R. 900 (Bankr. W.D. Okla. 2019) ...............................................................37

*In re Texaco Inc.*,
 84 B.R. 893 (Bankr. S.D.N.Y. 1988)......................................................................17

*In re Texas Equip. Co.*,
  283 B.R. 222 (Bankr. N.D. Tex. 2002) ..................................................................3, 38

*In re Theatre Holding Corp.*,
  22 B.R. 884 (Bankr. S.D.N.Y. 1982) ............................................................................38

*In re Tribune Co.*,
  477 B.R. 465 (Bankr. D. Del. 2012) ......................................................................39, 41

*In re Tribune Media Co.*,
  799 F.3d 272 (3d Cir. 2015) ..................................................................................38, 39

*In re Ultra Petroleum Corp.*,
  943 F.3d 758 (5th Cir. 2019) .......................................................................................16

*In re Ultra Petroleum Corp.*,
  No. 20-32631 (Bankr. S.D. Tex.) ................................................................................32

*In re Village at Camp Bowie I, L.P.*,
  710 F.3d 239 (5th Cir. 2013) .......................................................................................16

*In re Village at Camp Bowie I, L.P.*,
  No. 10-45097 (DML), 2012 WL 79091 (Bankr. N.D. Tex. Jan. 11, 2012) ............................30

*Nken v. Holder*,
  556 U.S. 418 (2009) ...............................................................................................35, 37

*Patino v. City of Pasadena*,
  229 F. Supp. 3d 582 (S.D. Tex. 2017) .........................................................................36

*Plaquemines Parish v. Chevron USA, Inc.*,
  84 F.4th 362 (5th Cir. 2023) ........................................................................................35

*Poplar Grove Planting & Refin. Co. v. Bache Halsey Stuart Inc.*,
  600 F.2d 1189 (5th Cir. 1979) ......................................................................................3

*Preston Wood & Assocs., LLC v. Cameron Architects, Inc.*,
  No. H-16-1427, 2019 WL 2904297 (S.D. Tex. Apr. 26, 2019) ...................................40

*Rhoten v. Stromen*,
  No. 1:16-CV-00648, 2020 WL 3545661 (W.D. Tex. June 30, 2020) ..........................36

*Ruff v. Ruff*,
  No. 4:22-CV-00321, 2023 WL 2574021 (E.D. Tex. Mar. 20, 2023) ..........................39

*Ruiz v. Estelle*,
  650 F.2d 555 (5th Cir. 1981) .......................................................................................36

*Schaeffler v. United States*,
  889 F.3d 238 (5th Cir. 2018) ........................................................................................17

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ........................................................................................13

*Thomas v. Bryant*,
  919 F.3d 298 (5th Cir. 2019) ........................................................................................14

*Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.*,
  711 F. Supp. 3d 627 (N.D. Tex. 2024) ........................................................................14

*Trend Intermodal Chassis Leasing, LLC v. Zariz Transp. Inc.*,
  No. 24-10105, 2024 WL 3423217 (5th Cir. July 16, 2024)..........................................14

*United States v. Texas*,
  97 F.4th 268 (5th Cir. 2024) ........................................................................................13

*Vine v. PLS Fin. Servs., Inc.*,
  No. 4:18-CV-00450, 2019 WL 4257108 (E.D. Tex. Sept. 9, 2019)..............................14

*Weinberger v. UOP, Inc.*,
  457 A.2d 701 (Del. 1983) ......................................................................................18, 19

*Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Rests., LLC*,
  No. 14-0609, 2014 WL 1871889 (W.D. La. May 6, 2014) .....................................29, 37

*Zehr v. Osherow*,
  No. 5:18-CV-355-DAE, 2019 WL 266973 (W.D. Tex. Jan. 17, 2019)..........................14

**Statutes**

11 U.S.C. § 1123...........................................................................................1, 15, 16, 17

11 U.S.C. § 1124...........................................................................................1, 15, 16, 17

11 U.S.C. § 1129.........................................................................................12, 15, 16, 17

28 U.S.C. § 158.........................................................................................................11

**Rules**

Fed. R. Bankr. P. 8007(c) ...................................................................................1, 3, 38

Fed R. Bankr. P. 9019.................................................................................... *passim*

Fed. R. Civ. P. 62(d) ...............................................................................................40

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this objection (the "Objection") to the *Preferred Shareholders' Emergency Motion for Stay Pending Appeal of Confirmation Order Under Bankruptcy Rule 8007(A), or, in the Alternative, For Limited Stay and Interim Stay Pending Hearing* [Docket No. 716] (the "Motion").

## PRELIMINARY STATEMENT

1. There is no basis for a stay pending appeal. Granting the requested relief would do nothing more than allow a handful of hedge funds to run out the last legs of their option play at the expense of the Debtors' creditors. The Court should deny the Motion.

2. The Preferred Shareholders satisfy none of the factors necessary to carry their heavy burden and secure the extraordinary relief they seek.

3. *First*, rather than argue that they will likely succeed on appeal, the Preferred Shareholders target a narrow exception—which asks whether their appeal poses a substantial question—that is available only when the remaining factors tilt *heavily* in favor of a stay. But none of the factors support the Preferred Shareholders, so the alternative framework they invoke is off limits. For that reason alone, the Preferred Shareholders lose on the first factor.

4. At any rate, the Preferred Shareholders could not surpass the substantial-question threshold even were it available to them. They posit three questions, none of which cast any doubt on this Court's approval of the Intercompany Settlement or confirmation of the Plan. The Preferred Shareholders begin by asking whether a creditor's claim is unimpaired under section 1124 if the creditor, pursuant to section 1123(a)(4), accepts less than the full value to which it would otherwise be entitled. Section 1124's text, which excludes from the definition of impairment the situations outlined in section 1123(a)(4), unambiguously answers the question: Yes. The Preferred Shareholders also ask whether Bankruptcy Rule 9019's standard for the review and approval of

settlements should sometimes use an "entire fairness" test, which originates from Delaware corporate law, not federal bankruptcy law. Court after court to consider the question has reached the same conclusion: No, the issues under Rule 9019 are different than the merger-related issues that gave rise to the "entire fairness" test. And the Fifth Circuit's standard, which this Court applied factor for factor, has been settled for over 30 years. Finally, the Preferred Shareholders ask whether the Court applied the Rule 9019 factors correctly. The Preferred Shareholders accuse the Court of casting aside its responsibilities in deference to the Disinterested Directors' business judgment, but even a passing glance at the Court's 103-page Memorandum Decision belies their contention. When deploying the wide discretion it holds to approve or reject settlements, the Court must be informed of all relevant facts and information so that it can make an independent judgment as to whether a proposed settlement is fair and reasonable under the circumstances. The four-day evidentiary hearing, testimony of eight witnesses, and hundreds of exhibits informed the Court of everything it needed to know to make that assessment. That the Court ultimately reached the same conclusion as the Debtors does not mean that it abdicated its duties in deference to them.

5.     *Second*, the Preferred Shareholders have not established that without a stay, they will suffer irreparable harm. They argue that if the Confirmation Order goes into effect and the Debtors consummate the Plan, their appeal will become equitably moot. But that is not enough. As courts throughout the Fifth Circuit have recognized, the possible application of the equitable-mootness doctrine does *not* demonstrate irreparable injury.

6.     *Third*, a stay would be devastating for the Debtors, their creditors, other stakeholders, and numerous other parties. In the three months leading up to their chapter 11 filings and the three months they have been in bankruptcy, the Debtors experienced substantial business turmoil and double-digit declines in topline revenue. Remaining stranded in bankruptcy for the

2

two years (or more) that it would take the appellate process to play out would compound those problems, deprive the Debtors of crucial opportunities to grow their business, and jeopardize the ability of Cornerstone Brands, Inc. ("Cornerstone," as defined in the Plan) to continue operating as a going concern. A stay would also hold up hundreds of millions of dollars in distributions to creditors who will have already waited nearly two months beyond the approved schedule to be paid, forcing them to bear meaningful lost opportunity costs on funds they could otherwise put to work. And every additional month in chapter 11 would fuel a mounting professional-fee burn (already tens of millions of dollars) that steadily erodes estate value with no offsetting benefit. Keyes Decl. ¶ 10.

7. *Fourth*, the public interest disfavors a stay. In a bankruptcy case, the public interest lies in promoting a successful reorganization, which the Debtors are on the cusp of achieving. Implementation of the Plan will allow Reorganized QVC, Inc. ("Reorganized QVC," as defined in the Plan) to emerge better positioned for long-term growth, which will benefit not only the company but also its employees, vendors, and commercial counterparties.

8. All four factors strongly disfavor a stay, but if the Court were nevertheless to consider granting one, then it must be conditioned on the Preferred Shareholders posting a substantial bond to cover the extensive harm that the Debtors, their estates, and various stakeholders would suffer. Under Rule 8007(c), courts commonly require the posting of a bond "to preserve the status quo while protecting the non-appealing party's rights pending appeal." *In re Texas Equip. Co.,* 283 B.R. 222, 229 (Bankr. N.D. Tex. 2002) (citing *Poplar Grove Planting & Refin. Co. v. Bache Halsey Stuart Inc.*, 600 F.2d 1189, 1190–91 (5th Cir. 1979)). And in recognition of the magnitude of the potential loss to debtors from staying the completion of a plan confirmation process, courts have generally held that, to obtain such a stay, movants must post

3

bonds for many hundreds of millions or billions of dollars. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (S.D.N.Y. 2007) (imposing bond of $1.3 billion on basis that this security was "near the full amount of the potential harm to the non-moving parties"); *cf. In re Gen. Motors Corp.*, 409 B.R. 24, 34 (Bankr. S.D.N.Y. 2009) (denying stay but noting "a bond would have to be posted in an amount no less than $7.4 billion" given the magnitude of harms faced by non-movants); *In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 207841, at *7 (Bankr. S.D.N.Y. Jan. 24, 2008) (denying stay but noting in dicta that "no stay would be issued without the posting of a bond to cover the enormous risk of loss to the Debtors, their estates, creditors and interest holders in the range of $900 million to $1 billion"). Any stay here would warrant a similarly significant bond. As the Debtors will establish at tomorrow's hearing, the proper bond amount would be no less than $900 million.

## BACKGROUND

### A. QVC Group's Story.

9. QVC Group, Inc. ("QVC Group" or "QVCG," as defined in the Plan) is a global, multi-platform retailer whose value lies in the scale and continuity of its operating business. Its roots trace back as far as HSN's initial radio broadcast in 1977. QVC Group was broadcasting nationally on cable and local television stations 24/7 by 1985 and broke the record for how fast a new American public company could reach $100 million in sales in 1988. Today, it has grown into what this Court described as "one of the world's largest multimedia retailers," distributing curated, video-rich shopping experiences to over 200 million households each day across 15 television channels, while also reaching customers through e-commerce sites, streaming services, social platforms, and mobile applications. ECF No. 4 at 7–10, 14–15; ECF No. 710 at 2–3.

10. The business now operates through three principal engines: QxH, QVC International, and Cornerstone. QxH, the combined U.S. QVC and HSN business, reaches

4

approximately 88 million homes through five television channels, provides live programming 20 hours per day, 364 days per year, and has become increasingly digital, with approximately 89% of new QxH customers in 2024 making their first purchase through digital platforms. ECF No. 4 at 14–16. For the year ending December 31, 2025, QxH contributed $5.9 billion, or 64%, of consolidated net revenue and $529 million of Adjusted OIBDA. *Id.* at 16–17. QVC International reaches approximately 124 million homes through ten television networks and reaches millions more through websites, mobile apps, smart TV apps, and social pages; in 2025, it generated $2.4 billion, or 26%, of consolidated net revenue and $292 million of Adjusted OIBDA, and its international businesses were generally net cash-flow positive as a whole. *Id.* at 17–18. Cornerstone comprises four brands dedicated to apparel and home lifestyle items including Frontgate, Ballard Designs, Garnet Hill, and Grandin Road and generates approximately 10 percent of QVC Group's net revenue. *Id.* at ¶ 31.

