**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>QVC GROUP, INC., *et al.*,[1]<br><br>Debtors.<br><br>Adam Gui, *et al.*,<br><br>Appellants. | Civil Action No. 26-cv-05680<br><br>Bankruptcy Case No. 26-90447 (ARP)<br><br>(Jointly Administered) |

**PREFERRED SHAREHOLDERS' MOTION FOR CERTIFICATION OF DIRECT APPEAL TO COURT OF APPEALS**

[1] A complete list of each of the Debtors in the chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in the Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii
TABLE OF AUTHORITIES ..... iii
Introduction ..... 1
Background ..... 5
Relief Sought and Legal Authority ..... 10
Questions Presented ..... 11
Argument ..... 13
A. Direct Appeal Is Warranted To Review Whether A Creditor's Consent Conclusively Establishes Unimpairment, Thereby Evading Section 1129(a)(10)'s Requirement Of An Impaired Accepting Class of Non-Insider Creditors ..... 13
B. Direct Appeal Is Warranted To Review Whether Section 1123(a)(4)'s Equal-Treatment Mandate, As Interpreted By The Fifth Circuit In *Serta*, Prohibits A Plan Release That Conferred Wildly Disparate Value On Different Members Of The Same Class ..... 17
C. Direct Appeal Is Warranted To Review Whether Entire Fairness Review, Rather Than Deferential Business Judgement Review, Applies To An Insider Settlement That Extinguished $1.4 Billion in Equity ..... 19
D. An Immediate Appeal Will Materially Advance the Progress of This Case ..... 24
Conclusion ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ball v. Soundview Capital Mgmt. Ltd. (In re Soundview Elite Ltd.)*,
594 B.R. 108 (Bankr. S.D.N.Y. 2018) ........ 23

*Bank of NY Tr. Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*,
584 F.3d 229 (5th Cir. 2009) ........ 12

*City of Sarasota Firefighters' Pension Fund v. Inovalon Holdings, Inc.*,
319 A.3d 271 (Del. 2024) ........ 22

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*,
68 F.3d 914 (5th Cir. 1995) ........ 23, 24

*Epstein v. Container Store Grp. (In re The Container Store Grp.)*,
676 B.R. 356 (S.D. Tex. 2026) ........ 16

*Franchise Servcs. of N. Am., Inc.v U.S. Trustee (In re Franchise Servs. of N. Am., Inc.)*,
891 F.3d 198 (5th Cir. 2018) ........ 13

*Gesoff v. IIC Indus., Inc.*,
902 A.2d 1130 (Del. Ch. 2006) ........ 22

*Hobbs v. Buffets, LLC*,
No. 5:19-CV-00173, 2019 WL 12497543 (W.D. Tex. June 24, 2019) ........ 13

*In re K Lunde, LLC*,
513 B.R. 587 (Bankr. D. Colo. 2014) ........ 15

*Kahn v. Tremont Corp.*,
694 A.2d 422 (Del. 1997) ........ 22

*In re LATAM Airlines Group. S.A.*,
620 B.R. 722 (Bankr. S.D.N.Y. 2020) ........ 22

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) ........ 12

*In re MPF Holding U.S. LLC*,
444 B.R. 719 (Bankr. S.D. Tex. 2011) ........ 25

*Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*,
119 F.3d 349 (5th Cir. 1997) ........ 23

*Official Comm. Of Unsecured Creditors v. Moeller (In re Age Refining, Inc.)*,
801 F.3d 530 (5th Cir. 2015) ........ 23

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
624 F.2d 599 (5th Cir. 1980) ........ 23

*In re Serta Simmons Bedding, L.L.C.*,
125 F.4th 555 (2024), *cert. denied sub nom., Barings L.L.C. v. AG Centre Street Partnership*, 146 S. Ct. 397 (2025) ........ *passim*

*In re Spirit Airlines, Inc.*,
668 B.R. 689 (Bankr. S.D.N.Y. 2025) ........ 16

*In re Tele-Commc'ns, Inc. S'holders Litig.*,
No. Civ. A. 16470, 2005 WL 3642727 (Del. Ch. Dec. 21, 2005) ........ 22

*In re Ultra Petroleum Corp.*,
No. 16-32202, 2017 WL 4863015 (Bankr. S.D. Tex. Oct. 26, 2017) ........ 13

*In re Vanderbilt Minerals, LLC*,
No. 26-60110, 2026 WL 1138767 (Bankr. N.D.N.Y. Apr. 27, 2026) ........ 23

*W. Real Estate Equities, LLC v. Vill. At Camp Bowie I, L.P. (Vill. at Camp Bowie I, L.P.)*,
710 F.3d 239 (5th Cir. 2013) ........ 14

*Weber v. U.S. Trustee*,
484 F.3d 154 (2d Cir. 2007) ........ 25

**Statutes**

11 U.S.C. § 101(31)(E) ........ 8, 20

11 U.S.C. § 101(2) ........ 8

11 U.S.C. § 101(2)(A) ........ 20

11 U.S.C. § 1123(a)(4) ........ 15, 17 *passim*

11 U.S.C. § 1124 .......... 9, 15

11 U.S.C. § 1124(1) .......... 14

11 U.S.C. § 1129 (a)(10) .......... *passim*

28 U.S.C. § 158(d)(2) .......... 10, 11, 12, 13

28 U.S.C. § 158(d)(2)(A) .......... 1, 12, 26

28 U.S.C. § 158(d)(2)(A)(i) .......... 3

28 U.S.C. § 158(d)(2)(A)(i)-(ii) .......... 13

28 U.S.C. § 158(d)(2)(A)(i)-(iii) .......... 12

28 U.S.C. § 158(d)(2)(A)(iii) .......... 24

**Other Authorities**

Fed. R. Bankr. P. 8006(b) .......... 11

Fed. R. Bankr. P. 8006(f)(1) .......... 11

TO THE HON. GEORGE C. HANKS JR., UNITED STATES DISTRICT JUDGE:

Pursuant to 28 U.S.C. § 158(d)(2)(A), Appellants Cygnus Opportunity Fund, LLC, Kenneth Grossman, Adam Gui, Highbridge Tactical Credit Institutional Fund, Ltd., Highbridge Tactical Credit Master Fund, L.P., and New Holland Trading LLC (the "Preferred Shareholders" or "Appellants")[2] respectfully request, pursuant to 28 U.S.C. § 158(d)(2) and Federal Rule of Bankruptcy Procedure 8006, certification for direct review by the United States Court of Appeals for the Fifth Circuit of this appeal from the Confirmation Order[3] entered by the bankruptcy court in the Chapter 11 proceedings of QVC Group, Inc. ("QVCG" and, together with its subsidiaries and affiliates in the above-captioned Chapter 11 Cases, the "Debtors").

