**In the United States District Court**
**for the Southern District of Texas**

IN RE: QVC GROUP, INC., ET AL.

ADAM GUI, *ET AL.*,
APPELLANTS
V.
QVC GROUP, INC., *ET AL.*,
DEBTORS-APPELLEES,

CIVIL ACTION NO. 26-CV-05680

On Appeal from the United States Bankruptcy Court
for the Southern District of Texas
Case No. 26-90447

# MOTION TO DISMISS APPEAL AS EQUITABLY MOOT

Joshua A. Sussberg*
Aparna Yenamandra*
Laila M. Kassis
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Chad J. Husnick*
Gabriela Zamfir Hensley*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654

Rex W. Manning
*Attorney-in-Charge*
Texas Bar No. 24118452
SDTX Bar No. 622333
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3474

Mark McKane*
Michael P. Esser*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104

*Counsel for Appellees*
(Additional Counsel Listed on Inside Cover)

October 2, 2026

Jason S. Brookner
Lydia R. Webb
Emily F. Shanks
GRAY REED
1300 Post Oak Blvd.
Houston, TX 77056

McClain Thompson*
Katherine McMullen*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

**Admitted Pro Hac Vice*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .................... iii

CITATION KEY .................... v

INTRODUCTION .................... 1

BACKGROUND .................... 3

A. The Doctrine of Equitable Mootness .................... 3

B. Factual Background .................... 5

1. QVC, faced with over $6 billion in funded debt, negotiates a financial restructuring with its creditors. .................... 5

2. QVC entities investigate, negotiate, and settle $3 billion in intercompany claims. .................... 7

C. Proceedings Below .................... 10

1. QVC declares bankruptcy and the bankruptcy court confirms its Chapter 11 Plan over Appellants' objection. .................... 10

2. Appellants seek, but cannot obtain, a stay pending appeal of Plan confirmation. .................... 12

3. QVC emerges from bankruptcy. .................... 12

D. Post-Emergence Developments .................... 12

1. QVC implements the Plan. .................... 12

2. Third parties rely on QVC's exit from Chapter 11 and implementation of the Plan. .................... 13

STATEMENT OF THE ISSUE .................... 14

STANDARD OF REVIEW .................... 15

ARGUMENT ....................................................................................... 15

I. The appeal is equitably moot. ........................................................ 15

A. The order confirming QVC's Chapter 11 Plan was not stayed. ........................................................................ 15

B. QVC has substantially consummated the Plan. ..................... 16

C. Appellants seek reversal of the Confirmation Order, which would necessarily foil the Plan's success—and would devastate third parties not before the Court. ............. 17

1. Reversal of the Confirmation Order would thwart the Plan's success. ............................................................ 18

2. Reversal of the Confirmation Order would trample the rights and expectations of parties not before the Court. ................................................................................ 20

D. Effective judicial relief is no longer available. ........................ 21

II. Fractional relief is unavailable. ........................................................ 22

III. Equity favors dismissal. .................................................................. 24

CONCLUSION ................................................................................... 25

CERTIFICATE OF SERVICE

CERTIFICATE OF CONFERENCE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Crystal Oil Co.*,
854 F.2d 79 (5th Cir. 1988) ........................................ 21, 22, 23, 24

*In re Green Aggregates Inc.*,
345 F. App'x 890 (5th Cir. 2009) ........................................ 18

*In re Grimland, Inc.*,
243 F.3d 228 (5th Cir. 2001) ........................................ 4

*In re GWI PCS 1 Inc.*,
230 F.3d 788 (5th Cir. 2000) ........................................ 15

*In re Hammersmith Dev. Co.*,
248 F.3d 1142 (5th Cir. 2001) ........................................ 2, 5, 15, 17, 21, 22

*In re Highland Cap. Mgmt., L.P.*,
48 F.4th 419 (5th Cir. 2022) ........................................ 22, 23

*In re Idearc, Inc.*,
662 F.3d 315 (5th Cir. 2011) ........................................ 21

*In re Manges*,
29 F.3d 1034 (5th Cir. 1994) ........................................ 4, 5, 15, 16, 17, 21, 25

*In re Pac. Lumber Co.*,
584 F.3d 229 (5th Cir. 2009) ........................................ 4, 5, 17, 18, 20, 22

*Pepper v. Litton*,
308 U.S. 295 (1939) ........................................ 3, 24

*In re Pequeno*,
246 F. App'x 274 (5th Cir. 2007) ........................................ 21

*In re Serta Simmons Bedding, LLC*,
125 F.4th 555 (5th Cir. 2024) ........................................ 24