11. That platform depends on thousands of employees and significant infrastructure. QVC Group employs approximately 15,800 people, including roughly 8,341 employees at QxH, 5,952 employees at QVC International, and 1,527 employees at Cornerstone. *Id.* at 19. QVC, Inc. ("QVC," as defined in the Plan) operates nine distribution centers and four contact centers worldwide, while Cornerstone operates 35 retail locations and four fulfillment centers. *Id.*

12. In other words, the value at stake is not abstract. It is the going-concern value of an operating enterprise—value that this Court found the Debtors' reorganization would preserve while maximizing asset value for creditors and safeguarding thousands of jobs and vendor relationships. *Id.* at 34; ECF No. 710 at 83–84.

**B.    QVC Group's Chapter 11 Cases.**

13. By the eve of these cases, the Debtors were in genuine financial distress, a fact this Court found "cannot be ignored." ECF No. 710 at 6. In recent years, the Debtors faced a

5

confluence of headwinds: accelerating "cord cutting," record inflation, supply-chain disruption, elevated labor costs, tariff uncertainty, and a December 2021 fire at the Rocky Mount distribution center that cost the Debtors more than one million customers and over $500 million in revenue. *Id.* at 5–6. Those pressures weighed on a complex, four-part intercompany capital structure carrying more than $6 billion in funded debt and equity obligations, including approximately $4.97 billion in notes and revolving credit facility obligations at QVC alone. ECF No. 4 at 4, 33–34.

14. Before filing, the Debtors pursued years of liability management and operational initiatives to buy time for a digital transformation, including the 2020 Restructuring, the 2022 Cash Management Plan, the 2024 Capital Contribution and Exchange, Project Athens, and the ongoing WIN Strategy. *Id.* at 22–28; ECF No. 710 at 6–7. Those initiatives were effective but not a panacea. Project Athens alone delivered more than $500 million of annual adjusted OIBDA impact, but QVC Group's debt burden, built on declining linear TV cash flows, impaired its ability to invest at the level necessary to complete the transition to the digital and live social shopping age. ECF No. 4 at 3, 26–27.

15. That is why the Debtors focused on a restructuring with "high levels of support and execution certainty" and "low impact on business and operations." *Id.* at 3–4. They and their advisors spent nearly eight months negotiating with their major creditor constituencies beginning in October 2025, producing over 22,000 pages of diligence, together with extensive financial modeling. *Id.* at 33–34. Management engaged directly with key stakeholders throughout the process. *Id.*

16. Those efforts produced the Restructuring Support Agreement, executed on April 16, 2026, and these chapter 11 cases, which the Debtors commenced on April 16, 2026. ECF No.

710 at 9. Speed was central from the start: as the First Day Declaration explained, the RSA contemplated that QVC Group would "move efficiently through chapter 11 and emerge in less than two months," because "[a] prolonged chapter 11 would unnecessarily result in larger administrative claims and greater risk to customer and supplier confidence." ECF No. 4 at 4–5. This Court later described the resulting settlement as one designed to achieve a global resolution, preserve or maximize value for the Debtors' estates, set up the company for a successful reorganization, pay all third-party general unsecured claims in full, and put the go-forward operating entity on the path toward long-term success. ECF No. 710 at 1.

### C.    The Intercompany Settlement.

17.    The Debtors' capital structure made the Intercompany Settlement indispensable. This Court found that QVCG, LINTA, QVC, and Cornerstone Brands, Inc. were the four key entities in a corporate family shaped by historical intercompany transactions and potential intercompany claims. ECF No. 710 at 3. This Court further found that the settlement "functions effectively as the keystone" to both the RSA and the Plan. *Id.* at 9. Put simply, QVCG had no path out of chapter 11 without resolving potential avoidance, fraudulent-transfer, shared-cost, and tax-sharing disputes with QVC, its own subsidiary and largest creditor. ECF No. 359 at 29–30.

18.    To address inherent conflicts, the Debtors implemented governance changes to ensure that each key entity had "independent and qualified fiduciaries" advocating for its own interests and the interests of its stakeholders. ECF No. 710 at 7. This Court found that each disinterested fiduciary who testified was "very credible," that the relevant governing bodies retained separate counsel, and that the Disinterested Directors engaged in a "fulsome and comprehensive assessment" of potential claims and defenses. *Id.* at 8–9. Throughout that process, they acted separately and independently, with the assistance of their own counsel. *Id.* at 9.

19. The resulting outcome was not preordained. This Court found that "[n]o Disinterested Director or Special Committee member at any Key Entity capitulated," and that the settlement terms were reached through a "thorough, complete, and arm's-length process." *Id.* at 34–35. It later reiterated that the settlement was achieved through a "fair, arm's-length process devoid of fraud and collusion." *Id.* at 72–73. The resulting Intercompany Settlement resolved the full range of intercompany disputes and delivered value across each of the estates, including unimpaired treatment for QVCG's general unsecured creditors and releases for QVCG's preferred equityholders, who had received more than $456 million in aggregate preferred dividends. *Id.* at 74.

20. The alternative was value-destructive litigation and uncertainty. As this Court put it, without the settlement the Debtors faced "an uncertain future" and "the dark waters of litigating the intercompany claims," along with funding uncertainty for the go-forward business, particularly at Cornerstone. ECF No. 710 at 72. No creditor objected to the Intercompany Settlement or the Plan, and the Plan was accepted by "a wide majority of each creditor-voting class." *Id.* That creditor support reflected the practical reality that the settlement was the only viable path to a global resolution. ECF No. 359 at 29–30; *Id.* at 72.

**D.     The Chapter 11 Plan.**

21. The Plan built on that settlement and achieved what this Court called "good results" for the Debtors and their creditors. ECF No. 710 at 83. It rests on four pillars designed to maximize recoveries while preserving the Debtors' going-concern value. ECF No. 4 at 34.

22. First, the Plan provides for *substantial deleveraging*, eliminating more than $5 billion in funded debt obligations and allowing the Debtors to "right-size their balance sheet, improve liquidity, and position their go-forward operating entity QVC for long-term success." *Id.* at 34; ECF No. 710 at 83.

23.     Second, the Plan *leaves unimpaired* all trade and other unsecured creditors, who held over $400 million in claims:  a remarkable result in a case of this magnitude.  ECF No. 389, Art. III.B.3–4; ECF No. 710 at 83.  This Court found that the Debtors were "able to pay all third-party GUC claims in full," a result tied directly to the Intercompany Settlement.  ECF No. 710 at 83.

24.     Third, the Plan enjoys *overwhelming creditor support*.  The Consenting RCF Lenders, the Consenting QVC Noteholders, and the Consenting LINTA Noteholders support the deal, and this Court found that all voting classes accepted the Plan "by large margins," with the Unsecured Creditors' Committee also expressing support.  ECF No. 4 at 34; ECF No. 710 at 84.

25.     Fourth, and most relevant here, the Plan *preserves going-concern value*.  QVC will emerge as Reorganized QVC, and Cornerstone will continue as its subsidiary, saving thousands of skilled jobs, including 1,527 at Cornerstone, and maintaining the vendor relationships on which the business depends.  ECF No. 4 at 34.  This Court found that these results are "consistent with the Bankruptcy Code's underlying purpose of preserving the company as a going-concern, and maximizing asset value for creditors."  ECF No. 710 at 83–84.

### E.     Cornerstone's Dependence on QVC.

26.     Cornerstone occupies a singular position in the QVC Group enterprise:  it presently cannot survive as a standalone business and depends on QVC.  ECF No. 4 at 18.  QVC supplies Cornerstone with "all the back office functions, including IT" and "a tremendous amount of synergies," including, most critically, the UPS shipping discount that QVC earns through its own shipping volume; without QVC, "the discount goes away."  Keglevic Testimony, Day 3:  51:11–

17; Meltzer Testimony, Day 3: 187:23–188:4, 188:13–19. [2] As the Debtors told the Court at confirmation, "[t]here is no more Cornerstone if it's not operated by QVC, Inc." Sussberg Opening Statement, Day 1: 12:16–22.

27. Cornerstone's financial fragility compounds that operational dependence. Months before the Petition Date, its credit-card processor advised that it "would no longer service Cornerstone," forcing Cornerstone onto QVC's facility, another service that would vanish outside the QVC umbrella. Keglevic Testimony, Day 3: 51:4–10. A February 2026 management study concluded that "the liquidation value of Cornerstone to shareholders was zero," and when the LINTA noteholders were offered Cornerstone, they answered: "We don't want it." *Id.* at 51:18–23.

28. No party has been willing to fund Cornerstone on a standalone basis. Coming off a year in which revenue fell roughly 10% and incremental tariffs strained its cash position, Cornerstone faced "a potential . . . need of a cash infusion," yet no one was "interested in making a capital injection in the business." Wafford Testimony, Day 2: 344:7–22. It was "very questionable" whether Topco had enough cash to support Cornerstone as a standalone entity, and QVC was "[a]bsolutely not" offering that cash. Meltzer Testimony, Day 3: 191:23–192:4. This Court found that the Plan "rescued CBI from its silo and brought it under QVC's umbrella," enabling synergies that "might otherwise save an entity which the Disinterested Directors believed had an uncertain future." ECF No. 710 at 83.

---

[2] With respect to any testimony cited in this Motion, "Day 1" references the first day of the Combined Hearing held on June 4, 2026; "Day 2" references the second day of the Combined Hearing held on June 5, 2026; "Day 3" references the third day of the Combined Hearing held on June 8, 2026.

29.     In short, the livelihoods of Cornerstone's 1,527 employees depend on QVC's continued operations.  Any delay that prevents QVC from emerging as Reorganized QVC places every one of those jobs in real jeopardy.  ECF No. 4 at 18.

**F.     Confirmation and This Court's Findings.**

30.     After a four-day evidentiary hearing that featured "eight highly credible Debtor-witnesses" and "hundreds of exhibits," this Court issued its Memorandum Decision approving the Disclosure Statement, confirming the Plan, and granting related relief, with the order following on July 20, 2026.  ECF No. 710 at 2.  This Court was emphatic: after reviewing the evidence, "all facts demonstrate the negotiations were, in reality, a thorough, fair, and arm's-length process."  *Id.*  It also found that "[n]o disinterested fiduciaries capitulated to any other, and the ultimate outcome for stakeholders was not preordained."  *Id.*

31.     Those findings dispose of the Preferred Shareholders' narrative.  This Court found that the Intercompany Settlement is "fair and equitable and in the best interest of the estates and their creditors," that it "reflects a sound exercise of the Debtors' business judgment," and that all applicable confirmation requirements were satisfied.  *Id.* at 74.  This Court also found that the Second Amended Plan was "proposed with a legitimate and honest purpose of reorganizing the business," had "a reasonable hope of success," and represented "a robust compromise where many, if not all stakeholders made concessions to achieve the result."  *Id.* at 83–84.  Finally, this Court rejected the Preferred Shareholders' disclosure and governance complaints, explaining that they "miss the mark" and that no record evidence supported a lack of good faith.  *Id.* at 84–85.

**G.     The Preferred Shareholders' Appeal and Stay Motion.**

32.     One day after the Memorandum Decision, on July 16, 2026, the Preferred Shareholders filed the Motion.  ECF No. 716.  They simultaneously noticed an appeal and stated an intention to seek certification of a direct appeal to the Fifth Circuit under 28 U.S.C. § 158(d)(2).

11

ECF No. 716 at 11. And earlier today (July 20, 2026), they filed a nearly identical stay motion in the district court. *See* ECF No. 3, *In re QVC Group, Inc.*, *et al.*, No. 4:26-cv-05680 (S.D. Tex.).

33. The Motion asks the Court to stay the Confirmation Order in its entirety or, in the alternative, to stay the "QVCG-specific" provisions of the Plan, including the Intercompany Settlement, the transfer of QVCG's distributable cash, the transfer of QVCG's 62% Cornerstone interest, and the cancellation of the Preferred Stock, together with an immediate interim stay. ECF No. 716 at 18–19, 36. The Preferred Shareholders contend that they present a substantial case on insider-settlement standards under Bankruptcy Rule 9019 and impairment under section 1129(a)(10), that they will be irreparably harmed by equitable mootness absent a stay, that a stay would not substantially harm others, and that the public interest favors a stay. *Id.* at 20, 32, 34–35. As shown below, each contention fails.