Copies of the Confirmation Order and the bankruptcy court's Memorandum Decision on confirmation are attached as **Exhibit A** and **Exhibit B**, respectively. A proposed order granting the relief requested herein is attached as **Exhibit C**.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Certification of a direct appeal under Section 158(d)(2) is warranted so that the Fifth Circuit can provide prompt guidance regarding the important structural safeguards that the Bankruptcy Code imposes to protect corporate stakeholders who lack a seat at the table when a Chapter 11 plan is crafted. Those protections are particularly crucial where, as here, the plan was devised by a select group of corporate insiders who utilized a purported

---

[2] The Preferred Shareholders are certain institutional and individual holders of the 8.000% Series A Cumulative Redeemable Preferred Stock issued by QVCG.

[3] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Memorandum Decision or Confirmation Order, as applicable.

settlement to violate fundamental bankruptcy requirements and transfer all value out of an otherwise solvent debtor for the benefit of stakeholders of other corporate entities.

The value transfer here was massive. The solvent entity, QVC Group, Inc. ("QVCG"), was the ultimate corporate parent of various entities associated with the QVC home shopping enterprise and other apparel and home lifestyle brands. QVCG had no funded debt and Appellants, as holders of QVCG's (now-cancelled) preferred stock interests should have been first in line to retain any residual value at QVCG. When the bankruptcy petition was filed, there was ample surplus at QVCG: It had no funded debt, was sitting on approximately $195 million *of cash*, and held a 62% equity interest in QRI Cornerstone, Inc. ("Cornerstone"), which the Debtors' financial advisor valued at *$35 million to $135 million*. But the Chapter 11 plan took 100% of QVCG's value and transferred it to creditors of *other* debtor entities, including QVC, Inc. ("QVC"), in satisfaction of a (previously undisclosed) $400 million intercompany claim against QVCG—the result of a settlement under Bankruptcy Rule 9019 settlement conducted in secret amongst statutory insiders. More remarkably still, the plan accomplished this transfer without the consent, vote, or participation of Appellants or any of QVCG's non-insider stakeholders. How? By violating at least three structural legal protections that the Bankruptcy Code erects to ensure that these kinds of self-dealing plans cannot be confirmed.

***First***, Section 1129(a)(10) requires that "[i]f a class of claims is impaired under the plan," there must be a *non-insider* impaired accepting class. 11 U.S.C. § 1129 (a)(10). The intercompany claim asserted by QVC against QVCG had been "settled" at a $400 million

valuation, but the plan provided only $278.7 million on account of that claim and thus it was "impaired." Accordingly, Section 1129(a)(10)'s requirement of an impaired accepting class was triggered. But Section 1129(a)(10) expressly forbids corporate *insiders* from supplying the impaired accepting class, and QVCG had no other impaired accepting class, so QVC reverse-engineered its way out of Section 1129(a)(10)'s requirements altogether. It argued that by retroactively agreeing that its $400 million claim should be deemed fully satisfied at $278.7 million, its class of claims would no longer be "impaired" and thus Section 1129(a)(10) could have no application. The bankruptcy court accepted this atextual maneuver, relying on Section 1123(a)(4), which permits *one member* of a class to agree to accept less-than-equal treatment vis-à-vis *other members* of that class. But QVC is the only member of the relevant class, so Section 1123(a)(4) does not apply and cannot plausibly provide such an end-run around Section 1129(a)(10). Unsurprisingly, the Fifth Circuit has never considered (much less condoned) the bankruptcy court's tortured reading of Section 1123(a)(4) to permit an end-run of Section 1129(a)(10). Based on this pure issue of statutory construction alone, direct review by thew Fifth Circuit is warranted. *See* 28 U.S.C. § 158(d)(2)(A)(i) (authorizing certification where appeal presents question of law "as to which there is no controlling decision of the court of appeals").

***Second***, the bankruptcy court significantly undermined the Fifth Circuit's recent decision in *In re Serta Simmons Bedding, L.L.C.*, 125 F. 4th 555, 592 (2024), *cert. denied sub nom., Barings L.L.C. v. AG Centre Street Partnership,* 146 S. Ct. 397 (2025), which reaffirmed that courts must "look below the surface to determine whether [plan treatment is] in fact equal in value" among members of the same class as required by Section

1123(a)(4). The confirmed plan included a blanket release of potential clawback claims for $456 million in dividends paid to QVCG's preferred shareholders, notably including QVCG insiders John Malone and Greg Maffei. But many other shareholders—including most of the Appellants here—had received *no dividends at all*. Simply put, Section 1123(a)(4) guarantees equal treatment, yet the plan confirmed here conferred releases that were worth potentially hundreds of millions of dollars to a subset of preferred shareholders (who also happen to be the plan's architects) but worth nothing to other preferred shareholders. Not only is there no "controlling" Fifth Circuit decision permitting such a result, *Serta* confirms that more than mere lip service to Section 1123(a)(4)'s equal-treatment guarantee is required.