*In re Smallhold, Inc.*,
675 B.R. 313 (Bankr. D. Del. 2025) .......... 18

*In re Sneed Shipbuilding, Inc.*,
916 F.3d 405 (5th Cir. 2019) .......... 1

*In re Thru, Inc.*,
782 F. App'x 339 (5th Cir. 2019) .......... 21

*In re Trib. Media Co.*,
799 F.3d 272 (3d Cir. 2015) .......... 4, 24

*In re Ultra Petroleum Corp.*,
2022 WL 989389 (5th Cir. Apr. 1, 2022) .......... 23

*In re U.S. Brass Corp.*,
169 F.3d 957 (5th Cir. 1999) .......... 19

*Young v. United States*,
535 U.S. 43 (2002) .......... 3, 24

**Statutes**

11 U.S.C. §1123 .......... 19

11 U.S.C. §1127 .......... 16

11 U.S.C. §1129 .......... 18

**Rules**

Fed. R. Bankr. P. 9019 .......... 19

## CITATION KEY

"Bk.Dkt." refers to the docket in the underlying bankruptcy proceeding.

"Dkt." refers to the docket in this case.

"CA5.Dkt." refers to the docket in *Gui v. QVC Group*, No. 26-20412 (5th Cir.).

## INTRODUCTION

"In bankruptcy, the right to appeal must sometimes give way to a heightened interest in finality." *In re Sneed Shipbuilding, Inc.*, 916 F.3d 405, 407 (5th Cir. 2019). This is one of those times.

QVC (the corporate family comprising Debtors-Appellees) has emerged from bankruptcy, cancelled billions of dollars of debt and equity interests, issued over a billion dollars of new debt and equity interests, and implemented a settlement that resolves billions more dollars of claims. It has distributed over $650 million to secured creditors and paid its trade partners in full. It has obtained $600 million in exit financing and has started to transfer over $167 million in irrevocable letters of credit to a new lending facility. And its common stock now trades on the public market.

Yet Appellants, who held less than a quarter of the preferred shares in just one of the 74 QVC entities, would scrap all that to start over. They ask this Court to reverse the confirmation of QVC's Chapter 11 Plan. But the doctrine of equitable mootness stands in their way.

When a debtor puts a Chapter 11 plan into action without opponents obtaining a stay, equitable mootness prevents those opponents from seeking to nullify the plan on appeal. This appeal checks all three equitable-mootness

boxes. Appellants did not secure a stay. QVC has substantially consummated its Plan. And Appellants seek to overturn it.

That is not all. When assessing whether an appeal is equitably moot, courts often ask whether the requested relief is even possible. Here, it would be impracticable—if not impossible—to undo implementation of the Plan. "[E]ffective judicial relief is no longer available," *In re Hammersmith Dev. Co.*, 248 F.3d 1142 (5th Cir. 2001), which is another reason why the Court should "decline to consider the merits of [the] appeal." *Id.*

Then there is equity. Because bankruptcy is an equitable endeavor, courts considering equitable mootness frequently contemplate the fairness of hearing an appeal. Fairness, too, supports dismissal. Reversal would prompt a long, contentious, value-destructive fight over now-settled claims. And a win for Appellants would be a devastating loss for everyone else. Creditors who accepted massive losses to facilitate QVC's reorganization would see their comprehensive, interdependent bargain washed away at the behest of structurally and statutorily subordinated, opportunistic equity holders, while Appellants' fellow shareholders would lose releases from potential claw-back liability for dividends they received.

QVC has reorganized. Creditors, investors, and trade partners are relying on the complex financial transactions that have occurred and, in many cases, cannot be unwound. The interest in finality could not be higher. The Court should dismiss this appeal.

## BACKGROUND

### A. The Doctrine of Equitable Mootness

Courts sitting in bankruptcy "are courts of equity." *Young v. United States*, 535 U.S. 43, 50 (2002). They "appl[y] the principles and rules of equity jurisprudence." *Pepper v. Litton*, 308 U.S. 295, 304 (1939). And they use their "broad equitable powers" to solve a "wide range of problems arising out of the administration of bankrupt[cy] estates." *Id.*

One such problem stems from the nature of bankruptcy proceedings. A debtor's need to reorganize usually means there isn't enough money to go around. Rarely does everyone walk away happy. Sometimes dissatisfaction prompts an appeal. And at times the party appealing seeks to demolish a reorganization in hopes of cutting a better deal at the expense of others.

What transforms wrecking-ball appeals from unconcerning (as they often are in other types of cases) to problematic is "the need for finality, and the need for third parties to rely on that finality, in bankruptcy proceedings."