### H. Time Is of the Essence.

34. The Debtors cannot absorb the indefinite delay a stay would impose. The RSA sets firm milestones under Section 4.01 and currently requires that the Plan must be confirmed by July 29, 2026 and go effective by August 17, 2026. RSA § 4.01. These dates may be further extended only with the consent of the Required Consenting QVC Noteholders, the Required Consenting RCF Lenders, and the Required Consenting LINTA Noteholders and future extensions are not guaranteed. If those milestones are missed, the Consenting RCF Lenders, the Consenting QVC Noteholders, and the Consenting LINTA Noteholders can each terminate the RSA. *Id.* § 12.01(f). Additionally, each individual Consenting Stakeholder also holds a separate termination right 180 days after the Agreement Effective Date (*i.e.*, October 13, 2026). *Id.* § 12.01(t). Upon termination, each party regains "the rights and remedies that it would have had, had it not entered into this Agreement." *Id.* § 12.05.

35. There is no replacement transaction waiting in the wings. No creditor group has offered to support an alternative path, and the Debtors' committed $600 million exit financing is conditioned on consummation of the Plan. ECF No. 359 at 35; ECF No. 389 at 67–68. The Debtors' debtor-in-possession financing compounds the risk: the DIP facility matures on the earlier of October 16, 2026 and the Effective Date, so any stay that pushes emergence past that date would trigger the DIP's maturity. And because a significant portion of the DIP Lenders have since sold their revolving credit facility positions and are no longer RSA parties, they have little incentive to extend the DIP, leaving the Debtors without a committed source of financing to bridge a prolonged appeal. Meanwhile, every additional week in chapter 11 depletes estate value: the Debtors incurred approximately $41 million in professional fees in just the first six weeks of these cases, and costs would continue to mount over the pendency of an appeal. Wafford Testimony, Day 2: 379:4–9.

36. QVC is poised to emerge with a balance sheet deleveraged by billions, healthy vendor relationships, and ample liquidity to resume ordinary-course operations. A stay would put all of that at risk by jeopardizing the RSA and stranding Cornerstone. The Plan should be allowed to do what this Court found it will: preserve the company as a going concern and maximize asset value for creditors. ECF No. 710 at 83–84.

## ARGUMENT

### I. The Stay Factors Weigh Heavily Against A Stay Pending Appeal.

37. A stay pending appeal is "an extraordinary remedy," *Texas v. United States*, 40 F.4th 205, 215 (5th Cir. 2022) (internal quotations omitted), "not a matter of right," *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024). The Preferred Shareholders' burden "is a substantial one." *Texas*, 40 F.4th at 215. They have not carried it.

13

38.     Whether to grant a stay turns on four factors: "1) whether the applicant has made a strong showing of likelihood to succeed on the merits; 2) whether the movant will be irreparably harmed absent a stay; 3) whether issuance of a stay will substantially injure other interested parties; and 4) where the public interest lies." *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019). Here, all four weigh heavily against a stay.

### A.     The Preferred Shareholders Have Not Shown a Likelihood of Success on Appeal.

39.     The Preferred Shareholders fail to establish anything close to the required "strong showing that [it] is likely to succeed on the merits." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Ordinarily, this standard requires that the movant show that "success on appeal is probable." *Zehr v. Osherow*, No. 5:18-CV-355-DAE, 2019 WL 266973, at *2 (W.D. Tex. Jan. 17, 2019). It is not enough to show that there is "a mere possibility of relief." *Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.*, 711 F. Supp. 3d 627, 640 (N.D. Tex. 2024), aff'd sub nom. *Trend Intermodal Chassis Leasing, LLC v. Zariz Transp. Inc.*, No. 24-10105, 2024 WL 3423217 (5th Cir. July 16, 2024) (internal quotations omitted).

40.     The Preferred Shareholders, however, seek refuge in a narrow exception: When the "other three factors strongly favor interim relief" and "a serious legal question is involved," the "court may lessen the burden … from a strong showing of succeeding on the merits, to a substantial case on the merits." *Vine v. PLS Fin. Servs., Inc.*, No. 4:18-CV-00450, 2019 WL 4257108, at *2 (E.D. Tex. Sept. 9, 2019). For the exception to be applicable, the other three factors must be "*heavily* tilted in the movant's favor." *Id.* (emphasis in original). This case does not present a substantial legal question, and the other factors do not tilt in the Preferred Shareholders' favor at all, much less *heavily* so.

14

### 1. The Plan Complies with Section 1129(a)(10).

41. Section 1129(a)(10) provides that if a "class of claims is impaired under the plan," then "at least one class of claims that is impaired under the plan" must accept the plan. 11 U.S.C. § 1129(a)(10). The Court correctly concluded that section 1129(a)(10) does not apply to QVCG because QVCG has no impaired class of claims. The Preferred Shareholders take issue with that ruling, but their argument overlooks the clear text of the Bankruptcy Code, which dooms their position.

42. Section 1129(a)(10) triggers only when a class is "impaired." 11 U.S.C. § 1129(a)(10). Section 1124 outlines what constitutes "impairment," but it carves out exceptions "as provided in section 1123(a)(4)." 11 U.S.C. § 1124. Section 1123(a)(4), in turn, provides that a plan must give each claim in a class the same treatment "unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). The carve-out clause in section 1124 is not surplusage; it removes treatment in accordance with section 1123(a)(4) from the definition of "impairment." Putting the words of the three sections together: consensual "less favorable treatment of [a] particular claim or interest" is not impairment under section 1124, and so cannot trigger section 1129(a)(10).

43. Courts applying that text agree that when a creditor "consent[s] to specific treatment that is less than the creditor's full legal and equitable rights," its claim is no longer considered impaired. *In re Spirit Airlines, Inc.*, 668 B.R. 689, 702 (Bankr. S.D.N.Y. 2025); *see also In re Container Store Grp., Inc.*, 676 B.R. 356, 377 (S.D. Tex. 2026) ("Parties who agree to a settlement under this provision are considered unimpaired"); *In re 1300 Desert Willow Rd., LLC*, 677 B.R. 176, 184 n.4 (Bankr. S.D.N.Y. 2026) ("[A] creditor's consent to receive less than its full legal and equitable rights does not constitute impairment."); *In re Hanish, LLC*, 570 B.R. 4, 20 (Bankr. D.N.H. 2017) ("[A]n agreement to less favorable treatment under 11 U.S.C. § 1123(a)(4)

15

does not create an impairment, it removes one."); *In re K Lunde, LLC*, 513 B.R. 587, 595 n.5 (Bankr. D. Colo. 2014) ("An agreement or consent to a particular treatment removes the claim from the presumption of impairment."). That is exactly what happened here. The Preferred Shareholders contend that QVC's claim, and the single-claim class in which it resided, was impaired. But QVC agreed to accept a $400 million claim to be satisfied in full and finally by the QVCG Distributable Cash. That agreement is a section 1123(a)(4) agreement to less favorable treatment, so by the plain text of section 1124 both QVC's claim and its class are unimpaired. Section 1129(a)(10)'s requirements therefore do not apply.

44. Nothing in the three cases the Preferred Shareholders cite states otherwise, let alone addresses section 1123(a)(4). *Ultra Petroleum* and *American Solar King* answered a different question: whether a claim is impaired when the plan alters the creditor's rights (it is) or when the Bankruptcy Code itself does (it is not). 943 F.3d 758, 763 (5th Cir. 2019); 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988). *Village at Camp Bowie*, for its part, concerned artificial impairment, holding that section 1129(a)(10) imposes no motive or materiality requirement because section 1124 must be read literally. 710 F.3d 239, 245 (5th Cir. 2013). Stringing these inapposite decisions together does not manufacture a serious legal question, much less create a likelihood of success on the merits.

45. The Preferred Shareholders separately contend that the three decisions on which the Court relied (*In re Container Store Grp., Inc.*, 676 B.R. 356 (S.D. Tex. 2026), *In re Spirit Airlines, Inc.*, 668 B.R. 689 (Bankr. S.D.N.Y. 2025), and *In re K Lunde, LLC*, 513 B.R. 587 (Bankr. D. Colo. 2014)) do not compel a different result because they arose in different factual settings, namely third-party-release opt-outs and statutory tax-claim treatment. *See* ECF No. 716 at 22. But those decisions were cited for a single proposition: that a creditor's consent to less favorable

16

treatment under section 1123(a)(4) removes impairment under section 1124. That proposition holds regardless of the factual vehicle in which the consent arrives, and the Preferred Shareholders nowhere contend that it is wrong. Nor could they, because it follows directly from the statutory text, and unambiguous text is where the analysis begins and ends. *See Schaeffler v. United States*, 889 F.3d 238, 242 (5th Cir. 2018) ("In the absence of any ambiguity, our examination is confined to the words of the statute." (internal quotation marks and citation omitted)). Indeed, the Preferred Shareholders do not dispute that QVC consented to its treatment; they contest only whether that consent renders the claim unimpaired, which is the precise question section 1124's cross-reference to section 1123(a)(4) answers.

46. The Preferred Shareholders also accuse the Debtors of "flip-flopping" by treating the QVC-QVCG Settlement Claim as unimpaired while classifying the settling RSA parties as impaired and soliciting their votes. *See* ECF No. 716 at 23. There is no inconsistency; the two situations differ in a way that section 1124 specifically contemplates. *See* 11 U.S.C. § 1124 ("Except as provided in section 1123(a)(4) of this title, *a class* of claims or interests is impaired under a plan unless, *with respect to each claim or interest of such class*, the plan…."). Class A4 (QVC-QVCG Settlement Claim) has a single member that accepted its treatment, so the entire class is definitionally unimpaired. In contrast, the multi-member RSA classes were each impaired because each class contained non-settling creditors. Far from "gerrymandering" impairment status, ECF No. 716 at 24, the Debtors applied the boundaries as section 1124 draws them.

47. Finally, the Preferred Shareholders argue that the Plan impairs the QVC-QVCG Settlement Claim by liquidating and reducing its potential prepetition liability. But a prepetition claim can be modified by agreement without creating impairment. *See In re Texaco Inc.*, 84 B.R. 893, 894–99, 910 (Bankr. S.D.N.Y. 1988) (finding section 1129(a)(10) inapplicable where

17

Pennzoil, Texaco Inc.'s largest unsecured creditor, settled its $11.12 billion pre-petition judgment, a portion of which Pennzoil held the right to further dispute, for $3 billion—*post-petition*). So their position is unavailing.

### 2. Bankruptcy Rule 9019's Standard Is Well Settled, Does Not Incorporate the Test That the Preferred Shareholders Propose, and Would Not Change the Outcome If Expanded.

48. All agree that "courts are empowered to approve a compromise settlement of a debtor's claim under Bankruptcy Rule 9019(a)." *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997). And no one contests that courts in the Fifth Circuit must consider three factors: "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise," *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (internal citation omitted), which includes both (3)(a) "the best interests of the creditors, with proper deference to their reasonable views" and (3)(b) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion," *Cajun Elec.*, 119 F.3d at 356. The standard is the standard; it has operated unchanged for over 30 years. *See In re Foster Mortgage Corp.*, 68 F.3d 914 (5th Cir. 1995) (last expansion of standard, in 1995).

49. Yet the Preferred Shareholders claim to have spotted a substantial question on "the standard of review" lurking in the shadows of state law. ECF No. 716 at 24. They advocate for what is called the "entire fairness" test, which originated not in bankruptcy, but in a case in which minority shareholders sought to set aside a merger under Delaware law. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). In that context, the Delaware Supreme Court held that when "one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Id*.