***Third***, the bankruptcy court applied the wrong standard of review in approving the legitimacy of the Rule 9019 settlement by which the Plan transferred away over $278 million of QVCG's assets—literally *all* of the company's residual value. Where multiple debtors within a corporate enterprise have conflicting interests, the Bankruptcy Code does not excuse them from complying with basic rights and responsibilities of corporate separateness. Key among those is that non-arm's length transactions among affiliates are reviewed under the "entire fairness" standard, while only genuinely independently evaluated affiliate transactions are afforded more deferential "business judgment" review. Here, the bankruptcy court erroneously applied business judgment review to the conflicted, insider-led settlement which all value flowed from QVCG to other entities, even though (a) QVCG's purportedly disinterested directors never engaged their own financial advisor, and were instead forced to rely on the same investment banker who was also advising QVC;

(b) Appellants and other preferred shareholders who were *not* stakeholders in other debtor entities were deliberately excluded from the plan negotiations, despite requesting a seat at the table; and (c) after their own counsel had urged that the alleged intercompany claim was meritless, QVCG's purportedly disinterested directors changed course and approved the Rule 9019 settlement following "negotiations" which lasted just one afternoon. *See* Confirmation Objection, Ex. 7; June 8, 2026 Trial Tr. (Meltzer) at 315: 2-12. Moments such as this—when one debtor suddenly concludes it should "settle" away all of its value for the benefit of an affiliate—is precisely when "entire fairness" review is essential. There is no Fifth Circuit decision supporting the bankruptcy court's application of business judgment review to a settlement between statutory insiders, and the weight of authority holds that entire fairness review should apply.

These three issues are not quotidian confirmation disputes. They present pure questions of law of exceptional importance to the administration of Chapter 11 cases throughout the Fifth Circuit and nationwide. Moreover, certification of a direct appeal here will materially advance the case. The amounts at stake—*i.e.*, preferred shareholders' entitlement to the substantial asset value at QVCG—ensures that any intermediate decision will be appealed. Certification will accelerate final resolution on the merits and avoid duplicative proceedings that would add to the Court's docket without a concomitant benefit for issues that will require ultimate resolution by the Fifth Circuit in any event.

## BACKGROUND

On April 16, 2026, QVCG and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§

101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Case No. 26-90447 (ARP), before the Honorable Alfredo R. Pérez. Contemporaneously with the filing, the Debtors filed a Joint Prepackaged Plan of Reorganization (the "Plan") and an accompanying disclosure statement (the "Disclosure Statement"). Bankr. Dkt. No. 15 (Plan); Bankr. Dkt. No. 14 (Disclosure Statement).

QVCG was the ultimate parent holding company in the Debtors' corporate structure. As of the Petition Date, QVCG had approximately $195 million in cash, zero funded indebtedness, and a 62% equity interest in Cornerstone, valued at $35 million to $135 million by the Debtors' financial advisor. Bankr. Dkt. No. 4 (First Day Decl.) ¶ 36; Jun. 5, 2026 Trial Tr. (Griffin) at 425:10-12. QVCG had issued approximately $1.272 billion in face amount of 8.000% Series A Cumulative Redeemable Preferred Stock (the "Preferred Stock"). Disclosure Statement, Art. IV.D.2(e).

The Plan reflects a prepackaged restructuring negotiated pursuant to a Restructuring Support Agreement (the "RSA") among the Debtors and certain of their creditor constituencies, including QVC noteholders, RCF lenders, and LINTA noteholders. First Day Decl. ¶ 6. The Preferred Shareholders—the only stakeholders with a meaningful economic interest in QVCG—were not parties to the RSA and, despite specifically asking to be included, were excluded from the restructuring negotiations.

The Plan is premised on an intercompany settlement (the "Intercompany Settlement") between QVCG and its debtor-subsidiary, QVC. Under the Intercompany Settlement, QVC received a $400 million allowed general unsecured claim against QVCG (the "QVC-QVCG Settlement Claim") to settle alleged intercompany claims that related

to dividends and tax-related transfers that were: (a) approved by QVC's directors; (b) consistent with QVC's tax-sharing agreements; and (c) supported by contemporaneous solvency opinions from Kroll. *See* Confirmation Objection, Exh. 10, 11, 18, 19. Notably, this purported liability was never disclosed in QVC's prepetition SEC filings—even as a "contingent" liability. Rather, it was identified as a possible liability only *after* the Company had filed for bankruptcy and the Rule 9019 settlement had already been agreed. Approximately two months before the plan was proposed, QVCG's outside counsel urged that the intercompany claims were meritless, but QVCG's purportedly disinterested directors would—following just an afternoon of "negotiation"—reject their own counsel's review and conclude that it was appropriate to grant QVC a $400 million intercompany claim, which just so happened to swamp the asset value at QVCG. *See* Jun. 8, 2026 Trial Tr. (Meltzer) at 315:2-12. Accordingly, in satisfaction of the QVC-QVCG Settlement Claim, QVC received all of QVCG's distributable cash and QVCG's 62% equity interest in Cornerstone, effectively transferring 100% of QVCG's value to its subsidiary. Bankr. Dkt. No. 147 (Statement of QVC Disinterested Directors); Bankr. Dkt. No. 149 (Statement of QVCG Special Committee); Bankr. Dkt. No. 389 (Plan), Art. III.B.4.

The Plan provided that the Preferred Stock will be cancelled and that Preferred Shareholders "shall not receive any distribution, property, or other value under this Plan on account of [the Preferred Stock]." Bankr. Dkt. No. 389 (Plan), Art. III.B.6(b). No class of claims against or interests in QVCG voted to accept the Plan.

The QVC-QVCG Settlement Claim was placed in Class A4 of the Plan. The bankruptcy court found that the combined value of QVCG's Distributable Cash and equity

interests in Cornerstone was substantially less than the $400 million allowed claim. Memorandum Decision at 90. More particularly, QVC's maximum recovery on account of the QVC-QVCG Settlement Claim is roughly $278.7 million—approximately 70% of the allowed claim amount.[4]

The contemporaneous plan documents confirm the significance of Class A4's classification. Drafts of the Plan dated April 12, April 14, April 15, and April 16 all treated Class A4 as "Impaired." *See* JX 0043 (4/12/26 Draft Plan) at 32; JX 0044 (4/14/26 Draft Plan) at 31; JX 0045 (4/15/26 Draft Plan) at 116; JX 0046 (4/16/26 Draft Plan) at 127. But, these draft plans could not satisfy Section 1129(a)(10) of the Bankruptcy Code. So, the filed Plan changed course: it treated Class A4 as "Unimpaired," deemed QVC to accept under Section 1126(f), and asserted that Section 1129(a)(10) was satisfied or inapplicable because QVCG had no impaired class of claims. Plan, Art. III.B.4(d), III.G.