*In re Grimland, Inc.*, 243 F.3d 228, 231 (5th Cir. 2001). Those needs are especially acute in intricate corporate restructurings. "Complex bankruptcies reorganize thousands of relationships among countless parties." *In re Trib. Media Co.*, 799 F.3d 272, 288–89 (3d Cir. 2015) (Ambro, J., concurring). When a large corporate debtor puts a plan of reorganization into action, it can become "as difficult to restore" things to how they were previously "as it is to gather all the feathers from the proverbial pillow." *Id.* The unwinding of a confirmed and implemented reorganization plan, when it is even possible, "is also a crushing expense to the reorganized entity and its shareholders." *Id.* "Every incremental risk of revision" therefore "puts a cloud over the plan of reorganization and derivatively over the assets of the reorganized [debtor]." *In re Manges*, 29 F.3d 1034, 1039–40 (5th Cir. 1994).

The equitable-mootness doctrine helps solve the need-for-finality problem. It functions as "a kind of appellate abstention," *In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009), through which appellate courts recognize "that there is a point beyond which they cannot order fundamental changes in reorganization actions," *Manges*, 29 F.3d at 1038–39. When an appellate court "determines that effective judicial relief is no longer

available," it "may decline to consider the merits of an appeal." *Hammersmith*, 248 F.3d at 1142 (internal quotation marks omitted).

"The doctrine is firmly rooted in Fifth Circuit jurisprudence." *Pac. Lumber*, 584 F.3d at 240. It seeks to balance "the equitable considerations of finality and good faith reliance on a judgment" and "the right of a party to seek review of a bankruptcy order adversely affecting him." *Manges*, 29 F.3d at 1039. And it activates when those considerations "become paramount to a resolution of the dispute between the parties on appeal." *Id.* at 1040–41.

### B. Factual Background

QVC is an international conglomerate that specializes in home shopping. Bk.Dkt.4 ¶20. Before emerging from bankruptcy, the former parent company, QVC Group, Inc., was a holding company with common and preferred stock traded publicly. Ex.A. ¶10. The primary operating company, QVC, Inc., also issued notes that traded publicly. *Id.*

#### 1. QVC, faced with over $6 billion in funded debt, negotiates a financial restructuring with its creditors.

In 2025, QVC explored financial restructuring. At the time, it owed more than $6.5 billion, including $2.9 billion under a revolving credit

facility; $2.15 billion in QVC, Inc. notes; and $1.5 billion in notes from another QVC entity, Liberty Interactive LLC. *Id.* ¶7.

QVC held unsecured trade debt as well. Its retail business required suppliers and inventory, which in turn meant QVC's day-to-day operations generated significant accounts payable. When QVC declared bankruptcy, it owed its business partners approximately $426 million. *Id.* ¶9.

After QVC approached its funded-debt creditors, they organized into groups and retained separate outside counsel. *Id.* ¶8. After months of negotiations, QVC and the creditors reached a tentative deal.

The bargain involved major concessions. The funded-debt creditors agreed to extinguish over $6.5 billion in debt and to replace it with just under $1.3 billion in new debt. *Id.* ¶21. They also agreed to major reductions to allow QVC's trade creditors to recover in full. *Id.* ¶16. That concession helped to stabilize QVC's ongoing operations by ensuring that QVC could continue to pay its suppliers and other business partners. As a result, QVC set itself up to deleverage its funded debt by more than $5 billion. *Id.* ¶17. In exchange for those concessions, QVC agreed to give its funded-debt creditors its equity, subject to a potential dilution by shares reserved for a management-incentive plan. *Id.* ¶22.

QVC and its funded-debt creditors memorialized the terms of the deal in a Restructuring Support Agreement. Bk.Dkt.4 at Ex.A. As its name suggests, the contract required QVC to pursue a pre-packaged Chapter 11 restructuring (meaning QVC put together and gathered support for a reorganization plan before declaring bankruptcy) and required its funded-debt creditors to support the effort. *Id.* §5.02(a). Creditor support was contingent on the reorganization happening quickly, without changes to the key terms. If QVC had not reorganized by October 13, 2026, the agreement would have terminated automatically. *Id.* §12.01(t). And if the financial terms changed, creditors could have walked away. *Id.* §12.01(k), (m), (q), (r).

**2. QVC entities investigate, negotiate, and settle $3 billion in intercompany claims.**

While QVC negotiated with its creditors, companies within the group negotiated among themselves. QVC Group and Liberty Interactive had taken over $2.2 billion out of QVC, Inc. Ex.B at 15-22. QVC Group had then paid its shareholders around $2.1 billion in dividends. *Id.* at 25. Those entities also had a complicated tax relationship, with consolidated filings, indemnities, and potentially massive deferred-tax liabilities. Bk.Dkt.149 ¶15.

QVC Group, QVC, Inc., and Liberty Interactive each appointed Disinterested Directors to investigate, assess, and determine what to do with possible intercompany claims. Ex.B at 7–8. An extensive investigation revealed that QVC, Inc. had potential claims against QVC Group and Liberty Interactive totaling over $3 billion. Ex.B at 40. The claims encompassed the allegedly fraudulent transfer of money out of QVC, Inc., possible deferred-tax liability, and the prospect of clawing back the dividends that QVC Group had paid shareholders. *Id.* at 26–34.