50.    Problems pervade the Preferred Shareholders' position.  First, the Rule 9019 standard does *not* contain the "entire fairness" test.  Dissatisfied parties frequently advocate for its inclusion, but courts have rejected the invitation time and again.  *See, e.g.*, *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012) (declining to apply the entire fairness test because the "issues under Rule 9019 are different"); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 272167, at *16 (Bankr. S.D.N.Y. Jan. 28, 2022); *In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 644 (Bankr. D. Del. 2022), *supplemented*, No. 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023), *aff'd in part, rev'd in part, dismissed in part sub nom. In re Boy Scouts of Am.*, 137 F.4th 126 (3d Cir. 2025), and *aff'd*, 650 B.R. 87 (D. Del. 2023) (rejecting pleas to apply entire fairness standard to settlement because the court found "no reason to impose a higher burden than required under the Code"); *In re Charter Commc'ns*, 419 B.R. 221, 241 (Bankr. S.D.N.Y. 2009) (holding the settlement "should be evaluated under the standards applicable to approval of bankruptcy settlements in this Circuit and not under the 'entire fairness' standard of Delaware law applicable to transactions with controlling insiders").  Although Preferred Shareholders suggest that a substantial question looms because the Fifth Circuit has not yet weighed in on the issue, ECF No. 716 at 24–25, there can be no substantial question when courts uniformly reject their position, *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 516 (W.D. Tex. 2000) (finding no serious legal question when "a survey of case law and legal scholarship indicates a general agreement" on the issue).

51.    Second, the Intercompany Settlement would not trigger the "entire fairness" standard even if it fell within the Rule 9019 framework.  The parties who negotiated the Intercompany Settlement were the Disinterested Directors, each represented by independent outside counsel.  Far from "stand[ing] on both sides of [the] transaction," *Weinberger*, 457 A.2d

19

at 710, they were appointed as "independent and qualified fiduciaries to advocate for each of their respective interests and the interests of their stakeholders, and to address potential conflicts," ECF No. 710 ¶ 14. Nor were they the directors who authorized the historical dividends or intercompany transactions that gave rise to the potential claims in the first place. ECF No. 710 at 62–63. Instead, as this Court found, they were newly appointed, investigated independently, and reached independent conclusions with the benefit of separate counsel. *Id.*

52. Third, the Intercompany Settlement was *eminently and entirely fair*, and the Preferred Shareholders' arguments to the contrary evince nothing more than an unwillingness to accept this Court's extensive fact findings. The Preferred Shareholders insist that the "purportedly independent directors simply capitulated," but the Court found that "[n]o disinterested fiduciaries capitulated to any other" and no "Disinterested Director or Special Committee member at any Key Entity capitulated during the negotiations." *Compare* ECF No. 716 at 20 *with* ECF No. 710 at 2, 34–35. The Preferred Shareholders declare that "this settlement was . . . preordained," the "outcome was preordained," yet the Court found that "the terms of the negotiated Intercompany Settlement were not preordained" and were in fact reached "as part of a thorough, complete, and arm's-length process." *Compare* ECF No. 716 at 7, 9 *with* ECF No. 710 at 35. They contend that the $400 million claim was "manufactured" to engineer confirmation, but the Court found that the figure "was not arrived at to manufacture Plan confirmation" and was instead "the lowest figure [the QVC Disinterested Directors] could accept as fiduciaries." *Compare* ECF No. 716 at 8 *with* ECF No. 710 at 63, 73. And they protest that the process was "non-arm's-length" and infected by insider conflict, yet the Court found "the investigation and negotiation of the Intercompany Settlement was not subject to a conflict" and was "achieved through a fair, arm's-length process devoid of fraud and collusion." *Compare* ECF No. 716 at 30 *with* ECF No. 710 at 66, 73. These

aspects of the Intercompany Settlement and the process that led to it show why, during opening statements, the Debtors told the Court: "[G]o ahead. Apply the entire fairness standard." Sussberg Opening Statement, Day 1: 18:2-4. The Debtors' point was not, as the Preferred Shareholders incorrectly suggest, an "admission concerning the proper standard of review." ECF No. 716 at 25. Instead, it was simply a recognition that the Intercompany Settlement would pass the "entire fairness" test if that were the applicable standard. *See* id. at 18:6–7 ("We satisfied [the entire fairness standard] in spades over and over and over again because we did this right.").

53.     The Preferred Shareholders also stretch for Fifth Circuit precedent to support their position, but it does them no good. They emphasize that in *In re Foster Mortgage Corporation*, the Fifth Circuit recognized that "a court's scrutiny must be great" when a settlement involves an insider and most creditors oppose it. ECF No. 716 at 25 (quoting 68 F.3d 914, 919 (5th Cir. 1995)). But in *Foster Mortgage*, the Fifth Circuit reversed after a bankruptcy court "gave no consideration to" "the paramount interest of creditors with proper deference to their reasonable views" and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id*. at 917–18. And the *Foster Mortgage* court recognized that at the time, the Fifth Circuit "ha[d] not elaborated on the other factors bearing on the wisdom of the compromise," so it took the opportunity to "do so" by outlining creditors' interests and arms-length bargaining as two such factors. *Id*. at 197. So what the Preferred Shareholders suggest is a heightened level of scrutiny is really just today's Rule 9019 standard, which this Court faithfully applied.

54.     Finally, the Preferred Shareholders accuse the Court of "simply defer[ring] to the business judgment of the debtors." ECF No. 716 at 27. That is not what happened. "The Court conducted a four-day evidentiary hearing where testimony was adduced from eight highly credible Debtor-witnesses, and the parties introduced hundreds of exhibits." ECF No. 710 at 2. It

21

"extensively" reviewed the historical intercompany transactions. *Id.* at 2; 67–68. Ultimately, after considering the evidence, the Court concluded, in a thorough, 103-page Memorandum Decision, that "all facts demonstrate the negotiations were, in reality, a thorough, fair, and arm's-length process." *Id.* The Court further determined that "[n]o disinterested fiduciaries capitulated to any other, and the ultimate outcome for stakeholders was not preordained," rather, "[t]he equity holders' treatment under the settlement is a result of the range and magnitude of potential claims the parent-Debtor entity they hold interests in was facing from its subsidiaries and other sources— as well as their own liability." *Id.* at 2.

> **3.    The Court Did Not Abuse Its Discretion in Approving the Intercompany Settlement, and the Preferred Shareholders Cannot Show Otherwise.**

55.    The Preferred Shareholders also take issue with the Court's application of the Rule 9019 factors and its decision to approve the Intercompany Settlement. ECF No. 716 at 26–32. They contest how the Court analyzed every factor of the test. To overturn the Court's decision, they must show an abuse of discretion. *Cajun Elec.*, 119 F.3d at 355. They cannot make that showing.

56.    Rule 9019 requires that a settlement be "fair, equitable, and in the best interest of the estate." *Jackson Brewing Co.*, 624 F.2d at 602 (internal quotation marks omitted). To clear that bar, a settlement need only fall "within the range of reasonable litigation alternatives." *In re Allied Props., LLC*, No. 06-33754, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007) (internal quotation marks omitted). That bar "is not high." *Id.* "After all, compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Id*. (citing Cajun Elec., 119 F.3d at 354). When applying Rule 9019's factors, a court need not "conduct a mini-trial to determine the probable outcome of any claims waived in the settlement." *Cajun Elec.*, 119 F.3d at 356.

22

Instead, it must simply "be informed of all relevant facts and information in order to make an independent judgment as to whether settlement is fair and reasonable under the circumstances." *Cook v. Waldron*, No. H-05-3438, 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006). The Court's Rule 9019 analysis passes that test with flying colors.

### a. Probability of Success.

57. The Preferred Shareholders attack the Court's analysis of Rule 9019 factor one: the probability of success in the litigation, with due consideration for the uncertainty in fact and law. They posit that the Court "deferred entirely to the Disinterested Directors' judgment rather than independently assessing the merits." ECF No. 716 at 27. But they mischaracterize the Court's analysis. As discussed above, the Court did not simply defer to the Disinterested Directors. Instead, it detailed the nature of each type of claim, the available defenses, and the reasons why the outcome was uncertain. *See* ECF No. 710 at 26–34. That the Court's decision aligned with the Disinterested Directors' assessment does not mean the Court abdicated its role; it means the record supported the Disinterested Directors' conclusions.

58. The Preferred Shareholders invoke *In re Emerald Oil Co.*, 807 F.2d 1234 (5th Cir. 1987), arguing that its holding "is instructive." ECF No. 716 at 28. But there, the Fifth Circuit disagreed with a bankruptcy court's assessment because "the trustee…probably could set the transfer aside as a matter of law." 807 F.2d at 1239. Here, by contrast, no party demonstrated that any of the Intercompany Claims would succeed or fail as a matter of law. Rather, the Disinterested Directors at QVCG concluded that insolvency was litigable, and the "claims [had] various legal and factual contingencies that would need to be determined or proved up in litigation." ECF No. 710 at 68–69. So unlike *Emerald Oil*, where the factual record largely pointed in one direction, the record here demonstrated genuine uncertainty on both sides. *Id.* at 65. (The only one-sided aspect of the disputes was which party would be liable for them: QVCG.) This uncertainty as to

23

the strength of claims is precisely the "due consideration for the uncertainty in fact and law" that the Court is required to consider, and the quintessential circumstance where compromise is most appropriate. *Jackson Brewing* Co., 624 F.2d at 604 ("The Court concluded, after extensive testimony, and we agree, that the resolution of these questions was sufficiently uncertain not to risk the consequences of an adverse decision.").

59. That the Preferred Shareholders disagree with this Court's assessment of the probability of success and consideration of uncertainty does not mean that it was unintelligent and uninformed. They cannot show any error in the Court's analysis—and therefore have not identified a substantial question weighing in favor of a stay pending appeal.

### b. Complexity and Duration of the Litigation.

60. The Preferred Shareholders also take issue with the Court's assessment of factor two: the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay. They say that "[c]omplexity may justify compromise" but "cannot justify total capitulation." ECF No. 716 at 29. Their argument simply repeats their incorrect, disproven, and rejected contention that QVCG traded everything for nothing in the Intercompany Settlement just because they do not personally value the releases the agreement provides. It also ignores the factor's inclusion of attendant expense, inconvenience, and delay—all of which matter to the QVCG estate but make no difference to the Preferred Shareholders because they have nothing to lose.

61. The Preferred Shareholders also dismiss the Court's recognition that the Intercompany Claims "implicate manifold legal issues" as well as "complicated factual issues" that would be time-consuming and expensive to litigate. They suggest that the same could be said "of any settlement of significant bankruptcy litigation claims." ECF No. 716 at 28. That's true, but only because the reasoning is circular: significant bankruptcy litigation claims, if not settled,

24

necessarily involve significant litigation. And the conclusion that the Preferred Shareholders draw from their analytical loop—that if complex and expensive-to-litigate claims always favored settlement, then the factor would be "meaningless," ECF No. 716 at 28—misses the point. That litigation would be costly or complex is *always* relevant under factor two because that's the whole point of the factor. The more complicated and expensive a claim would be to litigate, the better it is for the debtor's estate to settle the claim.

62.     The Preferred Shareholders then argue that "litigation would have given QVCG *some chance of a recovery*, whereas th[e] [S]ettlement eliminated any chance of one." ECF No. 716 at 28. But that suggestion paints only half the picture. QVCG might not have recovered money, but it obtained considerable *value*. The company secured go-forward indemnification from potential tax liability that could have stretched into the billions, and it procured releases for its preferred shareholders—many of whom had received part of the $450 million in dividends that QVC otherwise would have sought to claw back. ECF No. 710 at 83. What the Preferred Shareholders really mean is that litigation might have resolved the Intercompany Claims for less than the settled amount, which in turn might have meant that *they* recovered money after all senior claims and interests were paid. In other words, they contend that factor two counseled against settlement because it was not in their best interests. Yet the Preferred Shareholders are not the only—or even the paramount—stakeholders whose interests the Disinterested Directors had to consider. Just the opposite: "[A] debtor in possession, like a trustee, takes on fiduciary responsibilities to all creditors." *Azby Fund v. Wadsworth Ests., LLC*, No. 22-30092, 2022 WL 17582273, at *2 (5th Cir. Dec. 12, 2022). QVCG and the Disinterested Directors therefore had to assess what complexity and cost meant for the entire estate, not just those who recovered no money and did not value the releases they received.