That change is not a bookkeeping point. It is the mechanism by which the Plan attempted to avoid the fundamental protection that Section 1129(a)(10) provides at QVCG: acceptance by an impaired non-insider class of claims. If the plan had properly treated Class A4 as impaired, QVC would be the only impaired accepting class of claim at QVCG, and QVC is an insider whose vote could not be counted to satisfy Section 1129(a)(10). QVC was an insider of QVCG because QVCG directly or indirectly owned 100% of QVC. *See* 11 U.S.C. § 101(31)(E) (defining "insider" to include, inter alia, an "affiliate" of the debtor); *id.* § 101(2) (defining "affiliate" to include an entity that "directly or indirectly

---

[4] This figure is calculated from QVCG's $195 million in cash on hand *plus* a 62% stake in Cornerstone using the $135 million high end of the valuation ascribed by Evercore.

owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor"); *see also* First Day Decl., Exh. B2 (Simplified Corporate Structure Chart). *See* **Exhibit D**.

The bankruptcy court adopted the Debtors' argument that the QVC-QVCG Settlement Claim is unimpaired because QVC agreed, through the RSA and the Intercompany Settlement, to accept QVCG's Distributable Cash and the equity in Cornerstone (which, again, the bankruptcy court had valued at $278.8 million) in full satisfaction of its $400 million allowed settlement claim. Memorandum Decision at 95. In the bankruptcy court's view, Section 1124 exempts this treatment from the impairment analysis because QVC, as holder of the claim, agreed under Section 1123(a)(4) to accept less than the full value to which it would otherwise be entitled. *Id.* However, this is circular. QVC was taking *all* of the value of QVCG, and if it didn't agree to accept this "less than full value," QVC could not receive *any* value because it couldn't satisfy Section 1129(a)(10).

This maneuver is at odds with how QVC treated other similarly situated creditors under the Plan. Specifically, the RCF Lenders, QVC Noteholders, and LINTA Noteholders also "settled" disputed recoveries as part of the RSA and the broader restructuring. Indeed, the LINTA Noteholders accepted an approximately 92.5% haircut on their claims. *See* Memorandum Decision at 72. Yet, unlike the QVC-QVCG Settlement Claim, the Debtors classified those RSA parties' claims as impaired, solicited their votes, and relied on their acceptance to satisfy Section 1129(a)(10) at the QVC and LINTA Debtor levels. *See* Memorandum Decision at 92-93.

The Preferred Shareholders objected to confirmation of the Plan, arguing, among other things, that (i) the Intercompany Settlement was not fair and equitable under Bankruptcy Rule 9019, (ii) the Plan violated Section 1123(a)(4) by improperly deeming the QVC-QVCG Settlement Claim "unimpaired," (iii) the Plan failed to satisfy Section 1129(a)(10) because no impaired non-insider class of claims at QVCG accepted the Plan, and (iv) the Plan was not proposed in good faith. Bankr. Dkt. No. 318.

After a multi-day evidentiary hearing, on July 15, 2026, the bankruptcy court entered its *Memorandum Decision (I) Approving Disclosure Statement, (II) Confirming Second Amended Plan, and (III) Granting Related Relief* [Bankr. Dkt. No. 710] (the "Memorandum Decision") overruling the Preferred Shareholders' objections, approving the Intercompany Settlement, and setting forth its reasons for confirming the Plan. The Preferred Shareholders filed an initial Notice of Appeal on July 16, 2026. Bankr. Dkt. No. 714 (Notice of Appeal). On July 20, 2026, the Bankruptcy Court entered the Confirmation Order. Bankr. Dkt. No. 722 (Confirmation Order). That same day, the Preferred Shareholders filed an amended Notice of Appeal encompassing the bankruptcy court's Confirmation Order. Dkt. No. 726 (Amended Notice of Appeal). Following denials of motions for a stay pending appeal by this Court and the Fifth Circuit, the Plan went effective on August 4, 2026, at which point the Preferred Stock was cancelled. *See* Bankr. Dkt. No. 845 (Notice of Effective Date).

**RELIEF SOUGHT AND LEGAL AUTHORITY**

Appellants seek certification for direct review by the United States Court of Appeals for the Fifth Circuit pursuant to 28 U.S.C. § 158(d)(2). The underlying appeal seeks

reversal of the bankruptcy court's Confirmation Order.

This Court has authority to enter the requested certification under Section 158(d)(2) and Federal Rule of Bankruptcy Procedure 8006. Appellants' request is timely because it is being filed within 60 days of entry of the Confirmation Order. *See* Fed. R. Bankr. P. 8006(f)(1). And Appellants' request is appropriately directed to this Court, rather than the bankruptcy court, because it has been more than 30 days since Appellants' notice of appeal was filed. *See id.* (providing that a request for certification should be filed with the court where "the matter is pending"); Fed. R. Bankr. P. 8006(b) (providing that, for purposes of certification, "a matter remains pending in the bankruptcy court for 30 days after the first notice of appeal concerning that matter becomes effective[,]" and thereafter is pending in the district court).

## QUESTIONS PRESENTED

1. Whether the bankruptcy court erred in concluding that the QVC-QVCG Settlement Claim was unimpaired, and hence did not trigger 11 U.S.C. § 1129(a)(10)'s requirement of an impaired-accepting class of non-insider creditors, because QVC had purportedly consented to its plan treatment under 11 U.S.C. § 1123(a)(4), a provision that was inapplicable by its terms because it permits a creditor to consent to less favorable treatment than *other members* of the party's class and QVC was its class's sole member.

2. Whether the bankruptcy court erred in holding that the Plan did not violate 11 U.S.C. § 1123(a)(4)'s requirement that a Chapter 11 plan must "provide the same treatment for each claim or interest of a particular class," despite the fact that the plan included releases that provided significant value to some Preferred Shareholders and no

value at all to others.

3. Whether the bankruptcy court erred in evaluating a settlement between affiliated debtors (*i.e.*, statutory insiders) under the deferential business judgment standard, rather than applying heightened "entire fairness" review?