The three entities and others eventually negotiated a Settlement that, like the Restructuring Support Agreement, contemplated a Chapter 11 reorganization. QVC Group agreed to give QVC, Inc. a $400 million general unsecured claim. Bk.Dkt.389 Art.IV.A–IV.B. QVC, Inc. agreed to release QVC Group from all liability and its shareholders from claw-back liability. *Id.* Art.III.B.3. QVC, Inc. also agreed to pay QVC Group's general unsecured creditors in full. Bk.Dkt.149 ¶24. QVC, Inc. agreed to contribute $23 million to Liberty Interactive to resolve potential claims stemming from past capital contributions and a promissory note. Bk.Dkt.148 ¶¶14, 28–29. And the parties exchanged mutual releases. Bk.Dkt.389 Art.IV.B, Art.VIII.C.

QVC Group; QVC, Inc.; and Liberty Interactive also agreed to provide certainty to another QVC subsidiary, QRI Cornerstone, Inc., which runs a brick-and-mortar and catalog retail division of the business. Ex.A ¶12. Liberty Interactive, which held a portion of Cornerstone's equity, did not want to take full ownership. *Id.* ¶12. QVC Group also owned part of Cornerstone's equity, which it agreed to contribute to QVC, Inc. Bk.Dkt.149 ¶¶ 19–20(iii). Liberty Interactive likewise agreed to transfer its equity to QVC, Inc. Bk.Dkt.148 ¶¶28–29. And QVC, Inc. agreed to accept full ownership of Cornerstone, which in turn would allow Cornerstone to take advantage of synergies between the businesses. Ex.A ¶30.

Like the Restructuring Support Agreement, the Settlement encompassed major concessions. QVC, Inc., for example, initially had no interest in releasing QVC Group's shareholders from claw-back liability. Bk.Dkt.854 at 32:4–9. But QVC Group's Disinterested Directors pushed for and secured such a release. *Id.* at 32:10–16, 132:19–133:3, 172:25–173:9.

And like the Restructuring Support Agreement, the Settlement was contingent on a successful Chapter 11 restructuring on the terms to which the QVC entities had agreed. A Chapter 11 proceeding would be the mechanism through which the Settlement was implemented, which meant

the Settlement would be incorporated into the eventual reorganization plan. Bk.Dkt.389 Art.IV.A–B. That interdependence, in turn, meant the terms of a Chapter 11 plan needed to match the terms of the Settlement. *Id.*

### C. Proceedings Below

#### 1. QVC declares bankruptcy and the bankruptcy court confirms its Chapter 11 Plan over Appellants' objection.

With the Restructuring Support Agreement and Settlement in hand, QVC crafted a pre-packaged reorganization Plan and sought Chapter 11 relief. *See* Bk.Dkt.1-Bk.Dkt.80. The Plan reduced QVC's total debt by over $5 billion, implemented the Settlement, ensured that trade partners were paid in full, positioned the QVC enterprise and Cornerstone to stay in business, and arranged exit financing to provide post-bankruptcy liquidity. *See* Bk.Dkt.14.

To produce those results, the Plan called for extinguishing QVC's funded debt and for issuing new debt. Bk.Dkt.389 Art.IV.C, H. The Plan also required QVC Group to distribute its cash, which amounted to $170 million, to QVC, Inc., which would then distribute $553 million to its creditors. Bk.Dkt.843 at 1408. And the Plan arranged for Liberty Interactive to distribute $97 million to its creditors. *Id.*

Under the Plan, QVC's equity interests would also be extinguished. Bk.Dkt.389 Arts.III.B.15, IV.H. QVC Group and Liberty Interactive were to be wound down. *Id.* Art.VI.N. QVC, Inc., was scheduled to issue new equity, largely to its former creditors, who could then trade the shares on public markets. *Id.* Art.IV.E.2. And Cornerstone's equity would be transferred to QVC, Inc. Bk.Dkt.212 Ex.C.

Every major creditor constituency overwhelmingly supported the Plan. Bk.Dkt.364 at 9.

Appellants did not. They owned roughly 22.5% of QVC Group's preferred stock, which the Plan would extinguish while providing releases from claw-back liability for past dividends. Bk.Dkt.315. Many of them had acquired their shares either shortly before or immediately after QVC declared bankruptcy. Bk.Dkts.138, 153, 204, 315. That meant Appellants—as a small subset of all preferred shareholders—hadn't received the dividend and didn't value the release. Bk.Dkt.318 ¶58.

Appellants objected to the Plan and the Settlement (which needed separate approval). Bk.Dkt.318. After a four-day evidentiary hearing, the bankruptcy court issued a 103-page opinion overruling their objections, Ex.B, approved the Settlement, and confirmed the Plan, Ex.C.