25

      **c.**      **The Best Interests of Creditors and Existence of Arm's-Length Bargaining.**

63.      The Preferred Shareholders last challenge the Court's treatment of Rule 9019's third factor, which weighs "the best interests of the creditors, with proper deference to their reasonable views," together with "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Cajun Elec.*, 119 F.3d at 356 (internal quotation marks omitted). The Court considered both components at length and made detailed factual findings on each. The Preferred Shareholders' disagreement with those findings falls well short of the abuse of discretion they must show.

64.      Start with the interests of creditors. The Court found that the Intercompany Settlement served the best interests of creditors because it "functions as the keystone to the RSA and the Plan," and that without it the Debtors faced "an uncertain future, both in terms of the dark waters of litigating the intercompany claims, as well as funding their go-forward operations absent the proposed reorganization." ECF No. 710 at 72. The record bore that out: no creditor objected to the Intercompany Settlement or the Plan, and the Plan was accepted by a wide majority of each voting class. *Id.* at 71–72. Creditor support of that breadth is powerful evidence that the compromise served the estate's best interests.

65.      The Preferred Shareholders recast the Court's "keystone" reasoning as a failure to conduct a QVCG-specific inquiry, arguing that QVCG should not have contributed its distributable cash and 62% Cornerstone interest while Preferred Shareholders received nothing. ECF No. 716 at 30–31. But Rule 9019 asks whether the Intercompany Settlement was fair, equitable, and in the estate's and creditors' best interests, not whether it preserved an out-of-the-money equity recovery. Because the Intercompany Settlement paid QVCG's general unsecured creditors in full and enabled the creditor-supported Plan, its central role supports approval.

66.     The Preferred Shareholders' real complaint is that the Court did not treat their opposition as dispositive, insisting that they are the "only stakeholders with a meaningful economic interest in QVCG."  ECF No. 716 at 14.  But *Foster Mortgage* makes creditor views paramount:  "in the bankruptcy context, the interests of the creditors not the debtors are paramount," and courts should give "proper deference to their reasonable views."  68 F.3d at 917.  Here, no creditor objected to the Intercompany Settlement or the Plan.  ECF No. 710 at 67, 72.  Equity holders standing behind creditors in a debtor facing potential liabilities far beyond its available assets cannot override the creditor support the factor actually prioritizes.

67.     Nor does *RNI* help them.  There, the court considered equity's interests only because creditors were "in the money" by approximately $100 million and, unlike in "most bankruptcy cases," there was a "likelihood of a recovery for equity."  *In re RNI Wind Down Corp.*, 348 B.R. 286, 298 (Bankr. D. Del. 2006).  That premise is absent here:  the Court found, based on the only record evidence addressing the Preferred Shareholders' proposed alternative, that "equity would still receive no recovery."  ECF No. 710 at 90.  *RNI* therefore confirms that equity interests may matter when equity is realistically in the money, not when the record shows equity is out of the money under any alternative.

68.     The arm's-length component fares no better for the Preferred Shareholders.  After a four-day evidentiary hearing, the Court found that the Intercompany Settlement was "achieved through a fair, arm's-length process devoid of fraud and collusion."  *Id.* at 73.  Each Key Entity was represented by Disinterested Directors advised by their own independent conflicts counsel, and the negotiation unfolded as a "robust process" of posturing, counterproposals, and ultimately give-and-take.  *Id.* at 63–64, 72–73.  The QVCG Special Committee opened with "the most

27

aggressive position" it could take and then negotiated as its understanding of QVCG's leverage evolved, the hallmark of genuine arm's-length bargaining, not capitulation. *Id.* at 63–64.

69. Against these findings, the Preferred Shareholders offer little more than the assertion that titles and process labels "are not talismans." But the Court did not rest on labels. It examined the very negotiating sequence the Preferred Shareholders now recite, including the QVCG Special Committee's early framing, QVCG's opening position that QVC's clawback claims were not likely viable, and the parties' progression to a $400 million claim. The Court found that sequence to be consistent with legitimate negotiating tactics rather than a preordained outcome. ECF No. 710 at 63–64. The Preferred Shareholders never engage with that analysis, let alone identify the clear error required to set it aside.

70. The Preferred Shareholders separately fault the QVCG Disinterested Directors for declining to retain additional advisors and for not securing a Preferred Shareholder recovery, likening the process to the retention of a nominally independent fiduciary to "sprinkle holy water" on a conflicted transaction. ECF No. 716 at 30 (citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 240 (Bankr. D. Del. 2001)). *Coram* is nothing like this case. There, the debtor's CEO had a continuing, actual conflict arising from a nearly $1 million annual consulting arrangement with one of the debtor's largest creditors, and that conflict tainted the debtors' restructuring efforts even after it came to light in discovery. *Id.* at 232, 235–36, 238–40. Here, by contrast, the Court found that the Disinterested Directors "engaged in a fulsome and comprehensive assessment of potential claims and defenses," acted "separately and independently of one another, with and through each's respective counsel," and "made their own independent determinations, through the advice of counsel." ECF No. 710 at 9, 63. The Memorandum Decision also found that the information flow included "diligence, fund flow analyses, financial projections, solvency analysis, and valuation

28

analysis," and that the shared advisors "did not … tell the Disinterested Directors what opinions to formulate." *Id.* at 63. That the Directors chose not to layer duplicative advisors atop the process does not make the Intercompany Settlement anything other than the product of arm's-length bargaining.

71. In short, the Court weighed both the interests of creditors and the integrity of the negotiating process and made supported findings on each. The Preferred Shareholders' quarrel with those findings identifies no abuse of discretion, and therefore no substantial question warranting a stay pending appeal.

**B. The Preferred Shareholders Have Not Shown They Will Suffer Irreparable Harm.**

72. The irreparable injury prong also counsels against a stay pending appeal. The Preferred Shareholders claim that absent a stay, consummation of the Plan may render "appellate review [] equitably moot." *See* ECF No. 716 at 32. They argue that if the Confirmation Order goes into effect and the Debtors consummate the Plan, "they would implement the very QVCG-specific transactions that the Preferred Shareholders seek to challenge on appeal." *Id.* at 33. And once "QVCG distributable cash and the 62% Cornerstone interest are transferred, releases become operative, and the Preferred Stock is canceled," the Preferred Shareholders protest that they "cannot be restored fully after the fact." *Id.* at 33.

73. That is not enough. "[T]he possibility of the application of equitable mootness does not demonstrate irreparable injury." *In re Container Store Grp., Inc.*, No. 24-90627, 2025 WL 4226766, at *9 (Bankr. S.D. Tex. Apr. 7, 2025). It is not a close question, either; "many courts in the Fifth Circuit have held" as much. *Id.*; *see also In re Nat'l CineMedia, LLC*, No. 4:23-CV-02414, 2023 WL 5030098 at *8 (S.D. Tex., Aug. 4, 2023); *Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Rests., LLC*, No. 14-0609, 2014 WL 1871889, at *4 (W.D. La. May 6, 2014); *In re*

*Village at Camp Bowie I, L.P.*, No. 10-45097 (DML), 2012 WL 79091, at *2 (Bankr. N.D. Tex. Jan. 11, 2012); *In re Camp Arrowhead*, No. SA-10-CV-11-XR, 2010 WL 363773 at *7 (W.D. Tex., Jan. 22, 2010).

74.     Rather than confront the overwhelming caselaw that rejects their contention, the Preferred Shareholders invoke out-of-circuit cases and Fifth Circuit decisions addressing whether certain appeals have actually become moot. *See* ECF No. 716 at 32–33.  Yet nowhere do they attempt to explain why the uniform approach in this Circuit is wrong while the approach elsewhere is right.  Nor would any argument on the point be persuasive.  The Preferred Shareholders' view collapses the rule into the exception:  If mootness alone were enough to show irreparable harm, then "anytime an appeal is mooted, a stay would be required."  *In re Container Store Grp.*, 2025 WL 4226766, at *9 (no irreparable harm).  And what the Fifth Circuit has said when ruling on the merits of a mootness argument is an entirely different issue.  At this stage, the question is not whether the Preferred Shareholders' appeal will become moot, but whether the possibility that the equitable-mootness doctrine could trigger is itself irreparable harm.  It is not.  *See In re Container Store Grp.*, 2025 WL 4226766.

75.     A stay would not prevent the harm, either.  This Court made a finding of fact, supported by the only record evidence on the matter, that under any alternative scenario, "equity would still receive no recovery."  *See* ECF No. 710 at 90.  The Preferred Shareholders nevertheless want QVCG to press its luck and litigate QVC's claims against it.  But as this Court also found, that long, expensive, contentious process would be "value destructive," and "all QVCG stakeholders would be worse off."  *See id.*  As much as the Preferred Shareholders worry that without a stay, they "cannot be restored fully after the fact," ECF No. 716 at 33, the combination

30

of QVCG's limited assets, its significant liabilities, and the Bankruptcy Code's priority scheme mean that regardless of what happens, there will be nothing to restore.

**C.      A Stay Would Substantially and Irreparably Harm the Debtors, Their Creditors, Other Stakeholders, and Numerous Other Parties.**

*76.*      The harm the Debtors and interested parties face from a stay would be extraordinary and preventable.  The third stay factor considers whether there is an "absence of substantial harm to the other parties from granting of the stay[.]"  *In re Serta Simmons Bedding LLC*, No. 23-90020, 2023 WL 4275019, at *2 (S.D. Tex. June 29, 2023).  "To succeed on this prong, applicants must show that the requested stay *will not harm* the opposing appellees or other interested parties."  *All. for Hippocratic Med. v. F.D.A.*, No. 23-10362, 2023 WL 2913725, at *19 (5th Cir. Apr. 12, 2023) (emphasis added).  The Preferred Shareholders have not made—and cannot make—that showing.

**1.      A Stay of the Confirmation Order Would Have Devastating Consequences.**

77.      Although the Preferred Shareholders ask the Court to "stay[] the Confirmation Order pending appeal" and to "prohibit[] the Debtors from causing the Effective Date to occur while any stay remains in effect," ECF No. 716 at 37, nowhere do they acknowledge (much less confront) the sweeping ramifications of such a stay.

78.      The delay a stay would impose would likely last years.  Recent chapter 11 confirmation appeals confirm that the process routinely stretches well beyond a year, and frequently past two.  In the Fifth Circuit, such appeals have taken as long as 939 days from notice of appeal to final order.  *See, e.g.*, *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d 523 (5th Cir. 2018) (939 days); *In re Highland Capital Mgmt., L.P.*, 132 F.4th 353 (5th Cir. 2025) (684 days); *In re Serta Simmons Bedding, LLC*, 125 F.4th 555 (5th Cir. 2024) (614 days).  Appeals resolved at the district-court level in this District have taken comparable time.  *See, e.g.*, *N. Am. Specialty Ins. Co.*, No. 4:21-cv-02201 (S.D. Tex.) (615 days); *In re Quintela Grp., LLC*, No. 4:20-

cv-03499 (S.D. Tex.) (350 days). And where review proceeds to the Supreme Court, the delay is greater still. *See In re Ultra Petroleum Corp.*, No. 20-32631 (Bankr. S.D. Tex.) (close to 1,000 days from confirmation to denial of certiorari). Combining the median resolution times in the five most recent confirmation appeals that the Debtors could locate in this District and the Fifth Circuit[3] yields an expected delay of roughly 31 months—well over two years.

79. Make no mistake: a stay of the Confirmation Order would wreak havoc. Start with the Debtors. Even just the threat of a potential chapter 11 proceeding "put a lot more stress on the system." Wafford Testimony, Day 2: 347:22–23. It caused vendors to demand letters of credit or prepayment before shipping inventory. It increased employee anxiety, which prompted the need for retention and incentive plans to convince valued team members to stay on. And it caused the Debtors to incur tens of millions of dollars in professional fees. These harms were felt even while the Debtors were able to message to the public and their stakeholders that their stay in bankruptcy would be brief. Keyes Decl. ¶ 9. The Debtors are now over a month beyond the timeline messaged in their initial scheduling motion, which contemplated emergence by June 8, 2026. *Id*.