## STANDARD OF REVIEW

Congress authorized directed review of bankruptcy court decisions in the courts of appeals under 28 U.S.C. § 158(d)(2)(A) to advance "twin purposes": "expedit[ing] appeals in significant cases and . . . generat[ing] binding appellate precedent in bankruptcy, whose caselaw has been plagued by indeterminacy." *Bank of NY Tr. Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 241-42 (5th Cir. 2009) (citation omitted). To pursue those ends, Section 158(d)(2)(A) permits direct review of a bankruptcy court's order if the district court in which an appeal is pending certifies the appeal and the court of appeals then authorizes direct appeal. The district court "shall" certify an order for direct appeal if it concludes (i) that the "the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance"; (ii) that that "the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions"; or (iii) that "an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken." 28 U.S.C. § 158(d)(2)(A)(i)-(iii). Consistent with Section 158(d)(2)(A)'s use of the obligation-creating verb "shall," *see Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998), certification is mandatory when one or more of the

statutory preconditions is present. *See, e.g.*, *Hobbs v. Buffets, LLC*, No. 5:19-CV-00173, 2019 WL 12497543, at *2 (W.D. Tex. June 24, 2019); *In re Ultra Petroleum Corp.*, No. 16-32202, 2017 WL 4863015, at *5 (Bankr. S.D. Tex. Oct. 26, 2017).

## ARGUMENT

The statutory criteria for direct appeal are readily satisfied here. This appeal presents multiple issues of bankruptcy law that have not been resolved in this Circuit, each of which calls out of prompt clarification by the Fifth Circuit. Moreover, given the nature of these purely legal issues and the stakes of this dispute—which effectively guarantee a further appeal to the Fifth Circuit after a decision on the merits by this Court—direct review is likely to materially advance ultimate resolution of this litigation. Here, although the Preferred Shareholders need only satisfy a single statutory condition, multiple statutory conditions are met, and certification is therefore required. [5]

### A. Direct Appeal Is Warranted To Review Whether A Creditor's Consent Conclusively Establishes Unimpairment, Thereby Evading Section 1129(a)(10)'s Requirement Of An Impaired Accepting Class Of Non-Insider Creditors

Certification is warranted to permit the Fifth Circuit to review the bankruptcy

[5] Under Section 158(d)(2), the Fifth Circuit's jurisdiction extends to a "judgment, order, or decree" that is certified for direct appeal so long as it "involves" at least one certifiable question. 28 U.S.C. § 158(d)(2)(A)(i)-(ii). In other words, a direct appeal under Section 158(d)(2) "looks to the entire certified order and is not tied to the particular question formulated by the district court." *Franchise Servcs. Of N. Am., Inc.v U.S. Trustee (In re Franchise Servs. of N. Am., Inc.)*, 891 F.3d 198, 206 (5th Cir. 2018) (cleaned up). Because the Fifth Circuit's appellate jurisdiction would extend to the entirety of the Confirmation Order if that decision is certified for direct appeal, this Motion discusses only those issues that most obviously warrant direct review. For the avoidance of doubt, Appellants may present additional issues or arguments in their merits briefing.

court's unprecedented and atextual holding that QVC's consent to its plan treatment conclusively eliminated any possibility that QVC's Settlement Claim was impaired under the Plan. No Fifth Circuit decision supports the bankruptcy court's holding, which permitted the Debtors to evade the critical confirmation safeguard in Section 1129(a)(10)'s requirement of plan acceptance by an impaired class of non-insider creditors.

Section 1129(a)(10) of the Bankruptcy Code provides that, if any class of claims is impaired under a plan, the plan may not be confirmed unless it is accepted by "at least one class of claims that is impaired under the plan . . . , determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As pertinent here, a class of claims is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder[.]" 11 U.S.C. § 1124(1). And there can no dispute that QVC's Settlement Claim against QVCG was impaired under that standard: QVC held a $400 million allowed settlement claim against QVCG and agreed—through the RSA and the Intercompany Settlement—to accept QVCG's Distributable Cash and equity in Cornerstone in full satisfaction of that claim. *See supra* at 9. The Debtors' own valuation confirmed that QVC's recovery is roughly $278.7 million—approximately 70 cents on the dollar on the allowed claim. *See supra* at 8. The text of Section 1124(1) requires that a claim is impaired unless it is left "unaltered," and the Fifth Circuit has confirmed this means "*any* alteration of a creditor's rights, no matter how minor[.]" *W. Real Estate Equities, LLC v. Vill. At Camp Bowie I, L.P. (Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 245 (5th Cir. 2013) (citation omitted) (emphasis added). Paying a $400 million allowed claim only $278.7 million of value is clearly impairment.

The conclusion that QVC's claim was impaired should have been a fatal barrier to confirmation of the Debtors' Plan. It triggers Section 1129(a)(10)'s requirement of an impaired accepting class, which governs "[i]f a class of claims is impaired under the plan," 11 U.S.C. 1129(a)(10), as was the case here given the impairment of QVC's claim. Thus, the Debtors should have been required to demonstrate that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." *Id.* That was impossible here, given that all other classes of (non-insider) creditors received payment in full and were thus designated as unimpaired, while QVC's single-member class necessarily had no non-insider creditors and thus could not have delivered a qualifying acceptance under Section 1129(a)(10).

To escape that straightforward conclusion, the bankruptcy court invoked 11 U.S.C. § 1123(a)(4) to hold that QVC's *consent* to its plan treatment rendered its claim unimpaired. But there is no basis for that result in the text of the Bankruptcy Code. To be sure, Section 1124's general definition of impairment governs "except as provided in section 1123(a)(4) of this title[.]" 11 U.S.C. § 1124. But Section 1123(a)(4) is inapplicable here. That provision states that a Chapter 11 plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). The provision thus addresses equality of treatment *among multiple members of the same class*. Here, however, QVC was the *sole* member of its class, so intra-class disparate treatment that Section 1123(a)(4) addresses could never arise. As a matter of basic logic, QVC could not have "agree[d] to a less favorable treatment" of its claim than that

afforded to other class members, because there were no other class members.