**2. Appellants seek, but cannot obtain, a stay pending appeal of Plan confirmation.**

Appellants took an appeal. Bk.Dkt.714. They also sought a stay pending appeal three times over. Bk.Dkt.716; Dkt.14; CA5.Dkt.13. The bankruptcy court denied a stay. Bk.Dkt.749. This Court did, too. Dkt.39. And the Fifth Circuit dismissed their appeal of this Court's stay denial for lack of appellate jurisdiction. CA5.Dkt.36-1.

**3. QVC emerges from bankruptcy.**

With no stay in place, QVC emerged from bankruptcy. Bk.Dkt.845.

**D. Post-Emergence Developments**

**1. QVC implements the Plan.**

QVC immediately put the Plan into action.

*Debt and Equity*. QVC cancelled over $6.5 billion in past funded debt. Ex.A ¶21. It issued just under $1.3 billion in new debt. *Id.* It cancelled all public equity, including the preferred stock in QVC Group. *Id.* ¶22. And it issued 50 million new common shares in Reorganized QVC, Inc. *Id.*

*Settlement*. QVC also immediately implemented the Settlement. QVC Group, QVC, Inc., and Liberty Interactive released one another from all claims. *Id.* ¶23. QVC Group's shareholders were also released from any claw-back liability. *Id.* QVC Group transferred approximately $170 million

to QVC, Inc. *Id.* And QVC Group and Liberty Interactive transferred to QVC, Inc. their equity interests in Cornerstone. *Id.*

*Creditor Distributions*. Upon QVC, Inc.'s receipt of the funds from QVC Group, creditor distributions began. *Id.* ¶24. QVC, Inc. distributed $553 million to creditors that had previously participated in QVC's credit facility or held its notes. *Id.* Liberty Interactive distributed $97 million to the creditors that had held its notes. *Id.* Because the Plan left unsecured creditors unimpaired, QVC has continued to pay those creditors in the ordinary course of its operations. *Id.* ¶25.

*Exit Financing*. QVC obtained $600 million in exit financing through an asset-based lending facility. *Id.* ¶26. It was contingent on consummation of the Plan and includes former lenders and new lenders. *Id.*

### 2. Third parties rely on QVC's exit from Chapter 11 and implementation of the Plan.

*Stock*. Shortly after QVC's emergence from bankruptcy, Reorganized QVC, Inc. renamed itself "QVC Group, Inc." *Id.* ¶27. The new equity it issued was then approved for trading on Nasdaq, where third parties—including retail investors—can buy and sell shares. *Id.* Just over 37 million shares were registered on the exchange. *Id.* An average of 350,000 shares have traded

each day. *Id.* In total, over 13.7 million shares have been bought or sold since they were first registered. *Id.*

*Letters of Credit*. QVC's suppliers and vendors often require letters of credit to guarantee payment for the products they deliver and the services they perform. *Id.* ¶28. During the Chapter 11 proceedings, QVC issued letters of credit through a debtor-in-possession letter-of-credit facility. *Id.* Upon QVC's exit from bankruptcy, that facility had to close. *Id.* The asset-based-lending facility described above will replace it. *Id.* The transition requires QVC to cancel past letters of credit and to issue new ones. *Id.* The process requires QVC to engage with each vendor individually, which has proven both time- and resource-intensive. *Id.* The new letters are irrevocable, meaning vendors have no obligation to return them until they mature. *Id.* ¶29. Barclays—the bank that issues the letters on QVC's behalf—holds the obligation to honor vendor payments. *Id.* Barclays has issued over 36 letters of credit that guarantee payment of over $167 million. *Id.*

## STATEMENT OF THE ISSUE

1. Whether this appeal is equitably moot.

## STANDARD OF REVIEW

Whether a bankruptcy appeal is equitably moot depends on three factors: (1) whether a stay was obtained; (2) whether the Chapter 11 plan has been "substantially consummated"; and (3) whether the relief requested would affect either the success of the plan or the rights of parties not before the court. *Manges*, 29 F.3d at 1039.

## ARGUMENT

### I. The appeal is equitably moot.

All three equitable-mootness factors favor dismissal. Appellants have not obtained a stay. QVC has substantially consummated the Plan. And Appellants seek reversal of the bankruptcy court's order confirming the Plan, which would foil the Plan's success and wreak havoc on third parties.

#### A. The order confirming QVC's Chapter 11 Plan was not stayed.

Factor one asks whether Appellants obtained a stay. *Id.* They did not. Bk.Dkt.749; Dkt.39; CA5.Dkt.36-1. This factor therefore "militates in favor of dismissal…." *In re GWI PCS 1 Inc.*, 230 F.3d 788, 801 (5th Cir. 2000).