80. If the Debtors could not emerge from chapter 11 until the Preferred Shareholders saw their appeal through to the bitter end, all those problems (and the costly solutions to them) would compound. In the wake of these chapter 11 cases, vendors' letter-of-credit requirements have ballooned to $300 million. Keyes Decl. ¶ 9. No rational vendor, when informed that the Debtors face an indefinite stay in bankruptcy, would reduce its demands. The Debtors' retention

---

[3]     *See In re Houston Regional Sports Network, L.*P., 886 F.3d 523 (5th Cir. 2018) (939 days)*; In re Highland Capital Management, L.*P., 132 F.4th 353 (5th Cir. 2025) (684 days)*; In re Serta Simmons Bedding, L*LC, 125 F.4th 555 (5th Cir. 2024) (614 days: median of Fifth Circuit appeals)*; In re Live*ly, 717 F.3d 406 (5th Cir. 2013) (400 days)*; In re Fieldwood Energy L*LC, 93 F.4th 817 (5th Cir. 2024) (340 days)*; In re North American Specialty Insurance C*o., No. 4:21-cv-02201 (S.D. Tex.) (615 days)*; In re GuangDong Midea Consumer Electric Mf'g Co. Lt*d., No. 4:24-cv-00847 (S.D. Tex.) (387 days)*; In re Quintela Group, L*LC, No. 4:20-cv-03499 (S.D. Tex.) (350 days: median for Southern District of Texas appeals)*; In re Costagl*io, No. 4:25-cv-03616 (S.D. Tex.) (294 days)*; In re Ovation Servic*es, No. 2:22-cv-00309 (S.D. Tex.) (243 days).

and compensation agreements for key employees expire in January. Should the stay extend the effective date beyond January, the Debtors will be forced to renew a key employee retention and incentive program that previously cost $72.6 million to put in place. *Id.* And professional fees—already averaging $17 million per month since the retention of shared professionals—would inevitably continue to mount.

81. An extended stay in bankruptcy would also rob the Debtors of crucial opportunities in the coming months. Without completing their reorganization, freeing themselves from chapter 11 restrictions, and obtaining access to post-emergence liquidity, the Debtors may miss the narrow window to transition from traditional media to social media. Keyes Decl. ¶ 9.

82. But the Court need not take the Debtors' word for it; recent developments reveal the effects that the Debtors' need to reorganize has caused. For Q1 2026, the quarter immediately prior to the chapter 11, QVC experienced an 8.5% year-over-year decline in topline revenue. In Q2, while the Company was in chapter 11, the decline accelerated to 10.3%. That represents a 180 basis point acceleration in decline, even with a proposed efficient, short stay in bankruptcy. Assuming this 180 basis point acceleration is maintained, QVC would experience a hit to topline revenue of approximately $135 million over a 12-month stay, a $209 million hit over an 18-month stay, and a $270 million hit over a 24-month stay against the projections introduced at the confirmation trial. Keyes Decl. ¶ 9. All told, should the Court stay the Confirmation Order pending appeal, the Debtors' businesses would degrade at a time when they are primed to flourish.

83. *Any* stay (including the "narrow" stay the Preferred Shareholders propose) would also leave Cornerstone in limbo, threatening its ability to continue on a go-forward basis and risking a liquidation of that brand, jeopardizing the livelihoods of its 1,527 employees. Prior to the Debtors' chapter 11 cases, the Cornerstone business was operating on razor-thin margins, even

33

while receiving significant support from QVC. Keyes Testimony, Day 1: 264:6–15; 268:14–16; 271:18–272:2 (Jason Keyes noting that Cornerstone benefits substantially from QVC's agreement with UPS); 272:15–25 (noting QVC provides certain administrative services to Cornerstone); 273:2–14 (noting QVC provides roughly $700,000 in third-party services to Cornerstone, including audit and tax services); 273:15–25 (noting the IT and Audit services QVC provides to Cornerstone). In an event where Cornerstone remained owned by QVCG and LINTA and the Debtors collectively remain in bankruptcy, Cornerstone faces a real and substantial risk of liquidation. Keglevic Testimony, Day 3: 51:18–23 ("So management had done a study in February that said the liquidation value of Cornerstone to shareholders was zero. And, you know, interestingly, LINTA said, we don't want it."); *id.* at 53:1–10 ("Now, there's, in fact, a study in February that says there's zero liquidation value associated with [Cornerstone]. So people are making - - would have to make assumptions. And, of course, in the valuation assumptions that everybody issues, they use the company's projections again, which have proved to be too high, both from a profit standpoint and from a revenue standpoint."). Should the Court issue a stay of its confirmation order, the Debtors estimate the losses to Cornerstone's topline revenue of approximately $20 million over a 12-month stay, $30 million over an 18-month stay, and $40 million over a 24-month stay against the projections introduced at the confirmation trial. Keyes Decl. ¶ 9. It is only after emergence, with Cornerstone owned directly by QVC, that the Cornerstone business has a chance to realize any value. Keglevic Testimony, Day 3: 52:8–13 ("So if there was going to be any value at Cornerstone, you know, [QVC was] the only one that could capture it because there was zero value to LINTA and zero value to TopCo."); *id.* at 53:11–16 ("So, you know, [QVC] ascribe[s] very little value to Cornerstone. It's going to take a turnaround and it might have some value but I think you could certainly argue the value range

34

starts with zero."); *id*. at 51:11–17 ("QVC, Inc. provides, I think it was testified to, all the back office functions, including IT. And also, there's a tremendous amount of synergies. I think the one that was brought up, UPS is probably by far the biggest one, the rate that Cornerstone got.").

### 2. A Tailored Stay Would Not Prevent the Harm.

84. Rather than acknowledge the widespread harm their requested blanket stay would impose, the Preferred Shareholders focus instead on the consequences of a narrower stay. They submit that a stay "will not substantially harm other parties *because the Court can tailor relief to the QVCG-specific provisions.…*" ECF No. 716 at 34 (emphasis added). And they proffer a stay that would stop "transfer or distribution of QVCG distributable cash, the transfer of QVCG's 62% Cornerstone interest, the cancellation of Preferred Stock, and enforcement of releases against the Preferred Shareholders." ECF No. 716 at 34. "Practically speaking," they say, blocking those events "will result only in lowering the amount of distribution certain of QVC's creditors will take at emergence." ECF No. 716 at 34. Not so.

85. As an initial matter, the Preferred Shareholders' maneuver signals a tacit admission of the harm that will follow from the full stay they request. But even the so-called "tailored" stay is a wolf in sheep's clothing. The transfers and releases that Preferred Shareholders seek to block are foundational components of the Intercompany Settlement. And the Intercompany Settlement "functions as the keystone to the RSA and the Plan." ECF No. 710 at 72. So without those items, there is no Intercompany Settlement. And without the Intercompany Settlement, there is no Plan. The alternative stay that the Preferred Shareholders propose might be narrow in form, but its function would be no different than a full stay of the Confirmation Order.

### 3. The Harm of a Stay Greatly Outweighs Any Harm Absent One.

86. These injuries are real, substantial, and serious and far exceed any alleged injury to the Preferred Shareholders in absence of a stay. "A stay is not a matter of right, even if irreparable

35

injury might otherwise result." *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). "It is ultimately necessary to balance the equities – to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Rhoten v. Stromen*, No. 1:16-CV-00648, 2020 WL 3545661, at *3 (W.D. Tex. June 30, 2020) (citation modified); *see also F.D.I.C. v. Belcher*, No. 19-12561, 2020 WL 242781, at *6 (E.D. La. Jan. 16, 2020) ("A determination of the balance of equities, 'i.e., consideration of the other three factors,' is critically relevant to the court's determination." (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565–66 (5th Cir. 1981)).

87.     Notwithstanding stay applicants' own irreparable injuries, courts in this District have routinely denied stays to the applicants where the opposing party would suffer substantial harm under a stay. *Bank of America, N.A. v. Mega World Builder Corp.*, No. 4:24-cv-3021, 2025 WL 1485868, at *2–3 (S.D. Tex. Jan. 8, 2025) (denying a stay whereby the party opposing the stay would see "millions of dollars of [its] assets" dissipated, notwithstanding the movant's evidence "at best, show[ing] some possibility that the Court's order will irreparably injure" them.); *In re Boca Del Rio Props., Inc.*, No. H-0602439, 2006 WL 2459445, at *1–2 (S.D. Tex. Aug. 23, 2006) (denying a stay where the party opposing the stay would see its collateral used rent free by the debtor, notwithstanding the debtor, the movant, possibly seeing its appeal become equitably moot); *Patino v. City of Pasadena*, 229 F. Supp. 3d 582, 588–90 (S.D. Tex. 2017) (denying the City's request for a stay of an injunction against its recently enacted voting districts, where the party opposing the stay would suffer substantial injury from the dilution of their right to vote, notwithstanding the city's irreparable injury of not being able to enforce its laws). Here, the Debtors' and other stakeholders' injuries far outweigh the Preferred Shareholders' claims of harm

36

that might befall them.  That the balance of the equities tilts so significantly in the Debtors' favor is even more reason to deny the Motion.

### D. The Public Interest Disfavors a Stay.

88.     Finally, the fourth stay factor, which asks "where the public interest lies," also weighs against a stay.  *Nken*, 556 U.S. at 434.  "In a bankruptcy case, the public interest is in promoting a successful reorganization."  *In re Raborn*, No. 15-10938, 2017 WL 4536090, at *4 (Bankr. M.D. La. 2017) (quoting *In re Babcock & Wilcox*, No. CIV.A.00-1410, 2000 WL 1092434, at *3 (E.D. La. Aug. 2, 2000)); *see also In re Smith*, 397 B.R. 134, 148 (Bankr. D. Nev. 2008) ("great public interest in the efficient administration of the bankruptcy system" weighed against issuance of a stay pending appeal); *In re Stewart*, 604 B.R. 900, 909 (Bankr. W.D. Okla. 2019) (public interest in expeditious administration of bankruptcy cases weighs against issuance of stay).  And "[c]ourts recognize the strong public 'need for finality of decisions, especially in a bankruptcy proceeding.'"  *Piccadilly Rests.*, 2014 WL 1871889, at *5 (denying stay pending appeal) (quoting *In re Calpine Corp.*, 2008 WL 207841, at *7).

89.     Implementation of the Plan will allow Reorganized QVC to emerge better positioned for long-term growth.  This will benefit all parties, including Reorganized QVC's employees, vendors, and commercial counterparties.  Granting the Preferred Shareholders' request for a stay would severely hinder the public interest by delaying the reorganization process, causing uncertainty and potential harm to creditors and other stakeholders who are relying upon the finality of the Confirmation Order, and undermining the success of Reorganized QVC's reorganization. That result benefits only the Preferred Shareholders, who would enjoy tremendous hold-up leverage.  Such an outcome would be directly contrary to the public's interest.

90.     In response, the Preferred Shareholders offer a vague claim that the public interest "favors correct application of the Bankruptcy Code's confirmation requirements."  ECF No. 716

37

at 35.  This argument assumes that the Preferred Shareholders are right about the law.  Not only is that assumption incorrect for the reasons explained above, but the argument itself conflates the likelihood-of-success factor with the public interest factor.

91.  In arguing that the public interest favors a stay, the Preferred Shareholders further assert that "loss of appellate rights is irreparable prejudice."  *Id*.  Setting aside the merits of the claim, it similarly confuses the question of whether they face a risk of irreparable harm with the question of whether the *public interest* would be served by a stay.  Whatever the scope of that interest, it pales in comparison to the interest in preserving the tangible benefits of a highly successful restructuring.

## II.  At A Minimum, A Stay Pending Appeal Should Require The Preferred Shareholders To Post A $900 Million Bond.

92.  If the Court finds that the Preferred Shareholders have carried their burden in proving that a stay is appropriate (they have not), then under Bankruptcy Rule 8007(c), the Court should impose a bond.  Doing so will account for the vast harm that the stay would cause the Debtors, their creditors, and other stakeholders.