The Fifth Circuit has never considered, let alone endorsed, the proposition that a single-member class is unimpaired so long as the sole creditor in the class consents to its plan treatment, thereby eliminating Section 1129(a)(10) requirement of an impaired accepting class. Nor does any case the bankruptcy court cited endorse this novel interpretation. Both *Epstein v. Container Store Grp. (In re The Container Store Grp.)*, 676 B.R. 356, 377-88 (S.D. Tex. 2026), and *In re Spirit Airlines, Inc.*, 668 B.R. 689, 702-03 (Bankr. S.D.N.Y. 2025), addressed opt-out mechanics for third-party releases, not whether an insider settlement claim can be deemed unimpaired to avoid Section 1129(a)(10). *In re K Lunde, LLC*, 513 B.R. 587, 595 n.4 (Bankr. D. Colo. 2014), involved statutory tax treatment under Section 1129(a)(9)(D), not a plan-created settlement transferring a debtor's remaining assets. None of these cases permits manufacturing unimpairment of an insider's discounted settlement claim so that no impaired class of claims exists at that debtor.

The first question presented thus warrants certification for direct review. No Fifth Circuit decision addresses whether the consent of a creditor in a single-member class can render that class unimpaired for purposes of Sections 1124 and 1129(a)(10). The bankruptcy court's novel interpretation of these provisions—one that permits any debtor, at its sole option, to eliminate the requirement that an impaired non-insider class accept the plan—calls out for prompt correction by the Fifth Circuit.

### B. Direct Appeal Is Warranted To Review Whether Section 1123(a)(4)'s Equal-Treatment Mandate, As Interpreted By The Fifth Circuit In *Serta*, Prohibits A Plan Release That Conferred Wildly Disparate Value On Different Members Of The Same Class

Ironically, despite invoking Section 1123(a)(4)'s equal treatment provision to excuse compliance with Section 1129(a)(10), the bankruptcy court refused to then recognize that the equal treatment provision forbade the plan from conferring releases worth massive value to certain members of a class (who happened to be the plan's architects) but were worthless to other members of that same class. As noted above, absent individual consent, a Chapter 11 plan must "provide the same treatment for each claim or interest of a particular class," 11 U.S.C. § 1123(a)(4). The Plan included a release of potential clawback claims against all preferred shareholders that was valuable only to the subset of preferred shareholders that had reaped $456 million in dividends prior to the bankruptcy filing but was of *no value at all* to many other members of the class (including most of the Appellants), who did not receive dividends. Particularly given the Fifth Circuit's recent guidance on the Bankruptcy Code's equal treatment requirements, this issue independently warrants certification.

The bankruptcy court's analysis demonstrates that no binding appellate authority supports the bankruptcy court's misunderstanding of Section 1123(a)(4)'s equal-treatment mandate. Indeed, the bankruptcy court began with the Fifth Circuit's recent decision in *Serta*, which strongly supports *the Preferred Shareholders' position* by holding that courts must "look below the surface to determine whether [plan treatment is] in fact equal in value" and not merely identical in form. 125 F.4th at 592. Applying that test, the Fifth

Circuit held that Section 1123(a)(4) did not authorize an indemnity that conferred dramatically disparate value on different class members depending on their participation in a prior transaction, because "[t]o [certain class members], the indemnity was potentially worth millions or even tens of millions of dollars[,]" whereas "to other class members . . the indemnity was worth little or even nothing." *Id.* at 591-92, n.63. The same rationale applies here with equal force. Although the Plan's release from clawback claims on $456 million in dividends paid is nominally available to all Preferred Shareholders, it has economic value only for a subset of shareholders who actually received the dividends (including QVCG insiders). For the majority of the class, including most of the Appellants here, the release is worth nothing at all. The Fifth Circuit's analogy set forth in *Serta* underscores the absurd treatment of the Preferred Shareholders here: the releases for the Preferred Shareholders are akin to giving a claimant the ability to litigate an asbestos injury even though they do not have one. *Id*. at 592.

The bankruptcy court's attempt to distinguish *Serta* does not withstand scrutiny. It reasoned that "[w]hereas an indemnity creates an affirmative right to payment in the event of litigation, a release does not create any such affirmative right to payment (*i.e.*, 'value') for the Preferred Shareholders in the same way." Memorandum Decision at 78. But that analysis is untethered to any economic logic—a debtor's release of potentially valuable causes of action it holds can be just as valuable as a debtor's agreement to indemnify a party against third-party claims—and thus represents precisely the kind of formalism that *Serta* rejected. *Serta* did not hold that Section 1123(a)(4) prohibits only unequal *payments*; it held that Section 1123(a)(4) prohibits providing consideration to a class that is facially

equal, but which holds no value at all for a portion of that class have. *Serta's* instruction to "look below the surface" to demands that courts evaluate the economic reality of plan treatment, not the label attached to it.

Moreover, the Debtors cannot have it both ways. They justified the Intercompany Settlement in part by touting the releases as a "potential recovery" for the preferred shareholders—value that the QVCG's (purportedly) Disinterested Directors "negotiated for" on their behalf. *See* Memorandum Decision at 44, 77 n. 303. The Debtors cannot simultaneously argue that the releases constitute meaningful consideration for extinguishing $1.4 billion in preferred equity and that they confer no cognizable "value" under Section 1123(a)(4)—in fact the QVCG directors must have valued the releases so highly that they exchanged *all* of the value of QVCG for them.

In short, the bankruptcy court's attempted distinction between indemnification rights and releases is incompatible with the practical analysis of economic substance adopted by the Fifth Circuit in *Serta*. At an absolute minimum, nothing in *Serta* endorses that distinction, and the question whether releases may violate Section 1123(a)(4)'s equal-treatment mandate remains (at best) an open one in this Circuit. Thus, the second question presented independently warrants certification.

### C. Direct Appeal Is Warranted To Review Whether Entire Fairness Review, Rather Than Deferential Business Judgement Review, Applies To An Insider Settlement That Extinguished $1.4 Billion in Equity

The Confirmation Order also involves a third question of law as to which there is no controlling decision of the Fifth Circuit: When a bankruptcy court evaluates a settlement between affiliated debtors (*i.e.*, statutory insiders) under Rule 9019, must it apply

heightened "entire fairness" review, or may it defer to the debtor's "business judgment"?