To be sure, Appellants vigorously sought a stay. Bk.Dkt.716; Dkt.14; CA5.Dkt.13. But "whether a stay was diligently pursued is not the critical inquiry." *Hammersmith*, 248 F.3d at 1142. "[A] stay sought and denied" still

leads "to the implementation of the plan of reorganization." *Manges*, 29 F.3d at 1040. And "it is the reliance interests engendered by the plan, coupled with the difficulty of reversing critical transactions, that counsels against attempts to unwind things on appeal." *Id.*

Factor one favors dismissal.

**B. QVC has substantially consummated the Plan.**

Factor two asks whether QVC has "substantially consummated" the Plan. *Id.* at 1039. The phrase refers to the line that 11 U.S.C. §1127(b) draws, beyond which a bankruptcy court may not modify a reorganization plan. *Id.* at 1040; *see also* 11 U.S.C. §1127(b) ("The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan…."). The Fifth Circuit has deployed the concept when assessing mootness because it "informs [courts'] judgment as to when finality concerns and the reliance interests of third parties upon the plan as effectuated have become paramount to a resolution of the dispute between the parties on appeal." *Manges*, 29 F.3d at 1041. "Under the Bankruptcy Code, consummation includes transferring all or substantially all of the property covered by the

plan, the assumption of business by the debtors' successors, and the commencement of plan distributions." *Pac. Lumber*, 584 F.3d at 242.

QVC has substantially consummated the Plan. It has emerged as a reorganized company group and has assumed the QVC business. Ex.A ¶21–26. It has cancelled past debt and equity interests, issued new debt and equity, and started Plan distributions. *Id.* ¶21. And the QVC entities have implemented the Settlement. *Id.* ¶23. These developments represent the quintessential example of a substantially consummated plan. *See, e.g.*, *Hammersmith*, 248 F.3d at 1142.

As the Fifth Circuit recognized in *Pacific Lumber*, "plan consummation may often be dispositive of the question of equitable mootness." 584 F.3d at 242. So it is here. Given all that has taken place, "it is very doubtful that effective relief could be afforded even if [Appellants] prevailed on the merits." *Manges*, 29 F.3d at 1042. "This factor alone weighs heavily in favor of a finding of mootness." *Id.*

### C. Appellants seek reversal of the Confirmation Order, which would necessarily foil the Plan's success—and would devastate third parties not before the Court.

Factor three asks whether the relief Appellants request would affect the Plan's success or the rights of non-parties. *Id.* at 1039. It would do both.

### 1. Reversal of the Confirmation Order would thwart the Plan's success.

Appellants seek "nothing less than a wholesale annihilation of the Plan." *Id.* at 1043. They even say as much in their motion seeking certification of a direct appeal:

> The underlying appeal seeks reversal of the bankruptcy court's Confirmation Order.

Dkt.65 at 10–11. The Confirmation Order approved the Plan and "mark[ed] [QVC's] emergence from bankruptcy." *In re Smallhold, Inc.*, 675 B.R. 313, 326 (Bankr. D. Del. 2025). By requesting its reversal, Appellants target the Plan.

The issues Appellants ask to certify for direct appeal confirm the point. Were they to prevail, "[t]he plan confirmed by the bankruptcy court could not go forward and the implementation of the plan would have to be undone." *In re Green Aggregates Inc.*, 345 F. App'x 890, 890 (5th Cir. 2009).

To begin, Appellants argue the Plan fell short of 11 U.S.C. §1129(a)(10) because it misclassified QVC, Inc.'s claim against QVC Group as unimpaired. Dkt.65 at 11. But as the Fifth Circuit recognized in *Pacific Lumber* when finding a similar objection equitably moot, for such a contention, "no remedy…is practicable other than unwinding the plan." 584 F.3d at 251.

Next, Appellants assert that the Plan ran afoul of 11 U.S.C. §1123(a)(4)'s requirement that each interest within a class receive equal treatment because some members of their class valued the claw-back release more than others did. Dkt.65 at 11–12. Yet the release was a core component of the Settlement, Ex.C ¶¶31–34; reconfiguring it or removing it would shatter the accord and scuttle the Plan. The Fifth Circuit recognized the implications of a comparable §1123(a)(4) challenge in *In re United States Brass Corporation*, 169 F.3d 957 (5th Cir. 1999). There, the challenge would have removed an essential settlement from the reorganization plan. *Id.* at 961. The Fifth Circuit determined that the proposed relief "would dismantle a substantially consummated plan" and that "effective relief" was "unattainable," so it dismissed the appeal as equitably moot. *Id.* at 962, 958.