93.  "The purpose of requiring such a 'bond in a bankruptcy court is to indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court.'"  *In re Tribune Media Co.*, 799 F.3d 272, 281 (3d Cir. 2015) (citing *In re Theatre Holding Corp.*, 22 B.R. 884, 885 (Bankr. S.D.N.Y.1982)).  "In determining whether a bond should be ordered, the court looks to whether the bond would be necessary to protect 'against diminution in the value of property pending appeal' and to 'secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal.'"  *In re Adelphia Commc'ns*, 361 B.R. at 350 (citation omitted); *In re Texas Equip. Co., Inc.*, 283 B.R. at 229 (similar).  "Moreover, the posting of a bond 'guarantees the costs of delay incident to the appeal.'"

38

*In re Adelphia Commc'ns*, 361 B.R. at 350 (citation omitted). "The form, the amount and the sufficiency of that security are generally matters within the discretion of and for determination by the bankruptcy court." *Ruff v. Ruff*, No. 4:22-CV-00321, 2023 WL 2574021, at *3 (E.D. Tex. Mar. 20, 2023) (quoting *In re Gleasman*, 111 B.R. 595, 602 (Bankr. W.D. Tex. 1990)).

94.     When calculating the amount of the bond, courts evaluate the costs to the non-moving party and its creditors that a stay would cause, including additional professional fees, opportunity costs to creditors who would now receive delayed distributions, and loss in market value to equity investors caused by delayed emergence from bankruptcy, among other factors. *See, e.g.*, *In re Tribune Media*, 799 F.3d at 282. The Court should generally "set a bond at or near the full amount of the potential harm to the non-moving parties." *In re Adelphia Commc'ns,* 361 B.R. at 368. Such bonds can reach amounts ranging into the hundreds of million or billions of dollars. *See, e.g.*, *id.* (ordering appellants to post bond in amount of $1.3 billion with ten percent to be posted within twenty-four hours of the opinion and remainder to be posted within seventy-two hours); *id.* at n.166 (collecting cases); *In re Tribune Media*, 799 F.3d at 282 (finding bankruptcy court's calculation of supersedeas bond in amount of $1.5 billion "was well-considered and as convincing as the alchemy of valuation in bankruptcy can be"); *In re Tribune Co.*, 477 B.R. 465, 480–83 (Bankr. D. Del. 2012) (ordering same); *cf. In re Gen. Motors Corp.*, 409 B.R. at 34 (denying stay but noting "a bond would have to be posted in an amount no less than $7.4 billion" given the magnitude of harms faced by non-movants); *In re Calpine Corp.*, 2008 WL 207841, at *7 (denying stay but noting in dicta that "no stay would be issued without the posting of a bond to cover the enormous risk of loss to the Debtors, their estates, creditors and interest holders in the range of $900 million to $1 billion").

95.     The burden is on the appealing party to prove that a bond in the full amount of the potential harm is not required. *See In re Perry*, No. CV 23-5265, 2024 WL 68257, at *4 n.41 (E.D. La. Jan. 5, 2024) ("A bond is generally required for a stay. While posting an appeal bond is not mandatory, 'if the movant seeks imposition of a stay without a bond, the applicant has the burden of demonstrating why a court should deviate from the ordinary full security requirement'" (quoting *In re Motors Liquidation Co.*, 539 B.R. 676, 686 (Bankr. S.D.N.Y. 2015))); *see also Preston Wood & Assocs., LLC v. Cameron Architects, Inc.*, No. H-16-1427, 2019 WL 2904297, at *2 (S.D. Tex. Apr. 26, 2019) (under Fed. R. Civ. P. 62(d), "'If a court chooses to depart from the usual requirement of a full security supersedeas bond,' the burden is on the moving party to 'objectively demonstrate' that posting a full bond would impose an undue financial burden.").

96.     The Preferred Shareholders have failed to carry their burden here. Not only have the Preferred Shareholders failed to explain why the Court should deviate from the standard practice of requiring a supersedeas bond, the Preferred Shareholders also ignore the substantial, quantifiable harm to the Debtors, their creditors, and other stakeholders that would result should any stay be ordered. Any stay would result in significant business decline, including decreased topline revenue, heightened vendor anxiety, and significant employee retention concerns. *See* Keyes Decl. ¶ 9 (explaining that QVC is directly seeing the impact of the bankruptcy in its revenue); *id.* (explaining that vendors have demanded letters of credit now totaling $300 million and should a stay be enacted the Company will not see the return of a budgeted $100 million in liquidity slated to return from their expiration); *id.* (explaining that any stay may result in the Debtors needing to renew employee retention programs that previously cost the business $72.6 million to enact). Any stay would also result in continued professional fees, to the tune of at least $8 million per month over the course of the stay. *Id.* ¶ 9. A stay too would cause the

40

company to incur increased fees to the U.S. Trustee, amounting to $3 million over a twelve-month stay, $4.5 million over an eighteen-month stay, and $6 million over a twenty-four-month stay. *Id.* Any stay would necessarily also result in further devaluation of the Cornerstone business, likely leading to a substantial liquidity crisis for Cornerstone such that its 1,527 employees' jobs are threatened. *See id.* Courts have found these types of quantifiable harms persuasive in evaluating whether to institute a bond. *See, e.g.*, *In re Adelphia Commc'ns*, 361 B.R. at 352–54, 368 (discussing factors influencing finding that value erosion would occur should a stay be put in place); *In re Tribune Co.*, 477 B.R. at 478–83 (weighing factors raised by the parties).

97.     Further, any stay would also result in additional financial harms that are harder to quantify, including lost investment opportunities for creditors, potential loss of the exit ABL facility, which is contingent on the consummation of the restructuring transactions in the Plan within 180 days, the maturity of the Debtors' debtor-in-possession financing on October 16, 2026, and the significant risk of an unraveling of the RSA and Plan, which would wreak havoc on the Debtors' restructuring efforts. This type of value erosion is something courts have highlighted when determining whether to implement a bond. *See, e.g.*, *In re Adelphia Commc'ns*, 361 B.R. at 354.

98.     The Preferred Shareholders' arguments that no bond need be posted—arguments for which they provide no supporting case law, *see* ECF No. 716 at 35—ignore the vast harm that would result to the Debtors. The Preferred Shareholders argue that "[t]he assets at issue during the pendency of the stay … will remain intact and available to be transferred to the Debtors or other parties *later* should the Preferred Shareholders not prevail on appeal." *Id.* (emphasis added). The Preferred Shareholders fail to account for the real harm that any delay in transfer of the assets would work on the Debtors and other stakeholders by wrongfully assuming—as they have

41

repeatedly—that QVCG can just be carved out of the Intercompany Settlement. As Mr. Keyes details, decreased topline revenue at QVC and Cornerstone, continued fee burn, U.S. Trustee fees, lost investment opportunities for creditors, and employee retention could materialize into approximately $419 million over a 12-month stay, $603 million over an 18-month stay, and $776 million over a 24-month stay—even before taking into account the loss of a planned $100 million in additional liquidity as letters of credit would otherwise begin to expire. *See* Keyes Decl. ¶ 10.

99.     What's more, the Preferred Shareholders' alternative argument that "the Debtors are already holding approximately $75 million in professional fees that QVCG funded … and for which QVCG is entitled to reimbursement" and which therefore "can serve as adequate security for a stay… without requiring the Preferred Shareholders to post any additional collateral," ECF No. 716 at 35, gets the requirement exactly backwards. To obtain a stay, it is the Preferred Shareholders who must post the bond—and they must do so with their own money, not money at QVCG and not money QVCG is purportedly owed by its professionals or another debtor entity.

100.     Should the Court find that a stay is warranted, it should order that the moving Preferred Shareholders post a bond in the amount of $900 million, on account of the decreased topline revenue at QVC and Cornerstone, continued fee burn, U.S. Trustee fees, lost investment opportunities for creditors, employee retention costs totaling approximately $419 million over a 12-month stay, $603 million over an 18-month stay, and $776 million over a 24-month stay—even before taking into account the loss of a planned $100 million in additional liquidity as letters of credit would otherwise begin to expire—plus the incalculable and irreparable harm to the business of being prevented from achieving its planned transition to social media and one-time opportunity to seize market share. Only such a bond would ensure the value of the enterprise can be protected

42

from the risks it inevitably will face due to delays in the Debtors' reorganization necessitated by a stay pending appeal.

## CONCLUSION

101. The Debtors have covered a marathon's distance at a sprinter's pace. Nothing warrants barricading the finish line for two years while the Preferred Shareholders pursue a long-shot appeal. The Court should deny the Motion.

[*Remainder of page intentionally left blank.*]

Dated: July 20, 2026

*/s/ Jason S. Brookner*

| | |
|---|---|
| **GRAY REED** | **KIRKLAND & ELLIS LLP** |
| Jason S. Brookner (TX Bar No. 24033684) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Lydia R. Webb (TX Bar No. 24083758) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Emily F. Shanks (TX Bar No. 24110350) | Aparna Yenamandra, P.C. (admitted *pro hac vice*) |
| 1300 Post Oak Blvd. | 601 Lexington Avenue |
| Suite 2000 | New York, New York 10022 |
| Houston, Texas 77056 | Telephone: (212) 446-4800 |
| Telephone: (713) 986-7000 | Facsimile: (212) 446-4900 |
| Facsimile: (713) 986-7100 | Email: joshua.sussberg@kirkland.com |
| Email: jbrookner@grayreed.com | aparna.yenamandra@kirkland.com |
| lwebb@grayreed.com | |
| eshanks@grayreed.com | - and - |

Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gabriela Zamfir Hensley (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: chad.husnick@kirkland.com
gabriela.hensley@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

*Co-Counsel for the Debtors and Debtors in Possession*

44

**Certificate of Service**

I certify that on July 20, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason S. Brookner*
Jason S. Brookner

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| QVC GROUP, INC., *et al.*,[1] | ) Case No. 26-90447 (ARP) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

### DECLARATION OF JASON KEYES IN SUPPORT OF
### DEBTORS' OPPOSITION TO THE PREFERRED SHAREHOLDERS' EMERGENCY
### MOTION FOR STAY PENDING APPEAL OF CONFIRMATION ORDER UNDER
### BANKRUPTCY RULE 8007(A), OR, IN THE ALTERNATIVE, FOR LIMITED STAY
### AND INTERIM STAY PENDING HEARING

I, Jason Keyes, hereby declare under penalty of perjury, to the best of my knowledge, information, and belief:

1. I am a Partner and Managing Director at AlixPartners, LLP ("AlixPartners"), the financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company"). I submit this declaration (the "Declaration") in support of the *Debtors' Opposition to the Preferred Shareholder's Emergency Motion for Stay Pending Appeal of Confirmation Order Under Bankruptcy Rule 8007(a), or, In the Alternative, For a Limited Stay and Interim Stay Pending Hearing*. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.

2. The Declaration is based upon (a) my experience and personal knowledge, (b) information obtained from members of the Debtors' management team, employees, or

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson Drive, West Chester, Pennsylvania, 19380.

advisors, (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and (d) my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts and opinions set forth in this Declaration.

**Professional Background**

3. AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing restructuring advisory services, and has assisted and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these chapter 11 cases.

4. I have over fifteen years of restructuring, corporate finance, accounting, and turnaround experience, including business plan development, plan negotiations, and interim management experience. Since joining AlixPartners, I have provided restructuring advice to companies, creditors, and investors, both in chapter 11 and on an out-of-court basis, in the retail, transportation, technology, infrastructure, energy, aerospace, and mining industries. As an advisor, I have been involved in a number of chapter 11 cases, including STG Logistics, Inc., Riverbed Technology, Inc., J. Crew Group, Inc., Toisa Ltd., Aegean Marine Petroleum Network Inc., UCI International, LLC, Chassix Holdings, Inc., Allied Nevada Gold Corp., American Roads Holding LLC, Essar Steel Minnesota LLC, and Walter Energy, Inc. I have worked on six retail restructurings and turnarounds, on both an in-court and out-of-court basis.