The question arose squarely below. The Intercompany Settlement was between QVCG and its debtor-subsidiary, QVC—statutory insiders under 11 U.S.C. §§ 101(31)(E) and 101(2)(A). The settlement transferred all of QVCG's assets (approximately $195 million in cash and a 62% equity interest in Cornerstone) to QVC, extinguishing $1.4 billion in preferred equity without any distribution. The bankruptcy court applied business judgment deference and held that entire fairness applies only when the facts show an actual conflict (*i.e.*, when a decisionmaker "stands on both sides" of the transaction) and that appointing disinterested directors negates that concern. Memorandum Decision at 61-67.

Solely for purposes of this motion, we assume *arguendo* that purportedly disinterested directors who were recommended by debtors' counsel and rely on debtors' counsel for a large share of their current and future engagements can actually serve as disinterested fiduciaries of a kind that could warrant deferential review. The bankruptcy court went on to ignore the serious issues presented by the undisputed fact that those QVCG directors were required to share crucial *non-legal* advisors with their counterparties to this transaction. Even with the use of separate legal counsel, advice provided to, and information reviewed by, the (purportedly) Disinterested Directors was produced by investment bankers and financial advisors who stood on both sides of the transaction. In such a complex transaction, that is hardly the sort of arm's-length arrangement that would merit deferential business-judgment review. Put another way, if QVCG were "settling" a purported $3 billion dispute with a truly unaffiliated third party for $400 million, would any director in his or her right mind propose that the two sides "share" financial advisors

to analyze the deal, model recoveries, *etc.*? Of course not.

The evidentiary record also belies any suggestion that the QVCG directors truly negotiated at arm's length. Among other things, QVCG's director conceded that the settlement recognized *no possibility* that QVCG might prevail (*see* June 8 Trial Tr. (Meltzer) at 320:13-18) and that he never even came to a view regarding QVC's probability of success on the alleged claims (S*ee* June 8 Trial Tr. (Meltzer) at 316:18-317:1). QVCG obtained no estimate of litigation costs (*see id*. at 320:19-24)—let alone leverage those costs, QVC's litigation risk, or QVC's desire for a "fast and final" resolution as leverage (*see id.* at 321:8-24; June 8 Trial Tr. (Keglevic) at 101:18-22). Rather than negotiating on QVCG's behalf, QVCG's purportedly disinterested directors effected a full and immediate *surrender*—abandoning the position that QVCG's own counsel had urged, only days earlier, that QVC's claims were entirely meritless.

What is more, the preferred shareholders were deliberately excluded from all aspects of the negotiations relating to the Plan, the Restructuring Support Agreement, and other definitive documents—despite making a documented request for a seat at the table. *See* June 8 Trial Tr. (Meltzer) at 325:15-327:19. Preferred and common equity holders, are notably not "Consenting Stakeholders" as defined in the Restructuring Support Agreement. Further, neither Appellants, nor any other equity holder, were put under NDA in connection with negotiating the Restructuring Transactions. *See* QVC, Inc., Current Report (Form 8-K), item 7.01(April 16, 2026). Thus, the Debtors and their lenders negotiated the material terms of the Restructuring Transactions behind closed doors, with Appellants (and all other equity holders) left to scramble *after* the commencement of the Chapter 11 cases. By that

point, the deal was fully baked, including a settlement that frittered away their potential to recover by a deal that was struck by the same advisors on both sides.

Unsurprisingly, Delaware law is replete with examples where even the use of the same advisors on both sides of a transaction precludes reliance on the business judgment rule. *See Kahn v. Tremont Corp.*, 694 A.2d 422, 429-30 (Del. 1997) (finding lack of independence where an affiliate bank of special committee's financial advisor had derived significant fees from controlling shareholder's companies); *City of Sarasota Firefighters' Pension Fund v. Inovalon Holdings, Inc.*, 319 A.3d 271, 291-95 (Del. 2024) (finding an investment banker's concurrent engagement advising the buyer was a material conflict, as financial advisor conflicts are "uniquely important considerations for minority stockholders…."); *Gesoff v. IIC Indus.*, Inc., 902 A.2d 1130, 1138-39, 1149-52 (Del. Ch. 2006) (the merger was not the product of fair dealing where (i) individual on single-person special committee "had no real authority to choose either his own lawyer or his own financial advisor[,]" (ii) committee's lawyer "had long been [one of the merger parties'] main outside counsel, and had already spent considerable time working on the proposed transaction[,]" and (iii) the process was "redolent . . . with cynicism and corruption[.]"); *In re Tele-Commc'ns, Inc. S'holders Litig.*, No. Civ. A. 16470, 2005 WL 3642727, at *10 (Del. Ch. Dec. 21, 2005) (use of parent's advisors "alone rais[ed] questions regarding the quality and independence of the counsel and advice received[,]" particularly where the shared financial advisor had an incentive fee tied to completion of the transaction).

The weight of authority in bankruptcy courts agrees that entire fairness review is required for such insider transactions. In *In re LATAM Airlines Group. S.A.*, 620 B.R. 722,

769 (Bankr. S.D.N.Y. 2020), the court held that "[b]y definition, the business judgment rule is not applicable to transactions among a debtor and an insider of the debtor[,]" because those transactions are "inherently suspect" and "rife with the possibility of abuse." (cleaned up). *In re Vanderbilt Minerals, LLC*, No. 26-60110, 2026 WL 1138767, at *6 (Bankr. N.D.N.Y. Apr. 27, 2026) (citation omitted), applied entire fairness to an insider intercompany settlement, examining "whether the process and price of a proposed transaction not only appear fair but are fair." *See also Ball v. Soundview Capital Management Ltd. (In re Soundview Elite Ltd.)*, 594 B.R. 108, 129 (Bankr. S.D.N.Y. 2018).

For purposes of certification, it is sufficient to establish that there is no controlling Fifth Circuit authority to answer this question. Although Fifth Circuit decisions evaluating settlements under Rule 9019 establish a multi-factor framework, none addresses whether that framework shifts where, as here, the settlement is between statutory insiders. *See, e.g., Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980); *Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355-56 (5th Cir. 1997); *Official Comm. Of Unsecured Creditors v. Moeller (In re Age Refining, Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015).