Finally, Appellants insist the bankruptcy court erred when it approved the Settlement under Federal Rule of Bankruptcy Procedure 9019. Dkt.65 at 12. But the Settlement is integral to the Plan. Bk.Dkt.368 ¶1; Bk.Dkt.359 ¶285; Bk.Dkt.363 ¶2. Without the Settlement, there is no Plan. Bk.Dkt.368 ¶1. And the Plan is what implements the Settlement, Ex.C at 19–20, so reversing the Settlement's approval would require reversing the Confirmation Order, which would "dismantle" the Plan. *U.S. Brass*, 169 F.3d at 962.

**2. Reversal of the Confirmation Order would trample the rights and expectations of parties not before the Court.**

If Appellants were to succeed in unraveling the Plan, third parties would suffer enormous harm. QVC has cancelled over $6.5 billion in debt and issued just under $1.3 billion in new debt. Ex.A ¶21. It has extinguished former equity interests and created and granted new common stock, which has traded on the public market. *Id.* ¶22. It has implemented the Settlement, which transferred $170 million from QVC Group to QVC, Inc.; released all intercompany claims; and released QVC Group's former shareholders from potential claw-back liability. *Id.* ¶23. It has distributed over $650 million to creditors. *Id.* ¶24. It has obtained $600 million in exit financing through a new asset-based lending facility. *Id.* ¶26. And it has issued over $167 million in letters of credit to backstop its future accounts payable to its vendors, with issuances continuing weekly. *Id.* ¶29. "All of these events created third-party reliance and expectations that would be dislodged if [Appellants] succeed in entirely reversing the confirmation order." *Pac. Lumber*, 584 F.3d at 242.

Even a portion of those events generated sufficient reliance interests to warrant dismissal. Distributions to creditors create "[t]hird-party expectations" that "cannot reasonably be undone." *Id.* at 251. So when

"reversal would require third-party creditors to return distributions already paid," "the Plan ha[s] progressed too far for the relief requested to practically be granted." *In re Thru, Inc.*, 782 F. App'x 339, 341 (5th Cir. 2019); *see also Hammersmith*, 248 F.3d at 1142 (dismissing appeal following distributions). Reliance interests double when funds received from a settlement then pay creditor distributions, *see, e.g.*, *In re Pequeno*, 246 F. App'x 274, 275 (5th Cir. 2007), which has happened here, Ex.A ¶21–26. And when a reorganized debtor's new common stock trades publicly, as a portion of Reorganized QVC, Inc.'s common stock does, an appeal threatens "numerous third parties' financial rights." *In re Idearc, Inc.*, 662 F.3d 315, 320 (5th Cir. 2011).

*       *       *

"The extensive dismantling of this successfully executed Plan would be nothing short of a disaster…." *Manges*, 29 F.3d at 1043.

**D. Effective judicial relief is no longer available.**

Although not a formal equitable-mootness factor, the availability of relief has at times played a role in the Fifth Circuit's analysis. *See, e.g.*, *In re Crystal Oil Co.*, 854 F.2d 79, 81 (5th Cir. 1988) ("We doubt that effective relief is possible."); *see also Manges*, 29 F.3d at 1042 ("[I]t is very doubtful that effective relief could be afforded even if [the appellants] prevailed on the

merits.”); *Hammersmith*, 248 F.3d at 1142 (“[E]ffective judicial relief is no longer available.”). Here, it is unclear whether consummation of the Plan could even be unwound. QVC has implemented billions of dollars of complex financial transactions. Ex.A ¶21–26. Millions of shares of Reorganized QVC, Inc., have changed hands on the public market. *Id.* ¶27. And QVC’s trade partners have received irrevocable letters of credit totaling over $167 million. *Id.* ¶29. Given those developments, “[i]t is unlikely that this [C]ourt could return the [QVC] estates or the affected third parties to the status quo as it existed before consummation of the Plan.” *Hammersmith*, 248 F.3d at 1142. Because there is good reason to “doubt that effective relief is possible,” “common sense and equitable considerations require dismissal….” *Crystal Oil*, 854 F.2d at 81.

## II. Fractional relief is unavailable.

Equitable mootness, like all doctrines, has its limits. One of them is the availability of “fractional relief.” *In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 431 (5th Cir. 2022). Rather than obtain nothing on account of dismissal, the thinking goes, an appellant “would readily accept some fractional recovery” that keeps the Plan and third parties’ interests intact. *Pac. Lumber*, 584 F.3d at 241. So if an appellate court “can craft relief” that “would not have

significant adverse consequences to the reorganization," then the appeal is not equitably moot. *Highland Cap.*, 48 F.4th at 430.