5. I, together with my team members at AlixPartners, have been assisting the Company with financial planning and strategic alternative assessment since May 2025. In that role I have become familiar with the Debtors' business and books and records. I have also become familiar with the Debtors' operations, including its interactions with its customers, vendors, and trade base. I have worked closely with the Debtors' senior management to evaluate liquidity and

2

credit issues, and formulate strategies necessary to successfully implement the Debtors' business plan and restructuring transactions. Further, I have assisted the Debtors with the development of projections and analyses that formed the foundation of the Restructuring Support Agreement (the "RSA"), the Plan of Reorganization (the "Plan"), and the Debtor's exit financing (the "Exit ABL").

### The Confirmed Plan is a Tremendous Success

6. The confirmed Plan is a terrific accomplishment for each of the Debtors' estates, including QVC Group, Inc. ("QVC Group"). As the Court noted, this global settlement is the "keystone" of the Plan (and RSA). *See* ECF No. 710 at 9, 72. Because of its many benefits, the Plan earned near universal consensus. As set forth in the Voting Report, the Plan received the support of every class eligible to vote in favor of confirmation. Holders of 100% in principal amount and 100% in number of the Class B3 Claims, 99.88% in principal amount and 85.56% in number of the Class B4 Claims, and 98.95% in principal amount and 81.91% in number of the Class C3 Claims have voted to accept the Plan.

7. The overwhelming support from the Debtors' stakeholders primes the Debtors to emerge from chapter 11 as a strong, well-positioned company with QVC, Inc. ("QVC Inc.") at the helm. The Plan preserves the jobs of approximately 15,800 employees; right sizes the Debtors' balance sheet, resolves all material intercompany claims between and among the Debtors, and provides releases to QVC Group's Preferred Shareholders, protecting primarily non-institutional investors from avoidance action risk on account of nearly $450 million in dividend payments they received in recent years. Among other benefits to the estate, the Plan accomplishes:

- *Substantial Deleveraging*. Through the restructuring transactions, the Debtors will eliminate more than $5 billion in funded debt obligations, which will free up capital and opportunities for the reorganized Debtors to continue their transformation efforts.

- *Satisfaction of All Third-Party Unsecured Claims*. Through the Plan, the Debtors, with the support of their funded debt Creditors (who themselves are taking significant concessions in their recoveries) are satisfying in full all third-party unsecured claims

3

across every Debtor entity, including all employee and vendor claims. The result is that all third-party general unsecured creditors across the Debtors' corporate structure have received payment in full of over $330 million in payments related to pre-petition claims.

- ***Resolution of Complex Intercompany Claims Facilitates Distributions; Avoids Multi-Year Protracted Litigation***. The Plan provides for the settlement and releases related to numerous intercompany claims that have the potential to exceed $2 billion in total between QVC, QVC Group, Liberty Interactive LLC ("LINTA"), and QRI Cornerstone ("Cornerstone"). The intercompany claims resolved include potential fraudulent transfers, tax obligations, and possible deferred tax liability resulting from LINTA notes. The resolution of these claims, rather than their litigation, expedites distributions and saves all parties millions of dollars in professional fees that can otherwise be distributed to the Debtors' stakeholders.

- ***Exit Financing***. The Debtors have obtained commitments for the Exit ABL in an amount of $600 million, which will significantly bolster liquidity upon emergence. The Exit ABL reflects the confidence of the sophisticated lenders in the Debtors' post-emergence business plan and positions the Company for long-term, sustainable growth.

- ***Preserving the Going Concern Value of the Business***. Most importantly, the Plan provides the Debtors with negotiated commitments that ensures each of QVC and Cornerstone continue as a going concern post emergence. Cornerstone, an otherwise challenged business with limited free cash flows in recent years, will be sustained as a subsidiary of QVC and benefit from QVC's economics of scale. By preserving themselves as a going concern, the Debtors are saving thousands of skilled jobs and minimizing disruption to the Debtors' vendor networks.

8.     All of these benefits will likely be lost if the Plan is stayed and does not go effective. The Plan is the only path currently available for the Debtors to holistically and successfully emerge from chapter 11 as a strong enterprise. I am aware of no actionable alternative, nor am I aware of an alternative proposal that would preserve the Debtors go-forward business plan and see them exit chapter 11 as a healthy, right-sized company.

## **The Harm Created by the Stay**

9.     If a stay motion is granted, the Debtors and their stakeholders will suffer severe harm—some of which can be quantified, and some of which is existential and irreparable.

- ***Decreased QVC Revenue***. Customers have expressed skepticism over the Debtors' continued operations in chapter 11 as indicated by a precipitous drop in QVC's net promoter score over Q1 and Q2 2026. QVC, Inc. is directly seeing this impact in its

4

revenue. For Q1 2026, the quarter immediately prior to the chapter 11, QVC, Inc. experienced an 8.5% year-over-year decline. In Q2, while the Company was in chapter 11, the decline accelerated to 10.3%. That represents a 180 basis point acceleration in decline, even with an efficient and proposed short stay in bankruptcy. Assuming this 180 basis point acceleration is maintained, QVC, Inc. would experience a hit to topline revenue of approximately $135 million over a 12-month stay, a $209 million hit over an 18-month stay, and a $270 million hit over a 24-month stay against the projections introduced at the confirmation trial. An extended stay in chapter 11 could easily cause an even larger basis point reduction in topline revenue as the below issues arise, leading to a far larger hit to topline revenue than identified here.

- *Decreased Cornerstone Revenue*. Cornerstone is also feeling the impact of the chapter 11. For Q1 2026, the quarter immediately prior to the chapter 11, Cornerstone experienced a 5.8% year-over-year decline in revenue. In Q2, while the Company was in chapter 11, the decline accelerated to 7.9%. That represents a 210 basis point acceleration in decline, even with an efficient and proposed short stay in bankruptcy. Assuming this 210 basis point acceleration is maintained, Cornerstone would experience a hit to topline revenue of approximately $20 million over a 12-month stay, $30 million over an 18-month stay, and $40 million over a 24-month stay against the projections introduced at the confirmation trial. An extended stay in chapter 11 could easily cause an even larger basis point reduction in topline revenue as the below issues arise, leading to a far larger hit to topline revenue than identified here. Absent continued support from the QVC mothership and the benefit of a successful emergence, Cornerstone may be unable to fund its operations, jeopardizing the livelihoods of its approximately 1,500 employees.

- *Narrow Window to Transition to Social Media.* A prolonged and uncertain stay in bankruptcy may leave the Debtors unable to achieve their long-planned objectives to transition the company into the social-media age and enhance operational efficiencies. The Debtors have a narrow window to complete the transition from traditional media to social media, including through establishing market position and competitive advantage on TikTok, and that window could be missed if the Debtors are unable to make the necessary reinvestment efforts that they have planned at emergence. If the Debtors remain in a prolonged bankruptcy, they may miss the narrow window to further establish a digital foothold—a window that may not open again, preventing the Debtors from achieving their business plan. Missing this narrow window may result in significant underperformance in the Debtors' financial projections, which relies upon the success of the social media strategy.

- *Significant Impact to the Business*. In the absence of a quick and efficient exit from chapter 11, the Debtors will continue to face significant economic headwinds. Since the release of a February 2026 Bloomberg News article regarding the Debtors' potential restructuring, the Debtors have faced significant additional business and economic stress. Vendors have pushed back and demanded letters of credit or prepayments. Employees have experienced heightened anxiety about their job security. That friction would only increase as we get closer to the holiday buying season.

- *Additional Letters of Credit*. An extended stay in bankruptcy may force the Debtors to increase the letters of credit provided to vendors to ensure delivery of products. Up to this point, the Debtors have approximately $300 million in letters of credit outstanding for the vendors. The Debtors plan (assuming a mid-year effective date) to reduce letters of credit outstanding by over $100 million over the next six to nine months, as their expiration and removal is a core component of the go forward liquidity plan. An extended stay in bankruptcy would eliminate that liquidity infusion. In addition, with an uncertain additional period of chapter 11, vendors may require additional letters of credit. Each dollar held as collateral to support these letters of credit is one less dollar of liquidity available to the Debtors.

- *Renegotiation of DIP LC Facility*. Further, the Debtors' DIP LC Facility is set to terminate six months from the petition date, and each letter of credit has an expiration date of no more than twelve months from issuance. A protracted bankruptcy would require the renegotiation of the DIP LC facility, potentially at increased costs to the Debtors.

- *Significant Employee Retention Concerns*. A stay could potentially result in significant costs associated with the retention of management and key employees. In August 2025, the Debtors enacted a holistic retention plan, which the company prepaid in the amount of $72.6 million. If the Debtors are still in chapter 11 when that initial plan terminates in December 2026, the Debtors would need to design and seek approval for a replacement.

- *Unraveling of the RSA and Plan After August 3*. A stay poses significant risk that the Debtors' RSA and Plan unravel, thereby jeopardizing the Debtors restructuring efforts. The RSA represents months of arm's-length negotiations and is the only viable path to restructuring the Debtors. The RSA required that the Debtors satisfy certain milestones, including achieving the Plan Effective Date no later than 90 days after the Petition Date. The RSA parties have since extended the Effective Date milestone to August 3, 2026, but they are under no obligation to do so again. If granted, a stay would necessarily extend the effective date beyond the RSA milestone deadline, and the RSA parties could exercise their rights to terminate the RSA. Further, a stay that could last upwards of one year will certainly put a strain on the RSA parties' willingness to maintain the RSA and Plan. Just one constituency deciding to exercise its termination right could imperil the entire RSA structure and the support for the interlocking intercompany settlements underlying the Plan. The RSA is premised on a delicate, intertwined compromise, and there is no guarantee that consensus will remain over a prolonged timeline.

- *Loss of the Exit ABL Facility*. A stay would jeopardize the Exit ABL facility, preventing the Debtors from accessing a much-needed $600 million facility. It is my understanding that the Exit ABL lenders can terminate the Exit ABL commitment 180 days following the execution of the commitment documents. Further, it is my understanding that the Exit ABL commitment cannot take effect until the restructuring transactions in the Plan are consummated, which includes the transactions with respect to QVC Group.

6

- *Lost Investment Opportunities for Creditors*. Any stay would significantly reduce the investment opportunities currently available to creditors. The Debtors' creditors are scheduled to receive over $930 million at emergence. In total, conservatively assuming a 10% rate of return,[2] lost investment opportunities for creditors could total approximately $93 million over a 12-month stay, $143 million over an 18-month stay, and $195 million over a 24-month stay.

- *Increased Professional Fees*. A prolonged bankruptcy will cause the Debtors, and primarily QVC, to incur millions of dollars in excess professional fees. Since the shared professionals were retained 13 months ago, the total costs of the restructuring have been approximately $219 million to date (averaging approximately $17 million per month). Assuming an estimated fee run rate of $8 million per month to account for significant costs associated with administering a prolonged and stalled restructuring, fees could total approximately $96 million over a 12-month stay, $144 million over an 18-month stay, and $192 million over a 24-month stay. These excess fees will unnecessarily deplete estate resources.

- *Increased United States Trustee Fees*. A prolonged period of bankruptcy will also cause the Debtors to incur millions of dollars in excess fees due to the United States Trustee. To date, the Debtors have unpaid obligations of approximately $750,000 in United States Trustee fees. Should a stay be issued, future fees to the United States Trustee could total approximately $3 million over a 12-month stay, $4.5 million over an 18-month stay, and $6 million over a 24-month stay. These excess fees will unnecessarily deplete estate resources.

10. In sum, the overall harm to the Debtors and their constituencies from a protracted stay in bankruptcy would be massive. Decreased topline revenue at QVC, Inc. and Cornerstone, continued fee burn, U.S. Trustee fees, lost investment opportunities for creditors, and employee retention could materialize into approximately $419 million over a 12-month stay, $603 million over an 18-month stay, and $776 million over a 24-month stay—even before taking into account the loss of a planned $100 million in additional liquidity as letters of credit would otherwise begin to expire. In addition to those quantifiable categories, other portions of the harm to the estate— such as the failure to capture a narrow window to transition to social media—are incalculable.

---

[2] For reference, QVC's cost of capital the Court accepted in Evercore's valuation of Cornerstone is 12-14%. *See* DX 384.

7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of information and belief.

Dated: July 20, 2026                         */s/ Jason Keyes*
                                             Jason Keyes