*Connecticut General Life Insurance Co. v. United Cos. Financial Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914 (5th Cir. 1995), is instructive and confirms the need for further guidance to correct the bankruptcy court's error. The *Foster* court held that "scrutiny must be great when the settlement is between insiders and an overwhelming majority of creditors in interest oppose such settlement of claims." *Id.* at 919. *Foster* did not definitively establish what triggers that heightened scrutiny, nor did it hold that the

presence of disinterested directors conclusively rebuts the need for heightened review. The bankruptcy court sidestepped *Foster*, holding that Preferred Shareholders' classification as holders of equity interests (rather than as creditors) obviated the need for heightened review. *See* Memorandum Decision at 67. But the bankruptcy court did not explain why holders of equity interests in an otherwise solvent debtor are less deserving of the protections of the Bankruptcy Code or general corporate law, especially where the Preferred Shareholders are the only true economic stakeholders at QVCG. Nor, in any event, has the Fifth Circuit ever endorsed such a categorical exclusion from the protection *Foster* affords, particularly where, as here, the debtor was solvent as of the Petition Date. The question remains open and would benefit from immediate review.

Here again, the third question presented independently warrants certification for direct review. This Circuit has never resolved what standard governs when a Rule 9019 settlement is between statutory insiders. The bankruptcy court recognized the absence of controlling authority, and the lower courts diverge. Because multi-debtor Chapter 11 cases involving intercompany settlements are commonplace, the appropriate standard of review will affect many future cases in this Circuit and elsewhere. Certification is warranted.

**D. An Immediate Appeal Will Materially Advance the Progress of This Case**

Finally, this Court should certify a direct appeal because "an immediate appeal . . . may materially advance the progress of the case." 28 U.S.C. § 158(d)(2)(A)(iii).

For starters, the financial stakes make it virtually certain that any decision by this Court will be appealed to the Fifth Circuit. QVCG's approximately $195 million in cash,

its 62% equity interest in Cornerstone valued by the Debtors' own advisor at $35 million to $135 million, the $1.272 billion face amount of Preferred Stock, and alleged intercompany claims estimated at $1 to $3 billion make this a dispute of exceptional magnitude. *See* First Day Decl. ¶ 36; Disclosure Statement, Arts. IV.D.2(e), V.D; June 5 Trial Tr. (Griffin) at 425:8-12; QVC Board Statement ¶ 22. In *In re MPF Holding U.S. LLC*, 444 B.R. 719, 727 (Bankr. S.D. Tex. 2011), the bankruptcy court certified a direct appeal where a subsequent circuit appeal was likely because of "the amount in controversy—over $25.0 million." The amounts at issue here dwarf that amount. Requiring the parties to brief and argue the case before this Court, only to repeat that exercise before the Fifth Circuit, would waste the resources of the parties and the Court, while prolonging uncertainty on the important issues of bankruptcy law implicated in this case.

Moreover, the record is fully developed, and this is not a case in which "percolation through the district court would cast more light on the issue[s]" before review by the Fifth Circuit. *Weber v. U.S. Trustee*, 484 F.3d 154, 161 (2d Cir. 2007). The bankruptcy court conducted a four-day evidentiary hearing and entered a detailed Memorandum Decision addressing each legal issue on a complete factual record. And, as explained above, the appeal presents several purely legal issues, each of which provides an independent basis for reversal of the bankruptcy court's judgment. Given the strength of those arguments—and the corresponding likelihood that the appeal will result in reversal and require further proceedings before the bankruptcy court—prompt review by the Fifth Circuit is warranted.

## CONCLUSION

The Preferred Shareholders' request for certification should be granted.

Dated: September 18, 2026

**WILLKIE FARR & GALLAGHER LLP**

By: /s/ *Jennifer J. Hardy*
Jennifer J. Hardy, Esq. (Texas Bar No. 24096068)
600 Travis Street
Houston, Texas 77002
Telephone: (713) 510-1700
Email: jhardy2@willkie.com

– and –

Mark T. Stancil, Esq. (*pro hac vice* pending)
Donald Burke, Esq. (*pro hac vice* pending)
1875 K Street N.W.
Washington, DC 20006
Telephone: (202) 303-1000
Email: mstancil@willkie.com
dburke@willkie.com

– and –

Jeffrey D. Pawlitz, Esq. (*pro hac vice* pending)
Max M. Freedman, Esq. (*pro hac vice* pending)
300 North LaSalle Drive
Chicago, Illinois 60654
Telephone: (312) 728-9000
Email: jpawlitz@willkie.com
mfreedman@willkie.com

*Counsel to the Preferred Shareholders*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Motion complies with Section 7(a) of the Court Procedures of the Honorable George C. Hanks, Jr., United States District Judge because, excluding the parts of the document exempted by Section 7(a)(1), (7), this Motion does not exceed 25 pages.

By: *<u>/s/ Jennifer J. Hardy</u>*
Jennifer J. Hardy

**CERTIFICATE OF CONFERENCE**

Pursuant to the Court Procedures of the Honorable George C. Hanks, Jr., counsel for the Preferred Shareholders certify that they have conferred with counsel for the Debtors regarding the substance of the relief requested herein. The Debtors oppose the relief requested in this Motion.

By: */s/ Jennifer J. Hardy*
Jennifer J. Hardy

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 18, 2026, I served the foregoing Motion upon all parties and/or counsel of record, via CM/ECF to all counsel of record and on the counsel listed below by e-mail in accordance with the Federal Rules of Civil Procedure.

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com

Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gabriela Zamfir Hensley (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: chad.husnick@kirkland.com
gabriela.hensley@kirkland.com

-and-

**GRAY REED**

Jason S. Brookner (TX Bar No. 24033684)
Lydia R. Webb (TX Bar No. 24083758)
Emily F. Shanks (TX Bar No. 24110350)
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com
eshanks@grayreed.com

By: */s/ Jennifer J. Hardy*

Jennifer J. Hardy