It is not possible to craft such relief here. For one thing, Appellants have not requested it; they seek "reversal of the bankruptcy court's Confirmation Order." Dkt.65 at 10–11. That means fractional relief is not in play. *See In re Ultra Petroleum Corp.*, 2022 WL 989389, at *3 (5th Cir. Apr. 1, 2022) ("we do not analyze whether fractional recovery is possible" when appellants seek "full re-litigation of the bankruptcy proceedings."). For another thing, Appellants raise all-or-nothing issues that would require unwinding the Plan. *See supra*, pp.18–19; *see also Ultra*, 2022 WL 989389, at *5 (refusing to consider fractional relief when appellant "request[ed] reversal of the entire confirmation order" and "issues" on appeal were "issues that the doctrine of equitable mootness was fashioned to prevent"). And for yet another thing, the Plan provided QVC interlocking reorganizational relief that was the result of extensive negotiations and significant concessions on all sides. *See supra*, pp.5–11. Every part of the Plan relies on every other part of the Plan, so changing any part would require unwinding it all to allow the parties to "reevaluate the concessions [they] made to get the[ benefits for which they bargained]." *Crystal Oil*, 854 F.2d at 81.

In fractional-relief cases, a common refrain is that "equitable mootness is a scalpel, rather than an axe." *In re Serta Simmons Bedding, LLC*, 125 F.4th 555, 585 (5th Cir. 2024) (internal quotation marks omitted). But Appellants have come to court with dynamite. Because they target the entire Plan, the equitable-mootness scalpel cuts their fuse.

**III. Equity favors dismissal.**

Looming over every equitable-mootness determination is equity itself. After all, courts sitting in bankruptcy "are courts of equity." *Young*, 535 U.S. at 50. They use their "broad equitable powers" to solve a "wide range of problems arising out of the administration of bankrupt[cy] estates," *Pepper*, 308 U.S. at 296, 304. Courts therefore ask "whether it is fair in stark circumstances to grant relief that will scramble a consummated plan or will upset third parties' legitimate reliance on the finality of such a plan." *Trib. Media*, 799 F.3d at 287 (Ambro, J., concurring). And when it would be "fundamentally unfair" to grant the requested relief, *Crystal Oil*, 854 F.2d at 81, courts find the appeal equitably moot, *see, e.g.*, *id.*

Fairness favors dismissal. *If* consummation of the Plan could be unwound, a long, contentious, value-destructive fight over the now-settled intercompany claims would follow. Such protracted litigation would benefit

no one. QVC Group's $3 billion of potential exposure was orders of magnitude larger than the value of the assets it held (roughly $255 million), Bk.Dkt.493 at 43–50, 85, so a loss on even a small portion of claims could exhaust whatever amount was left after litigation costs drained the estate.

Whatever modicum of upside Appellants might gain from reversal would carry a profusion of downside for all others. Creditors agreed to let QVC deleverage by over $5 billion and to allow trade creditors to recover in full. Those concessions were contingent on QVC's successful reorganization, which Appellants seek to unmake. Overturning the Plan would also rescind the claw-back release, which was a major concession that QVC Group secured for its shareholders. Ex.A ¶19. That Appellants, who hold just 22.5% of QVC Group's preferred shares, do not value the release does not mean it is worthless to the other 77.5%. The release shields past dividends from recoupment and saves shareholders the time, money, stress, and trouble of litigation, but unwinding the Plan would expose them to all those things.

## CONCLUSION

"[T]here is a point beyond which [appellate courts] cannot order fundamental changes in reorganization actions." *Manges*, 29 F.3d at 1038. This case has reached it. The Court should dismiss this appeal.

October 2, 2026

Respectfully submitted,

s/ *Rex W. Manning*
Rex W. Manning
*Attorney-in-Charge*
Texas Bar No. 24118452
SDTX Bar No. 622333
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3474

Mark McKane*
Michael P. Esser*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104

McClain Thompson*
Katherine McMullen*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

Joshua A. Sussberg*
Aparna Yenamandra*
Laila M. Kassis
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Chad J. Husnick*
Gabriela Zamfir Hensley*
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654

Jason S. Brookner
Lydia R. Webb
Emily F. Shanks
GRAY REED
1300 Post Oak Blvd.
Houston, TX 77056

**Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the above motion was filed electronically on October 2, 2026, and will therefore be served electronically upon all counsel.

*s/ Rex W. Manning*
Rex W. Manning

## CERTIFICATE OF CONFERENCE

The undersigned certifies that counsel for Appellees conferred with counsel for Appellants regarding the substance of the relief this motion requests. Appellants oppose the requested relief.

*s/ Rex W. Manning*

Rex W. Manning

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this motion complies with the word limit of Federal Rule of Bankruptcy Procedure 8013(f)(3)(A) because, excluding the parts of the document exempted by Federal Rule of Bankruptcy Procedure 8015(g), it contains 5,002 words. This motion also complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because it has been prepared in a proportionally spaced, roman-style typeface of 14 points or more.

*s/ Rex W. Manning*

Rex W. Manning